UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

---------------------------------------------------------

TRACY L. WINK,

        Plaintiff,

   -vs-                Case No. 14-367

MILLER COMPRESSING COMPANY,

        Defendant.

---------------------------------------------------------


        Examination of TRACY L. WINK, taken at the
instance of the Defendant, under and pursuant to the
Federal Rules of Civil Procedure, before KARA D. SHAWHAN,
a Certified Realtime Reporter, Registered Merit Reporter
and Notary Public in and for the State of Wisconsin, at
Brown & Jones Reporting, Inc., 735 North Water Street,
Milwaukee, Wisconsin, on November 21, 2014, commencing at
10:26 a.m. and concluding at 12:41 p.m.

1                    A P P E A R A N C E S

2    ALAN C. OLSON & ASSOCIATES, S.C., by
     MR. ALAN C. OLSON,
3    2880 South Moorland Road,
     New Berlin, Wisconsin 53151-3744,
4    appeared on behalf of the Plaintiff.

5    THOMSON COBURN, LLP, by
     MS. SUSAN LORENC,
6    55 East Monroe Street, 37th Floor,
     Chicago, Illinois 60603,
7    appeared on behalf of the Defendant.

8
                     A L S O   P R E S E N T
9
     Ms. Sarah K. Barbian
10

11                      * * * * *
                     I N D E X
12

13   Examination:                              Page

14   By Ms. Lorenc.................................  3

15
     Exhibits Identified:                      Page
16
     No. 1 - May 18, 2010 E-Mail......................  11
17   No. 2 - October 17, 2011 E-Mail..................  20
     No. 3 - Cell Phone/Texting/E-Mailing And Driving
18           Policy...................................  54

19                      * * * * *

20
     Disposition Of Original Exhibit/s:
21
     Attached To Original Transcript
22

23                      * * * * *

24

25

1              TRANSCRIPT OF PROCEEDINGS

2              TRACY L. WINK, called as a witness

3       herein, having been first duly sworn on oath, was

4       examined and testified as follows:

5              (Exhibit Nos. 1 through 3 were marked.)

6                      EXAMINATION

7    BY MS. LORENC:

8    Q   Good morning, Tracy.

9    A   Good morning.

10   Q   As I mentioned a second ago, my name is Susan

11      Lorenc.  I represent Miller.  I'm going to be

12      taking your deposition today.  Could you state your

13      name for the record, please?

14   A   Tracy Lynn Wink.

15   Q   And have you ever given a deposition before, Tracy?

16      Do you mind if I call you Tracy?

17   A   That's fine.

18   Q   Okay.

19   A   No, I have not.

20   Q   Okay.  So let me just kind of go through some of

21      the ground rules.  As you see, we have a court

22      reporter here today that's going to be taking down

23      everything that is said.  She has a difficult time

24      getting two conversations at once, so if you would

25      let me ask my question before you answer it even

1    though there could be instances where you know

2    exactly where I'm going, and conversationally want

3    to jump in.  If you could let me finish my

4    question, and I do my best to do the same -- give

5    you an opportunity to finish your answer before I

6    ask the next question.

7         Because we're having all of this

8    transcribed, she can't take down nods, gestures,

9    "uh-huhs," things like that.  So if you don't mind

10   giving an audible response to all the questions,

11   I'd appreciate it.  This is not a marathon or a

12   test, so if, at any point, you feel you need a

13   break, just let me know.  I would just ask that we

14   finish the question that's been asked before taking

15   a break, but otherwise I'd be happy to accommodate

16   that.

17        If, at any point in time, you don't

18   understand what I'm asking, please let me know and

19   I'll rephrase it.  Otherwise I'll assume that

20   you've understood or heard what I've asked.  Do you

21   have any questions before we get started?

22   A    No.

23   Q    Okay.

24        MR. OLSON:  I have just one housekeeping

25   matter.  We found a typo in Plaintiff's Response to

1      the Defendant's Request for Admission No. 38, so we

2      fixed that this morning, and I want to give it to

3      you before the depo so there's no question about

4      that.  It just deletes out where it's probably

5      apparent from the content that -- The word deleted

6      was "not" from the original.

7                  MS. LORENC:  Okay.  So Request to

8      Admit 38, just for the record, reads, "During the

9      July 13 meeting, Barbian and/or Chavez explained

10     that Miller would no longer be able to offer the

11     flexible hours because Miller Compressing was under

12     significant financial strain, or words to that

13     effect," and the response was "Deny.  Ms. Barbian

14     did not bring up Miller's financial strain."  Is

15     that the "not" you're referring to?

16                 MR. OLSON:  It's the second "not" further

17     down.

18                 MS. LORENC:  Okay.  "She stated that

19     Ms. Wink needed to be in the office every day,

20     Monday through Friday, and that Ms. Wink's hours

21     were not going to have to be 8 a.m. to 4 p.m."

22                 MR. OLSON:  That's the one.  Right.

23                 MS. LORENC:  Okay.  So you want it to

24     read that "Ms. Wink's hours were going to have to

25     be 8 a.m. to 4 p.m."?

Case 2:14-cv-00367-NJ   Filed 03/11/15   Page 5 of 109   Document 32

1            MR. OLSON:  Right.

2            MS. LORENC:  Okay.  Thank you.

3            MR. OLSON:  Um-hum.

4    BY MS. LORENC:

5    Q    Okay.  Ms. Wink, have you ever filed a lawsuit

6         before?

7    A    No.

8    Q    Have you ever been a defendant in a lawsuit before?

9         Have you ever been sued?

10   A    No.

11   Q    Prior to working at Miller Compressing, where did

12        you work?  We can start from high school and go

13        forward.

14   A    I worked at -- I was a clerk at an insurance

15        company, Prudential Insurance Company.  I'm sorry.

16        This is a long time ago.

17   Q    That's all right.  What years were you at

18        Prudential?

19   A    1996, maybe, to 1997.

20   Q    Did you graduate from high school in 1996?

21   A    '95.

22   Q    Okay.  And why did you leave Prudential in or

23        around 1997?

24   A    I took a different position at a company called

25        Mitter Accounting.

1    Q    Did you voluntarily leave Prudential?

2    A    Yes.

3    Q    You resigned from Prudential?

4    A    Yes.

5    Q    Okay.  And Midyear, did you say the next company

6         was?

7    A    Mitter, M-i-t-t-e-r.

8    Q    Okay.  And what did you do at Mitter?

9    A    Accounting.  Accounts payable.

10   Q    How long were you at Mitter?

11   A    I believe a few months.  I wasn't there long.

12   Q    And why did you leave Mitter?

13   A    To pursue a different job, making more money.

14   Q    Did you quit?

15   A    Yes.

16   Q    Where did you go after Mitter?

17   A    Meyer's Family Restaurant.

18   Q    What did you do at Meyer's Family Restaurant?

19   A    I cleaned.

20   Q    How long were you there?

21   A    Years.  I don't recall how many years I was there.

22        I worked there up until I started at Miller in '99

23        then.  I was there for a couple years.

24   Q    So if I'm doing the chronology correctly, you think

25        you might have worked at Prudential from about '96

Case 2:14-cv-00367-NJ   Filed 03/10/15   Page 7 of 109   Document 32

```
 1        to '97?
 2   A    Right.
 3   Q    Then you were at Mitter for --
 4   A    Just a couple months.
 5   Q    -- a couple months?
 6   A    And then --
 7   Q    And then, according to my records, you were hired
 8        by Miller in 1999?
 9   A    Right.  So I probably worked at Meyer's for like
10        two years, maybe, maybe a little bit more.
11   Q    So maybe from '97 to '99?
12   A    Yeah -- Yes.
13   Q    And why did you leave Meyer's?
14   A    I had back injuries.  I couldn't do the physical
15        labor anymore.
16   Q    Did you quit working at Meyer's or were you
17        terminated?
18   A    I quit.
19   Q    And after Meyer's, did you go to Miller
20        Compressing?
21   A    Yes.
22   Q    Did you ever file any sort of employment-related
23        charges against Prudential?
24   A    No.
25   Q    Did you ever file any employment-related charges
```

1         against Mitter?

2    A    No.

3    Q    And what about at Meyer's?  Did you file any

4         employment-related charges or claims?

5    A    No.

6    Q    Did you file a workers' comp claim against Meyer's?

7    A    No.

8    Q    Other than those three companies, did you work

9         anyplace after high school prior to going to Miller

10        Compressing?

11   A    Yes.  There was a -- There was another one in

12        there.  I don't recall the year, though -- if it

13        was directly after high school and before

14        Prudential or it was after Prudential.  I worked at

15        a vet as an animal care technician.

16   Q    And did you quit working for the vet or were you

17        terminated?

18   A    I quit working there.

19   Q    Subsequent to leaving Prudential, did you file any

20        unemployment claim against Prudential?

21   A    No.

22   Q    Because you immediately started working at Mitter

23        or was there some other reason?

24   A    I believe I immediately started working.

25   Q    Okay.  And after quitting Mitter, did you file an

1          unemployment claim?

2     A    No.

3     Q    And is that because you immediately started working

4          at Meyer's?

5     A    Yes.

6     Q    And following your resignation from Meyer's, did

7          you file an unemployment claim?

8     A    No.

9     Q    Prior to leaving Miller Compressing, had you ever

10         filed an unemployment claim?

11    A    No.

12    Q    So as I've already said, according to our records,

13         you were hired by Miller Compressing in November

14         1999.  Does that sound correct?

15    A    Yes.

16    Q    What were your work hours when you were hired by

17         Miller Compressing in November of 1999?

18    A    8 to 4.

19    Q    And what -- That changed at some point.  Correct?

20    A    Yes.

21    Q    Tell me about that.  Why did your hours change and

22         when?

23    A    My hours changed when my eldest son started

24         kindergarten.

25    Q    What year was that?  Do you recall?

1    A    2007-2008.

2    Q    Okay.

3    A    Kindergarten year.

4    Q    Okay.  And why did they change?

5    A    So I could pick him up from school.

6    Q    You requested the change?

7    A    Yes.

8    Q    And what did they change to?

9    A    7 to 3.

10   Q    Who did you make that change-in-hours request to?

11   A    My team leader.

12   Q    Who was that?

13   A    In 2007?  I don't recall if it would have been

14        Margo at that time.  We had several supervisor

15        changes.  I believe it would have been Margo back

16        then.

17   Q    Okay.  I want to show you what I've previously had

18        marked Wink Exhibit 1, and I have a copy that I can

19        show your attorney as well.  Here's the marked

20        copy.  If you want to review this e-mail before I

21        ask you questions about it.

22   A    Okay.

23   Q    Okay.  So we've marked as Exhibit 1 an e-mail

24        between you and Sarah Kay dated May 18, 2010.

25        Correct?

1    A    Yes.

2    Q    Who is Sarah Kay?

3    A    Sarah Barbian.

4    Q    Formerly known as Sarah Kay?  And what was Sarah's

5         role in 2010, when you were e-mailing with her?

6    A    HR.

7    Q    Okay.  I want to focus your attention to that first

8         paragraph of your e-mail to her that starts with

9         "Thanks for the follow-up."  Do you see where I'm

10        looking?  That last sentence of the first

11        paragraph, "I work 7 to 3 during the school year

12        and closer to 8 to 4 during summer break."  Do you

13        see that part?

14   A    Yes.

15   Q    So when -- At the time that you wrote this in May

16        2010, and based on your earlier testimony, is it

17        correct to say that you've been working this 7-3

18        schedule for about three years?

19   A    Two to three years, yes.

20   Q    Okay.  And that when your child wasn't in school,

21        you were able to go back to the 8-to-4 hours.

22        Correct?

23   A    Yes.

24   Q    Okay.  Did you go back to the 8 to 4 during summer

25        break because those were the normal business hours

1       at Miller Compressing?

2                   MR. OLSON:  Object to form.  You can

3       answer.

4                   THE WITNESS:  If they needed me to, yes.

5   BY MS. LORENC:

6   Q   And did they need you to in 2010 -- to go back to 8

7       to 4 during the summer?

8   A   No.  No.  It was never really a problem for me to

9       work 7 to 3.  There were plenty of people coming

10      and going at various hours.

11  Q   Did you volunteer to go back to 8 to 4 during

12      summer break?

13  A   I -- Yes.  I told them I could if they needed me

14      to.

15  Q   Because you understood that's what you had been

16      hired in to do, correct, in 1999?

17                  MR. OLSON:  Object to form.

18  BY MS. LORENC:

19  Q   You understood that when you were hired in 1999,

20      your work hours were from 8 to 4.  Correct?

21  A   Yes.

22  Q   And that at your own request in 2007, your hours

23      were altered to 7 to 3.  Correct?

24  A   Yes.

25  Q   What was your job when you were hired in November

1        of 1999?

2    A   I was hired in the order processing department for

3        -- At the time it was called the scale payables

4        desk.

5    Q   And what were your job responsibilities in order

6        processing?

7    A   I would process scale tickets, weight tickets for

8        scrap metal, pay for the scrap metal and pay

9        freight charges for hauling that scrap metal, and

10       other miscellaneous duties included filing,

11       matching up check stubs to the -- or ticket stubs

12       to the checks.

13   Q   Did you interface with customers?

14   A   Sometimes.

15   Q   And at some point in time from November of 1999,

16       when you were hired, to December -- or excuse me --

17       to 2012, when you left Miller, did your role change

18       at the company?

19   A   Yes.  Several times.

20   Q   Okay.  What was your first job change from when you

21       were hired?

22   A   From the scale payables desk, I moved on to the

23       trip ticket desk.

24   Q   When was that?

25   A   I don't recall.

1    Q    Do you have an approximation how many years or

2         months after you were hired?

3    A    I think it was just -- I think it was just maybe

4         several months after I started.

5    Q    Okay.  So maybe early 2000, somewhere around there?

6    A    Yes.

7    Q    And what were your job responsibilities at the trip

8         ticket desk?

9    A    Processing Miller-hauled scrap load tickets and

10        paying for those loads to -- paying the industrial

11        accounts for those loads and calculating Miller's

12        freight cost and other miscellaneous duties such as

13        filing, matching up checks with their ticket stubs.

14   Q    Did you interface with customers in that role?

15   A    Sometimes.

16   Q    How long were you at the trip ticket desk?

17   A    I don't recall.  I know that it's on my reviews how

18        long I was -- like, when I switched desks.  You

19        know, they kept us moving along.

20   Q    Was it a promotion to go from order processing to

21        the trip ticket desk?

22   A    You mean from the scale payable desk to the trip

23        ticket desk?

24   Q    Yes.  Scale payable.

25   A    Yes.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 15 of 109  Document 32

1    Q    And where did you go after the trip ticket desk?

2    A    I believe I went to the orders desk.  I'm not

3         positive.  I've switched back and forth a couple

4         times between the orders desk and the sales

5         brokerage desk, so I can't remember if I started

6         out first at the orders desk or if it was

7         vice-versa.

8    Q    Okay.  But whatever the move was from the trip

9         ticket desk, was that part of a promotion?

10   A    Yes.

11   Q    And assuming that it was the -- Well, strike that

12        question.  Do you know how long you were at the

13        trip ticket desk?

14   A    No.

15   Q    Do you think it was months or years?

16   A    I think it was maybe a year, maybe more.

17   Q    Okay.

18   A    Maybe around a year.

19   Q    What were your job responsibilities at the orders

20        desk?

21   A    Entering contracts that were made between the

22        marketing agents and customers, putting pricing

23        into the system so that the orders -- you know, so

24        the tickets would be paid correctly, calculating

25        pricing based on iron age reports or other market

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 16 of 109  Document 32

1          papers.  Other miscellaneous duties included more

2          filing.  I don't recall all of the duties.  I know

3          there's more -- a lot more.

4     Q    Okay.  And did you interface with customers at the

5          orders desk?

6     A    Not -- No.

7     Q    Okay.  How long were you at the orders desk?

8     A    I don't know.

9     Q    Months or years?

10    A    I don't know.  I don't recall how long I was at any

11         of the desks, really.

12    Q    Okay.

13    A    I know the longest one that I was at was the sales

14         brokerage desk.

15    Q    And you think that was -- that could have been

16         after the orders desk or the reverse?

17    A    Right.  We would flip around based on the needs of

18         the department at the time.  I know between the

19         sales and orders desk, I flipped back and forth

20         between those two desks a couple times, and I'd

21         also go back to other desks, as needed.

22    Q    And in terms of the "as needed" or "what the

23         department needs were at the time," was that due,

24         in part, to some of the reductions that were taking

25         place at Miller from year to year?

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 17 of 109  Document 32

1    A   No.  That was based on if I had to help train

2         people or if other people were -- We did a lot of

3         cross-training, and we were doing a six-month

4         rotation where we would each do a desk for six

5         months and then move along to another desk for six

6         months.  So they had, like, a schedule so that we

7         could all stay current on each other's job duties.

8    Q   When you moved to the sales brokerage desk, was

9         that a promotion?

10   A   Yes.

11   Q   And what were the job responsibilities there?

12   A   Process daily scale tickets to invoice customers

13        for scrap, process brokerage tickets to pay an

14        invoice to customers for scrap.  I had to enter

15        manually outside-hauler brokerage tickets for

16        payables and receivables for scrap.  I had to mail

17        out invoices to customers.  Miscellaneous duties

18        included filing, making copies for customer's

19        checks, and I'm sure there's more.  There were a

20        lot of duties at that desk.

21   Q   Did you interface with customers at that desk?

22   A   Sometimes.  If there was a problem, if there was a

23        price wrong or something, they would call.  People

24        -- Sometimes people would call, but it wasn't very

25        often that there was a problem.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 18 of 109  Document 32

1    Q    Okay.  But if a customer did have a problem with

2         their invoice or if they were going to make a late

3         payment or had some sort of issue, was it the sales

4         brokerage desk that they would call?

5    A    They would call whatever desk that was working on

6         their paperwork, yes.  So if there was a problem

7         with an invoice and I did that invoice, yes, I

8         would take that call.

9    Q    And how many years were you at the sales brokerage

10        desk -- or months?

11   A    I don't know the exact amount of years.  I know it

12        was several years that I was there.  Probably --

13        Steady?  At least five steady years.

14   Q    Were you working at the sales brokerage desk in

15        2007?

16   A    2007?  I couldn't be sure.

17   Q    Okay.  Did you work any -- in any other role other

18        than the sales brokerage desk that we were just

19        discussing and the other positions you already

20        mentioned?

21   A    Yes.

22   Q    So where did you go after the sales brokerage desk?

23   A    No.  Within that, I cross-trained in other

24        departments.  I didn't work at another desk, but I

25        used to help out and work in the Pewaukee scale.  I

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 19 of 109  Document 32

1    was trained out there, and I would work there on

2    Saturdays.

3  Q    Were you working at the sales brokerage desk in

4        2012, when you left the company?

5  A    Yes.

6  Q    Okay.  So other than the four positions and the

7        Pewaukee location, are there any other positions

8        that you held during your tenure at Miller

9        Compressing?

10 A    I don't believe so.

11 Q    Okay.  In 2011, you requested the ability to

12       telecommute and work from home.  Is that correct?

13 A    Correct.

14 Q    And why is that?

15 A    Does it say when in 2011?

16 Q    Well, I -- Let me show you what we have marked as

17       Exhibit 2.  This might help refresh your

18       recollection.  And just for the record, this is an

19       October 17, 2011 e-mail that references "Time

20       Warner has begun, and Tracy has confirmed,

21       TeleWorker Internet service as of October 13, 2011.

22       She is at the $34.79/month rate."  Do you see where

23       I'm reading at the top of the e-mail chain?

24 A    Yes.

25 Q    Okay.  And I know you're not on this e-mail, so I

1        don't know if you've ever seen that, but does that

2        help refresh your recollection as to when you

3        requested to be able to work from home and to

4        telecommute?

5    A   No.

6    Q   Okay.

7    A   That's incorrect.

8    Q   Okay.

9    A   This doesn't have anything to do with that.

10   Q   Okay.  So what makes you say that this doesn't have

11       anything to do with when you requested that you

12       work from home?

13   A   This was an offer by Time Warner Cable that the

14       entire company got made through Miller Compressing.

15       Time Warner Cable offered all of us business class

16       speed if we would take Internet through Miller, and

17       they would deduct it from our paycheck every month.

18       I had already had Internet at home.  But if you

19       wanted an upgrade for a reduced fee, you could do

20       that.  This deal was offered to the entire company.

21   Q   Okay.  But did you request or take advantage of the

22       deal because you were going to start working from

23       home, and so you wanted the business service or had

24       you already started working from home at the time

25       that you upgraded?

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 21 of 109  Document 32

1    A    Can you please split your questions up?

2    Q    Sure.  I'm trying to figure out when it was that

3         you requested to start working from home.  So my

4         question is, had you already started working from

5         home before you requested and received the upgraded

6         service from Time Warner?

7    A    No.  This didn't have any -- I was not -- This did

8         not have to do with me working at home.

9    Q    Okay.  So you had not started working from home yet

10        at the time that the TeleWork Internet service was

11        added to your home service?

12   A    Not that I recall.

13   Q    Okay.  Do you recall when you did start working

14        from home?

15   A    Yes.

16   Q    And when was that?

17   A    February.

18   Q    Of what year?

19   A    2012.

20   Q    And why did you request to work from home and to

21        telecommute in February of 2012?

22   A    That's when my son was removed from daycare.

23   Q    Okay.  And why did you need -- What does that have

24        to do with your request?

25   A    Because he has a disability, and I was exercising

1    my FMLA rights to be able to take care of him.

2  Q  Okay.  I understand you think you were exercising

3     your FMLA rights.  I'm trying to understand what

4     your son's diagnosis had to do with your request to

5     work from home.  So can you tell me why you needed

6     to be able to telecommute or work from home?

7  A  To help offset my workload at the time that I

8     wasn't able to be at work, to be able to do the

9     work that I was, you know, supposed to be -- the --

10    Say it again, please.  I'm confused.

11 Q  I'm trying to understand what prompted you to

12    request the ability to telecommute and work from

13    home in February 2012.

14 A  Okay.

15 Q  That's the question.

16 A  Say it again.

17 Q  Why did you ask to work from home in February 2012?

18 A  So I could work -- So I could get work done.

19 Q  But what prompted -- What prevented you from going

20    in to the office to get your work done?

21 A  My son's disability.

22 Q  Okay.  What about your son's disability prevented

23    you from being able to go into the office?

