1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF WISCONSIN
2                        MILWAUKEE DIVISION
    -----------------------------------------------------------
3   TRACY L. WINK,

4                    Plaintiff,

5   vs.                                    Case No. 14-C-367

6   MILLER COMPRESSING COMPANY,

7                    Defendant.

8   -----------------------------------------------------------

9

10

                    Deposition of MATTHEW E. CHAVEZ
11
                    Monday, January 26th, 2015
12
                            2:58 p.m.
13
                               at
14
                    ALAN C. OLSON & ASSOCIATES, S.C.
15                     2880 South Moorland Road
                        New Berlin, Wisconsin
16

17

18

19

20

21                  Reported by Elaine A. Thies, RPR

22

23

24

25

1                Deposition of MATTHEW E. CHAVEZ, a

2       witness in the above-entitled action, taken at the

3       instance of the Plaintiff, pursuant to Chapter 804 of

4       the Wisconsin Statutes, pursuant to notice, before

5       Elaine A. Thies, RPR and Notary Public, State of

6       Wisconsin, at ALAN C. OLSON & ASSOCIATES, S.C., 2880

7       South Moorland Road, New Berlin, Wisconsin, on the

8       26th day of January, 2015, commencing at 2:58 p.m.

9       and concluding at 3:35 p.m.

10

11      A P P E A R A N C E S:

12      ALAN C. OLSON & ASSOCIATES, S.C., by
        Mr. Alan C. Olson and Ms. Brianna M. Covington
13      2880 South Moorland Road
        New Berlin, Wisconsin  53151
14      Appeared on behalf of the Plaintiff.

15      THOMPSON COBURN LLP, by
        Ms. Susan M. Lorenc
16      55 East Monroe Street, 37th Floor
        Chicago, Illinois  60603
17      Appeared on behalf of the Defendant.

18
        ALSO PRESENT:  Sarah Barbian
19

20                      I N D E X

21      Examination by:                              Page

22      Mr. Olson                                    3

23

24                    E X H I B I T S

25                    (No exhibits marked.)

1                    TRANSCRIPT OF PROCEEDINGS

2                    MATTHEW E. CHAVEZ, called as a witness

3          herein, having been first duly sworn on oath, was

4          examined and testified as follows:

5                              EXAMINATION

6     BY MR. OLSON:

7     Q    Mr. Chavez, we had met in the hallway.  I'm

8          representing Ms. Wink.  I'm Alan Olson.  During the

9          deposition I'll be asking you questions.  You're

10         under oath.  You have to provide truthful responses

11         to my questions.  If you don't hear a question I

12         can restate it.  If you don't understand a question

13         I can rephrase it for you.  If you answer my

14         question I'll assume that you heard it, you

15         understood it, and you were answering it

16         accurately.  As was mentioned already, Elaine has

17         to get everything down accurately today so we have

18         to try not to talk over one another.  If you need

19         to take a break at some point, we can do that as

20         long as there's no question pending.

21                    Do you have any questions about the

22         process?

23    A    No.

24    Q    Have you ever given a deposition before?

25   A   No.

 1   Q   Have you ever been a party to a lawsuit before?

 2   A   No.

 3   Q   Have you ever tested positive for drugs or alcohol?

 4   A   No.

 5   Q   Do you know of any reason why you would not be able

 6       to give accurate testimony today?

 7   A   No.

 8   Q   What did you do to prepare for your deposition

 9       today?

10   A   I just spoke briefly with Susan.

11   Q   When was that?

12   A   Friday afternoon.

13   Q   For how long?

14   A   About 45 minutes I believe.

15   Q   Did you speak in person or by phone?

16   A   By phone.

17   Q   Did you review any documents related to this case?

18   A   No.

19   Q   Have you ever reviewed documents related to this

20       case?