24 A  Because he was unable to attend daycare due to his

25    disability.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 23 of 109  Document 32

```
1    Q    And you had no other child care?

2    A    No.  He was kicked out of daycare.  I did have

3         other -- My mother watched him three days a week,

4         and then I care for him the other two days a week.

5    Q    Okay.  When your mother cared for him, what were

6         your work hours on the days that your mother cared

7         for him?  When would you go in to work?

8    A    7 to 3.

9    Q    Okay.  So you kept your previously-approved changed

10        hours.  Correct?

11   A    Yes.

12   Q    Okay.  And then on the two days when you cared for

13        him, what did your schedule entail?  Did you go in

14        to the office at all?

15   A    Yes.  I would go in to pick up my workload.

16   Q    And what time would you do that?

17   A    In the morning, probably -- I'd probably have to

18        drop off my other son at school, so I would assume

19        I would maybe get there at 9 a.m.

20   Q    And then you would take your work home?

21   A    Yes.

22   Q    And do your work throughout the course of the day?

23              MR. OLSON:  Object to form.

24   BY MS. LORENC:

25   Q    You can answer.
```

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 24 of 109  Document 32

1   A   If time permitted.  If he napped.

2   Q   Do you recall which two days out of the week you

3       would work remotely when you first requested this

4       in February 2012?

5   A   No.

6   Q   Was it -- Was your schedule consistent as to which

7       days you worked at home and which days you came in

8       to the office in 2012?

9   A   I believe so.

10  Q   Did it remain consistent throughout 2012?

11  A   I believe it did.

12  Q   When you requested the ability to work from home in

13      February of 2012, did you intend it to be a formal

14      permanent change to your schedule?

15  A   I didn't have any intentions about it at the time.

16      I had no idea what was going to happen with my son.

17      We were hoping -- We were trying to get him help.

18  Q   Did you -- In February 2012, were you looking for

19      other forms of child care other than your mother

20      and you?

21  A   Yes.

22  Q   And were you intending to be able to come back to

23      work those other two days at some point in time?

24  A   Yes.

25  Q   And at any point in time -- Strike that.  Were you

1      able to find child care for your son for those

2      other two days in 2012?

3   A  For a bit of time, I did.  I had another relative

4      of mine come into my home on those other two days

5      for a time, and then she ended up having a seizure

6      and could no longer drive.

7   Q  Do you recall when that was?

8   A  No.

9   Q  And do you recall how long it was that you had that

10     child care for the other two days?

11  A  No.

12  Q  Are we talking months?  Are we talking a couple of

13     times?

14  A  It was probably just a couple weeks -- maybe a few

15     weeks that she was able to come and help me.

16  Q  And on those days that she was able to come and

17     help you, did you then go in to the office those

18     two days?

19  A  Yes.

20  Q  So for those couple of weeks, you were working five

21     days a week?

22  A  I don't recall.

23  Q  And do you recall for those couple of weeks in 2012

24     when you had additional help, were you working 7 to

25     3?

1    A    Yes.

2    Q    During your time at Miller Compressing from

3         November of 1999 to your departure in 2012, did the

4         company undergo reductions in force?

5    A    Yes.

6    Q    Tell me about that.  When did that occur?

7    A    I know that there was a reduction when the scrap

8         market crashed in, like, 2008.

9    Q    Okay.  And do you know how many people were laid

10        off?

11   A    No.  I have no idea.

12   Q    Were you ever laid off in 2008?

13   A    No.

14   Q    Subsequent to 2008, are you aware of any other

15        reductions in force?

16   A    What does "subsequent" mean?

17   Q    After 2008.

18   A    After?  Yes.

19   Q    When was the next one, that you recall?

20   A    I don't recall a year.  I just know -- I know that

21        they got rid of some yard guys.

22   Q    And any other times that you recall them going

23        through reductions?

24   A    No.  I don't know -- I know that they had the 2008

25        crash and I know that they had gotten rid of a few

1       people after that, but I have no idea about the

2       years when that was done.

3    Q  How many people do you think they got rid of in

4       2008?

5    A  I have no idea.

6    Q  Okay.  Were you aware that between 2008 and 2012,

7       they went through eight reductions in force?

8                 MR. OLSON:  She just said she didn't

9       know.

10                 THE WITNESS:  No.

11                 MR. OLSON:  I object to form.

12   BY MS. LORENC:

13   Q  You're allowed to answer.  I believe you said "No,"

14      you weren't aware of that?

15   A  No.

16   Q  Were you aware that in September of 2012, Miller

17      Compressing was bought by another company?

18   A  When?

19   Q  In September of 2012.

20   A  No, I was not aware that they were bought.

21   Q  Were you aware that in July of 2012, there was a

22      reduction in force undertaken?

23   A  No.

24   Q  You'd never heard that people were going to be laid

25      off in July of 2012 because of the financial

Case 2:14-cv-00367-NJ   Filed 03/11/15   Page 28 of 109   Document 32

1           strains of the company?

2    A      Are you talking about like rumors?  Did we hear

3           rumors of people getting let go?

4    Q      Well, let's start with rumors.  Did you hear any

5           rumors that in July of 2012, people were going to

6           be let go?

7    A      Yes.

8    Q      Okay.  Do you recall hearing rumors as to why

9           people were going to be let go in July of 2012?

10   A      I'd heard that the company was on the market.

11   Q      On the market to be purchased?

12   A      Right.

13   Q      Okay.  Do you know why it was on the market?

14   A      Because Bob Miller died, and nobody in his family

15          wanted it.  That's what we were under the

16          impression of.  None of his family members wanted

17          to take over the business, so it had been on the

18          market for years, according to what we were told --

19          that it was always going to be available for

20          purchase.

21   Q      Do you remember being told that the company wasn't

22          doing well in July of 2012?

23   A      No.

24   Q      Do you remember having any meetings in the summer

25          of 2012, aside from rumors?  Do you remember having

1    any meetings about the company being in financial

2    difficulties?

3  A  I remember meetings being held about the company's

4    financial state, but what I remember being said was

5    that the non-ferrous side of the company was being

6    -- kept us afloat.

7  Q  What do you mean?

8  A  There's a non-ferrous metal and a ferrous metal.

9    The ferrous side of the company was breaking even,

10    but the non-ferrous side of the company was the

11    money-maker, and they would always tell us that

12    that is what was keeping the company going.

13  Q  Okay.  Let's talk about that a little bit.  Which

14    side were you on?

15  A  I was on the -- My desk dealt with -- My desk or

16    the department?  We dealt with both.

17  Q  Okay.  Which side was your desk on?

18  A  My desk was on the ferrous side of the company.

19    The ferrous side -- I dealt with ferrous.

20  Q  Okay.

21  A  Sorry.  It's confusing.

22  Q  But your department dealt with both sides.  Is that

23    what you're saying?

24  A  Yes.  So -- We would always do both, but there are

25    certain desks that dealt with -- We were all

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 30 of 109  Document 32

1          intermingled, so when I did the orders desk, it was

2          doing both.  So it just depended on what you were

3          doing at the time.  So -- Like I said, we were all

4          in that rotation.  So we --

5      Q   Okay.  And when do you recall -- You said you

6          remember being told or being in a meeting, I think

7          you said, that you were told that the ferrous side

8          would -- was just breaking even, but the

9          non-ferrous side was the money-maker.  When was

10         that meeting?

11     A   I don't recall.

12     Q   Was it in 2012?

13     A   I don't know.

14     Q   Do you remember when it was in relation to when you

15         left the company?

16     A   No.  I have no idea.

17     Q   Was it pretty soon before -- or pretty close to the

18         time or are we talking a year before you left the

19         company?

20     A   I don't recall.  I have no idea.

21     Q   Okay.  I believe you said that at the time you left

22         the company you were with the sales brokerage desk.

23         Correct?

24     A   Yes, I was.

25     Q   And you'd been there for about five years?

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 31 of 109  Document 32

1    A    Yes.

2    Q    Okay.  When you first came over to the sales

3         brokerage desk, how many people were in that

4         department?

5    A    When I first came over there?  I don't know if I

6         had -- if -- If I'd say anything, it would be a

7         guess.  I don't know.

8    Q    What would your guess be?

9    A    Six.

10   Q    Okay.  And I appreciate this is going back to

11        roughly 2007, so I understand that this is a while

12        back, but your guess would be about six people.  At

13        the time that you left the company in 2012, how

14        many people were in that department?

15   A    There was six of us.

16   Q    When you first started at the sales brokerage desk

17        to when you left the company in 2012, did you have

18        additional responsibilities placed on you?

19   A    Say that again, please.

20   Q    I'll rephrase it.  From when you started in that

21        department in roughly 2007 to when you left, did

22        you get additional responsibilities that you were

23        charged with handling when you were in that

24        department?

25   A    From desk to desk or just --

1    Q    While still at the sales brokerage desk.  Did they

2         ask you to do more things?

3    A    I don't recall.  I mean, I did everything that the

4         desk -- that pertained to that desk.  I didn't,

5         like, do anything from other people or, like,

6         people didn't just give me duties to do.

7    Q    Do you remember the job itself changing over those

8         five years of what was expected of you?

9    A    No.  The paperwork all stayed the same.  It was

10        always the same paperwork.  If anything, it got

11        more efficient as they got new programs and stuff.

12        Some of it got more efficient.

13   Q    Did you take on new or different paperwork in

14        addition to what you had previously been doing?

15   A    Not that I recall.

16   Q    Okay.  So it's your recollection that the sales

17        brokerage desk job was pretty much the same

18        throughout that entire five-year period?

19   A    Yeah, pretty much.  Some of the forms changed here

20        and there, and we got laser printers instead of,

21        like, three-part.  I mean, you know, some stuff was

22        simplified.  It made it easier to do.

23   Q    But overall, you don't remember the job changing

24        much in the five years that you were at that desk.

25   A    No.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 33 of 109  Document 32

1    Q    And it's your testimony that the size of the

2         department did not change in the five years you

3         were at that desk.

4    A    The size of the department would vary.  We had a

5         time where we were short-staffed, and then they

6         would hire somebody new, and then that that person

7         wouldn't work out, so then we'd be short-staffed.

8         So, yes, the company -- The department itself did

9         change, but usually there was six people at --

10        There's one person for each desk.  That's the way

11        it was when I got there, and that's the way it was

12        up until the end.  There were six people.  As far

13        as I remember, there were six people -- one person

14        for each desk.

15   Q    When do you recall the department being short-

16        staffed?

17   A    One of my maternity leaves, I know it was short-

18        staffed.  They hired a replacement for me to go on

19        maternity leave, and they fired her like a week

20        before I left.

21   Q    So was that for your first pregnancy or your second

22        pregnancy?

23   A    My second.

24   Q    And what year would that have been?

25   A    2008.

1   Q   Okay.  And so your understanding is they just hired

2       someone to fill your role for the 12 weeks you were

3       out on FMLA leave?

4   A   Correct.  But I wasn't out for the full 12 weeks.

5       I came back early because they needed the help.

6   Q   Okay.  You voluntarily came back early?

7   A   My boss or my supervisor asked if I could come back

8       early part-time, and I agreed.

9   Q   And that was in 2008, you said?

10  A   Yes.

11  Q   Any other times that you remember the department

12      being short-staffed?

13  A   I don't recall ever missing, like, a complete

14      person other than if somebody was out on medical.

15      I know when somebody was out on medical, we'd all

16      have to scramble and piece apart that person's

17      desk, and that would be an example of taking on

18      additional duties, but they weren't permanent.

19      They were just temporary.

20  Q   Okay.  Do you know how big the sales brokerage desk

21      department is now, by any chance?

22  A   No.  I have no idea.

23  Q   And if you need to take a break at any point, just

24      let me know.  You just mentioned taking one FMLA

25      leave in 2008, but during your time at Miller, you

1        took several FMLA leaves.  Isn't that correct?

2   A   Yes.

3   Q   Based on the answers to your request to admit, you

4        took an FMLA-approved leave in February of 2003

5        related to preeclampsia.  Correct?

6   A   Correct.

7   Q   And again in 2005, you took leave -- FMLA-approved

8        leave to deal with a scheduled D & C.  Is that

9        correct?

10   A   Correct.

11   Q   May of 2006, you took an FMLA-approved leave to

12        undergo some chemotherapy treatments?

13   A   Correct.

14   Q   In October 2006, you took FMLA-approved leave to

15        have surgery on your right foot.  Is that correct?

16   A   Correct.

17   Q   In September 2007, you took FMLA-approved leave due

18        to a herniated disc in your lower back.  Correct?

19   A   Correct.

20   Q   We already talked about the March -- I believe it

21        was March of 2008, your FMLA-approved leave due to

22        your second pregnancy.  Correct?

23   A   Correct.

24   Q   You took a week of FMLA-approved leave in September

25        of 2008.  Is that correct?

1    A    Correct.

2    Q    And then in July of 2011, you requested FMLA leave

3         to cover appointments necessary for treatment.  Do

4         you recall that?

5    A    Yes.

6    Q    What were -- What treatments were you seeking leave

7         to attend appointments?

8    A    For my children's appointments.  They weren't for

9         mine.

10   Q    Okay.  What kinds of appointments?

11   A    Doctors' appointments or evaluations.

12   Q    You said "children's."  Was this for both your kids

13        or one of your two children?

14   A    At the -- Just for a short period of time both of

15        them were -- I had to get my other son an

16        appointment for something as well.

17   Q    So this was a one-off type of situation or was this

18        for something that was going to be reoccurring?

19   A    This -- For Evan, it was going to be reoccurring.

20        We were trying to get him evaluated and --

21   Q    Is Evan your first or second child?

22   A    Second.

23   Q    Okay.  So in July of 2011, Evan was going through

24        evaluations?

25   A    Yes.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 37 of 109  Document 32

1    Q    And you needed FMLA intermittent leave to be able

2         to take him to doctors' appointments.  Is that a

3         fair statement?

4    A    Yes.

5    Q    Okay.  And that -- And then the February 2012,

6         which we've already talked about, was when you were

7         requesting the ability to work from home two days a

8         week.  Is that correct?

9    A    Yes.

10   Q    And all those FMLA-approved leaves that we just

11        went through, all of those were approved by the

12        company.  Correct?

13   A    Yes.

14   Q    And you came back to work in the same job you'd

15        left for each one of those leaves.  Correct?

16   A    Yes.

17   Q    Tell me why you've filed a lawsuit against Miller

18        Compressing.

19              MR. OLSON:  Object to the form, overly

20        broad, calls for a narrative.

21              MS. LORENC:  None of which are

22        impermissible.

23              MR. OLSON:  You can answer if you

24        understand it.

25              THE WITNESS:  Repeat the question,

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 38 of 109  Document 32

1      please.

2      BY MS. LORENC:

3      Q    Tell me why you've filed a lawsuit against Miller

4           Compressing.

5      A    Because they violated my FMLA rights.

6      Q    And how have they done that?

7                   MR. OLSON:  Object to form.

8      BY MS. LORENC:

9      Q    You can answer.

10     A    By not allowing me to stay home to take care of my

11          disabled son.

12     Q    Any other ways that they've violated your FMLA

13          rights?

14                  MR. OLSON:  Object to form to the extent

15          it calls for a legal conclusion.  You can answer.

16                  THE WITNESS:  Yes.

17     BY MS. LORENC:

18     Q    How else?

19     A    By changing my hours from 7 to 3 to 8 to 4.

20     Q    Any other ways?

21                  MR. OLSON:  Same objection as to form, to

22          the extent it calls for a legal conclusion.  You

23          may answer.

24     BY MS. LORENC:

25     Q    Any other ways that Miller Compressing violated

1        your FMLA rights?

2    A    Yes.

3    Q    And what else?

4    A    I was told that I could not longer make or receive

5         any calls regarding Evan during the workday unless

6         I was on break.

7    Q    Any other ways that your FMLA rights were violated

8         by Miller Compressing?

9              MR. OLSON:  Same objection.  Go ahead.

10             THE WITNESS:  Yes.

11   BY MS. LORENC:

12   Q    What other ways?

13   A    I was told that my FMLA only covered appointments

14        and therapy sessions for Evan and that it did not

15        include being able to stay home and care for him.

16   Q    Appointments and what was the other thing you were

17        told that was covered?  I'm sorry.

18   A    Therapy.

19   Q    Therapy.  Any other ways you believe your FMLA

20        rights were violated by Miller Compressing?

21   A    Yes.

22   Q    What else?

23   A    I was told I could no longer discuss Evan with any

24        employees.

25   Q    Any other ways you believe your FMLA rights were

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 40 of 109  Document 32

1        violated by Miller Compressing?

2                MR. OLSON:  Same objection.

3                THE WITNESS:  Yes.  Could we recap what

4        I've said so far?

5    BY MS. LORENC:

6    Q   Well, how about I read them and you tell me if I'm

7        missing anything or have misstated anything.  You

8        believe your rights were violated because you were

9        told you could no longer stay home to care for your

10       disabled son.  Correct?

11   A   (Witness nods head.)

12   Q   Yes?

13   A   Correct.

14   Q   Because your hours were changed from 7 to 3 to 8 to

15       4.  Correct?

16   A   Yes.

17   Q   You were told that you could no longer make or

18       receive calls regarding Evan.  Correct?

19   A   During the workday, unless I was on break.

20   Q   During the workday.  Okay.  You were told that FMLA

21       only covered Evan's appointments and therapy

22       sessions.  Correct?

23   A   Correct.

24   Q   And that you were told you couldn't discuss Evan

25       with other employees during the workday.

```
 1    A    Correct.

 2    Q    Did I misstate anything other than when you already

 3         corrected me?  And I apologize for that.

 4    A    Not that I'm aware of.

 5    Q    And is there anything else, after hearing the

 6         recap?

 7    A    Yes.  I was also -- Hang on.  I was also told that

 8         I could not use my boss to help me prioritize my

 9         desk.

10    Q    What does that mean?

11    A    Like, just in general.  I could not use -- Because

12         I was -- If I was staying home with him two days a

13         week, and Matt would need me to do something

14         urgently if I would come in the next day, he would

15         say "Do this first."  I could no longer ask him if

16         there was -- I could no longer ask him advice on

17         how to prioritize -- if he needed something done

18         right away.  I could no longer ask him because I

19         was missing those two days in the office.  I could

20         also no longer ask any of our OP team members -- I

21         could not use them for backup anymore.  We all had

22         backups that we were able to use if we were out

23         sick for a day.  Everybody was trained on each

24         other's desk.  I was told I could no longer have a

25         backup within the department or eliminating Diana,
```

1          who was my backup.  I could no longer use her

2          anymore.

3      Q   Were you told why you could no longer use Diana?

4      A   No.

5      Q   Anything else?

6      A   There may be more.  They are listed in the

7          interrogatories.

8      Q   Okay.  All right.  So let's go back and kind of go

9          through these things.  When you say your FMLA

10         rights were violated because you were told you

11         could no longer stay home to take care of your

12         disabled son, does that mean that you were told you

13         could no longer have your two days working from

14         home?

15     A   Correct.

16     Q   That you were expected to be in the office five

17         days a week?

18     A   Yes.

19     Q   Okay.  And when -- Was this in July of 2012 that

20         you were told that you could no longer telecommute

21         two days?

22     A   Yes.  July 13.

23     Q   And at that point, you'd been telecommuting since

24         February of 2012.  Is that correct?

25     A   Yes.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 43 of 109  Document 32

1    Q    Did they tell you why you needed to work five days

2         out of the week in the office in -- starting in

3         July of 2012?

4    A    They said my FMLA coverage did not cover me being

5         able to stay home with him.  I needed to be in the

6         office Monday through Friday, 8 to 4.

7    Q    Did they give you any other reasons?

8    A    Not that I recall.

9    Q    Do you recall them telling you it had anything to

10        do with the financial issues at the company?

11   A    No.

12   Q    Do you remember being told that there were going to

13        be reductions in force in July of 2012 during the

14        time that you were told that you needed to be in

15        the office five days out of the week?

16   A    No.

17   Q    Do you recall being told that the department was

18        going to have to do less -- or do more with less?

19   A    No.

20   Q    Do you recall anything about your -- Strike that.

21        Let's back up to the July 13 date when you were

22        given this information.  How were you -- How was

23        this information conveyed to you?  Did you have a

24        meeting?

25   A    Yes.  I was called -- It was not a pre-planned

1       meeting, no.  I was just called down to the HR

2       conference room at the end of the day.

3    Q  Yeah.  And I didn't ask you if it was pre-planned.

4       But you had a meeting on July 13 with --

5              MR. OLSON:  You're doing fine.  Answer

6       the questions as you understand them.

7              THE WITNESS:  Pardon me?

8              MR. OLSON:  You're doing fine.  Answer

9       the questions as you understand them.

10   BY MS. LORENC:

11   Q  I just want to be clear that this was not a group

12      session or a phone call.  You had a meeting with

13      people on July 13.  Correct?

14   A  Yes.

15   Q  And who was that meeting with?

16   A  Sarah Barbian and Matt Chavez.

17   Q  And it was during that meeting that you were told

18      you needed to be in the office five days out of the

19      week.  Correct?

20   A  Yes.

21   Q  And it's your testimony that during that meeting

22      you were not told that the company was going to be

23      going through reductions in force?

24   A  Correct.

25   Q  Did either Sarah or Matt tell you anything about

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 45 of 109  Document 32

1          the financial situation of the company or some

2          terminations that were coming up or anything about

3          what was going on at the company?

4    A    No.

5    Q    You also mentioned that they said that your hours

6          needed to change from 7 to 3 to 8 to 4.  Did they

7          explain why?

8    A    I believe that's just because that's what everybody

9          else -- it was more in accordance with what

10         everybody was working.

11   Q    And that was also during the July 13 meeting with

12         Sarah and Matt, that that message was conveyed to

13         you?

14   A    Yes.

15   Q    Do you recall them saying that you needed to be

16         there from 8 to 4 because that's when customers

17         also worked?

18   A    Specifically, no.

19   Q    Do you generally recall that being conveyed to you?

20   A    No.  I recall them saying that it had to do with

21         more in accordance with what everybody else in our

22         company worked, 8 to 4.

23   Q    And you don't remember any reference to customer

24         hours?

25   A    No.  I don't remember any reference to customer

1    hours.

2  Q   You mentioned you believe your FMLA rights were

3      interfered with or violated because you were told

4      you could no longer make or receive calls regarding

5      Evan.  Was this during this same July 13 meeting?

6  A   Yes, it was.

7  Q   Okay.  And do you recall being told why that was?

8  A   No.

9  Q   Was an explanation given?

10 A   You're confused on something.  Some of those bullet

11     points do not have to do with the actual meeting.

12     Some of those bullet points were the phone call

13     that Sarah and I had after the meeting.

14 Q   Okay.  So -- Thank you for clearing that up.  Let's

15     take it a step back.  Were you told during your

16     July 13 meeting with Matt and Sarah that you could

17     no longer make or receive calls regarding Evan?

18 A   No.

19 Q   When were you told that?

20 A   On the phone.

21 Q   When?

22 A   About 20 minutes after that meeting, after I left

23     for the day, on a phone call with Sarah.

24 Q   Okay.  So you left the meeting at some point in

25     time, and then -- Did you leave the office right

1          after the meeting?

2     A    Yes.  It was my time to go.  It was about 3:00.

3     Q    And if I recall correctly, July 13 was a Friday.

4          Correct?

5     A    Yes, it was.

6     Q    Okay.  Did you call Sarah after the meeting or did

7          she call you?