21   A   No.

22   Q   What is your educational background?

23   A   Some college.  High school, some college.

```
24   Q    Okay.  And you worked at Miller Compressing during

25        what time period?
```

```
 1   A    October 1997 until February 28th, 2014.

 2   Q    And your separation was for what reason?

 3   A    Two things:  One was the scrap market took a dive,

 4        and I guess they just no longer needed my -- needed

 5        me anymore.  I guess kind of like a duplication of

 6        responsibilities.

 7   Q    Okay.  And did you have any disagreement with the

 8        employer as to the circumstances surrounding the

 9        separation?

10   A    No, I understood.

11   Q    Did they provide you with a severance package?

12   A    Yes.

13   Q    How many weeks of severance pay did you receive?

14             MS. LORENC:  And I'm going to object.  I

15        have not seen the document, but to the extent

16        there's a confidentiality provision, I would just

17        ask you to adhere to that.

18             MR. OLSON:  Confidentiality is not a

19        basis to instruct a witness not to answer.

20             MS. LORENC:  I don't think I did.  I said

21        I asked him to adhere to that.  But you can answer

22        the question if you can answer it.

23   BY MR. OLSON:
```

```
24   Q    So the attorney is not telling you not to answer

25        the question about how many weeks of severance pay
```

```
 1        you received.  How many weeks of severance pay did

 2        you receive?

 3   A    I don't recall right now.

 4   Q    Do you recall the dollar amount?

 5   A    No, not exactly, no.

 6   Q    Okay.  That was about -- that was less than a year

 7        ago that you got that?

 8   A    Yes.

 9   Q    Okay.  Was it less than a hundred thousand?

10   A    Yes.

11   Q    Was it more than 10,000?

12   A    Yes.

13   Q    Was it more than 30,000?

14   A    No.

15   Q    Somewhere between ten and 30?

16   A    Close to ten I'd say.

17   Q    Okay.  And did you have to sign a release in

18        connection with that?

19   A    Yes.

20   Q    Did you sign a -- what's known as a

21        non-disparagement clause?

22   A    I'm not sure.
```

23    Q    A non-disparagement clause would be, just to

24          clarify, an agreement where you agree to not say

25          anything bad about the company.

1     A    I don't recall reading anything like that.

2     Q    Okay.  And did you consult an attorney -- don't

3          tell me what was said if you did, but did you

4          consult an attorney about the document?

5     A    No.

6     Q    And have you secured employment since then?

7     A    Yes.

8     Q    Okay.  And where do you work currently?

9     A    Tapco.

10    Q    When did you start there?

11    A    Let's see.  Early October 2014.

12    Q    All right.  Is your job similar there to what you

13         had at Miller?

14    A    Not necessarily, no.

15    Q    Okay.  What is your home address?

16    A    2222 North Lefeber Avenue, Wauwatosa, Wisconsin

17         53213.

18    Q    And what is the best phone number to reach you at?

19    A    414-426-2320.

20    Q    Okay.  Did you receive messages from my office to

21         try and reach you?

22    A    Yes.

23    Q    Okay.  How many of those did you receive?  Three or

24         four?

25    A    I believe three.

1     Q    Okay.  And why did you not respond to those?

2     A    Because Alter -- Susan is representing me and I did

3          not want to talk -- to speak to you directly without

4          representation.

5     Q    Okay.  Did anyone suggest to you not to talk to me?

6     A    Yes.

7     Q    Okay.  They told you not to talk to me; correct?

8     A    Yes.

9     Q    And you understood that you are being represented

10         now by Alter's attorneys?

11    A    Yes.

12    Q    Okay.  And that representation started when?

13    A    I don't know.  I assume it was when I was called to

14         give a deposition.

15    Q    Okay.  When were you told -- on what date were you

16         told that you were not to talk to me?

17    A    I don't know.

18    Q    Was it recent or months ago, around the time of the

19         termination, when the lawsuit was filed?

20    A    No, last week.

21    Q    Okay.  And you were told not to return my calls?

22    A    No.

23    Q    You were just told not to talk to me?

24    A    Yes.

25    Q    Okay.  But you didn't talk to -- You didn't return

1          our calls before that; correct?

2     A    Correct.

3     Q    Okay.  And had you been told by anyone not to

4          return our calls?

5     A    No.

6     Q    When did you first receive notice that a lawsuit

7          had been filed in this case?

8     A    I don't know the specific date but sometime in 2014.

9     Q    Okay.  And did you have an understanding prior to

10         that time that it was likely a lawsuit would be

11         filed?

12    A    No.

13    Q    What was your progression of jobs at Miller

14         Compressing?

15    A    I started as a messenger -- excuse me, let me go

16         back.  For a couple days I started on -- in the yard

17         on the sorter.  That wasn't working out.  They had a

18         position as a messenger.  I took that and I did that

19         for about a year or so.  Then I went to the scale and

20         I became a scale operator.  And several years after

21         that I went into the -- what we call the order

22      processing department and I became a team leader

23      there -- training first, then team leader.