8     A    She called me.

9     Q    And why did she call you?

10    A    She left me a voicemail saying she had more things

11         she wanted to discuss, such as those points that

12         you wrote down.

13    Q    And did you then call her back?

14    A    Yes, I did.

15    Q    Also on July 13?

16    A    Yes.

17    Q    And what was discussed during that phone call?

18    A    All the changes that needed to be made by Monday if

19         I wanted to keep my job, which were some of the

20         points that you wrote down.

21    Q    Okay.  Did she explain why, during that phone call,

22         you could no longer make or receive calls regarding

23         Evan?

24    A    No.  She didn't explain.

25    Q    Did you ask her why?

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 48 of 109  Document 32

1    A    No.

2    Q    Did you ask her any questions during that

3         conversation about why these things were being --

4         why these changes were occurring?

5    A    Yes, I asked her why my FMLA coverage did not

6         include taking care of Evan two days a week

7         anymore.

8    Q    And what response did she give you?

9    A    She said that the doctors would write anything on

10        the FMLA paper in order to get it approved, and

11        that all small children needed to be in daycare and

12        that I couldn't work from home anymore.

13   Q    So let's talk about that.  She's telling you that a

14        doctor will put anything on a doctor's note.  Did

15        you respond to that?

16   A    No, I did not.

17   Q    Did you say "That's not what's occurring in my

18        situation"?

19   A    No, I did not.  I just asked her to list everything

20        that they needed me to change.  She said she had

21        several more things they needed me to make changes

22        on, so I asked her to list them so I could discuss

23        it with my husband and my mother to see if we could

24        make it work.

25   Q    That seems like a pretty serious statement for

1    someone in HR to say -- that a doctor would put

2    anything on a sheet.  Did that strike you as

3    offensive when she made that comment?

4  A    I was taken aback by it, yes.

5  Q    But you didn't say anything to her in response to

6    it?

7  A    No.

8  Q    Why?

9  A    Because I was already upset, and I just figured

10    "Let's get everything on" -- You know, let's -- I

11    had to hear what she had to say.  She said if I

12    didn't call her back by the end of the day, I would

13    be considered a voluntary quit.  So I just wanted

14    to hear what she had to say so I could figure out,

15    you know, what she needed me to do.

16  Q    She told you you needed to make a decision by the

17    end of July 13 as to whether or not you could make

18    those changes?

19  A    No.  I had the weekend.

20  Q    Okay.  You previously said that you had to make the

21    decision by the end of the day.

22  A    I had to call her back by the end of the day.

23  Q    Of July 13 -- of that Friday.

24  A    What's your question?  Start over.

25  Q    I'm trying to understand what time frame she put on

1         it.  You said that you needed to call her back by

2         the end of that day or else it would be considered

3         a voluntary quit.

4     A   Right.  After I left the meeting.

5     Q   So the end of July 13, that Friday, you needed to

6         call her back?  Is that your statement?

7     A   I needed to call her back to hear the rest of the

8         changes that they needed me to make.

9     Q   Okay.  So are you talking about her voicemail at

10        this point then?  Her voicemail said that you

11        needed to call her back by the end of the day?

12    A   Yes.

13    Q   So not that you needed to make a decision as to

14        whether or not you could accept the terms by the

15        end of July 13, but you needed to call her back by

16        the end of July 13.

17    A   Yes.  I needed to call her back by the end of the

18        day on July 13.

19    Q   Okay.  But in terms of then when you did call her

20        back, is that when she made the statement about you

21        could no longer make or receive calls regarding

22        Evan?

23    A   Yes.

24    Q   It wasn't something that she said during her

25        voicemail.  It was something communicated directly

1       to you?

2   A   Yes.

3   Q   And her statement about "A doctor will put anything

4       on a doctor's note," was that made on the voicemail

5       or was that made directly to you?

6   A   On the phone call directly to me.

7   Q   Okay.  All right.  But you didn't say anything in

8       response to that kind of comment?

9              MR. OLSON:  Asked and answered.  You can

10      answer again.

11             THE WITNESS:  No, I did not.  I asked her

12      to go over everything that they needed me to

13      change.

14  BY MS. LORENC:

15  Q   What about her comment that "All small children

16      should be in daycare"?  Were you offended by that

17      statement?

18  A   She said "All small children need daycare."

19  Q   Okay.  Did that bother you when she said that?

20  A   Yes.

21  Q   Did you respond to that statement?

22  A   I believe I said something to the effect that "His

23      disability prevents him from being in daycare" or

24      something to the effect of "not disabled children."

25  Q   Did she say anything in response to that?

1    A    Not that I recall.

2    Q    Did it bother you that she made a statement like

3         that?

4              MR. OLSON:  Asked and answered.

5    BY MS. LORENC:

6    Q    You can answer.

7    A    Yes.

8    Q    Did you complain to anybody at Miller Compressing

9         that Sarah had said to you "Any doctor will put" --

10        something to the effect that "Any doctor will write

11        anything on a doctor's note" or her statement that

12        "All small children should be in daycare"?

13   A    I don't know.  Did I complain to anybody?  Like

14        after that phone call?

15   Q    Yes.

16   A    I was already at home.  So no.

17   Q    Did you tell Matt Chavez that Sarah had made these

18        kinds of comments to you?

19   A    No.

20   Q    Was Matt your supervisor at the time?

21   A    Yes.

22   Q    Did you complain to anybody above Matt that Sarah

23        had made these kinds of comments to you?

24   A    No.  I was already at home.  I was already at home

25        on the phone with her.  There was nobody I could

```
 1        complain to.
 2   Q    Beyond just July 13.  At any point in time did you
 3        make a complaint about the statements that were
 4        made to you about the doctor's note and children
 5        needing to be in daycare?
 6   A    No.
 7   Q    You mentioned Margo before.  Was she still employed
 8        by Miller Compressing in July of 2012?
 9   A    Yes.
10   Q    Did you mention to her that Sarah had made these
11        comments to you?
12   A    No.  I have no contact with Margo.
13   Q    The making and receiving of phone calls, I want to
14        show you what we've previously marked as Wink
15        Exhibit 3, and I'm showing you what's dated
16        October 11, 2011.  It's entitled "Cell
17        phone/texting/e-mailing and driving policy."  Is
18        that correct?
19   A    Yes.
20   Q    And just for the record, this is Bates labeled
21        D000537 through 538.  If you could read the first
22        sentence of the second paragraph for the record.
23   A    "Personal cell phones are prohibited from being
24        used during working hours by all employees and
25        should be kept in the employee's locker or desk,
```

1           except for production truck drivers, and used only

2           while on lunch or break times."

3     Q    Okay.  Did you understand this policy to be in

4           effect in July 2012?

5                    MR. OLSON:  Object to form.

6     BY MS. LORENC:

7     Q    You were aware that this policy was in effect in

8           July of 2012.  Correct?

9                    MR. OLSON:  Object to form.

10    BY MS. LORENC:

11    Q    You can answer.

12    A    Yes.

13    Q    And by "this policy," I'm referring to the cell

14          phone/texting/e-mailing and driving policy, so I

15          will rephrase the question.  You understood that in

16          July of 2012, the document marked Exhibit 3

17          entitled "Cell phone/texting/e-mailing and driving

18          policy" was in effect.  Correct?

19                   MR. OLSON:  Object to form.

20    BY MS. LORENC:

21    Q    You can answer.

22    A    Yes.  But I had an exception.

23    Q    Who told you you had an exception?

24    A    John Busby and HR.  I cleared it with them to be

25          able to use my cell phone just for that specific

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 55 of 109  Document 32

1          time period because I was waiting on so many

2          doctors' calls.

3     Q    What specific time period?

4     A    February to July of 2012.

5     Q    So explain that to me.  When did you get the

6          exception from John Busby in HR?

7     A    I don't recall the exact month.

8     Q    Was this a conversation that you had with John in

9          HR or how did this exception come about?

10    A    It was a conversation I had with John Busby asking

11         if it was -- I asked him if it was okay that I had

12         my cell phone on during the day while I was waiting

13         for all of these calls and appointments and

14         evaluations, and he said that was fine.  He said to

15         let HR know.

16    Q    Do you recall roughly when that conversation with

17         John was?

18    A    No.

19    Q    Who is John Busby?

20    A    He was the president of the company at the time.

21    Q    Was he your direct supervisor?

22    A    No.

23    Q    Did you speak to your direct supervisor about

24         needing an exception to the cell phone policy?

25    A    Yes.  Yeah.  He knew that my phone was on and that

1          I got permission to do so.

2    Q    So your first communication was with John, and then

3          you conveyed that message to your supervisor.  Is

4          that correct?

5    A    I don't recall how it -- if I talked to Matt about

6          it first and he told me to ask John or if I was

7          having a conversation with John and then had one

8          with Matt.  I don't remember how it went.

9    Q    Okay.  And Matt is Matt Chavez?

10   A    Yes.

11   Q    And then at some point in time you mentioned HR.

12         Did you speak to HR about needing an exception to

13         the cell phone policy?

14   A    I told them that I was granted an exception to the

15         cell phone policy.

16   Q    And who is "they"?  Who did you tell that to within

17         the HR department?

18   A    It would have either been Peggy or Sarah.  I don't

19         know.  Whoever was down there.  I don't remember.

20   Q    Okay.  But you understood it to be an exception to

21         this policy.

22   A    Yes.

23   Q    And you mentioned from this period of February to

24         July 2012, in your mind was this a temporary

25         exception or was this a permanent exception to the

1          no-cell-phone policy that was given to you?

2      A   Temporary.

3      Q   And in your mind, when would the exception end?

4      A   I don't know.  They didn't give me a limit.

5      Q   Did you have an idea in mind of when you would no

6          longer need the exception?

7      A   Yes.

8      Q   When was that?

9      A   When I could get him into the right kinds of

10         doctors that -- The people at Wisconsin Early

11         Autism Project were telling me to get him checked

12         out by a psychiatrist and get him re-evaluated, so

13         I was just waiting on a couple phone calls.

14     Q   When were you waiting on a couple of phone calls?

15         What month are we in when you're waiting for these

16         phone calls?

17     A   It was within that time period.

18     Q   Well, is there any way to narrow it down?  So you

19         said -- I believe you previously testified that

20         your son was diagnosed with autism in February of

21         2012.  Correct?

22     A   On or around.

23     Q   Okay.  And then when did he start -- When did you

24         start speaking with these various doctors to try to

25         get him evaluated?

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 58 of 109  Document 32

1   A   I had calls in to several different doctors at the

2       time.

3   Q   What time?  We're still in February?

4   A   Throughout that whole period, I was -- had doctors'

5       offices.  I had messages in to clinics and

6       neurologists, psychiatrists.  It was very difficult

7       for somebody to say that they would take on a

8       four-year-old patient, so I had calls in to

9       multiple facilities, offices and different kinds of

10      doctors.

11  Q   And explain what that means, when you say you had

12      "calls in to."  What does that mean?

13  A   To try to get appointments.

14  Q   So you would call and speak to someone at one of

15      these doctor's offices and say "I have a

16      four-year-old son that I'd like you to evaluate" or

17      what were you requesting?  An evaluation?

18  A   Evaluations and -- Yeah, I would say "evaluations."

19      I think that's really the word.  There's not really

20      any tests.  I mean, there's not like a lab test

21      they could do.

22  Q   Okay.  And did any of these offices give you any

23      indication of when they would be calling you back?

24  A   No.  I was on waiting lists.

25  Q   So it was more just an open-ended -- You wanted to

1    be able to take a call whenever it came in.  Is

2    that a fair statement?

3  A    Yes.

4  Q    The cell phone that you requested the exception

5    for, was this your own personal cell phone or was

6    this a cell phone dedicated just to doctors'

7    offices?  Was this a special phone number that you

8    were giving out?

9  A    No.  It was a personal cell phone.

10  Q    The same cell phone you were using for your

11    everyday use.  Correct?

12  A    Yes.

13  Q    Okay.  So when you requested the exception to the

14    -- the cell phone -- The exception to the cell

15    phone policy that you were requesting of John Busby

16    in or around February of 2012 was just related to

17    your own personal cell phone.  Correct?

18  A    Yes.

19  Q    You wanted to be able to just utilize your own

20    personal cell phone and make that an exception to

21    the policy that said you would be prohibited from

22    using your personal cell phone.  Correct?

23  A    I wanted to be able to not miss the doctor calls,

24    so I just requested to have it on so that I could

25    answer it if doctors called.

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 60 of 109  Document 32

1    Q    Okay.  So in February of 2012, when John Busby

2         granted you the exception to July of 2012, did any

3         doctors call you during work hours?

4    A    Yes.

5    Q    Okay.  Related to your request that they evaluate

6         Evan.  Correct?

7    A    Yes.

8    Q    And you would take those calls during work hours.

9         Correct?

10   A    Yes.

11   Q    Did you take any other calls during work hours?

12   A    No.

13   Q    How would you know when the phone rang whether it

14        was related to a doctor's office calling back in

15        response to your request for an evaluation?

16   A    Based on the phone number.

17   Q    Did you have all those doctors' offices inputted

18        into your phone?

19   A    Yes, I did.

20   Q    So you would be able to see who was calling you in

21        each instance when the phone rang?

22   A    Right.  Caller ID.

23   Q    So you would know if it was a Wisconsin -- the

24        Wisconsin program you were talking about.  You had

25        the capacity to know when the phone rang that it

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 61 of 109  Document 32

1          was them?

2     A    Yes.

3     Q    Was there ever a time that you answered the phone

4          and it wasn't related to one of the doctors that

5          you had called to seek an evaluation for Evan?

6     A    I don't think so.

7     Q    Each one of the doctor's offices you called, you

8          inputted their information into your phone.  Is

9          that your testimony?

10    A    Yes.  The ones I was dealing with, yes.

11    Q    So you don't believe there was ever a time that you

12         took a phone call during work hours on your cell

13         phone that did not relate to a doctor who you were

14         seeking evaluation for Evan.

15    A    Not that I recall.  I don't even recall getting

16         that many phone calls.  I only recall getting like

17         two phone calls during that time that had to do

18         with that whole time period.  I remember having to

19         walk into a different office.

20    Q    And yet even though you'd only had to deal with the

21         cell phone issue twice, according to your

22         testimony, you still felt like this was a big deal

23         that they were telling you you now had to adhere to

24         the cell phone policy of the company?

25    A    Say it again.

1    Q   Well, you just testified that you only recall

2        getting two phone calls during work hours related

3        to your own personal cell phone.

4    A   Um-hum.

5    Q   Correct?

6    A   Correct.

7    Q   And yet even though there were only two of them, it

8        still felt like a violation of your FMLA rights to

9        you when they told you you could no longer use your

10      personal cell phone during work hours?

11   A   They told me I could no longer make or receive any

12      calls regarding Evan during a workday regardless of

13      whether it was on the cell phone or not.

14   Q   Okay.  So let's take that a step back.  First of

15      all, when you say you only got two calls related to

16      Evan on your cell phone, how many calls on your

17      personal cell phone do you think you made related

18      to Evan?

19   A   I don't know.  I don't recall if I only received

20      two calls.  I said I only remember -- I remember

21      getting two calls, but I don't know how many I -- I

22      don't recall if that's a -- if that was all of them

23      or not.

24   Q   Do you have an approximation of how many calls you

25      made related to Evan during work hours?

1    A    No.  I would try to make the phone calls while I

2         was at home caring for him the other two days that

3         I was not there.

4    Q    Do you think you made a phone call a day on your

5         days that you were in the office related to Evan?

6    A    No.

7    Q    One a week?

8    A    I have no way of guessing or knowing how many phone

9         calls I would have made back then.  I don't know.

10   Q    Well, how -- Just so I get an understanding of what

11        we're talking about here, how frequently were you

12        making phone calls related to his treatment from

13        July of 2012 to -- or excuse me -- from February of

14        2012 to July of 2012?  Was this a fairly

15        time-consuming process or was this just a one-off

16        call here and there throughout the week?

17   A    No.  It wasn't very time-consuming.  We were on

18        waiting lists to be seen, so I just had my phone on

19        in case places would call so I wouldn't get

20        skipped.  So no, it wasn't time-consuming.

21   Q    Okay.

22   A    Can we take a bathroom break?

23   Q    Sure.  Yeah.  Absolutely.

24                   (A break was taken.)

25   BY MS. LORENC:

1    Q    We were talking, before we went off the record,

2         about the making and receiving of calls regarding

3         Evan.  We focused quite a bit on the cell phone --

4         your personal cell phone and the exception to the

5         cell phone policy you received from John Busby, but

6         were you also making phone calls related to Evan on

7         your work phone?

8    A    I don't remember.

9    Q    Do you remember being told that you were using your

10        work phone too much to make personal phone calls?

11   A    No.

12   Q    You don't recall that ever coming up?

13   A    I don't recall.

14   Q    Do you recall being told that others around you

15        were complaining about your excessive use of the

16        work phone to make personal calls?

17   A    No, I do not.

18   Q    Do you recall, during your phone call with Sarah on

19        July 13, being told that she'd had complaints about

20        your excessive use of the work phone to make

21        personal calls?

22   A    No.

23   Q    Going on to the next item you mentioned that you

24        believe violated your FMLA rights, you said you

25        were told that FMLA only covered your son's

1          appointments and therapy sessions.  Is that an

2          accurate statement?

3    A     Yes.

4    Q     Okay.  Was that during your meeting with Sarah and

5          Matt or was that comment made during your phone

6          call with Sarah?

7    A     I believe it was both.

8    Q     Okay.  Tell me about the meeting itself.  How long

9          did the meeting last with Sarah and Matt?

10   A     Approximately ten minutes.

11   Q     And why did it end?

12   A     I left.

13   Q     Did you leave before the meeting was done?

14   A     Yes.  I got very emotional, and I left -- and I

15         just left for the day.

16   Q     Okay.  You punched out?

17   A     I don't even remember if I punched out.

18   Q     You left right after the meeting.

19   A     Yes, I did.

20   Q     Okay.  And that's why Sarah had to call you back

21         and say "We weren't finished."  Right?  "We need to

22         keep talking about the items" that they had called

23         you in to discuss.  Correct?

24   A     Yes.

25   Q     And that's why she said you needed to call her back

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 66 of 109  Document 32

1       by the end of the day, since you abruptly left the

2       meeting.  Correct?

3    A  Yes.

4    Q  One of the other items you mentioned violated your

5       FMLA rights is that you were told you couldn't

6       discuss Evan with any other employees.  Is that a

7       correct statement?

8    A  Correct.

9    Q  Did your sister work in your department in July of

10      2012?

11   A  Yes.

12   Q  And when did she start working in the same

13      department as you?

14   A  I started after her at Miller.

15   Q  Okay.  You came to Miller --

16   A  So I came to Miller after she was already working

17      there.

18   Q  Did you guys always work in the same department?

19   A  No.

20   Q  At some point in time you both started working at

21      the sales brokerage desk.  Is that correct?

22   A  Pardon me?

23   Q  At some point in time you were both working in the

24      sales brokerage department.  Correct?

25   A  The order processing department, you mean?

1   Q    Yes.

2   A    Yes.

3   Q    And you were on the sales brokerage desk.

4   A    Yes.

5   Q    And what desk was she on in July of 2012?

6   A    In July?  The orders desk, I think.

7   Q    And was that all in the same department, in the

8        orders processing department?

9   A    Yes.

10  Q    Where, in relation to your desk, was her desk?

11  A    She was two desks away or two cubicles away.

12  Q    All right.  When you were told that you couldn't

13       discuss Evan with any other employees, was that

14       during the meeting portion of your discussion with

15       Sarah that day or was that on the phone call?

16  A    The phone call.

17  Q    Do you recall Sarah specifically saying you and

18       your sister couldn't discuss Evan throughout the

19       day?

20  A    No, she didn't.  It was I couldn't discuss Evan

21       with any employees.

22  Q    Do you recall being told that there had been

23       complaints that you were speaking with others

24       frequently throughout the day about personal

25       issues?

1    A    No.

2    Q    Do you recall being told that it was disruptive to

3         other peoples' work that you were discussing

4         personal issues with other employees?

5    A    No.

6    Q    What did you say in response to being told that you

7         couldn't discuss Evan with other employees?

8    A    I didn't say anything.  This is when she was

9         listing all of the changes that needed to be made

10        by Monday, so I just let her list them.

11   Q    And then when she got done listing them, did you

12        say anything in response to that?

13   A    Yeah.  I told her I would have to talk with my

14        mother and my husband to see if we could make these

15        changes.  We set up a meeting for Monday then.

16   Q    Okay.  Other than sort of that general statement,

17        did you respond specifically to any of the items

18        she'd listed during that phone call?

19   A    Not that I recall, no.

20   Q    Do you recall asking her any questions about any of

21        the specific items during that phone call?

22   A    I remember asking her the question why my FMLA did

23        not cover me staying home with him when it was

24        previously covered to do so.

25   Q    But other than that specific item, did you ask her

1      questions about any of the other items that you

2      listed as violating your FMLA rights?

3  A   I don't recall asking any questions.

4  Q   Do you recall asking her which employees you

5      weren't allowed to speak to about Evan?

6  A   No.  She just said I couldn't talk about Evan to

7      any of my co-workers.

8  Q   But that seems like an odd -- To me, that seems

9      like an odd thing to be told.  Were you curious as

10     to why you weren't allowed to speak to any other

11     co-workers about Evan?

12 A   No.  I just knew that -- I mean, that's what she

13     had said -- that I couldn't -- It had to go back

14     with -- It had to go back to do with I couldn't

15     discuss anything about Evan to anybody.

16 Q   And as we sit here today, you don't know why that

17     is?

18 A   No.  I mean, it just was -- It went along with all

19     the other changes they needed me to make.

20 Q   Because when you say "change," previously you had

21     been speaking to your co-workers about Evan.

22     Correct?

23 A   Yes.  Specifically, John Busby and I had a

24     conversation where he even recommended Penfield

25     Children's Center as a possible treatment for Evan.

1           So yes, it was discussed amongst other people who

2           would ask me how things were going.

3    Q      So John Busby, you already testified, was the

4           president of Miller Compressing at the time.

5           Right?

6    A      Correct.

7    Q      But this was specifically related to co-workers.

8           So were there co-workers within your department

9           that you were speaking to about Evan?

10                  MR. OLSON:  Object to form.  Could you

11          read that question back, please?

12                  (Record read.)

13                  MR. OLSON:  If you understand it, go

14          ahead and answer.

15                  THE WITNESS:  They're all co-workers.

16   BY MS. LORENC:

17   Q      Were there co-workers within the order processing

18          department in 2012 that you were speaking to on a

19          regular basis about Evan?

20   A      Yes.

21   Q      Other than your sister, were there other co-workers

22          within the order processing department that you

23          were speaking to about Evan?