24   Q   Was that the last position you held is team leader?

25   A   Yes.

1    Q   Okay.  And as a team leader were you an exempt

2        employee for purposes of overtime?

3    A   Initially, no, but eventually, yes.

4    Q   Okay.  And when did you become exempt?

5    A   I'm not sure.

6    Q   Was there an event that occurred that coincided

7        with you becoming exempt such as a change in title

8        or change in duties?

9    A   No.

10   Q   Approximately how long were you not paid overtime

11       at the end of your employment?

12   A   I'd say maybe three years.

13   Q   Okay.  Did you work more than 40 hours a week

14       during the end of your employment --

15           MS. LORENC:  Objection --

16   BY MR. OLSON:

17   Q   -- during the last three years of your employment?

18           MS. LORENC:  Objection.  You can answer.

19   BY MR. OLSON:

20   Q   You can answer.

21  A    Yes.

22  Q    How much overtime did you work per week during the

23       last three years of your employment?

24  A    I don't know.

25  Q    What's your best estimate?

1   A    It varied.  I can't give you an estimate.

2   Q    Okay.  What was the least amount of overtime you'd

3        work during -- let's look at the 2012 time period.

4   A    I'd get at least 40 hours in.

5   Q    Okay.  And then what was the --

6   A    And -- excuse me.

7   Q    Sure, go ahead.

8   A    And when I did go to salary, it was understood I

9        would get a certain amount of time in over 40 hours.

10  Q    Okay.

11  A    And I don't know how that was calculated.

12  Q    So when you went to salary, are you saying that

13       your overtime was rolled into your salary or that

14       you were paid extra if you worked over 40 hours?

15  A    It was rolled in.

16  Q    It was rolled in.  Okay.  So when did you go to

17       salary?

18  A    Like I said before, I'm not sure.

19  Q    Did that coincide with you becoming a team

20       leader --

21    A    No.

22    Q    -- or sometime after that?

23    A    Yes.

24    Q    So you were initially a team leader hourly --

25    A    Yes.

1    Q    -- getting overtime, then they changed it?

2    A    Yes.

3    Q    And did you supervise other employees as a team

4         leader?

5    A    Other -- what do you mean by other employees?

6    Q    Employees other than yourself.

7    A    Yes.

8    Q    How many?

9    A    It varied.

10    Q    Okay.  I assume it went down over time?

11    A    Yes.

12    Q    Okay.  So was it around six and then decreased?

13    A    I'd say around six.

14    Q    Okay.  And then at the end how many were you

15         supervising?

16    A    Probably -- I believe two or -- two I believe.

17    Q    All right.  And in 2012 how much of the work were

18         you doing that was the same as what your employees

19         you were supervising were doing?

20   A    I don't recall.

21   Q    Were you doing a lot of the same tasks that they

22        were doing --

23   A    I would assist --

24   Q    -- or were you delegating that work?

25   A    I was delegating it but I would assist if necessary.

1    Q    Would you say that you were doing more or less than

2         50 percent of the same work that your employees

3         were doing?

4    A    Much less than 50 percent.

5    Q    Okay.

6    A    And it was as needed.

7    Q    As the company reduced its workforce, did your

8         overtime hours increase, stay the same, or go down?

9    A    I don't recall.

10   Q    Was there a push at some point in 2012 to have

11        fewer people doing more work?

12   A    I would say so, yes.

13   Q    Okay.  Was your time there recorded in some way; by

14        computer log-on or time punch or anything like

15        that?

16   A    No.

17             MS. LORENC:  Objection to form.  You can

18        answer.

19   BY MR. OLSON:

20  Q  As a result of fewer people doing more work, was

21     there an expectation that was communicated to you

22     that you work more hours than you had been

23     previously?

24  A  No.

25  Q  So you continued to work about the same hours

1      before and after the reductions in force at the

2      company; is that accurate?

3   A  I really don't recall.

4   Q  So you may have worked more hours, you may have

5      worked less, you don't know one way or the other;

6      is that right?

7   A  That's correct.

8   Q  Did you receive any training regarding the FMLA law

9      at any time?

10  A  No.

11  Q  Did you have any job responsibility concerning the

12     FMLA?

13  A  Yes.

14  Q  What was your job duty or duties in that regard?

15  A  It was administering or keeping -- I should say --

16     excuse me -- keeping track of the FMLA time.