24   A      Yes.  Matt Chavez.  I kept him up-to-date on

25          everything.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 71 of 109  Document 32

1    Q    Other than Matt and your sister, were there other

2         co-workers that were assigned to desks, so the

3         other desks within the order processing department,

4         that you were speaking to frequently about Evan?

5    A    Yes.  I believe they knew what was going on.

6    Q    Would you and your sister talk about Evan at work

7         on a regular basis?

8    A    Yes.

9    Q    We talked a little bit about this next bullet point

10        that you listed, but you said that you believe your

11        FMLA rights were violated because you couldn't use

12        your boss to help prioritize your desk.  Is that a

13        correct statement?

14   A    Correct.

15   Q    What is it about asking your boss to help

16        prioritize your desk that involved your FMLA

17        rights?

18   A    I don't understand the --

19   Q    Well, and I'm trying to understand what

20        prioritizing your desk and asking your boss to help

21        you do that -- how that relates to your FMLA

22        rights.  Are you saying it's because you were off

23        work for two days a week and then when you came

24        back in, you wanted to know what you should be

25        working on or what had top priority?

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 72 of 109  Document 32

1    A    Yes.  That's what I -- why I asked him to help me

2         prioritize my desk is because I was working -- or

3         because I was not working those two days.

4    Q    So in your mind, the two things are linked because

5         you needed help prioritizing because you were out

6         two days, but you didn't seek FMLA leave to receive

7         assistance to prioritize your desk.  Correct?

8    A    Correct.

9    Q    Was that statement made to you during your meeting

10        with Matt and Sarah or was that statement made

11        during the phone call?

12   A    The phone call.

13   Q    And did you have any response to that statement

14        when it was made to you?

15   A    No.

16   Q    Did you ask why you weren't allowed to use your

17        boss anymore to prioritize your desk?

18   A    No.

19   Q    And when you say "your boss," you're referring to

20        Matt?

21   A    Yeah.

22   Q    Did you have a belief as to why you were told you

23        couldn't use Matt to help prioritize your desk

24        anymore?

25   A    Yes.

1   Q   And what was your belief?

2   A   My belief was that they -- or that they wanted --

3       They just wanted me to do it and not have to

4       interrupt his day, I guess.  I mean, they just

5       wanted me to do as much as I could.

6   Q   To complete your job.

7   A   Yes.

8   Q   And then the last item you mentioned regarding the

9       way in which FMLA rights were violated is that you

10      couldn't use OPT?  Am I saying that correctly?

11  A   Oh, that stands for order processing team member, I

12      believe.  I'm sorry.

13  Q   No, that's okay.  That was going to be my next

14      question.  "OP team members as backup," and you

15      said "including Diana."  First of all, was that

16      comment made during the meeting portion or the

17      phone call portion?

18  A   The phone call.

19  Q   Okay.  And did you ask why you would no longer be

20      able to use OP team members as backup?

21  A   No.

22  Q   Before we move on to Diana, you mentioned that

23      previous to being told this, people would use other

24      OP team members to help them if they needed someone

25      on any given day.  Correct?

1    A    Correct.

2    Q    But you needed help as backup twice a week every

3         week.  Correct?

4                   MR. OLSON:  Object to form.

5    BY MS. LORENC:

6    Q    In 2012.

7                   MR. OLSON:  Object to form.

8    BY MS. LORENC:

9    Q    You can answer.

10   A    Oh.  Incorrect.

11   Q    Okay.  So tell me when you needed help with backup.

12   A    If I was unable to do any of the work that I was

13        taking home -- Like I would do work on nights and

14        weekends.  If there was -- If I needed help

15        catching up, I would use somebody for backup, but

16        typically I came in and picked up the workload, did

17        it after-hours and did it on the weekends.

18   Q    How often in 2012 did you need help from other OP

19        team members to complete your work?

20   A    I don't know.

21   Q    Every week?

22   A    I don't know.  I recall doing most of the work

23        myself, if not all of it.  I was getting it all

24        done.

25   Q    Well, I'm curious as to why this statement would

1          even need to be made unless it was something that

2          you were frequently doing.  So were you often

3          seeking help from other members of the OTP -- OPT

4          department, excuse me, to help complete your job

5          tasks?

6     A    No.

7     Q    Would you say once a month you would ask others for

8          help completing your job?

9     A    I don't know.

10    Q    Were you surprised that this statement was made to

11         you?

12    A    Yes.  I was surprised that all of them were made.

13    Q    Were you specifically surprised that this statement

14         was made because it wasn't something you were doing

15         anyway?

16    A    I don't -- Yes.

17    Q    Because it's your recollection that you were able

18         to complete your job.

19    A    Yes.  It's my recollection that I was able to do

20         most of it after-hours and on the weekends.  I

21         don't recall needing a regular backup.

22    Q    But as part of this conversation, you were going to

23         be expected to work in the office five days.

24         Correct?

25    A    Right.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 26 of 109  Document 32

1    Q    And you were going to be expected to work from 8 to

2         4.  Correct?

3    A    Correct.

4    Q    So if those two things were true, you probably

5         wouldn't have needed any backup because you would

6         have been there during normal business hours and

7         five days a week.  Correct?

8              MR. OLSON:  Object to form.

9    BY MS. LORENC:

10   Q    You can answer.

11   A    Correct.

12   Q    I'm sure you've probably already told me this, but

13        what's Diana's last name, if you recall?

14   A    Kasprzyk.

15   Q    Okay.  Do you know how to spell that?

16   A    I believe --

17             MS. BARBIAN:  K-a-s-p-r-z-y-k.

18   BY MS. LORENC:

19   Q    What department was Diana in, in July of 2012?

20   A    Dispatch.

21   Q    That's different than the OPT department.  Correct?

22   A    Order processing, yes.  That's different.

23   Q    Had you used Diana in the past as backup?

24   A    Yes.

25   Q    Why use someone in a different department as

1      backup?

2   A  It's my understanding that Diana was brought back

3      into the department specifically to train at the

4      sales brokerage desk so I could move on.  So she

5      was trained thoroughly, and she was the most recent

6      person trained at my desk.

7   Q  Okay.  Let's break that up a little bit.  When you

8      say "so that you could move on," what does that

9      mean?

10  A  They wanted me to learn another desk -- the

11     non-ferrous desk was my next step.

12  Q  Do you recall when you were supposed to make that

13     move to the new desk?

14  A  No.  It had been brought up for the last couple

15     years, me training at that desk, but it just never

16     worked out because we couldn't find a consistent

17     backup for the sales brokerage desk.  So that's why

18     they brought Diana onboard, was to take over my

19     desk, so that I could eventually go to the

20     non-ferrous desk, because that's the last desk in

21     the department that I needed to learn.

22  Q  And that would have been a promotion to move to the

23     non-ferrous desk?

24  A  Yes.

25  Q  When was Diana trained on your desk?  Do you

1      recall?

2   A  No.  I don't remember when she was hired, but it

3      was when she was hired.

4   Q  That she was trained?  Okay.  So she was trained on

5      your desk, but was working in a different

6      department.  Is that a fair statement?

7   A  Yes.

8   Q  Okay.  And how often would you use Diana as backup?

9   A  I don't know.  It would be for, like, vacations.

10     You know, like, if I would go on vacation or have

11     more than a couple days off, they would call her

12     over and she would do my desk, but I don't recall

13     when I took vacations.

14  Q  When Diana would cover your desk, is that because

15     you would ask her to do it or would someone else

16     say "Tracy's going to be gone.  We need backup"?

17     Were you in charge of finding your backup or would

18     someone else do it?

19  A  Someone else would do it.

20  Q  Okay.  So you just know that it was her, but it's

21     not because you had asked her to be your backup.

22  A  Correct.

23  Q  Okay.  And I'm sure you said this, but what

24     department was Diana in?

25  A  Dispatch.

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 79 of 109  Document 32

1    Q    Dispatch?  I apologize.  Do you recall being told

2         in July of 2012 that dispatch was going to be going

3         through a reorganization?

4    A    No.

5    Q    Do you recall being told why you could no longer

6         use Diana as backup?

7    A    No.

8    Q    Did you ask why you could no longer use Diana?

9    A    No.

10   Q    Other than for vacation and things where you had

11        scheduled to be out, do you recall using Diana to

12        help you when you weren't able to get your tasks

13        completed?

14   A    No.

15   Q    At any point in time between February of 2012, when

16        you started working from home two days out of the

17        week, and July of 2012, did you ask Diana to

18        complete any of your tasks for you?

19   A    Not that I recall, unless it was, like, a

20        scheduled, you know, like I said, day off or

21        something.

22   Q    As part of your job responsibilities, were you

23        supporting the sales and marketing team when you

24        were at the sales brokerage desk?

25   A    What do you mean, "supporting" them?

1    Q    Were you doing the invoices for and entering the

2         orders and getting payments for the sales and

3         marketing teams?

4    A    That's more like the orders desk duties.  They're

5         the ones that took all their paperwork and inputted

6         it.  I processed the tickets that came from --

7    Q    And where did the tickets come from?

8    A    The scales or dispatch.

9    Q    So when you were on the sales brokerage desk -- And

10        it's your testimony, I believe, that you were on

11        the sales brokerage desk when you left the company

12        in July of 2012.  Correct?

13   A    Yes.

14   Q    Okay.  Did you interface with the sales and

15        marketing team?

16   A    Yes.  We all did.

17   Q    And what were you doing for the sales and marketing

18        team in July of 2012?

19   A    I didn't have any direct duties from them.

20   Q    Okay.  Your direct duties were from dispatch and

21        scales, you said?

22   A    From the scale, yeah.  I got my workload from the

23        dispatch and the scales.

24   Q    What were the work hours of the people in the

25        dispatch department?  If you know.

1   A   I don't know their hours.

2   Q   Do you know what the work hours were for the people

3       in the scales department in July of 2012?

4   A   No.

5   Q   So we've talked about your July 13 meeting.  Tell

6       me what you were told when you went in to the

7       July 13 meeting other than the bullet points that

8       we've gone through.  Were you told anything else?

9   A   In the meeting -- In the actual meeting, not the

10      phone call?

11  Q   Correct.  In the actual meeting.

12  A   No.  In the actual meeting, I was told that I

13      needed to be in the office Monday through Friday

14      and that my hours needed to change to 8 to 4 and

15      that my FMLA only would cover doctors' appointments

16      and therapy sessions and that they had to be

17      scheduled at the end of the day so as not to

18      interfere with work -- or to interfere the least

19      amount as possible with work.

20  Q   You were told that Miller could no longer

21      accommodate your request for a flexible schedule.

22      Correct?

23  A   Correct.

24  Q   And that Miller could no longer accommodate your

25      request to telecommute.  Correct?

1    A    I believe that was in the phone call.  That part --

2         that I was no longer able to work from home.  Is

3         that what "telecommute" means?

4    Q    Yes.  So you think you were just told that they

5         could no longer accommodate your flexible schedule

6         during the actual meeting?

7    A    Oh.  Yeah.  They told me I could no longer work

8         from home, that I had to be in the office Monday

9         through Friday, and that my hours had to be changed

10        from 7 to 3 to 8 to 4.

11   Q    And they told you that they could no longer

12        accommodate the flexible schedule because of the

13        financial strain on the company, or words to that

14        effect.  Correct?

15             MR. OLSON:  Object to form.

16   BY MS. LORENC:

17   Q    You can answer.

18             MR. OLSON:  You can answer.

19             THE WITNESS:  No.

20   BY MS. LORENC:

21   Q    They didn't tell you anything about what was going

22        on at the company financially during that July 13

23        meeting?

24   A    No.

25   Q    They didn't give you any explanation as to why

```
 1        these changes needed to be made to your schedule?
 2   A    They said I needed to work 8 to 4 to be in
 3        accordance to what everybody else in the company
 4        worked.  That's what their explanation was.
 5   Q    And they didn't give you any explanation as to why.
 6   A    No.
 7   Q    So you said that they did tell you that you would
 8        be able to continue to use FMLA leave to attend
 9        Evan's doctors' appointments and therapy sessions.
10        Correct?
11   A    Correct.
12   Q    And then I believe you testified that you were
13        upset about this conversation and that you
14        subsequently left the meeting.  Right?
15   A    Yes.
16   Q    During your phone call with Sarah after the meeting
17        but also on July 13, did she say to you you could
18        take the weekend and speak to your mother and
19        husband and figure out if that change in the
20        schedule would work for you?
21   A    Yes.
22   Q    I believe you said you then scheduled a time on
23        Monday, which I think would be July 16, to meet and
24        discuss your decision.  Correct?
25   A    Correct.
```

BROWN & JONES REPORTING, INC.
414-224-9533

```
1    Q    Do you recall when that meeting on the 16th took
2         place?
3    A    No.  I believe it was morning, but I'm not sure.
4    Q    Okay.  And who -- Tell me about that meeting.  Who
5         was in that meeting?
6    A    That meeting was with Sarah and Matt.
7    Q    The same people that you met with on the 13th.
8    A    Yes.
9    Q    Okay.  And what did you tell them when you got into
10        that meeting?
11   A    I told them that I did not have enough time or that
12        the weekend was not enough time for me to make all
13        the changes that they needed from me in order for
14        me to keep my job.
15   Q    Anything else?
16   A    There may be more.  It's in the interrogatories
17        that I already wrote up or that are filed.
18   Q    As we sit here today, do you remember saying
19        anything else during that July 16 meeting?
20   A    I just -- I think I restated that I didn't
21        understand how they could not -- how they could not
22        still allow my FMLA to be able to work from home
23        two days a week, and I remember asking Sarah how
24        we're going to deal with unemployment, since I'm
25        not agreeing that I'm -- that I'm not -- We're not
```

```
1              in agreement with how my employment is ending.

2      Q    Okay.  So before we get to the employment ending

3           part, how did you come to the conclusion that your

4           employment was ending?

5      A    Because they told me if I could not come in to work

6           Monday through Friday, that the first time I would

7           miss a day of work, that that would be considered a

8           voluntary quit.

9      Q    But you hadn't missed a day yet at this point, as

10          of July 16.  Right?  You were at work.  Correct?

11     A    I was at work for that meeting?

12     Q    Yeah.

13     A    Yes.

14     Q    All right.  So they told you that if you were to

15          miss a day, that that would be grounds for

16          termination, but you hadn't missed a day yet, and

17          yet you'd already come to the conclusion that your

18          employment was ending during that July 16 meeting.

19          Is that accurate?

20     A    Can you split that up?  You're asking like three

21          questions.

22     Q    Well, I'm trying to understand how you got to the

23          conclusion during the July 16 meeting that you were

24          no longer working at Miller, because you hadn't

25          been terminated.  You had come to work on July 16.
```

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 86 of 109  Document 32

1          Right?

2     A    I came for the meeting on July 16.

3     Q    Did you intend on working the rest of your day when

4          you came in to work on July 16?

5     A    No.  We had set up a meeting to discuss whether all

6          those changes could be made in order for me to

7          continue working.

8     Q    So when you went in to the meeting, you knew that

9          it wasn't going to work.  You weren't going to be

10         able to meet their demands, and your time at Miller

11         was going to be done.  Correct?

12              MR. OLSON:  Object to form.

13    BY MS. LORENC:

14    Q    You can answer.

15              MR. OLSON:  You can answer if you

16         understand it.

17              THE WITNESS:  Repeat the question,

18         please.

19              MS. LORENC:  Can you read it back,

20         please?

21              (Record read.)

22              THE WITNESS:  Can you rephrase that

23         question?

24    BY MS. LORENC:

25    Q    Tell me what your intention was going in to the

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 87 of 109  Document 32

1          July 16 meeting.

2     A    To tell them that I couldn't make all those changes

3          over the weekend.

4     Q    Did you intend, going in to that meeting, to

5          continue working at Miller Compressing?

6     A    I wanted to.

7     Q    But you wanted to keep your prior schedule.

8     A    Yes.

9     Q    Correct?

10    A    I asked Sarah what would happen if I would just --

11         if I could just continue working like that for a

12         little while longer until I could work something

13         out, and that's when she stated that the first time

14         that I would miss a day of work, they would

15         consider that a voluntary quit if I didn't have

16         daycare.

17    Q    Did you think about, before you went to that

18         meeting on July 16, if they said it was not an

19         option to continue working from home two days out

20         of the week, what that would mean for you?

21    A    Can you say that again, please?

22    Q    When you left -- Strike that.  On July 13, you were

23         told that you needed to be in the office five days

24         out of the week and that you needed to work from 8

25         to 4.  My understanding is, when you went in to the

1        meeting on July 16, you were effectively saying to

2        them "I can't do that.  I can't work in the office

3        five days out of the week, and I can't work from 8

4        do 4."  Is that a correct statement?

5   A    Yes.

6   Q    Okay.  So considering the employer, Miller, was

7        saying, "We need you to do Monday through Friday, 8

8        to 4," and you were saying, "No, I can't do that,"

9        what was your understanding of what was going to

10       happen?

11  A    That I had the weekend to try to find daycare for

12       Evan for five days a week and also change my hours.

13       That was my understanding, is that we were going to

14       discuss it on Monday then whether or not I could --

15       whether or not I found daycare for him.

16  Q    Okay.  I believe you already testified that you

17       didn't or you couldn't, so when you went to the

18       meeting on July 16, knowing that you weren't going

19       to be able to meet their requirements, what was

20       your understanding of what would occur?

21  A    That I'd be terminated because I couldn't come to

22       work.

23  Q    But you came to work that day.  So on -- In that

24       meeting, were you expecting to no longer work for

25       Miller after that conversation?

1    A     Yes.

2    Q     Do you recall being told either on July 13 or on

3          July 16 that if you could start working five days a

4          week and if you could work from 8 to 4, that they

5          wanted you to keep working at Miller Compressing?

6    A     Say it again.

7    Q     Do you remember being told either on July 13,

8          whether it was during your actual meeting or on the

9          phone with Sarah or during that July 16 meeting

10         that if you could meet their directive to work five

11         days out of the week and to work from 8 to 4, that

12         they wanted you to stay at Miller Compressing?

13   A     I don't recall that specifically being said, but

14         that's implied by them saying they wanted me to

15         come back to work five days a week.

16   Q     They didn't want to terminate you.  Correct?

17               MR. OLSON:  Object to form.

18   BY MS. LORENC:

19   Q     You can answer.

20               MR. OLSON:  You're asking what they

21         wanted?  Okay.  I object to form, calls for

22         speculation, state of mind of a third person.  You

23         can answer.

24               THE WITNESS:  No.  I don't know what they

25         wanted.

Case 2:14-cv-00367-NJ   Filed 03/11/15   Page 90 of 109   Document 32

1    BY MS. LORENC:

2    Q    It was your understanding that they didn't want to

3         terminate you.  They just wanted you to work in the

4         office five days out of the week.  That was your

5         understanding.  Correct?

6                   MR. OLSON:  Object to form.  Same

7         objection.  Calls for speculation.

8                   MS. LORENC:  I'm asking what her

9         understanding was.

10   BY MS. LORENC:

11   Q    You can answer.

12   A    My understanding was -- is that they were telling

13        me my FMLA did not cover me working from home and

14        that they were taking away my right to work from

15        home two days a week, forcing me to come in five

16        days a week.

17   Q    Because they wanted to retain you.  Correct?

18                  MR. OLSON:  Object to form.  Same

19        objection --

20   BY MS. LORENC:

21   Q    Well --

22                  MR. OLSON:  -- as to what they wanted.

23        That is -- goes to intent of a third person.  You

24        can answer if you know.

25                  THE WITNESS:  I don't know what they

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 91 of 109  Document 32

```
1              wanted.
2    BY MS. LORENC:
3    Q    When you had your meeting on July 13, they didn't
4         fire you.  Correct?
5    A    No.
6    Q    They said your job was changing and you needed to
7         be in the office five days out of the week.
8         Correct?
9    A    No.  They never said my job was changing.
10   Q    They said your job schedule was changing, and they
11        needed you in the office five days out of the week.
12        Correct?
13   A    Yes.
14   Q    At no point during that July 13 meeting did they
15        say "We are terminating you."  Right?
16             MR. OLSON:  Object to form.
17   BY MS. LORENC:
18   Q    You can answer.
19   A    No, they did not specifically say they were
20        terminating me.
21   Q    And on July 16, they didn't say "You are
22        terminated."  Did they?
23             MR. OLSON:  Object to form.
24   BY MS. LORENC:
25   Q    You can answer.
```

1    A    No, they did not specifically use those words that

2         they were terminating me.  They were -- It was

3         implied that if I did not come to work the rest of

4         the two days a week, that they did not have a job

5         for me.

6    Q    How did the July 16 meeting end?

7    A    July 16 -- That was the Monday?

8    Q    The Monday, yes.

9    A    It was a quick meeting -- very quick.  It ended

10        with us discussing how to go about unemployment.  I

11        didn't know -- I never lost a job before like that,

12        so I didn't know what to do.

13   Q    So you came in to the meeting and told them that

14        you weren't able to find child care for those two

15        days.  Did you tell them anything else?

16   A    I don't recall.  If I did, it's in the

17        interrogatories that have been submitted.

18   Q    Do you recall either Sarah or Matt saying anything

19        else to you during that July 16 meeting?

20   A    No.  I know that there's a written account of it in

21        the interrogatories, but I don't specifically -- I

22        remember going in there to tell them that I could

23        not change all those things they needed me to

24        change over the weekend.  I could not make all

25        those changes that quickly.

Case 2:14-cv-00367-NJ  Filed 03/12/15  Page 93 of 109  Document 32

1    Q    But you don't -- As you sit here at this moment,

2         you don't recall what either Sarah or Matt's

3         response was to that?

4    A    No, I do not.

5    Q    Do you recall anything else about that July 16

6         meeting?

7    A    Yes.  I recall asking how to apply for unemployment

8         and how we were going to work that out.

9    Q    And did they have a response?  Did either Sarah or

10        Matt have a response to that?

11   A    Yeah.  Sarah told me that Miller Compressing was

12        not going to contest the unemployment, and I said,

13        "Well, how do we word it?"  Because I wasn't -- I

14        didn't quit, and they weren't saying they were

15        firing me.  We had a disagreement.  I kept -- I

16        reasserted that I was not quitting, so I didn't

17        know what to write on it.

18   Q    Did she reassert that they were not firing you?

19   A    No.

20   Q    But she had -- It was clear to you that there was a

21        disagreement as to what was occurring at that time.

22   A    No.  I wasn't in disagreement.

23   Q    But you previously -- Well, strike that.  Anything

24        else you recall from that July 16 meeting?

25   A    Yes.  Sarah told me to write on the unemployment

1       form that Miller could no longer accommodate my

2       schedule or that my flexible schedule was no longer

3       being able to be accommodated.

4   Q   Okay.  Anything else?

5   A   Not that I recall, no.

6   Q   What other Miller employees had flexible hours or

7       were allowed to -- Well, strike that.  Let's just

8       start with flexible hours -- prior to or during

9       July 2012?

10   A   I don't know.

11   Q   Are you aware of any other Miller employees that

12       were allowed to work from home during July of 2012?