17  Q  Okay.  And how did you do that?

18  A  On a spreadsheet.

19    Q    Was that on a computer?

20    A    Yes.

21    Q    Was there a particular software that you used for

22         that purpose?

23    A    Microsoft Excel.

24    Q    And did you maintain that record for time by

25         Ms. Wink?

1     A    Yes.

2     Q    Did you maintain it for any other employees?

3     A    No.

4     Q    Is that an Excel spreadsheet you developed

5          specifically to track Ms. Wink's hours, or was that

6          a document that already existed?

7     A    Specifically for Ms. Wink.

8     Q    At whose direction?

9     A    I believe it was my own.

10    Q    Did you discuss that spreadsheet with anyone?

11    A    Yes.

12    Q    With whom did you discuss the spreadsheet for the

13         FMLA hours?

14    A    Someone in HR.  I believe it was Peggy.  Possibly

15         Sarah.  Peggy --

16    Q    Peggy Malmstadt?

17    A    Yes.

18    Q    Or Sarah Barbian?

19    A    Correct.

20    Q    Okay.  When did you begin keeping track of the FMLA

21         hours?

22    A    I don't recall.

23    Q    And on what computer did you keep track of those

24         hours?

25    A    My work computer.

1     Q    Was that part of the company network computer --

2     A    Yes.

3     Q    -- on the server?

4     A    Yes.

5     Q    Who had access to that spreadsheet other than

6          yourself, in other words, just by going into the

7          computer?  Do you know of somebody who would go in

8          and look at it or put information into it or

9          anything like that?

10    A    Only I would do that.

11    Q    Okay.  And did you print it out from time to time?

12    A    I don't recall but I know I e-mailed it.

13    Q    Okay.  To whom did you e-mail the document?

14    A    Peggy.

15    Q    For what purpose did you e-mail that document to

16         Ms. Malmstadt?

17    A    To keep her up to speed as to where we were with the

18    FMLA time.

19 Q  And the FMLA time, are you referring to when that

20    started in 2011 or some other time period?

21 A  I don't recall.

22 Q  When --

23 A  Well -- excuse me.  It would be in 2012 or so -- I'm

24    not sure when it started, but it was to document

25    Tracy's FMLA time.

1 Q  Okay.  And why did that become an issue in 2012 in

2    contrast to prior times, because we're aware that

3    she was on FMLA before that?

4 A  Because she was using vacation time -- or I should

5    say paid time off and FMLA time.

6 Q  So in other words, she was substituting paid time

7    to use it for pay during her FMLA qualifying time?

8 A  Yes.

9 Q  Okay.  So --

10 A  You know --

11 Q  -- were you doing it so payroll had a record as to

12    what they would charge her?

13 A  I don't recall if payroll was involved.  They would-.

14 Q  Do you have anything to add?

15 A  No, I'm sorry.  No.

16 Q  So why was it that the fact that she was using

17    vacation pay to apply to her FMLA time that

18          prompted you to document it on a spreadsheet?

19    A     To distinguish between the two different times,

20          whether or not it was FMLA time or paid time off, and

21          I believe there may have been non-paid time.

22    Q     Okay.  Now, I think the record shows that during

23          prior FMLA leaves, she did substitute in paid time

24          for that.  Do you know why during that time period

25          you did not put it in a spreadsheet and during 2012

1           you did?

2     A     I recall it becoming very complex, her -- excuse

3           me -- her schedule becoming very complex because she

4           was working from home and she was I believe out for

5           different reasons --

6     Q     Okay.

7     A     -- her own medical issues and her son's --

8     Q     Okay.

9     A     -- and it was becoming very complicated.

10    Q     What did you understand were her son's medical

11          issues?

12    A     From what I understand he had behavioral issues.

13    Q     Okay.  Did you understand it was some form of

14          autism?

15    A     Yes.

16    Q     Okay.  Did you understand that she, Ms. Wink, did

17        not have day care for her son with autism?

18    A   Yes.

19    Q   Did you understand that one of the reasons that she

20        had applied for intermittent FMLA was so that she

21        could care for her son two days per week at her

22        home?

23    A   Yes.

24    Q   And did she share with you that her mother was not

25        available on those two days to care for him?

19

1    A   Yes.

2    Q   And did you understand that through the end of --

3        to be the case through the end of Ms. Wink's

4        employment?

5    A   Yes.

6    Q   Did anyone suggest to you that perhaps Ms. Wink was

7        using too much FMLA time and that it was

8        interfering with her work?