13   A   Yes.  There were -- Yes.

14   Q   Can you give me their names?

15   A   Within my department, Sue Hejdak and Kim Noonan

16       frequently took work home to get things done on the

17       weekend.

18   Q   Sue and Kim, did you say?

19   A   Um-hum.

20   Q   Yes?

21   A   Yes.

22   Q   So they were allowed to take work home, but they

23       worked in the office five days a week.  Correct?

24   A   Yes.

25   Q   And they worked from 8 to 4.  Correct?

Case 2:14-cv-00367-NJ   Filed 03/11/15   Page 95 of 109   Document 32

1    A    I don't know what their exact hours were.

2    Q    So when you say they were allowed to work from

3         home, that was in addition to working their normal

4         five days in the office.  Correct?

5    A    Yes.

6    Q    Are you aware of any Miller employees who had their

7         flexible hours revoked in July of 2012 other than

8         you?

9    A    No.

10   Q    But you weren't aware of who did have flexible

11        hours prior to July of 2012.  Correct?

12   A    No.  I'm not aware if anybody had flexible hours,

13        and if they did, I had no idea if they were revoked

14        or not.

15             MS. LORENC:  Okay.  I want to just take a

16        quick break to speak to my client, and then I think

17        we're almost done.

18             MR. OLSON:  Okay.

19             (A break was taken.)

20             MS. LORENC:  I don't think I have any

21        further questions.  Do you want to reserve for

22        signature?

23             MR. OLSON:  Yes.

24             MS. LORENC:  All right.  Thank you.

25             (Proceedings concluded at 12:41 p.m.)

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 96 of 109  Document 32

1     STATE OF WISCONSIN  )
                          ) SS:
2     COUNTY OF MILWAUKEE )

3

4

5              I, KARA D. SHAWHAN, a Certified Realtime

6     Reporter, Registered Merit Reporter and Notary Public in

7     and for the State of Wisconsin, do hereby certify that

8     the above deposition of TRACY L. WINK was recorded by me

9     on November 21, 2014, and reduced to writing under my

10    personal direction.

11             I further certify that I am not a

12    relative or employee or attorney or counsel of any of

13    the parties, or a relative or employee of such attorney

14    or counsel, or financially interested directly or

15    indirectly in this action.

16             In witness whereof I have hereunder set

17    my hand and affixed my seal of office at Milwaukee,

18    Wisconsin, this 25th day of November, 2014.

19

20

21             _____
                                Notary Public
22                   In and for the State of Wisconsin

23

24
      My Commission Expires:  August 29, 2017.
25

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 97 of 109  Document 32

1    STATE OF WISCONSIN  )
                         ) SS:
2    COUNTY OF MILWAUKEE )

3

4

5         I, TRACY L. WINK, do hereby certify that I

6    have read the foregoing transcript of proceedings, taken

7    on November 21, 2014, at Brown & Jones Reporting, Inc.,

8    735 North Water Street, Milwaukee, Wisconsin, and the

9    same is true and correct, except for the list of

10   corrections noted on the annexed page.

11

12        Dated at _____

13   this _____day of _____, 2014.

14

15

16                      _____

17                      TRACY L. WINK

18

19   Subscribed and sworn to before me
     this_____day of _____ 2014
20

21

22   _____
     Notary Public
23

24

     My Commission Expires:
25

Case 2:14-cv-00367-NJ  Filed 03/11/15  Page 98 of 109  Document 32

1                    C O R R E C T I O N S

2
      PAGE NO.    LINE NO.    DESCRIPTION
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'

**'95** [1] - 6:21
**'96** [1] - 7:25
**'97** [2] - 8:1, 8:11
**'99** [2] - 7:22, 8:11

**1**

**1** [4] - 2:16, 3:5, 11:18, 11:23
**10:26** [1] - 1:21
**11** [2] - 2:16, 54:16
**12** [1] - 35:2, 35:4
**12:41** [2] - 1:21, 96:25
**13** [28] - 5:9, 20:21, 43:22, 44:21, 45:4, 45:13, 46:11, 47:5, 47:16, 48:3, 48:15, 50:17, 50:23, 51:5, 51:15, 51:16, 51:18, 54:2, 65:19, 82:5, 82:7, 83:22, 84:17, 88:22, 90:2, 90:7, 92:3, 92:14
**13th** [1] - 85:7
**14-367** [1] - 1:8
**16** [20] - 84:23, 85:19, 86:10, 86:18, 86:23, 86:25, 87:2, 87:4, 88:1, 88:18, 89:1, 89:18, 90:3, 90:9, 92:21, 93:6, 93:7, 93:19, 94:5, 94:24
**16th** [1] - 85:1
**17** [2] - 2:17, 20:19
**18** [2] - 2:16, 11:24
**1996** [2] - 6:19, 6:20
**1997** [2] - 6:19, 6:23
**1999** [8] - 8:8, 10:14, 10:17, 13:16, 13:19, 14:1, 14:15, 27:3

**2**

**2** [2] - 2:17, 20:17
**20** [2] - 2:17, 47:22
**2000** [1] - 15:5
**2003** [1] - 36:4
**2005** [1] - 36:7
**2006** [2] - 36:11, 36:14
**2007** [7] - 11:13, 13:22, 19:15, 19:16, 32:11, 32:21, 36:17
**2007-2008** [1] - 11:1
**2008** [12] - 27:8, 27:12, 27:14, 27:17, 27:24, 28:4, 28:6,

34:25, 35:9, 35:25, 36:21, 36:25
**2010** [5] - 2:16, 11:24, 12:5, 12:16, 13:6
**2011** [8] - 2:17, 20:11, 20:15, 20:19, 20:21, 37:2, 37:23, 54:16
**2012** [60] - 14:17, 20:4, 22:19, 22:21, 23:13, 23:17, 25:4, 25:8, 25:10, 25:13, 25:18, 26:2, 26:23, 27:3, 28:6, 28:16, 28:19, 28:21, 28:25, 29:5, 29:9, 29:22, 29:25, 31:12, 32:13, 32:17, 38:5, 43:19, 43:24, 44:3, 44:13, 54:8, 55:4, 55:8, 55:16, 56:4, 57:24, 58:21, 60:16, 61:1, 61:2, 64:13, 64:14, 67:10, 68:5, 71:18, 75:6, 75:18, 77:19, 80:2, 80:15, 80:17, 81:12, 81:18, 82:3, 95:9, 95:12, 96:7, 96:11
**2014** [6] - 1:20, 97:9, 97:18, 98:7, 98:13, 98:19
**2017** [1] - 97:24
**21** [3] - 1:20, 97:9, 98:7
**25th** [1] - 97:18
**2880** [1] - 2:3
**29** [1] - 97:24

**3**

**3** [15] - 2:14, 2:17, 3:5, 11:9, 12:11, 13:9, 13:23, 24:8, 26:25, 39:19, 41:14, 46:6, 54:15, 55:16, 83:10
**34.79/month** [1] - 20:22
**37th** [1] - 2:6
**38** [2] - 5:1, 5:8
**3:00** [1] - 48:2

**4**

**4** [24] - 5:21, 5:25, 10:18, 12:12, 12:24, 13:7, 13:11, 13:20, 39:19, 41:15, 44:6, 46:6, 46:16, 46:22, 77:2, 82:14, 83:10, 84:2, 88:25, 89:4, 89:8, 90:4, 90:11, 95:25

**5**

**53151-3744** [1] - 2:3
**538** [1] - 54:21
**54** [1] - 2:18
**55** [1] - 2:6

**6**

**60603** [1] - 2:6

**7**

**7** [10] - 11:9, 12:11, 13:9, 13:23, 24:8, 26:24, 39:19, 41:14, 46:6, 83:10
**7-3** [1] - 12:17
**735** [2] - 1:19, 98:8

**8**

**8** [24] - 5:21, 5:25, 10:18, 12:12, 12:24, 13:6, 13:11, 13:20, 39:19, 41:14, 44:6, 46:6, 46:16, 46:22, 77:1, 82:14, 83:10, 84:2, 88:24, 89:3, 89:7, 90:4, 90:11, 95:25
**8-to-4** [1] - 12:21

**9**

**9** [1] - 24:19

**A**

**a.m** [4] - 1:21, 5:21, 5:25, 24:19
**aback** [1] - 50:4
**ability** [4] - 20:11, 23:12, 25:12, 38:7
**able** [32] - 5:10, 12:21, 21:3, 23:1, 23:6, 23:8, 23:23, 25:22, 26:1, 26:15, 26:16, 38:1, 40:15, 42:22, 44:5, 55:25, 60:1, 60:19, 60:23, 61:20, 74:20, 76:17, 76:19, 80:12, 83:2, 84:8, 85:22, 87:10, 89:19, 93:14, 95:3
**abruptly** [1] - 67:1
**absolutely** [1] - 64:23
**accept** [1] - 51:14
**accommodate** [6] - 4:15, 82:21, 82:24, 83:5, 83:12, 95:1
**accommodated** [1] - 95:3
**accordance** [3] - 46:9, 46:21, 84:3

**according** [4] - 8:7, 10:12, 29:18, 62:21
**account** [1] - 93:20
**accounting** [2] - 6:25, 7:9
**accounts** [2] - 7:9, 15:11
**accurate** [2] - 66:2, 86:19
**action** [1] - 97:15
**actual** [6] - 47:11, 82:9, 82:11, 82:12, 83:6, 90:8
**added** [1] - 22:11
**addition** [2] - 33:14, 96:3
**additional** [4] - 26:24, 32:18, 32:22, 35:18
**adhere** [1] - 62:23
**admission** [1] - 5:1
**admit** [2] - 5:8, 36:3
**advantage** [1] - 21:21
**advice** [1] - 42:16
**affixed** [1] - 97:17
**afloat** [1] - 30:6
**after-hours** [2] - 75:17, 76:20
**age** [1] - 16:25
**agents** [1] - 16:22
**ago** [2] - 3:10, 6:16
**agreed** [1] - 35:8
**agreeing** [1] - 85:25
**agreement** [1] - 86:1
**ahead** [2] - 40:9, 71:14
**ALAN** [2] - 2:2, 2:2
**allow** [1] - 85:22
**allowed** [8] - 28:13, 70:5, 70:10, 73:16, 95:7, 95:12, 95:22, 96:2
**allowing** [1] - 39:10
**almost** [1] - 96:17
**altered** [1] - 13:23
**amount** [2] - 19:11, 82:19
**animal** [1] - 9:15
**annexed** [1] - 98:10
**answer** [29] - 3:25, 4:5, 13:3, 24:25, 28:13, 38:23, 39:9, 39:15, 39:23, 45:5, 45:8, 52:10, 53:6, 55:11, 55:21, 60:25, 71:14, 75:9, 77:10, 83:17, 83:18, 87:14, 87:15, 90:19, 90:23, 91:11, 91:24, 92:18, 92:25

**answered** [3] - 52:9, 53:4, 62:3
**answers** [1] - 36:3
**anyplace** [1] - 9:9
**anyway** [1] - 76:15
**apart** [1] - 35:16
**apologize** [2] - 42:3, 80:1
**apparent** [1] - 5:5
**appeared** [2] - 2:4, 2:7
**apply** [1] - 94:7
**appointment** [1] - 37:16
**appointments** [14] - 37:3, 37:7, 37:8, 37:10, 37:11, 38:2, 40:13, 40:16, 41:21, 56:13, 59:13, 66:1, 82:15, 84:9
**appreciate** [2] - 4:11, 32:10
**approved** [11] - 24:9, 36:4, 36:7, 36:11, 36:14, 36:17, 36:21, 36:24, 38:10, 38:11, 49:10
**approximation** [2] - 15:1, 63:24
**aside** [1] - 29:25
**assigned** [1] - 72:2
**assistance** [1] - 73:7
**ASSOCIATES** [1] - 2:2
**assume** [2] - 4:19, 24:18
**assuming** [1] - 16:11
**Attached** [1] - 2:21
**attend** [3] - 23:24, 37:7, 84:8
**attention** [1] - 12:7
**attorney** [3] - 11:19, 97:12, 97:13
**audible** [1] - 4:10
**August** [1] - 97:24
**autism** [2] - 58:11, 58:20
**available** [1] - 29:19
**aware** [12] - 27:14, 28:6, 28:14, 28:16, 28:20, 28:21, 42:4, 55:7, 95:11, 96:6, 96:10, 96:12

**B**

**backup** [18] - 42:21, 42:25, 43:1, 74:14, 74:20, 75:2, 75:11, 75:15, 76:21, 77:5, 77:23, 78:1,

78:17, 79:8, 79:16, 79:17, 79:21, 80:6
**backups** [1] - 42:22
**BARBIAN** [1] - 77:17
**Barbian** [5] - 2:9, 5:9, 5:13, 12:3, 45:16
**based** [6] - 12:16, 16:25, 17:17, 18:1, 36:3, 61:16
**basis** [2] - 71:19, 72:7
**Bates** [1] - 54:20
**bathroom** [1] - 64:22
**begun** [1] - 20:20
**behalf** [2] - 2:4, 2:7
**belief** [3] - 73:22, 74:1, 74:2
**Berlin** [1] - 2:3
**best** [1] - 4:4
**between** [7] - 11:24, 16:4, 16:21, 17:18, 17:20, 28:6, 80:15
**beyond** [1] - 54:2
**big** [1] - 35:20, 62:22
**bit** [6] - 8:10, 26:3, 30:13, 65:3, 72:9, 78:7
**Bob** [1] - 29:14
**boss** [7] - 35:7, 42:8, 72:12, 72:15, 72:20, 73:17, 73:19
**bother** [2] - 52:19, 53:2
**bought** [2] - 28:17, 28:20
**break** [14] - 4:13, 4:15, 12:12, 12:25, 13:12, 35:23, 40:6, 41:19, 55:2, 64:22, 64:24, 78:7, 96:16, 96:19
**breaking** [2] - 30:9, 31:8
**bring** [1] - 5:14
**broad** [1] - 38:20
**brokerage** [25] - 16:5, 17:14, 18:8, 18:13, 18:15, 19:4, 19:9, 19:14, 19:18, 19:22, 20:3, 31:22, 32:3, 32:16, 33:1, 33:17, 35:20, 67:21, 67:24, 68:3, 78:4, 78:17, 80:24, 81:9, 81:11
**brought** [3] - 78:2, 78:14, 78:18
**Brown** [2] - 1:19,

98:7
**bullet** [4] - 47:10, 47:12, 72:9, 82:7
**Busby** [9] - 55:24, 56:6, 56:10, 56:19, 60:15, 61:1, 65:5, 70:23, 71:3
**business** [5] - 12:25, 21:15, 21:23, 29:17, 77:6
**BY** [35] - 3:7, 6:4, 13:5, 13:18, 24:24, 28:12, 39:2, 39:8, 39:17, 39:24, 40:11, 41:5, 45:10, 52:14, 53:5, 55:6, 55:10, 55:20, 64:25, 71:16, 75:5, 75:8, 77:9, 77:18, 83:16, 83:20, 87:13, 87:24, 90:18, 91:1, 91:10, 91:20, 92:2, 92:17, 92:24

## C

**Cable** [2] - 21:13, 21:15
**calculating** [2] - 15:11, 16:24
**caller** [1] - 61:22
**capacity** [1] - 61:25
**care** [13] - 9:15, 23:1, 24:1, 24:4, 25:19, 26:1, 26:10, 39:10, 40:15, 41:9, 43:11, 49:6, 93:14
**cared** [3] - 24:5, 24:6, 24:12
**caring** [1] - 64:2
**Case** [1] - 1:8
**case** [1] - 64:19
**catching** [1] - 75:15
**cell** [31] - 54:16, 54:23, 55:13, 55:17, 55:25, 56:12, 56:24, 57:13, 57:15, 58:1, 60:4, 60:5, 60:6, 60:9, 60:10, 60:14, 60:17, 60:20, 60:22, 62:12, 62:21, 62:24, 63:3, 63:10, 63:13, 63:16, 63:17, 65:3, 65:4, 65:5
**Cell** [1] - 2:17
**center** [1] - 70:25
**certain** [1] - 30:25
**Certified** [2] - 1:17, 97:5
**certify** [3] - 97:7, 97:11, 98:5
**chain** [1] - 20:23
**chance** [1] - 35:21
**change** [19] -

10:21, 11:4, 11:6, 11:8, 11:10, 14:17, 14:20, 25:14, 34:2, 34:9, 46:6, 49:20, 52:13, 70:20, 82:14, 84:19, 89:12, 93:23, 93:24
**change-in-hours** [1] - 11:10
**changed** [6] - 10:19, 10:23, 24:9, 33:19, 41:14, 83:9
**changes** [14] - 11:15, 48:18, 49:4, 49:21, 50:18, 51:8, 69:9, 69:15, 70:19, 84:1, 85:13, 87:6, 88:2, 93:25
**changing** [6] - 33:7, 33:23, 39:19, 92:6, 92:9, 92:10
**charge** [1] - 79:17
**charged** [1] - 32:23
**charges** [4] - 8:23, 8:25, 9:4, 14:9
**check** [1] - 14:11
**checked** [1] - 58:11
**checks** [3] - 14:12, 15:13, 18:19
**chemotherapy** [1] - 36:12
**Chicago** [1] - 2:6
**child** [7] - 12:20, 24:1, 25:19, 26:1, 26:10, 37:21, 93:14
**children** [7] - 37:13, 49:11, 52:15, 52:18, 52:24, 53:12, 54:4
**children's** [3] - 37:8, 37:12, 70:25
**chronology** [1] - 7:24
**Civil** [1] - 1:16
**claim** [5] - 9:6, 9:20, 10:1, 10:7, 10:10
**claims** [1] - 9:4
**class** [1] - 21:15
**cleaned** [1] - 7:19
**clear** [2] - 45:11, 94:20
**cleared** [1] - 55:24
**clearing** [1] - 47:14
**clerk** [1] - 6:14
**client** [1] - 96:16
**clinics** [1] - 59:5
**close** [1] - 31:17
**closer** [1] - 12:12
**co** [9] - 70:7, 70:11,

70:21, 71:7, 71:8, 71:15, 71:17, 71:21, 72:2
**co-workers** [9] - 70:7, 70:11, 70:21, 71:7, 71:8, 71:15, 71:17, 71:21, 72:2
**COBURN** [1] - 2:5
**coming** [2] - 13:9, 46:2, 65:12
**commencing** [1] - 1:20
**comment** [5] - 50:3, 52:8, 52:15, 66:5, 74:16
**comments** [3] - 53:18, 53:23, 54:11
**Commission** [2] - 97:24, 98:24
**communicated** [1] - 51:25
**communication** [1] - 57:2
**comp** [1] - 9:6
**companies** [1] - 9:8
**company** [36] - 6:15, 6:24, 7:5, 14:18, 20:4, 21:14, 21:20, 27:4, 28:17, 29:1, 29:10, 29:21, 30:1, 30:5, 30:9, 30:10, 30:12, 30:18, 31:15, 31:19, 31:22, 32:13, 32:17, 34:8, 38:12, 44:10, 45:22, 46:1, 46:3, 46:22, 56:20, 62:24, 81:11, 83:13, 83:22, 84:3
**COMPANY** [1] - 1:9
**Company** [1] - 6:15
**company's** [1] - 30:3
**complain** [4] - 53:8, 53:13, 53:22, 54:1
**complaining** [1] - 65:15
**complaint** [1] - 54:3
**complaints** [2] - 65:19, 68:23
**complete** [6] - 35:13, 74:6, 75:19, 76:4, 76:18, 80:18
**completed** [1] - 80:13
**completing** [1] - 76:8
**compressing** [1] - 8:20
**COMPRESSING** [1] - 1:9

**Compressing** [24] - 5:11, 6:11, 9:10, 10:9, 10:13, 10:17, 13:1, 20:9, 21:14, 27:2, 28:17, 38:18, 39:4, 39:25, 40:8, 40:20, 41:1, 53:8, 54:8, 71:4, 88:5, 90:5, 90:12, 94:11
**concluded** [1] - 96:25
**concluding** [1] - 1:21
**conclusion** [5] - 39:15, 39:22, 86:3, 86:17, 86:23
**conference** [1] - 45:2
**confirmed** [1] - 20:20
**confused** [2] - 23:10, 47:10
**confusing** [1] - 30:21
**consider** [1] - 88:15
**considered** [3] - 50:13, 51:2, 86:7
**considering** [1] - 89:6
**consistent** [3] - 25:6, 25:10, 78:16
**consuming** [3] - 64:15, 64:17, 64:20
**contact** [1] - 54:12
**content** [1] - 5:5
**contest** [1] - 94:12
**continue** [5] - 84:8, 87:7, 88:5, 88:11, 88:19
**contracts** [1] - 16:21
**conversation** [9] - 49:3, 56:8, 56:10, 56:16, 57:7, 70:24, 76:22, 84:13, 89:25
**conversationally** [1] - 4:2
**conversations** [1] - 3:24
**conveyed** [4] - 44:23, 46:12, 46:19, 57:3
**copies** [1] - 18:18
**copy** [2] - 11:18, 11:20
**correct** [102] - 10:14, 10:19, 11:25, 12:17, 12:22, 13:16, 13:20, 13:23, 20:12, 20:13, 24:10, 31:23, 35:4, 36:1, 36:5, 36:6, 36:9, 36:10,

Case 2:14-cv-00367-NJ   Filed 03/11/15   Page 101 of 109   Document 32

36:13, 36:15, 36:16, 36:18, 36:19, 36:22, 36:23, 36:25, 37:1, 38:8, 38:12, 38:15, 41:10, 41:13, 41:15, 41:18, 41:22, 41:23, 42:1, 43:15, 43:24, 45:13, 45:19, 45:24, 48:4, 54:18, 55:8, 55:18, 57:4, 58:21, 60:11, 60:17, 60:22, 61:6, 61:9, 63:5, 63:6, 66:23, 67:2, 67:7, 67:8, 67:21, 67:24, 70:22, 71:6, 72:13, 72:14, 73:7, 73:8, 74:25, 75:1, 75:3, 76:24, 77:2, 77:3, 77:7, 77:11, 77:21, 79:22, 81:12, 82:11, 82:22, 82:23, 82:25, 83:14, 84:10, 84:11, 84:24, 84:25, 86:10, 87:11, 88:9, 89:4, 90:16, 91:5, 91:17, 92:4, 92:8, 92:12, 95:23, 95:25, 96:4, 96:11, 98:9