9    A   No.

10    Q   Did you ever form that conclusion?

11    A   No.

12    Q   In -- Well, with respect to FMLA regarding her

13        son's autism, do you know when she first applied

14        for that?

15    A   I don't recall.

16    Q   Did she apply through you or discuss it with you at

17      that time that she was applying?

18   A   I would be involved, yes.

19   Q   Do you remember that conversation?

20   A   No.

21   Q   Now, that spreadsheet, do you know if that was

22       produced during the discovery process in this

23       litigation?

24   A   I don't know.

25   Q   Were you ever asked to produce it?

                                                    20


1    A   No.

2    Q   Now, you said you've e-mailed it to Malmstadt.  How

3        many times did you e-mail it to her?

4    A   I don't know.

5    Q   When was the first time you talked to anyone about

6        changing Ms. Wink's job in some manner that would

7        discontinue her being at home two days per week?

8    A   I don't recall.

9    Q   Do you remember discussing it at all at any time?

10   A   Yes.

11   Q   Okay.  And when is the first time you remember

12       discussing that?

13   A   I don't recall.

14   Q   Can you identify the context within which you

15       talked about that?

16    A    Yes.

17    Q    Okay.  What was that?

18    A    At the time we had to make a decision within the

19         department to cut an additional person, and at the

20         time there was a lot of talk about the company being

21         sold.

22    Q    Okay.

23    A    It wasn't official necessarily but there was talk

24         about that happening.

25    Q    Okay.

1     A    And from what I recall, my supervisor at the time --

2     Q    Who was that?

3     A    Margo Eshleman.

4     Q    Okay.

5     A    -- was told by upper management that we had to cut an

6          additional person in the department.

7     Q    Okay.  And how did that relate to Ms. Wink working

8          in the office three days and then being at home two

9          days per week?

10    A    We had to decide, as we have in the past, who was the

11         most cross-trained in different areas within the

12         department.

13    Q    Okay.  And was Ms. Wink identified as someone who

14         was most cross-trained?

15    A    Yes, she was.

16   Q   So would she be in that regard at least the most

17       useful as far as being able to cover various areas?

18   A   Yes, if she was there full-time.

19   Q   Okay.  So in other words, if she were there and not

20       at home two days a week with her son, then she

21       would be able to apply her different areas of

22       experience on the job in the office?

23   A   That's correct.

24   Q   Okay.  And so with whom did you have your first

25       conversation about Ms. Wink being in the office

1        full-time?

2    A   My supervisor Margo.

3    Q   Anyone else?

4    A   I don't recall.

5    Q   Okay.  And then when was the next time you had any

6        communication with anyone about Ms. Wink being in

7        the office five days a week?

8    A   I don't recall.

9    Q   Did you ever discuss the topic with Sarah Barbian?

10   A   Yes.

11   Q   When was that in relation to Ms. Wink's separation

12       of employment?

13   A   I don't recall.

14   Q   Was it within a month, within a week, a day; do you

15      have any recollection?

16   A   A month, weeks.  Several -- a couple weeks.

17   Q   Okay.  And as specifically and completely as you

18       can recall, what did you discuss with Ms. Barbian

19       about Ms. Wink being required to work in the office

20       five days a week?

21   A   I know we discussed -- we explained to her what Margo

22       and I -- what our findings were, what our --

23   Q   You and Margo explained it to Barbian?

24   A   I'm not sure if Margo was involved.  I believe she

25       was.

1    Q   In any event, you told what you had concluded with

2        Margo, you passed this on then to Ms. Barbian?

3    A   Yes.

4    Q   All right.  And what did you say to Ms. Barbian?

5    A   I don't recall specifics exactly what I said, but we

6        explained the situation as far as what we were

7        leaning towards.

8    Q   Which was?

9    A   It was going to be either Tracy Wink or her sister

10       Kim Noonan who would be our choice to be let go.

11   Q   Ms. Wink or Noonan would be let go?

12   A   Correct.

13   Q   And I thought you said that if Wink were full-time

14       in the office, that she'd be the best person to

15      keep on due to her cross-training?

16  A   That's true, that's correct.

17  Q   Okay.  Well, then why would you go to Barbian and

18      recommend that Wink would be one under

19      consideration for discharge?

20  A   Because -- I don't recall the specifics, but Kim was

21      just as knowledgeable as Tracy was when it came to

22      being cross-trained.