**corrected** [1] - 42:3
**corrections** [1] - 98:10
**correctly** [4] - 7:24, 16:24, 48:3, 74:10
**cost** [1] - 15:12
**counsel** [2] - 97:12, 97:14
**COUNTY** [2] - 97:2, 98:2
**couple** [13] - 7:23, 8:4, 8:5, 16:3, 17:20, 26:12, 26:14, 26:20, 26:23, 58:13, 58:14, 78:14, 79:11
**course** [1] - 24:22
**COURT** [1] - 1:1
**court** [1] - 3:21
**cover** [6] - 37:3, 44:4, 69:23, 79:14, 82:15, 91:13
**coverage** [2] - 44:4, 49:5
**covered** [5] - 40:13, 40:17, 41:21, 65:25, 69:24
**crash** [1] - 27:25
**crashed** [1] - 27:8
**cross** [2] - 18:3, 19:23
**cross-trained** [1] - 19:23
**cross-training** [1] - 18:3
**cubicles** [1] - 68:11

**curious** [2] - 70:9, 75:25
**current** [1] - 18:7
**customer** [3] - 19:1, 46:23, 46:25
**customer's** [1] - 18:18
**customers** [9] - 14:13, 15:14, 16:22, 17:4, 18:12, 18:14, 18:17, 18:21, 46:16

## D

**D000537** [1] - 54:21
**daily** [1] - 18:12
**date** [2] - 44:21, 71:24
**Dated** [1] - 98:12
**dated** [2] - 11:24, 54:15
**daycare** [12] - 22:22, 23:24, 24:2, 49:11, 52:16, 52:18, 52:23, 53:12, 54:5, 88:16, 89:11, 89:15
**days** [50] - 24:3, 24:4, 24:6, 24:12, 25:2, 25:7, 25:23, 26:2, 26:4, 26:10, 26:16, 26:18, 26:21, 38:7, 42:12, 42:19, 43:13, 43:17, 43:21, 44:1, 44:15, 45:18, 49:6, 64:2, 64:5, 72:23, 73:3, 73:6, 76:23, 77:7, 79:11, 80:16, 85:23, 88:19, 88:23, 89:3, 89:12, 90:3, 90:11, 90:15, 91:4, 91:15, 91:16, 92:7, 92:11, 93:4, 93:15, 95:23, 96:4
**deal** [6] - 21:20, 21:22, 36:8, 62:20, 62:22, 85:24
**dealing** [1] - 62:10
**dealt** [5] - 30:15, 30:16, 30:19, 30:22, 30:25
**December** [1] - 14:16
**decision** [4] - 50:16, 50:21, 51:13, 84:24
**dedicated** [1] - 60:6
**deduct** [1] - 21:17
**Defendant** [3] - 1:11, 1:15, 2:7
**defendant** [1] - 6:8
**defendant's** [1] - 5:1
**deleted** [1] - 5:5

**deletes** [1] - 5:4
**demands** [1] - 87:10
**deny** [1] - 5:13
**department** [40] - 14:2, 17:18, 17:23, 30:16, 30:22, 32:4, 32:14, 32:21, 32:24, 34:2, 34:4, 34:8, 34:15, 35:11, 35:21, 42:25, 44:17, 57:17, 67:9, 67:13, 67:18, 67:24, 67:25, 68:7, 68:8, 71:8, 71:18, 71:22, 72:3, 76:4, 77:19, 77:21, 77:25, 78:3, 78:21, 79:6, 79:24, 81:25, 82:3, 95:15
**departments** [1] - 19:24
**departure** [1] - 27:3
**depended** [1] - 31:2
**depo** [1] - 5:3
**deposition** [3] - 3:12, 3:15, 97:8
**DESCRIPTION** [1] - 99:2
**desk** [89] - 14:4, 14:22, 14:23, 15:8, 15:16, 15:21, 15:22, 15:23, 16:1, 16:2, 16:4, 16:5, 16:6, 16:9, 16:13, 16:20, 17:5, 17:7, 17:14, 17:16, 17:19, 18:4, 18:5, 18:8, 18:20, 18:21, 19:4, 19:5, 19:10, 19:14, 19:18, 19:22, 19:24, 20:3, 30:15, 30:17, 30:18, 31:1, 31:22, 32:3, 32:16, 32:25, 33:1, 33:4, 33:17, 33:24, 34:3, 34:10, 34:14, 35:17, 35:20, 42:9, 42:24, 54:25, 67:21, 68:3, 68:5, 68:6, 68:10, 72:12, 72:16, 72:20, 73:2, 73:7, 73:17, 73:23, 78:4, 78:6, 78:10, 78:11, 78:13, 78:15, 78:17, 78:19, 78:20, 78:23, 78:25, 79:5, 79:12, 79:14, 80:24, 81:4, 81:9, 81:11
**desks** [8] - 15:18, 17:11, 17:20, 17:21, 30:25, 68:11, 72:2, 72:3
**diagnosed** [1] - 58:20

**diagnosis** [1] - 23:4
**Diana** [16] - 42:25, 43:3, 74:15, 74:22, 77:19, 77:23, 78:2, 78:18, 78:25, 79:8, 79:14, 79:24, 80:6, 80:8, 80:11, 80:17
**Diana's** [1] - 77:13
**died** [1] - 29:14
**different** [10] - 6:24, 7:13, 33:13, 59:1, 59:9, 62:19, 77:21, 77:22, 77:25, 79:5
**difficult** [2] - 3:23, 59:6
**difficulties** [1] - 30:2
**direct** [4] - 56:21, 56:23, 81:19, 81:20
**direction** [1] - 97:10
**directive** [1] - 90:10
**directly** [5] - 9:13, 51:25, 52:5, 52:6, 97:14
**disability** [5] - 22:25, 23:21, 23:22, 23:25, 52:23
**disabled** [4] - 39:11, 41:10, 43:12, 52:24
**disagreement** [3] - 94:15, 94:21, 94:22
**disc** [1] - 36:18
**discuss** [14] - 40:23, 41:24, 48:11, 49:22, 66:23, 67:6, 68:13, 68:18, 68:20, 69:7, 70:15, 84:24, 87:5, 89:14
**discussed** [2] - 48:17, 71:1
**discussing** [3] - 19:19, 69:3, 93:10
**discussion** [1] - 68:14
**dispatch** [8] - 77:20, 79:25, 80:1, 80:2, 81:8, 81:20, 81:23, 81:25
**Disposition** [1] - 2:20
**disruptive** [1] - 69:2
**DISTRICT** [2] - 1:1, 1:2
**DIVISION** [1] - 1:3
**doctor** [7] - 49:14, 50:1, 52:3, 53:9, 53:10, 60:23, 62:13

**doctor's** [7] - 49:14, 52:4, 53:11, 54:4, 59:15, 61:14, 62:7
**doctors** [8] - 49:9, 58:10, 58:24, 59:1, 59:10, 60:25, 61:3, 62:4
**doctors'** [8] - 37:11, 38:2, 56:2, 59:4, 60:6, 61:17, 82:15, 84:9
**document** [1] - 55:16
**done** [11] - 23:18, 23:20, 28:2, 39:6, 42:17, 66:13, 69:11, 75:24, 87:11, 95:16, 96:17
**down** [8] - 3:22, 4:8, 5:17, 45:1, 48:12, 48:20, 57:19, 58:18
**drive** [1] - 26:6
**drivers** [1] - 55:1
**Driving** [1] - 2:17
**driving** [3] - 54:17, 55:14, 55:17
**drop** [1] - 24:18
**due** [4] - 17:23, 23:24, 36:17, 36:21
**duly** [1] - 3:3
**during** [56] - 5:8, 12:11, 12:12, 12:24, 13:7, 13:11, 20:8, 27:2, 35:25, 40:5, 41:19, 41:20, 41:25, 44:13, 45:17, 45:21, 46:11, 47:5, 47:15, 48:17, 48:21, 49:2, 51:24, 54:24, 56:12, 61:3, 61:8, 61:11, 62:12, 62:17, 63:2, 63:10, 63:12, 63:25, 65:18, 66:4, 66:5, 68:14, 69:18, 69:21, 73:9, 73:11, 74:16, 77:6, 83:6, 83:22, 84:16, 85:19, 86:18, 86:23, 90:8, 90:9, 92:14, 93:19, 95:8, 95:12
**duties** [12] - 14:10, 15:12, 17:1, 17:2, 18:7, 18:17, 18:20, 33:6, 35:18, 81:4, 81:19, 81:20

## E

**e-mail** [6] - 11:20, 11:23, 12:8, 20:19, 20:23, 20:25
**E-Mail**...................

[1] - 2:17
**E-Mail**..................
.... [1] - 2:16
**e-mailing** [1] - 12:5
**early** [5] - 15:5, 35:5, 35:6, 35:8, 58:10
**easier** [1] - 33:22
**East** [1] - 2:6
**EASTERN** [1] - 1:2
**effect** [8] - 5:13, 52:22, 52:24, 53:10, 55:4, 55:7, 55:18, 83:14
**effectively** [1] - 89:1
**efficient** [2] - 33:11, 33:12
**eight** [1] - 28:7
**either** [7] - 45:25, 57:18, 90:2, 90:7, 93:18, 94:2, 94:9
**eldest** [1] - 10:23
**eliminating** [1] - 42:25
**emotional** [1] - 66:14
**employed** [1] - 54:7
**employee** [2] - 97:12, 97:13
**employee's** [1] - 54:25
**employees** [12] - 40:24, 41:25, 54:24, 67:6, 68:13, 68:21, 69:4, 69:7, 70:4, 95:6, 95:11, 96:6
**employer** [1] - 89:6
**employment** [7] - 8:22, 8:25, 9:4, 86:1, 86:2, 86:4, 86:18
**employment-related** [3] - 8:22, 8:25, 9:4
**end** [17] - 34:12, 45:2, 50:12, 50:17, 50:21, 50:22, 51:2, 51:5, 51:11, 51:15, 51:16, 51:17, 58:3, 66:11, 67:1, 82:17, 93:6
**ended** [3] - 26:5, 59:25, 93:9
**ending** [4] - 86:1, 86:2, 86:4, 86:18
**entail** [1] - 24:13
**enter** [1] - 18:14
**entering** [2] - 16:21, 81:1
**entire** [3] - 21:14, 21:20, 33:18

**entitled** [2] - 54:16, 55:17
**evaluate** [2] - 59:16, 61:5
**evaluated** [3] - 37:20, 58:12, 58:25
**evaluation** [4] - 59:17, 61:15, 62:5, 62:14
**evaluations** [5] - 37:11, 37:24, 56:14, 59:18
**Evan** [40] - 37:19, 37:21, 37:23, 40:5, 40:14, 40:23, 41:18, 41:24, 47:5, 47:17, 48:23, 49:6, 51:22, 61:6, 62:5, 62:14, 63:12, 63:16, 63:18, 63:25, 64:5, 65:3, 65:6, 67:6, 68:13, 68:18, 68:20, 69:7, 70:5, 70:6, 70:11, 70:15, 70:21, 70:25, 71:9, 71:19, 71:23, 72:4, 72:6, 89:12
**Evan's** [2] - 41:21, 84:9
**eventually** [1] - 78:19
**everyday** [1] - 60:11
**exact** [3] - 19:11, 56:7, 96:1
**exactly** [1] - 4:2
**Examination** [2] - 1:14, 2:13
**EXAMINATION** [1] - 3:6
**examined** [1] - 3:4
**example** [1] - 35:17
**except** [2] - 55:1, 98:9
**exception** [18] - 55:22, 55:23, 56:6, 56:9, 56:24, 57:12, 57:14, 57:20, 57:25, 58:3, 58:6, 60:4, 60:13, 60:14, 60:20, 61:2, 65:4
**excessive** [2] - 65:15, 65:20
**excuse** [3] - 14:16, 64:13, 76:4
**exercising** [2] - 22:25, 23:2
**Exhibit** [5] - 11:18, 11:23, 20:17, 54:15, 55:16
**exhibit** [1] - 3:5
**Exhibit/s** [1] - 2:20
**Exhibits** [1] - 2:15
**expected** [4] - 33:8,

43:16, 76:23, 77:1
**expecting** [1] - 89:24
**Expires** [2] - 97:24, 98:24
**explain** [5] - 46:7, 48:21, 48:24, 56:5, 59:11
**explained** [1] - 5:9
**explanation** [4] - 47:9, 83:25, 84:4, 84:5
**extent** [2] - 39:14, 39:22

## F

**facilities** [1] - 59:9
**fair** [3] - 38:3, 60:2, 79:6
**fairly** [1] - 64:14
**family** [4] - 7:17, 7:18, 29:14, 29:16
**far** [2] - 34:12, 41:4
**February** [18] - 22:17, 22:21, 23:13, 23:17, 25:4, 25:13, 25:18, 36:4, 38:5, 43:24, 56:4, 57:23, 58:20, 59:3, 60:16, 61:1, 64:13, 80:15
**Federal** [1] - 1:16
**fee** [1] - 21:19
**felt** [2] - 62:22, 63:8
**ferrous** [13] - 30:5, 30:8, 30:9, 30:10, 30:18, 30:19, 31:7, 31:9, 78:11, 78:20, 78:23
**few** [3] - 7:11, 26:14, 27:25
**figure** [3] - 22:2, 50:14, 84:19
**figured** [1] - 50:9
**file** [7] - 8:22, 8:25, 9:3, 9:6, 9:19, 9:25, 10:7
**filed** [5] - 6:5, 10:10, 38:17, 39:3, 85:17
**filing** [4] - 14:10, 15:13, 17:2, 18:18
**fill** [1] - 35:2
**financial** [8] - 5:12, 5:14, 28:25, 30:1, 30:4, 44:10, 46:1, 83:13
**financially** [2] - 83:22, 97:14
**fine** [4] - 3:17, 45:5, 45:8, 56:14
**finish** [3] - 4:3, 4:5, 4:14
**finished** [1] - 66:21

**fire** [1] - 92:4
**fired** [1] - 34:19
**firing** [2] - 94:15, 94:18
**first** [19] - 3:3, 12:7, 12:10, 14:20, 16:6, 25:3, 32:2, 32:5, 32:16, 34:21, 37:21, 42:15, 54:21, 57:2, 57:6, 63:14, 74:15, 86:6, 88:13
**five** [25] - 19:13, 26:20, 31:25, 33:8, 33:18, 33:24, 34:2, 43:16, 44:1, 44:15, 45:18, 76:23, 77:7, 88:23, 89:3, 89:12, 90:3, 90:10, 90:15, 91:4, 91:15, 92:7, 92:11, 95:23, 96:4
**five-year** [1] - 33:18
**fixed** [1] - 5:2
**flexible** [10] - 5:11, 82:21, 83:5, 83:12, 95:2, 95:6, 95:8, 96:7, 96:10, 96:12
**flip** [1] - 17:17
**flipped** [1] - 17:19
**Floor** [1] - 2:6
**FMLA** [43] - 23:1, 23:3, 35:3, 35:24, 36:1, 36:4, 36:7, 36:11, 36:14, 36:17, 36:21, 36:24, 37:2, 38:1, 38:10, 39:5, 39:12, 40:1, 40:7, 40:13, 40:19, 40:25, 41:20, 43:9, 44:4, 47:2, 49:5, 49:10, 63:8, 65:24, 65:25, 67:5, 69:22, 70:2, 72:11, 72:16, 72:21, 73:6, 74:9, 82:15, 84:8, 85:22, 91:13
**FMLA-approved** [8] - 36:4, 36:7, 36:11, 36:14, 36:17, 36:21, 36:24, 38:10
**focus** [1] - 12:7
**focused** [1] - 65:3
**follow** [1] - 12:9
**follow-up** [1] - 12:9
**following** [1] - 10:6
**follows** [1] - 3:4
**foot** [1] - 36:15
**force** [6] - 27:4, 27:15, 28:7, 28:22, 44:13, 45:23
**forcing** [1] - 91:15
**foregoing** [1] - 98:6
**form** [24] - 13:2, 13:17, 24:23, 28:11, 38:19, 39:7, 39:14,

39:21, 55:5, 55:9, 55:19, 71:10, 75:4, 75:7, 77:8, 83:15, 87:12, 90:17, 90:21, 91:6, 91:18, 92:16, 92:23, 95:1
**formal** [1] - 25:13
**formerly** [1] - 12:4
**forms** [2] - 25:19, 33:19
**forth** [2] - 16:3, 17:19
**forward** [1] - 6:13
**four** [3] - 20:6, 59:8, 59:16
**four-year-old** [2] - 59:8, 59:16
**frame** [1] - 50:25
**freight** [2] - 14:9, 15:12
**frequently** [5] - 64:11, 68:24, 72:4, 76:2, 95:16
**Friday** [9] - 5:20, 44:6, 48:3, 50:23, 51:5, 82:13, 83:9, 86:6, 89:7
**full** [1] - 35:4

## G

**general** [2] - 42:11, 69:16
**generally** [1] - 46:19
**gestures** [1] - 4:8
**given** [5] - 3:15, 44:22, 47:9, 58:1, 74:25
**graduate** [1] - 6:20
**granted** [2] - 57:14, 61:2
**ground** [1] - 3:21
**grounds** [1] - 86:15
**group** [1] - 45:11
**guess** [4] - 32:7, 32:8, 32:12, 74:4
**guessing** [1] - 64:8
**guys** [2] - 27:21, 67:18

## H

**hand** [1] - 97:17
**handling** [1] - 32:23
**hang** [1] - 42:7
**happy** [1] - 4:15
**hauled** [1] - 15:9
**hauler** [1] - 18:15
**hauling** [1] - 14:9
**head** [1] - 41:11
**hear** [5] - 29:2, 29:4, 50:11, 50:14,

51:7
**heard** [3] - 4:20, 28:24, 29:10
**hearing** [2] - 29:8, 42:5
**Hejdak** [1] - 95:15
**held** [2] - 20:8, 30:3
**help** [26] - 18:1, 19:25, 20:17, 21:2, 23:7, 25:17, 26:15, 26:17, 26:24, 35:5, 42:8, 72:12, 72:15, 72:20, 73:1, 73:5, 73:23, 74:24, 75:2, 75:11, 75:14, 75:18, 76:3, 76:4, 76:8, 80:12
**hereby** [2] - 97:7, 98:5
**herein** [1] - 3:3
**hereunder** [1] - 97:16
**herniated** [1] - 36:18
**high** [4] - 6:12, 6:20, 9:9, 9:13
**hire** [1] - 34:6
**hired** [14] - 8:7, 10:13, 10:16, 13:16, 13:19, 13:25, 14:2, 14:16, 14:21, 15:2, 34:18, 35:1, 79:2, 79:3
**home** [47] - 20:12, 21:3, 21:12, 21:18, 21:23, 21:24, 22:3, 22:5, 22:8, 22:9, 22:11, 22:14, 22:20, 23:5, 23:6, 23:13, 23:17, 24:20, 25:7, 25:12, 26:4, 38:7, 39:10, 40:15, 41:9, 42:12, 43:11, 43:14, 44:5, 49:12, 53:16, 53:24, 64:2, 69:23, 75:13, 80:16, 83:2, 83:8, 85:22, 88:19, 91:13, 91:15, 95:12, 95:16, 95:22, 96:3
**hoping** [1] - 25:17
**hours** [42] - 5:11, 5:20, 5:24, 10:16, 10:21, 10:23, 11:10, 12:21, 12:25, 13:10, 13:20, 13:22, 24:6, 24:10, 39:19, 41:14, 46:5, 46:24, 47:1, 54:24, 61:3, 61:8, 61:11, 62:12, 63:2, 63:10, 63:25, 75:17, 76:20, 77:6, 81:24, 82:1, 82:2, 82:14, 83:9, 89:12, 95:6, 95:8, 96:1, 96:7,

96:11, 96:12
**housekeeping** [1] - 4:24
**HR** [10] - 12:6, 45:1, 50:1, 55:24, 56:6, 56:9, 56:15, 57:11, 57:12, 57:17
**huhs** [1] - 4:9
**hum** [6] - 6:3, 63:4, 95:19
**husband** [3] - 49:23, 69:14, 84:19

**I**

**ID** [1] - 61:22
**idea** [9] - 25:16, 27:11, 28:1, 28:5, 31:16, 31:20, 35:22, 58:5, 96:13
**Identified** [1] - 2:15
**Illinois** [1] - 2:6
**immediately** [3] - 9:22, 9:24, 10:3
**impermissible** [1] - 38:22
**implied** [2] - 90:14, 93:3
**impression** [1] - 29:16
**Inc** [2] - 1:19, 98:7
**include** [2] - 40:15, 49:6
**included** [3] - 14:10, 17:1, 18:18
**including** [1] - 74:15
**incorrect** [2] - 21:7, 75:10
**indication** [1] - 59:23
**indirectly** [1] - 97:15
**industrial** [1] - 15:10
**information** [3] - 44:22, 44:23, 62:8
**injuries** [1] - 8:14
**inputted** [3] - 61:17, 62:8, 81:5
**instance** [2] - 1:15, 61:21
**instances** [1] - 4:1
**instead** [1] - 33:20
**insurance** [1] - 6:14
**Insurance** [1] - 6:15
**intend** [3] - 25:13, 87:3, 88:4
**intending** [1] - 25:22
**intent** [1] - 91:23
**intention** [1] -

87:25
**intentions** [1] - 25:15
**interested** [1] - 97:14
**interface** [5] - 14:13, 15:14, 17:4, 18:21, 81:14
**interfere** [2] - 82:18
**interfered** [1] - 47:3
**intermingled** [1] - 31:1
**intermittent** [1] - 38:1
**Internet** [1] - 20:21
**internet** [3] - 21:16, 21:18, 22:10
**interrogatories** [4] - 43:7, 85:16, 93:17, 93:21
**interrupt** [1] - 74:4
**invoice** [5] - 18:12, 18:14, 19:2, 19:7
**invoices** [2] - 18:17, 81:1
**involved** [1] - 72:16
**iron** [1] - 16:25
**issue** [2] - 19:3, 62:21
**issues** [3] - 44:10, 68:25, 69:4
**item** [2] - 65:23, 69:25, 74:8
**items** [5] - 66:22, 67:4, 69:17, 69:21, 70:1
**itself** [3] - 33:7, 34:8, 66:8

**J**

**job** [24] - 7:13, 13:25, 14:5, 14:20, 15:7, 16:19, 18:7, 18:11, 33:7, 33:17, 33:23, 38:14, 48:19, 74:6, 76:4, 76:8, 76:18, 80:22, 85:14, 92:6, 92:9, 92:10, 93:4, 93:11
**John** [14] - 55:24, 56:6, 56:8, 56:10, 56:17, 56:19, 57:2, 57:6, 57:7, 60:15, 61:1, 65:5, 70:23, 71:3
**Jones** [2] - 1:19, 98:7
**July** [79] - 5:9, 28:21, 28:25, 29:5, 29:9, 29:22, 37:2, 37:23, 43:19, 43:22, 44:3, 44:13, 44:21, 45:4, 45:13, 46:11,