23  Q   But didn't you have a total of six people in your

24      department?

25  A   At that time I don't recall but it was not six

1       people.  That was at the high end.

2   Q   Was it down to four then?

3   A   I'm -- I'm not certain.  I'm not sure.

4   Q   Okay.  Was one of the reasons that Ms. Wink was

5       considered for discharge that even though she had

6       cross-training, she wasn't available to be in the

7       office five days a week?

8   A   That wasn't the sole reason I would say.

9   Q   It was -- it was a reason?

10  A   Sure, I would say that's true.

11  Q   Okay.  And you told that to Barbian, or did she

12      tell that to you?

13  A   No, we just explained the situation, you know, where

14        everyone was and the cross-training.

15   Q   But did Barbian agree with you that even though

16        Wink had been cross-trained and was versatile -- am

17        I using the right term, being versatile? --

18   A   Yes.

19   Q   -- that because she was not available two days per

20        week and couldn't be in the office, that that was

21        something that counted against her as far as

22        continuing her employment?

23   A   That is true.  That was my -- that was my -- that was

24        my and Margo's --

25   Q   Assessment?

1   A   -- assessment, yes.

2   Q   Okay.  And Ms. Barbian agreed with you?

3   A   I don't think it was -- I think so, yes.

4   Q   She certainly didn't vocalize disagreement; is that

5        true?

6             MS. LORENC:  Objection.  You can answer

7        it if you recall.

8             THE WITNESS:  I don't recall.

9  BY MR. OLSON:

10  Q   Now, you understand in this deposition that even if

11        the attorney for the company suggests that you may

12        not recall an answer, if you recall you have to

13        give a complete answer?

14    A    (Witness nodded head.)

15                    MS. LORENC:  I didn't suggest that he

16         doesn't recall.  I said if he does he can answer.

17                    MR. OLSON:  Right.

18    BY MR. OLSON:

19    Q    I just don't want a situation where the lawyer is

20         saying if you recall and you pick that up as a clue

21         that that's something you shouldn't remember for

22         some reason.  Do you understand that?

23    A    I understand that.

24    Q    All right.  Now, were you involved in the

25         separation of Ms. Wink's employment?

1    A    Yes.

2    Q    And were there a couple meetings around her

3         separation?

4    A    Yes.

5    Q    Okay.  And the -- one of the main requirements of

6         Ms. Wink was that if she were going to continue

7         with the company, she would have to be in the

8         office five days a week?

9    A    Yes.

10    Q    And Ms. Wink responded on that Friday that she

11         didn't think she'd be able to come up with coverage

12         for her son's care by the following Monday; is that

13      accurate?

14   A  I don't believe she -- I'm not sure if she actually

15      said that, but that was the -- that's what she

16      implied because of her reaction to the situation.

17   Q  She was upset?

18   A  Yes.

19   Q  And the communication between management and

20      Ms. Wink was that unless she could commit by the

21      following Monday to be in the office five days a

22      week, she could not continue her employment there;

23      true?

24   A  That's true.

25   Q  And she said words to the effect I have to care for

1       my son two days a week; yes?  At least in part?

2    A  I don't recall.

3    Q  Do you remember the gist of the communication from

4       her as I have to be able to care for my son two

5       days a week, my mom can only do it three days a

6       week?

7    A  The gist was she could not.

8    Q  She couldn't be in the office --

9    A  Correct.

10   Q  -- five days a week; correct?

11   A  The gist of it, yes.

12   Q  And the reason she gave was that she had to care

13      for her son two days per week; true?

14   A   She did not necessarily say that but it's implied,

15      yes --

16   Q   Well, everybody --

17   A   -- she could not cover that.  She could not be --

18      yes, because her son needed day care, yes.

19   Q   All right.  And you knew her son because of his

20      dangerous condition could not be in day care?

21   A   Yes.

22   Q   And the following Monday Ms. Wink reported to you

23      and Ms. Barbian that she was not able to arrange

24      alternate care for her son on such short notice;

25      true?

1    A   She did not -- she did not tell that to me.

2    Q   Were you aware of her communicating that to

3        Ms. Barbian?

4    A   I -- I know that she communicated something to Sarah,

5        but what that was I don't know --

6    Q   Okay.

7    A   -- specifically what it was, but, yes, she could

8        not -- she could not agree to our terms, what we

9        asked of her.

10   Q   Okay.  And the terms being that she be in the

11       office five days a week?