47:5, 47:16, 48:3, 48:15, 50:17, 50:23, 51:5, 51:15, 51:16, 51:18, 54:2, 54:8, 55:4, 55:8, 55:16, 56:4, 57:24, 61:2, 64:13, 64:14, 65:19, 67:9, 68:5, 68:6, 77:19, 80:2, 80:17, 81:12, 81:18, 82:3, 82:5, 82:7, 83:22, 84:17, 84:23, 85:19, 86:10, 86:18, 86:23, 86:25, 87:2, 87:4, 88:1, 88:18, 88:22, 89:1, 89:18, 90:2, 90:3, 90:7, 90:9, 92:3, 92:14, 92:21, 93:6, 93:7, 93:19, 94:5, 94:24, 95:9, 95:12, 96:7, 96:11
**jump** [1] - 4:3

**K**

**K-a-s-p-r-z-y-k** [1] - 77:17
**KARA** [2] - 1:16, 97:5
**Kasprzyk** [1] - 77:14
**Kay** [3] - 11:24, 12:2, 12:4
**keep** [5] - 48:19, 66:22, 85:14, 88:7, 90:5
**keeping** [1] - 30:12
**kept** [6] - 15:19, 24:9, 30:6, 54:25, 71:24, 94:15
**kicked** [1] - 24:2
**kids** [1] - 37:12
**Kim** [2] - 95:15, 95:18
**kind** [3] - 3:20, 43:8, 52:8
**kindergarten** [2] - 10:24, 11:3
**kinds** [5] - 37:10, 53:18, 53:23, 58:9, 59:9
**knowing** [2] - 64:8, 89:18
**known** [1] - 12:4

**L**

**lab** [1] - 59:20
**labeled** [1] - 54:20
**labor** [1] - 8:15
**laid** [3] - 27:9, 27:12, 28:24
**laser** [1] - 33:20
**last** [10] - 12:10, 66:9, 74:8, 77:13,

78:14, 78:20
**late** [1] - 19:2
**lawsuit** [4] - 6:5, 6:8, 38:17, 39:3
**leader** [1] - 11:11
**learn** [2] - 78:10, 78:21
**least** [2] - 19:13, 82:18
**leave** [22] - 6:22, 7:1, 7:12, 8:13, 34:19, 35:3, 35:25, 36:4, 36:7, 36:8, 36:11, 36:14, 36:17, 36:21, 36:24, 37:2, 37:6, 38:1, 47:25, 66:13, 73:6, 84:8
**leaves** [4] - 34:17, 36:1, 38:10, 38:15
**leaving** [2] - 9:19, 10:9
**left** [22] - 14:17, 20:4, 31:15, 31:18, 31:21, 32:13, 32:17, 32:21, 34:20, 38:15, 47:22, 47:24, 48:10, 51:4, 66:12, 66:14, 66:15, 66:18, 67:1, 81:11, 84:14, 88:22
**legal** [2] - 39:15, 39:22
**less** [2] - 44:18
**limit** [1] - 58:4
**LINE** [1] - 99:2
**linked** [1] - 73:4
**list** [4] - 49:19, 49:22, 69:10, 98:9
**listed** [4] - 43:6, 69:18, 70:2, 72:10
**listing** [2] - 69:9, 69:18
**lists** [2] - 59:24, 64:18
**LLP** [1] - 2:5
**load** [1] - 15:9
**loads** [2] - 15:10, 15:11
**location** [1] - 20:7
**locker** [1] - 54:25
**longest** [1] - 17:13
**looking** [2] - 12:10, 25:18
**LORENC** [46] - 2:5, 3:7, 5:7, 5:18, 5:23, 6:2, 6:4, 13:5, 13:18, 24:24, 28:12, 38:21, 39:2, 39:8, 39:17, 39:24, 40:11, 41:5, 45:10, 52:14, 53:5, 55:6, 55:10, 55:20, 64:25, 71:16, 75:5, 75:8, 77:9, 77:18, 83:16, 83:20,

87:13, 87:19, 87:24, 90:18, 91:1, 91:8, 91:10, 91:20, 92:2, 92:17, 92:24, 96:15, 96:20, 96:24
**Lorenc** [1] - 3:11
**Lorenc..................**
**..................** [1] - 2:14
**lost** [1] - 93:11
**lower** [1] - 36:18
**lunch** [1] - 55:2
**Lynn** [1] - 3:14

**M**

**M-i-t-t-e-r** [1] - 7:7
**mail** [7] - 11:20, 10:23, 12:8, 18:16, 20:19, 20:23, 20:25
**Mail..................** [1] - 2:17
**Mail..................**
[1] - 2:16
**mailing** [4] - 12:5, 54:17, 55:14, 55:17
**Mailing** [1] - 2:17
**maker** [2] - 30:11, 31:9
**manually** [1] - 18:15
**marathon** [1] - 4:11
**March** [2] - 36:20, 36:21
**Margo** [4] - 11:14, 11:15, 54:7, 54:12
**marked** [7] - 3:5, 11:18, 11:19, 11:23, 20:16, 54:14, 55:16
**market** [6] - 16:25, 27:8, 29:10, 29:11, 29:13, 29:18
**marketing** [5] - 16:22, 80:23, 81:3, 81:15, 81:17
**matching** [2] - 14:11, 15:13
**maternity** [2] - 34:17, 34:19
**Matt** [21] - 45:16, 45:25, 46:12, 47:16, 53:17, 53:20, 53:22, 57:5, 57:8, 57:9, 66:5, 66:9, 71:24, 72:1, 73:10, 73:20, 73:23, 85:6, 93:18, 94:10
**matt** [1] - 42:13
**Matt's** [1] - 94:2
**matter** [1] - 4:25
**mean** [16] - 15:22, 27:16, 30:7, 33:3, 33:21, 42:10, 43:12, 59:12, 59:20, 67:25,

70:12, 70:18, 74:4, 78:9, 80:25, 88:20
**means** [2] - 59:11, 83:3
**medical** [2] - 35:14, 35:15
**meet** [4] - 84:23, 87:10, 89:19, 90:10
**meeting** [68] - 5:9, 31:6, 31:10, 44:24, 45:1, 45:4, 45:12, 45:15, 45:17, 45:21, 46:11, 47:5, 47:11, 47:13, 47:16, 47:22, 47:24, 48:1, 48:6, 51:4, 66:4, 66:8, 66:9, 66:13, 66:18, 67:2, 68:14, 69:15, 73:9, 74:16, 82:5, 82:7, 82:9, 82:11, 82:12, 83:6, 83:23, 84:14, 84:16, 85:1, 85:4, 85:5, 85:6, 85:10, 85:19, 86:11, 86:18, 86:23, 87:2, 87:5, 87:8, 88:1, 88:4, 88:18, 89:1, 89:18, 89:24, 90:8, 90:9, 92:3, 92:14, 93:6, 93:9, 93:13, 93:19, 94:6, 94:24
**meetings** [3] - 29:24, 30:1, 30:3
**member** [1] - 74:11
**members** [7] - 29:16, 42:20, 74:14, 74:20, 74:24, 75:19, 76:3
**mention** [1] - 54:10
**mentioned** [12] - 3:10, 19:20, 35:24, 46:5, 47:2, 54:7, 57:11, 57:23, 65:23, 67:4, 74:8, 74:22
**Merit** [2] - 1:17, 97:6
**message** [2] - 46:12, 57:3
**messages** [1] - 59:5
**met** [1] - 85:7
**metal** [5] - 14:8, 14:9, 30:8
**Meyer's** [10] - 7:17, 7:18, 8:9, 8:13, 8:16, 8:19, 9:3, 9:6, 10:4, 10:6
**midyear** [1] - 7:5
**might** [2] - 7:25, 20:17
**Miller** [48] - 3:11, 5:10, 5:11, 6:11, 7:22, 8:8, 8:19, 9:9, 10:9, 10:13, 10:17,

13:1, 14:17, 15:9, 17:25, 20:8, 21:14, 21:16, 27:2, 28:16, 29:14, 35:25, 38:17, 39:3, 39:25, 40:8, 40:20, 41:1, 53:8, 54:8, 67:14, 67:15, 67:16, 71:4, 82:20, 82:24, 86:24, 87:10, 88:5, 89:6, 89:25, 90:5, 90:12, 94:11, 95:1, 95:6, 95:11, 96:6
**MILLER** [1] - 1:9
**Miller's** [2] - 5:14, 15:11
**Miller-hauled** [1] - 15:9
**MILWAUKEE** [3] - 1:3, 97:2, 98:2
**Milwaukee** [1] - 1:20, 97:17, 98:8
**mind** [7] - 3:16, 4:9, 57:24, 58:3, 58:5, 73:4, 90:22
**mine** [2] - 26:4, 37:9
**minutes** [2] - 47:22, 66:10
**miscellaneous** [4] - 14:10, 15:12, 17:1, 18:17
**miss** [4] - 60:23, 86:7, 86:15, 88:14
**missed** [2] - 86:9, 86:16
**missing** [3] - 35:13, 41:7, 42:19
**misstate** [1] - 42:2
**misstated** [1] - 41:7
**mitter** [10] - 6:25, 7:7, 7:8, 7:10, 7:12, 7:16, 8:3, 9:1, 9:22, 9:25
**moment** [1] - 94:1
**Monday** [13] - 5:20, 44:6, 48:18, 69:10, 69:15, 82:13, 83:8, 84:23, 86:6, 89:7, 89:14, 93:7, 93:8
**money** [3] - 7:13, 30:11, 31:9
**money-maker** [2] - 30:11, 31:9
**Monroe** [1] - 2:6
**month** [5] - 18:3, 21:17, 56:7, 58:15, 76:7
**months** [1] - 7:11, 8:4, 8:5, 15:2, 15:4, 16:15, 17:9, 18:5, 18:6, 19:10, 26:12

**Moorland** [1] - 2:3
**morning** [5] - 3:8, 3:9, 5:2, 24:17, 85:3
**most** [3] - 75:22, 76:20, 78:5
**mother** [7] - 24:3, 24:5, 24:6, 25:19, 49:23, 69:14, 84:18
**move** [7] - 16:8, 18:5, 74:22, 78:4, 78:8, 78:13, 78:22
**moved** [2] - 14:22, 18:8
**moving** [1] - 15:19
**MR** [43] - 2:2, 4:24, 5:16, 5:22, 6:1, 6:3, 13:2, 13:17, 24:23, 28:8, 28:11, 38:19, 38:23, 39:7, 39:14, 39:21, 40:9, 41:2, 45:5, 45:8, 52:9, 53:4, 55:5, 55:9, 55:19, 71:10, 71:13, 75:4, 75:7, 77:8, 83:15, 83:18, 87:12, 87:15, 90:17, 90:20, 91:6, 91:18, 91:22, 92:16, 92:23, 96:18, 96:23
**MS** [47] - 2:5, 3:7, 5:7, 5:18, 5:23, 6:2, 6:4, 13:5, 13:18, 24:24, 28:12, 38:21, 39:2, 39:8, 39:17, 39:24, 40:11, 41:5, 45:10, 52:14, 53:5, 55:6, 55:10, 55:20, 64:25, 71:16, 75:5, 75:8, 77:9, 77:17, 77:18, 83:16, 83:20, 87:13, 87:19, 87:24, 90:18, 91:1, 91:8, 91:10, 91:20, 92:2, 92:17, 92:24, 96:15, 96:20, 96:24
**multiple** [1] - 59:9

**N**

**name** [3] - 3:10, 3:13, 77:13
**names** [1] - 95:14
**napped** [1] - 25:1
**narrative** [1] - 38:20
**narrow** [1] - 58:18
**necessary** [1] - 37:3
**need** [12] - 4:12, 13:6, 22:23, 35:23, 42:13, 52:18, 58:6, 66:21, 75:18, 76:1, 79:16, 89:7
**needed** [50] - 5:19,

13:4, 13:13, 17:21, 17:22, 23:5, 35:5, 38:1, 42:17, 44:1, 44:5, 44:14, 45:18, 46:6, 46:15, 48:18, 49:11, 49:20, 49:21, 50:15, 50:16, 51:1, 51:5, 51:7, 51:8, 51:11, 51:13, 51:15, 51:17, 52:12, 66:25, 69:9, 70:19, 73:5, 74:24, 75:2, 75:11, 75:14, 77:5, 78:21, 82:13, 82:14, 84:1, 84:2, 85:13, 88:23, 88:24, 92:6, 92:11, 93:23
**needing** [4] - 54:5, 56:24, 57:12, 76:21
**needs** [2] - 17:17, 17:23
**neurologists** [1] - 59:6
**never** [5] - 13:8, 28:24, 78:15, 92:9, 93:11
**New** [1] - 2:3
**new** [4] - 33:11, 33:13, 34:6, 78:13
**next** [8] - 4:6, 7:5, 27:19, 42:14, 65:23, 72:9, 74:13, 78:11
**nights** [1] - 75:13
**NO** [2] - 99:2
**no-cell-phone** [1] - 58:1
**nobody** [2] - 29:14, 53:25
**non** [7] - 30:5, 30:8, 30:10, 31:9, 78:11, 78:20, 78:23
**non-ferrous** [7] - 30:5, 30:8, 30:10, 31:9, 78:11, 78:20, 78:23
**none** [2] - 29:16, 38:21
**noonan** [1] - 95:15
**normal** [3] - 12:25, 77:6, 96:3
**North** [1] - 1:19, 98:8
**Nos** [1] - 3:5
**Notary** [4] - 1:18, 97:6, 97:21, 98:22
**note** [4] - 49:14, 52:4, 53:11, 54:4
**noted** [1] - 98:10
**November** [9] - 1:20, 10:13, 10:17, 13:25, 14:15, 27:3, 97:9, 97:18, 98:7
**number** [2] - 60:7,

61:16

## O

**oath** [1] - 3:3
**object** [22] - 13:2,
13:17, 24:23, 28:11,
38:19, 39:7, 39:14,
55:5, 55:9, 55:19,
71:10, 75:4, 75:7,
77:8, 83:15, 87:12,
90:17, 90:21, 91:6,
91:18, 92:16, 92:23
**objection** [5] -
39:21, 40:9, 41:2,
91:7, 91:19
**occur** [2] - 27:6,
89:20
**occurring** [3] -
49:4, 49:17, 94:21
**October** [5] - 2:17,
20:19, 20:21, 36:14,
54:16
**odd** [2] - 70:8, 70:9
**OF** [6] - 1:2, 3:1,
97:1, 97:2, 98:1,
98:2
**offended** [1] -
52:16
**offensive** [1] - 50:3
**offer** [2] - 5:10,
21:13
**offered** [2] - 21:15,
21:20
**office** [27] - 5:19,
23:20, 23:23, 24:14,
25:8, 26:17, 42:19,
43:16, 44:2, 44:6,
44:15, 45:18, 47:25,
61:14, 62:19, 64:5,
76:23, 82:13, 83:8,
88:23, 89:2, 91:4,
92:7, 92:11, 95:23,
96:4, 97:17
**offices** [7] - 59:5,
59:9, 59:15, 59:22,
60:7, 61:17, 62:7
**offset** [1] - 23:7
**often** [4] - 18:25,
75:18, 76:2, 79:8
**old** [2] - 59:8, 59:16
**OLSON** [44] - 2:2,
2:2, 4:24, 5:16,
5:22, 6:1, 6:3, 13:2,
13:17, 24:23, 28:8,
28:11, 38:19, 38:23,
39:7, 39:14, 39:21,
40:9, 41:2, 45:5,
45:8, 52:9, 53:4,
55:5, 55:9, 55:19,
71:10, 71:13, 75:4,
75:7, 77:8, 83:15,
83:18, 87:12, 87:15,
90:17, 90:20, 91:6,

91:18, 91:22, 92:16,
92:23, 96:18, 96:23
**onboard** [1] - 78:18
**once** [2] - 3:24,
76:7
**one** [19] - 4:24,
5:22, 9:11, 17:13,
27:19, 34:10, 34:13,
34:17, 35:24, 37:13,
37:17, 38:15, 57:7,
59:14, 62:4, 62:7,
64:7, 64:15, 67:4
**one-off** [2] - 37:17,
64:15
**ones** [2] - 62:10,
81:5
**OP** [5] - 42:20,
74:14, 74:20, 74:24,
75:18
**open** [1] - 59:25
**open-ended** [1] -
59:25
**opportunity** [1] -
4:5
**OPT** [3] - 74:10,
76:3, 77:21
**option** [1] - 88:19
**order** [12] - 14:2,
14:5, 15:20, 49:10,
67:25, 71:17, 71:22,
72:3, 74:11, 77:22,
85:13, 87:6
**orders** [14] - 16:2,
16:4, 16:6, 16:19,
16:23, 17:5, 17:7,
17:16, 17:19, 31:1,
68:6, 68:8, 81:2,
81:4
**original** [1] - 5:6
**Original** [2] - 2:20,
2:21
**otherwise** [2] -
4:15, 4:19
**OTP** [1] - 76:3
**outside** [1] - 18:15
**outside-hauler** [1]
- 18:15
**overall** [1] - 33:23
**overly** [1] - 38:19
**own** [5] - 13:22,
60:5, 60:17, 60:19,
63:3

## P

**p.m** [4] - 1:21, 5:21,
5:25, 96:25
**Page** [2] - 2:13,
2:15
**page** [1] - 98:10
**PAGE** [1] - 99:2
**paid** [1] - 16:24
**paper** [1] - 49:10
**papers** [1] - 17:1

**paperwork** [5] -
19:6, 33:9, 33:10,
33:13, 81:5
**paragraph** [3] -
12:8, 12:11, 54:22
**pardon** [2] - 45:7,
67:22
**part** [9] - 12:13,
16:9, 17:24, 33:21,
35:8, 76:22, 80:22,
83:1, 86:3
**part-time** [1] - 35:8
**parties** [1] - 97:13
**past** [1] - 77:23
**patient** [1] - 59:8
**pay** [3] - 14:8,
18:13
**payable** [2] - 7:9,
15:22, 15:24
**payables** [3] - 14:3,
14:22, 18:16
**paycheck** [1] -
21:17
**paying** [1] - 15:10
**payment** [1] - 19:3
**payments** [1] -
81:2
**Peggy** [1] - 57:18
**Penfield** [1] - 70:24
**people** [27] - 13:9,
18:2, 18:23, 18:24,
27:9, 28:1, 28:3,
28:24, 29:3, 29:5,
29:9, 32:3, 32:12,
32:14, 33:5, 33:6,
34:9, 34:12, 34:13,
45:13, 58:10, 71:1,
74:23, 81:24, 82:2,
85:7
**peoples'** [1] - 69:3
**period** [8] - 33:18,
37:14, 56:1, 56:3,
57:23, 58:17, 59:4,
62:18
**permanent** [3] -
25:14, 35:18, 57:25
**permission** [1] -
57:1
**permitted** [1] - 25:1
**person** [7] - 34:6,
34:10, 34:13, 35:14,
78:6, 90:22, 91:23
**person's** [1] -
35:16
**personal** [16] -
54:23, 60:5, 60:9,
60:17, 60:20, 60:22,
63:3, 63:10, 63:17,
65:4, 65:10, 65:16,
65:21, 68:24, 69:4,
97:10
**pertained** [1] - 33:4
**Pewaukee** [2] -

19:25, 20:7
**phone** [78] - 45:12,
47:12, 47:20, 47:23,
48:17, 48:21, 52:6,
53:14, 53:25, 54:13,
55:25, 56:12, 56:24,
56:25, 57:13, 57:15,
58:1, 58:13, 58:14,
58:16, 60:4, 60:5,
60:6, 60:7, 60:9,
60:10, 60:14, 60:15,
60:17, 60:20, 60:22,
61:13, 61:16, 61:18,
61:21, 61:25, 62:3,
62:8, 62:12, 62:13,
62:16, 62:17, 62:21,
62:24, 63:2, 63:3,
63:10, 63:13, 63:16,
63:17, 64:1, 64:4,
64:8, 64:12, 64:18,
65:3, 65:4, 65:5,
65:6, 65:7, 65:10,
65:16, 65:18, 65:20,
66:5, 68:15, 68:16,
69:18, 69:21, 73:11,
73:12, 74:17, 74:18,
82:10, 83:1, 84:16,
90:9
**Phone/Texting/E**
[1] - 2:17
**phone/texting/e** [3]
- 54:17, 55:14,
55:17
**Phone/Texting/E-
Mailing** [1] - 2:17
**phone/texting/e-
mailing** [3] - 54:17,
55:14, 55:17
**phones** [1] - 54:23
**physical** [1] - 8:14
**pick** [2] - 11:5,
24:15
**picked** [1] - 75:16
**piece** [1] - 35:16
**place** [2] - 17:25,
85:2
**placed** [1] - 32:18
**places** [1] - 64:19
**Plaintiff** [2] - 1:6,
2:4
**plaintiff's** [1] - 4:25
**planned** [2] -
44:25, 45:3
**plenty** [1] - 13:9
**point** [18] - 4:12,
4:17, 10:19, 14:15,
25:23, 25:25, 35:23,
43:23, 47:24, 51:10,
54:2, 57:11, 67:20,
67:23, 72:9, 80:15,
86:9, 92:14
**points** [5] - 47:11,
47:12, 48:11, 48:20,

82:7
**policy** [15] - 54:17,
55:3, 55:7, 55:13,
55:14, 55:18, 56:24,
57:13, 57:15, 57:21,
58:1, 60:15, 60:21,
62:24, 65:5
**Policy..................
............** [1] - 2:18
**portion** [3] - 68:14,
74:16, 74:17
**position** [1] - 6:24
**positions** [3] -
19:19, 20:6, 20:7
**positive** [1] - 16:3
**possible** [2] -
70:25, 82:19
**pre** [2] - 44:25, 45:3
**pre-planned** [2] -
44:25, 45:3
**preeclampsia** [1] -
36:5
**pregnancy** [3] -
34:21, 34:22, 36:22
**president** [2] -
56:20, 71:4
**pretty** [5] - 31:17,
33:17, 33:19, 49:25
**prevented** [2] -
23:19, 23:22
**prevents** [1] -
52:23
**previous** [1] -
74:23
**previously** [9] -
11:17, 24:9, 33:14,
50:20, 54:14, 58:19,
69:24, 70:20, 94:23
**previously-
approved** [1] - 24:9
**price** [1] - 18:23
**pricing** [2] - 16:22,
16:25
**printers** [1] - 33:20
**prioritize** [8] - 42:8,
42:17, 72:12, 72:16,
73:2, 73:7, 73:17,
73:23
**prioritizing** [2] -
72:20, 73:5
**priority** [1] - 72:25
**problem** [5] - 13:8,
18:22, 18:25, 19:1,
19:6
**Procedure** [1] -
1:16
**PROCEEDINGS** [1]
- 3:1
**proceedings** [1] -
98:6
**Proceedings** [1] -
96:25
**process** [4] - 14:7,