12  A    Correct.

13  Q    And as of July 16, 2012, the Monday after the

14       Friday discussion --

15  A    Yes.

16  Q    -- you understood from Barbian that Wink had gone

17       back to Barbian and said I could not make

18       arrangements for my son's care so I couldn't be --

19       I can't be in the office five days a week; is that

20       accurate?

21              MS. LORENC:  Objection to form.  You can

22       answer.

23              THE WITNESS:  Those words -- I don't know

24       what Tracy told Sarah directly.

25

1  BY MR. OLSON:

2  Q    Right.

3  A    The point was it was relayed to me that she could

4       not -- she could not meet our request.

5  Q    Regarding the hours?

6  A    Yes.

7  Q    And you knew that because that's what Barbian told

8       you?

9  A    Yes.

10  Q   And that was the reason that Wink's employment

11      ended; is that accurate?

12  A   Well, from my understanding -- from what I recall on

13      that Friday, she was told if she were to -- if she

14      left the room, that she would -- they would consider

15      that her quitting.  Okay.  Again, I --

16  Q   Now, did you consider her to have quit as of

17      Friday?

18  A   Yes.

19  Q   So as far as you knew, as of Friday she was done

20      with the company?

21  A   Yes.

22  Q   But then you later learned from Barbian that the --

23      if she would have made day care arrangements for

24      her son, that her employment would have continued?

25  A   If -- yes, plus other things that we requested of

1       her.

2   Q   Sure.  Were you aware that Barbian called Wink on

3       the phone about 20 minutes after Wink left the

4       office upset on that Friday?

5   A   Yes, I do.

6   Q   Okay.  Now, that -- that meeting that you had with

7       Wink on that Friday, was that at the end of the

8       workday?

9   A   Near the end of the workday, yes, late in the day.

10  Q   Okay.  And were you present on Barbian's end of the

11    call when she got ahold of Wink by telephone on

12    Friday?

13  A  I don't recall.

14  Q  Barbian told you about the call nonetheless?

15  A  I know -- I knew of the call.

16  Q  Okay.  And Barbian told you that she gave Wink

17    until Monday to let them know whether she could

18    make arrangements for her son's day care?

19  A  I believe so.

20  Q  And in fact, you knew that Wink came in on that

21    following Monday; correct?

22  A  I found out about it, yes.  I found out about it

23    after the fact, yes.

24        MR. OLSON:  Okay.  All right.  Those are

25    my questions.  Thank you.

                                                  31


1        THE WITNESS:  All right.

2        MS. LORENC:  We'll read.

3        (The proceedings concluded at 3:35 p.m.)

4        (No exhibits marked.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF WISCONSIN )
                       ) SS.
2    MILWAUKEE COUNTY   )

3

4                      I, Elaine A. Thies, RPR and Notary

5    Public in and for the State of Wisconsin, do hereby

6    certify that the preceding deposition was recorded by

7    me and reduced to writing under my personal

8    direction.

9                      I further certify that said deposition

10     was taken at ALAN C. OLSON & ASSOCIATES, S.C., 2880

11     South Moorland Road, New Berlin, Wisconsin, on the

12     26th day of February, 2015, commencing at 2:58 p.m.

13     and concluding at 3:35 p.m.

14              I further certify that I am not a

15     relative or employee or attorney or counsel of any of

16     the parties, or a relative or employee of such

17     attorney or counsel, or financially interested

18     directly or indirectly in this action.

19              In witness whereof, I have hereunto

20     set my hand and affixed my seal of office on this 6th

21     day of February, 2015.

22

23              _____
                ELAINE A. THIES - Notary Public
24              In and for the State of Wisconsin

25     My commission expires 11-4-17.


                                                      33



1      STATE OF WISCONSIN     )
                              ) SS.
2      MILWAUKEE COUNTY       )

3

4              I, MATTHEW E. CHAVEZ, do hereby

5      certify that I have read the foregoing transcript of

6      proceedings, taken on the 26th day of January, 2015,

7      at ALAN C. OLSON & ASSOCIATES, S.C., 2880 South

8      Moorland Road, New Berlin, Wisconsin, and the same is

9      true and correct except for the list of corrections,

10      if any, noted on the annexed errata sheet.

11

12              Dated at _____,

13      _____, this _____ day of

14      _____, 2015.

15

16                      _____
                        MATTHEW E. CHAVEZ
17

18

19

20

21

22

23

24

25