18:12, 18:13, 64:15
**processed** [1] -
81:6
**processing** [11] -
14:2, 14:6, 15:9,
15:20, 67:25, 68:8,
71:17, 71:22, 72:3,
74:11, 77:22
**production** [1] -
55:1
**program** [1] - 61:24
**programs** [1] -
33:11
**prohibited** [2] -
54:23, 60:21
**project** [1] - 58:11
**promotion** [4] -
15:20, 16:9, 18:9,
78:22
**prompted** [2] -
23:11, 23:19
**Prudential** [11] -
6:15, 6:18, 6:22,
7:1, 7:3, 7:25, 8:23,
9:14, 9:19, 9:20
**psychiatrist** [1] -
58:12
**psychiatrists** [1] -
59:6
**Public** [4] - 1:18,
97:6, 97:21, 98:22
**punched** [2] -
66:16, 66:17
**purchase** [1] -
29:20
**purchased** [1] -
29:11
**pursuant** [1] - 1:15
**pursue** [1] - 7:13
**put** [5] - 49:14,
50:1, 50:25, 52:3,
53:9
**putting** [1] - 16:22

## Q

**questions** [12] -
4:10, 4:21, 11:21,
22:1, 45:6, 45:9,
49:2, 69:20, 70:1,
70:3, 86:21, 96:21
**quick** [3] - 93:9,
96:16
**quickly** [1] - 93:25
**quit** [9] - 7:14,
8:16, 8:18, 9:16,
9:18, 50:13, 51:3,
86:8, 88:15, 94:14
**quite** [1] - 65:3
**quitting** [2] - 9:25,
94:16

## R

**rang** [3] - 61:13,
61:21, 61:25
**rate** [1] - 20:22
**re** [1] - 58:12
**re-evaluated** [1] -
58:12
**read** [8] - 5:24,
41:6, 54:21, 71:11,
71:12, 87:19, 87:21,
98:6
**reading** [1] - 20:23
**reads** [1] - 5:8
**really** [4] - 13:8,
17:11, 59:19
**Realtime** [2] - 1:17,
97:5
**reason** [1] - 9:23
**reasons** [1] - 44:7
**reassert** [1] - 94:18
**reasserted** [1] -
94:16
**recap** [2] - 41:3,
42:6
**receivables** [1] -
18:16
**receive** [8] - 40:4,
41:18, 47:4, 47:17,
48:22, 51:21, 63:11,
73:6
**received** [3] - 22:5,
63:19, 65:5
**receiving** [2] -
54:13, 65:2
**recent** [1] - 78:5
**recollection** [5] -
20:18, 21:2, 33:16,
76:17, 76:19
**recommended** [1] -
70:24
**record** [6] - 3:13,
5:8, 20:18, 54:20,
54:22, 65:1
**Record** [2] - 71:12,
87:21
**recorded** [1] - 97:8
**records** [2] - 8:7,
10:12
**reduced** [2] -
21:19, 97:9
**reduction** [2] -
27:7, 28:22
**reductions** [7] -
17:24, 27:4, 27:15,
27:23, 28:7, 44:13,
45:23
**reference** [2] -
46:23, 46:25
**references** [1] -
20:19
**referring** [3] - 5:15,
55:13, 73:19
**refresh** [2] - 20:17,

21:2
**regarding** [9] -
40:5, 41:18, 47:4,
47:17, 48:22, 51:21,
63:12, 65:2, 74:8
**regardless** [1] -
63:12
**Registered** [2] -
1:17, 97:6
**regular** [3] - 71:19,
72:7, 76:21
**relate** [1] - 62:13
**related** [16] - 8:22,
8:25, 9:4, 36:5,
60:16, 61:5, 61:14,
62:4, 63:2, 63:15,
63:17, 63:25, 64:5,
64:12, 65:6, 71:7
**relates** [1] - 72:21
**relation** [2] - 31:14,
68:10
**relative** [2] - 26:3,
97:12, 97:13
**remain** [1] - 25:10
**remember** [29] -
16:5, 29:21, 29:24,
29:25, 30:3, 30:4,
31:6, 31:14, 33:7,
33:23, 34:13, 35:11,
44:12, 46:23, 46:25,
57:8, 57:19, 62:18,
63:20, 65:8, 65:9,
66:17, 69:22, 79:2,
85:18, 85:23, 90:7,
93:22
**remotely** [1] - 25:3
**removed** [1] -
22:22
**reoccurring** [2] -
37:18, 37:19
**reorganization** [1]
- 80:3
**repeat** [2] - 38:25,
87:17
**rephrase** [4] - 4:19,
32:20, 55:15, 87:22
**replacement** [1] -
34:18
**Reporter** [4] - 1:17,
97:6
**reporter** [1] - 3:22
**Reporting** [2] -
1:19, 98:7
**reports** [1] - 16:25
**represent** [1] - 3:11
**request** [14] - 5:1,
5:7, 11:10, 13:22,
21:21, 22:20, 22:24,
23:4, 23:12, 36:3,
61:5, 61:15, 82:21,
82:25
**requested** [12] -
11:6, 20:11, 21:3,

21:11, 22:3, 22:5,
25:3, 25:12, 37:2,
60:4, 60:13, 60:24
**requesting** [3] -
38:7, 59:17, 60:15
**requirements** [1] -
89:19
**reserve** [1] - 96:21
**resignation** [1] -
10:6
**resigned** [1] - 7:3
**respond** [3] -
49:15, 52:21, 69:17
**response** [14] -
4:10, 4:25, 5:13,
49:8, 50:5, 52:8,
52:25, 61:15, 69:6,
69:12, 73:13, 94:3,
94:9, 94:10
**responsibilities** [7]
- 14:5, 15:7, 16:19,
18:11, 32:18, 32:22,
80:22
**rest** [3] - 51:7, 87:3,
93:3
**restated** [1] - 85:20
**restaurant** [2] -
7:17, 7:18
**retain** [1] - 91:17
**reverse** [1] - 17:16
**review** [1] - 11:20
**reviews** [1] - 15:17
**revoked** [2] - 96:7,
96:13
**rid** [3] - 27:21,
27:25, 28:3
**rights** [19] - 23:1,
23:3, 39:5, 39:13,
40:1, 40:7, 40:20,
40:25, 41:8, 43:10,
47:2, 63:8, 65:24,
67:5, 70:2, 72:11,
72:17, 72:22, 74:9
**Road** [1] - 2:3
**role** [5] - 12:5,
14:17, 15:14, 19:17,
35:2
**room** [1] - 45:2
**rotation** [1] - 18:4,
31:4
**roughly** [3] - 32:11,
32:21, 56:16
**Rules** [1] - 1:16
**rules** [1] - 3:21
**rumors** [6] - 29:2,
29:3, 29:4, 29:5,
29:8, 29:25

## S

**S.C** [1] - 2:2
**sales** [28] - 16:4,
17:13, 17:19, 18:8,
19:3, 19:9, 19:14,

19:18, 19:22, 20:3,
31:22, 32:2, 32:16,
33:1, 33:16, 35:20,
67:21, 67:24, 68:3,
78:4, 78:17, 80:23,
80:24, 81:2, 81:9,
81:11, 81:14, 81:17
**Sarah** [35] - 2:9,
11:24, 12:2, 12:3,
12:4, 45:16, 45:25,
46:12, 47:13, 47:16,
47:23, 48:6, 53:9,
53:17, 53:22, 54:10,
57:18, 65:18, 66:4,
66:6, 66:9, 66:20,
68:15, 68:17, 73:10,
84:16, 85:6, 85:23,
88:10, 90:9, 93:18,
94:2, 94:9, 94:11,
94:25
**Sarah's** [1] - 12:4
**Saturdays** [1] -
20:2
**scale** [8] - 14:3,
14:7, 14:22, 15:22,
15:24, 18:12, 19:25,
81:22
**scales** [4] - 81:8,
81:21, 81:23, 82:3
**schedule** [14] -
12:18, 18:6, 24:13,
25:6, 25:14, 82:21,
83:5, 83:12, 84:1,
84:20, 88:7, 92:10,
95:2
**scheduled** [5] -
36:8, 80:11, 80:20,
82:17, 84:22
**school** [8] - 6:12,
6:20, 9:9, 9:13,
11:5, 12:11, 12:20,
24:18
**scramble** [1] -
35:16
**scrap** [8] - 14:8,
14:9, 15:9, 18:13,
18:14, 18:16, 27:7
**seal** [1] - 97:17
**second** [8] - 3:10,
5:16, 34:21, 34:23,
36:22, 37:21, 37:22,
54:22
**see** [7] - 3:21, 12:9,
12:13, 20:22, 49:23,
61:20, 69:14
**seek** [2] - 62:5,
73:6
**seeking** [3] - 37:6,
62:14, 76:3
**seizure** [1] - 26:5
**sentence** [2] -
12:10, 54:22
**September** [4] -
28:16, 28:19, 36:17,

36:24
**serious** [1] - 49:25
**service** [5] - 20:21,
21:23, 22:6, 22:10,
22:11
**session** [1] - 45:12
**sessions** [5] -
40:14, 41:22, 66:1,
82:16, 84:9
**set** [3] - 69:15,
87:5, 97:16
**several** [7] - 11:14,
14:19, 15:4, 19:12,
36:1, 49:21, 59:1
**SHAWHAN** [2] -
1:16, 97:5
**sheet** [1] - 50:2
**short** [6] - 34:5,
34:7, 34:15, 34:17,
35:12, 37:14
**short-staffed** [3] -
34:5, 34:7, 35:12
**show** [4] - 11:17,
11:19, 20:16, 54:14
**showing** [1] -
54:15
**sick** [1] - 42:23
**side** [9] - 30:5,
30:9, 30:10, 30:14,
30:17, 30:18, 30:19,
31:7, 31:9
**sides** [1] - 30:22
**signature** [1] -
96:22
**significant** [1] -
5:12
**simplified** [1] -
33:22
**sister** [5] - 67:9,
68:18, 71:21, 72:1,
72:6
**sit** [3] - 70:16,
85:18, 94:1
**situation** [3] -
37:17, 46:1, 49:18
**six** [9] - 18:3, 18:4,
18:5, 32:9, 32:12,
32:15, 34:9, 34:12,
34:13
**six-month** [1] -
18:3
**size** [2] - 34:1, 34:4
**skipped** [1] - 64:20
**small** [4] - 49:11,
52:15, 52:18, 53:12
**someone** [8] -
35:2, 50:1, 59:14,
74:24, 77:25, 79:15,
79:18, 79:19
**sometimes** [4] -
14:14, 15:15, 18:22,
18:24
**somewhere** [1] -

15:5
**son** [11] - 10:23,
22:22, 24:18, 25:16,
26:1, 37:15, 39:11,
41:10, 43:12, 58:20,
59:16
**son's** [4] - 23:4,
23:21, 23:22, 65:25
**soon** [1] - 31:17
**sorry** [4] - 6:15,
30:21, 40:17, 74:12
**sort** [3] - 8:22,
19:3, 69:16
**sound** [1] - 10:14
**South** [1] - 2:3
**speaking** [7] -
58:24, 68:23, 70:21,
71:9, 71:18, 71:23,
72:4
**special** [1] - 60:7
**specific** [4] - 55:25,
56:3, 69:21, 69:25
**specifically** [11] -
46:18, 68:17, 69:17,
70:23, 71:7, 76:13,
78:3, 90:13, 92:19,
93:1, 93:21
**speculation** [2] -
90:22, 91:7
**speed** [1] - 21:16
**spell** [1] - 77:15
**split** [2] - 22:1,
86:20
**sS** [2] - 97:1, 98:1
**staffed** [5] - 34:5,
34:7, 34:16, 34:18,
35:12
**stands** [1] - 74:11
**start** [11] - 6:12,
21:22, 22:3, 22:13,
29:4, 50:24, 58:23,
58:24, 67:12, 90:3,
95:8
**started** [16] - 4:21,
7:22, 9:22, 9:24,
10:3, 10:23, 15:4,
16:5, 21:24, 22:4,
22:9, 32:16, 32:20,
67:14, 67:20, 80:16
**starting** [1] - 44:2
**starts** [1] - 12:8
**state** [3] - 3:12,
30:4, 90:22
**STATE** [2] - 97:1,
98:1
**State** [3] - 1:18,
97:7, 97:22
**statement** [22] -
38:3, 49:25, 51:6,
51:20, 52:3, 52:17,
52:21, 53:2, 53:11,
60:2, 66:2, 67:7,
69:16, 72:13, 73:9,

73:10, 73:13, 75:25,
76:10, 76:13, 79:6,
89:4
**statements** [1] -
54:3
**STATES** [1] - 1:1
**stay** [7] - 18:7,
39:10, 40:15, 41:9,
43:11, 44:5, 90:12
**stayed** [1] - 33:9
**staying** [2] - 42:12,
69:23
**steady** [2] - 19:13
**step** [3] - 47:15,
63:14, 78:11
**still** [6] - 33:1, 54:7,
59:3, 62:22, 63:8,
85:22
**strain** [3] - 5:12,
5:14, 83:13
**strains** [1] - 29:1
**Street** [3] - 1:19,
2:6, 98:8
**strike** [4] - 16:11,
50:2, 94:23, 95:7
**Strike** [3] - 25:25,
44:20, 88:22
**stubs** [3] - 14:11,
15:13
**stuff** [2] - 33:11,
33:21
**submitted** [1] -
93:17
**Subscribed** [1] -
98:19
**subsequent** [3] -
9:19, 27:14, 27:16
**subsequently** [1] -
84:14
**sue** [2] - 95:15,
95:18
**sued** [1] - 6:9
**summer** [5] -
12:12, 12:24, 13:7,
13:12, 29:24
**supervisor** [6] -
11:14, 35:7, 53:20,
56:21, 56:23, 57:3
**supporting** [2] -
80:23, 80:25
**supposed** [2] -
23:9, 78:12
**surgery** [1] - 36:15
**surprised** [3] -
76:10, 76:12, 76:13
**SUSAN** [1] - 2:5
**Susan** [1] - 3:10
**switched** [2] -
15:18, 16:3
**sworn** [2] - 3:3,
98:19
**system** [1] - 16:23

**T**

**tasks** [3] - 76:5,
80:12, 80:18
**team** [10] - 11:11,
42:20, 74:11, 74:14,
74:20, 74:24, 75:19,
80:23, 81:15, 81:18
**teams** [1] - 81:3
**technician** [1] -
9:15
**telecommute** [8] -
20:12, 21:4, 22:21,
23:6, 23:12, 43:20,
82:25, 83:3
**telecommuting** [1]
- 43:23
**telework** [1] - 22:10
**TeleWorker** [1] -
20:21
**temporary** [3] -
35:19, 57:24, 58:2
**ten** [1] - 66:10
**tenure** [1] - 20:8
**terminate** [2] -
90:16, 91:3
**terminated** [5] -
8:17, 9:17, 86:25,
89:21, 92:22
**terminating** [3] -
92:15, 92:20, 93:2
**termination** [1] -
86:16
**terminations** [1] -
46:2
**terms** [3] - 17:22,
51:14, 51:19
**test** [2] - 4:12,
59:20
**testified** [5] - 3:4,
58:19, 63:1, 71:3,
84:12, 89:16
**testimony** [6] -
12:16, 34:1, 45:21,
62:9, 62:22, 81:10
**tests** [1] - 59:20
**THE** [14] - 13:4,
28:10, 38:25, 39:16,
40:10, 41:3, 45:7,
52:11, 71:15, 83:19,
87:17, 87:22, 90:24,
91:25
**therapy** [7] - 40:14,
40:18, 40:19, 41:21,
66:1, 82:16, 84:9
**they've** [1] - 39:12
**third** [2] - 90:22,
91:23
**this_____day**
[1] - 98:19
**THOMSON** [1] - 2:5
**thoroughly** [1] -
78:5
**three** [6] - 9:8,

12:18, 12:19, 24:3,
33:21, 86:20
**three-part** [1] -
33:21
**throughout** [7] -
24:22, 25:10, 33:18,
59:4, 64:16, 68:18,
68:24
**ticket** [10] - 14:11,
14:23, 15:8, 15:13,
15:16, 15:21, 15:23,
16:1, 16:9, 16:13
**tickets** [9] - 14:7,
15:9, 16:24, 18:12,
18:13, 18:15, 81:6,
81:7
**time-consuming**
[3] - 64:15, 64:17,
64:20
**today** [4] - 3:12,
3:22, 70:16, 85:18
**took** [13] - 6:24,
36:1, 36:4, 36:7,
36:11, 36:14, 36:17,
36:24, 62:12, 79:13,
81:5, 85:1, 95:16
**top** [2] - 20:23,
72:25
**TRACY** [6] - 1:5,
1:14, 3:2, 97:8,
98:5, 98:17
**Tracy** [5] - 3:8,
3:14, 3:15, 3:16,
20:20
**Tracy's** [1] - 79:16
**train** [2] - 18:1,
78:3
**trained** [8] - 19:23,
20:1, 42:23, 78:5,
78:6, 78:25, 79:4
**training** [2] - 18:3,
78:15
**transcribed** [1] -
4:8
**transcript** [1] - 98:6
**Transcript** [1] -
2:21
**TRANSCRIPT** [1] -
3:1
**treatment** [3] -
37:3, 64:12, 70:25
**treatments** [2] -
36:12, 37:6
**trip** [8] - 14:23,
15:7, 15:16, 15:21,
15:22, 16:1, 16:8,
16:13
**truck** [1] - 55:1
**true** [2] - 77:4, 98:9
**try** [4] - 58:24,
59:13, 64:1, 89:11
**trying** [8] - 22:2,
23:3, 23:11, 25:17,

37:20, 50:25, 72:19, 86:22

**twice** [2] - 62:21, 75:2

**two** [39] - 3:24, 8:10, 12:19, 17:20, 24:4, 24:12, 25:2, 25:23, 26:2, 26:4, 26:10, 26:18, 37:13, 38:7, 42:12, 42:19, 43:13, 43:21, 49:6, 62:17, 63:2, 63:7, 63:15, 63:20, 63:21, 64:2, 68:11, 72:23, 73:3, 73:4, 73:6, 77:4, 80:16, 85:23, 88:19, 91:15, 93:4, 93:14

**type** [1] - 37:17

**typically** [1] - 75:16

**typo** [1] - 4:25

## U

**uh-huhs** [1] - 4:9

**um-hum** [3] - 6:3, 63:4, 95:19

**unable** [2] - 23:24, 75:12

**under** [4] - 1:15, 5:11, 29:15, 97:9

**undergo** [2] - 27:4, 36:12

**understood** [5] - 4:20, 13:15, 13:19, 55:15, 57:20

**undertaken** [1] - 28:22

**unemployment** [9] - 9:20, 10:1, 10:7, 10:10, 85:24, 93:10, 94:7, 94:12, 94:25

**UNITED** [1] - 1:1

**unless** [4] - 40:5, 41:19, 76:1, 80:19

**up** [23] - 5:14, 7:22, 11:5, 12:9, 14:11, 15:13, 22:1, 24:15, 26:5, 34:12, 44:21, 46:2, 47:14, 65:12, 69:15, 71:24, 75:15, 75:16, 78:7, 78:14, 85:17, 86:20, 87:5

**up-to-date** [1] - 71:24

**upgrade** [1] - 21:19

**upgraded** [2] - 21:25, 22:5

**upset** [2] - 50:9, 84:13

**urgently** [1] - 42:14

**utilize** [1] - 60:19

## V

**vacation** [2] - 79:10, 80:10

**vacations** [2] - 79:9, 79:13

**various** [2] - 13:10, 58:24

**vary** [1] - 34:4

**versa** [1] - 16:7

**vet** [2] - 9:15, 9:16

**vice** [1] - 16:7

**vice-versa** [1] - 16:7

**violated** [13] - 39:5, 39:12, 39:25, 40:7, 40:20, 41:1, 41:8, 43:10, 47:3, 65:24, 67:4, 72:11, 74:9

**violating** [1] - 70:2

**violation** [1] - 63:8

**voicemail** [5] - 48:10, 51:9, 51:10, 51:25, 52:4

**voluntarily** [2] - 7:1, 35:6

**voluntary** [4] - 50:13, 51:3, 86:8, 88:15

**volunteer** [1] - 13:11

**vs** [1] - 1:8

## W

**waiting** [7] - 56:1, 56:12, 58:13, 58:14, 58:15, 59:24, 64:18

**walk** [1] - 62:19

**Warner** [4] - 20:20, 21:13, 21:15, 22:6

**watched** [1] - 24:3

**Water** [2] - 1:19, 98:8

**ways** [7] - 39:12, 39:20, 39:25, 40:7, 40:12, 40:19, 40:25

**week** [36] - 24:3, 24:4, 25:2, 26:21, 34:19, 36:24, 38:8, 42:13, 43:17, 44:2, 44:15, 45:19, 49:6, 64:7, 64:16, 72:23, 75:2, 75:3, 75:21, 77:7, 80:17, 85:23, 88:20, 88:24, 89:3, 89:12, 90:4, 90:11, 90:15, 91:4, 91:15, 91:16, 92:7, 92:11, 93:4, 95:23

**weekend** [7] - 50:19, 84:18, 85:12, 88:3, 89:11, 93:24, 95:17

**weekends** [3] - 75:14, 75:17, 76:20

**weeks** [6] - 26:14, 26:15, 26:20, 26:23, 35:2, 35:4

**weight** [1] - 14:7

**whereof** [1] - 97:16

**whole** [2] - 59:4, 62:18

**Wink** [5] - 3:14, 5:19, 6:5, 11:18, 54:14

**WINK** [6] - 1:5, 1:14, 3:2, 97:8, 98:5, 98:17

**Wink's** [2] - 5:20, 5:24

**WISCONSIN** [3] - 1:2, 97:1, 98:1

**Wisconsin** [10] - 1:18, 1:20, 2:3, 58:10, 61:23, 61:24, 97:7, 97:18, 97:22, 98:8

**Witness** [1] - 41:11

**witness** [2] - 3:2, 97:16

**WITNESS** [14] - 13:4, 28:10, 38:25, 39:16, 40:10, 41:3, 45:7, 52:11, 71:15, 83:19, 87:17, 87:22, 90:24, 91:25

**word** [3] - 5:5, 59:19, 94:13

**words** [3] - 5:12, 83:13, 93:1

**workday** [5] - 40:5, 41:19, 41:20, 41:25, 63:12

**workers** [9] - 70:7, 70:11, 70:21, 71:7, 71:8, 71:15, 71:17, 71:21, 72:2

**workers'** [1] - 9:6

**workload** [4] - 23:7, 24:15, 75:16, 81:22

**write** [4] - 49:9, 53:10, 94:17, 94:25

**writing** [1] - 97:9

**written** [1] - 93:20

**wrote** [4] - 12:15, 48:12, 48:20, 85:17

## Y

**yard** [1] - 27:21

**year** [15] - 9:12, 10:25, 11:3, 12:11, 16:16, 16:18, 17:25, 22:18, 27:20, 31:18, 33:18, 34:24, 59:8, 59:16

**years** [21] - 6:17, 7:21, 7:23, 8:10, 12:18, 12:19, 15:1, 16:15, 17:9, 19:9, 19:11, 19:12, 19:13, 28:2, 29:18, 31:25, 33:8, 33:24, 34:2, 78:15