1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF WISCONSIN
2               MILWAUKEE DIVISION
    ----------------------------------------------------------
3   TRACY L. WINK,

4              Plaintiff,

5   vs.                              Case No. 14-C-367

6   MILLER COMPRESSING COMPANY,

7              Defendant.

8   ----------------------------------------------------------

9

10

                  Deposition of SARAH K. BARBIAN
11
                  Monday, January 26th, 2015
12
                        9:03 a.m.
13
                           at
14
              ALAN C. OLSON & ASSOCIATES, S.C.
15               2880 South Moorland Road
                   New Berlin, Wisconsin
16

17

18

19

20

21            Reported by Elaine A. Thies, RPR

22

23

24

25

1                    Deposition of SARAH K. BARBIAN, a

2          witness in the above-entitled action, taken at the

3          instance of the Plaintiff, pursuant to Chapter 804 of

4          the Wisconsin Statutes, pursuant to notice, before

5          Elaine A. Thies, RPR and Notary Public, State of

6          Wisconsin, at ALAN C. OLSON & ASSOCIATES, S.C., 2880

7          South Moorland Road, New Berlin, Wisconsin, on the

8          26th day of January, 2015, commencing at 9:03 a.m.

9          and concluding at 2:29 p.m.

10

11          A P P E A R A N C E S:

12          ALAN C. OLSON & ASSOCIATES, S.C., by
            Mr. Alan C. Olson and Ms. Brianna M. Covington
13          2880 South Moorland Road
            New Berlin, Wisconsin  53151
14          Appeared on behalf of the Plaintiff.

15          THOMPSON COBURN LLP, by
            Ms. Susan M. Lorenc
16          55 East Monroe Street, 37th Floor
            Chicago, Illinois  60603
17          Appeared on behalf of the Defendant.

18

19                        I N D E X

20      Examination by:                              Page

21      Mr. Olson                                      5

22

23

24

1                    E X H I B I T S

2    Exhibit No.            Description            Page Identified

3    Exh. 4  - One-page document entitled Documents Bates
                 Labeled D000580-D000589 Withheld as
4                Privileged                                    41
         Exh. 5  - Two-page document entitled Miller
5                Compressing Company Job Description           79
         Exh. 6  - Answer and affirmative defenses to amended
6                complaint                                     82
         Exh. 7  - Application for FMLA Leave of Absence       84
7        Exh. 8  - Fax to Dr. Mance dated 2-29-12             89
         Exh. 9  - E-mails regarding sick time from March 2012  99
8        Exh. 10 - E-mail dated March 20, 2012, to Tracy
                 Wink from Peggy Malmstadt regarding FMLA     101
9        Exh. 11 - FMLA time records                          105
         Exh. 12 - Fax to Dr. Mance dated 7-5-12             106
10       Exh. 13 - Defendant's objections to interrogatories  122
         Exh. 14 - Defendant's answers to interrogatories     141
11       Exh. 15 - Payroll records                            126
         Exh. 16 - Reduction analysis spreadsheets            130
12       Exh. 17 - Miller Compressing QES Meeting Record      139
         Exh. 18 - E-mail dated July 24, 2012 to Sarah Barbian
13               from John Busby                              153
         Exh. 19 - E-mails starting 2-9-12 from Matt Chavez   153
14       Exh. 20 - 7-16-12 e-mail to Alan Dahl                156
         Exh. 21 - Time record for pay period July 9th through
15               July 15th, 2012                              157
         Exh. 22 - Discharge questionnaire                    161
16       Exh. 23 - Agreement With Respect to Inventions,
                 Confidentiality, Competition and Term of
17               Employment, Miller Compressing Company        163

18                (Original exhibits attached to original

19       transcript.  Copies attached to copy transcripts.)

20

21

22

23

24

25

1                    R E Q U E S T S

2   Request            Description                    Page

3   1.        Notes from Tracy's deposition              8
    2.        Log of documents withheld                 41
4   3.        Outline notes                              50
    4.        Calendar                                  102
5   5.        Documents regarding the reduction in force,
              including board minutes from June of 2012
6             and any other board meeting minutes where
              topic was discussed                       146
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1               TRANSCRIPT OF PROCEEDINGS

2                    SARAH K. BARBIAN, called as a witness

3       herein, having been first duly sworn on oath, was

4       examined and testified as follows:

5                         EXAMINATION

6   BY MR. OLSON:

7   Q   Could you state and spell your name for the record.

8   A   Sarah Barbian, S-A-R-A-H B-A-R-B-I-A-N.

9   Q   Ms. Barbian, during this deposition I will be

10      asking you questions.  You're under oath.  You have

11      to provide truthful responses to my questions.  If

12      you do not hear a question, I will restate it for

13      you.  If you don't understand a question I can

14      rephrase it.  If you answer my question, I will

15      assume that you heard it and you understood it and

16      you are answering it accurately.

17                   It's important that Elaine get

18      everything down accurately today, so we have to try

19      not to talk over one another.  If you need to take

20      a break at some point, as long as there's no

21      question pending we can take a break.

22                   Do you have any questions about the

23      process?
```

24    A    No.

25    Q    Have you ever given a deposition before?

1    A    Yes.

2    Q    Okay.  And how many times?

3    A    Twice.

4    Q    Okay.  And in what matter was that or matters?

5    A    One was an N.L.R.B. charge.

6    Q    Okay.

7    A    And the other was a non-compete case.

8    Q    Okay.  And the N.L.R.B. was when?

9    A    2011 or 2012.

10    Q    Okay.  At Miller Compressing?

11    A    Yes.

12    Q    Okay.  And what was the result of that action?

13    A    No findings.

14    Q    Okay.  And the non-compete, was that also at Miller

15        Compressing?

16    A    Yes, it was.

17    Q    Okay.  And when was that?

18    A    2006.

19    Q    The N.L.R.B. claim was brought by whom?

20    A    The union, the United Steelworkers, on behalf of

21        Luther Borders, the union business agent.

22    Q    Okay.  So that matter is done?

23    A    Yes.

    24    Q    There's nothing pending?  There's no appeal or

    25         anything else with that --

     1    A    Correct.

     2    Q    -- case?

     3                        And the non-compete, what was the

     4         result of that case?

     5    A    Miller Compressing won the non-compete case against

     6         the company who hired former employees of ours to

     7         directly compete against the company.

     8    Q    All right.  And have you been involved in any

     9         lawsuits other than those two?

    10    A    No.

    11    Q    Have you ever been arrested?

    12    A    No.

    13    Q    Have you ever tested positive for drugs or alcohol?

    14              MS. LORENC:  Objection.  You can answer.

    15              THE WITNESS:  No.

    16    BY MR. OLSON:

    17    Q    Have you ever filed for bankruptcy?

    18    A    No.

    19    Q    Have you ever been audited by the IRS?

    20    A    No.

    21    Q    Do you know of any reason why you would not be able

    22         to give accurate testimony today?

23    A    No.

24    Q    What did you do to prepare for your deposition

25         today?

1     A    I reviewed the interrogatories and responses.

2     Q    Okay.  Did you review any other documents?

3     A    I reviewed my notes from Tracy's deposition.

4     Q    Okay.  And when did you last review those?

5     A    This morning.

6     Q    Okay.  And those notes helped refresh your

7          recollection as to the facts as she stated them?

8     A    Correct.

9     Q    Okay.  I'd like to see those notes, please.

10              MS. LORENC:  We're going to object on a

11         work product privilege basis.

12              MR. OLSON:  That's it, work product?

13              MS. LORENC:  And attorney-client

14         privilege.  They may -- I have not reviewed them

15         but they may very well reflect conversations

16         between the two of us.

17              MR. OLSON:  Okay.

18   BY MR. OLSON:

19    Q    And do you have those notes in your possession?

20    A    Yes.

21    Q    Okay.  I'd like you to show me not the subject of

22     the notes at this point but the -- what the notes

23     look like so we can make a record of that.

24              MS. LORENC:  And I'll allow her to show

25     them sort of generally but not for your review.

1              MR. OLSON:  Right.

2     BY MR. OLSON:

3     Q    Okay.  So tell me if I'm describing this

4          accurately.  You've got a manila folder with

5          approximately 50 pages of documents and notes.  And

6          take a look at your notes.  Is there anything in

7          there where you are -- you have a note to your

8          lawyer or your lawyer has a note to you?

9     A    Repeatedly.

10    Q    Okay.  Those are notes that you shared with your

11         attorney during the deposition, is that it?

12    A    They're notes that I made so that she and I could

13         discuss them on breaks during the deposition.

14    Q    Okay.  And so those don't reflect the actual

15         conversations you had with your attorney.  They're

16         only notes to remind you of things that were said

17         by Ms. Wink during her deposition; true?

18              MS. LORENC:  Objection, misstates her

19         testimony.

20              MR. OLSON:  You can object to form

21         without giving a substantive statement.

```
22   BY MR. OLSON:

23   Q    Is that accurate?

24   A    They are notes of things that I wanted to discuss

25        with Susan on break.
```

```
1    Q    Okay.

2              MR. OLSON:  And you're refusing to

3         produce those notes today unless I bring a motion

4         with the Court; is that accurate?

5              MS. LORENC:  The former is accurate.  The

6         latter might be necessary.  I need to review the

7         notes in greater detail.

8              MR. OLSON:  All right.  What I'd suggest

9         is during a break if you'd like to look at those go

10        ahead, and I will make an effort to get the Court

11        on the phone.  You can decide how important it is

12        for you to stand by that objection.  If you want to

13        do that, that's fine, and I'll make an effort then

14        to communicate with the Court.

15             MS. LORENC:  That's fine.

16   BY MR. OLSON:

17   Q    What is your home address?

18   A    8060 South Bernards Way, Oak Creek, Wisconsin.

19   Q    Who resides there with you?

20   A    My husband.
```

```
21  Q   His name?

22  A   Shawn Barbian.

23  Q   Where does he work?

24  A   Kenall Manufacturing.

25  Q   And is that your first and only marriage?
```

```
 1  A   Yes.

 2  Q   What is your educational background?

 3  A   I have my -- I have a double major and a minor from

 4      undergrad, and I have coursework towards my masters

 5      degree, and I have a professional and human resources

 6      certification.

 7  Q   And from what institution did you earn your

 8      undergrad?

 9  A   University of Wisconsin, Whitewater.

10  Q   What year?

11  A   2000.

12  Q   You mentioned you have a double major.  What was

13      that?

14  A   Management computer systems and human resources.

15  Q   All right.  And your masters, you're working on

16      that where?

17  A   Marquette.

18  Q   Okay.  And when was the last time you took a course

19      toward your masters degree?

20  A   2008.
```

21    Q    How many credits are you away from that?

22    A    I don't know.  I haven't -- I haven't continued

23         taking it.  I think you misunderstood me.  I said I

24         took coursework toward my masters.

25    Q    I see.  So you don't have any intent to continue

1         that?

2     A    Correct.

3     Q    I see.  And where did you earn your HR professional

4          certificate from?  I'm paraphrasing what you told

5          me.

6     A    They're all earned from the same certification.  It's

7          a national certification.  It's the Human Resources

8          Certification Institute.

9     Q    Okay.  And through that training what have you

10         received on the topic of FMLA?

11    A    Could you be more specific?

12    Q    Sure.  Were you trained on the FMLA with respect to

13         your certification?

14    A    Yes.

15    Q    Okay.  And when last were you trained on FMLA?

16    A    The certification was in 2007, 2008.

17    Q    Okay.  And did you receive written materials

18         through that study?

19    A    Yes.

20  Q    And did you maintain those materials?

21  A    No.

22  Q    Have you received any training on the FMLA since

23       2007, 2008?

24  A    No.

25  Q    And by training I mean even informally through a

1       law firm, through a seminar, through written

2       materials provided by an HR entity or organization

3       or group.

4            MS. LORENC:  I'm going to object to the

5       extent that calls for attorney-client privileged

6       information, but you can answer otherwise.

7            MR. OLSON:  Well, she can identify

8       whether she's received training if I don't ask her

9       the substance at least at this point.  This is a

10      central issue in the case so I'm entitled to

11      establish this individual's background.

12  BY MR. OLSON:

13  Q    Again, what training have you received if it was

14       from a law firm on FMLA?

15           MS. LORENC:  And I'll object to the term

16      training, but you can answer if you understand it.

17           THE WITNESS:  I haven't received any

18      informal training from a law firm, but I have had

19      specific discussions with several attorneys

20      regarding Family Medical Leave.

21  BY MR. OLSON:

22  Q    Okay.  And did you have any of those discussions

23       with respect to Ms. Wink?

24  A    Yes, I did.

25  Q    Okay.  And when in relation to her termination did

1       you have those discussions:  Before, after, during,

2       or all?

3   A    All.

4   Q    Okay.  And did you have discussions with legal

5       counsel about Ms. Wink's termination before the

6       termination?

7   A    Ms. Wink wasn't terminated.  She voluntarily

8       resigned.

9   Q    She resigned when you could not accommodate her

10      hours; is that correct?

11              MS. LORENC:  Objection to form.  You can

12      answer.

13              THE WITNESS:  She resigned when the

14      company informed her that we were no longer able to

15      continue the exception to her differing work hours

16      from the rest of the department and when we

17      informed her that her work performance needed to

18      improve, that there would no longer be employees

```
19        from other departments who would be able to assist

20        in covering her workload.

21   BY MR. OLSON:

22   Q    Did you ever warn her about her performance?

23   A    Yes, we did.

24   Q    Okay.  Does the company have a progressive

25        discipline policy?
```

```
 1              MS. LORENC:  Objection to form.  When are

 2        you discussing?

 3              MR. OLSON:  Any time.

 4   BY MR. OLSON:

 5   Q    Does the company have a progressive discipline

 6        policy?

 7   A    The company has a series of policies.  There's a

 8        plant rule policy which follows progressive

 9        disciplinary action.

10   Q    Okay.  During --

11   A    Performance issues sometimes do and sometimes don't

12        follow progressive discipline.

13   Q    During Ms. Wink's employment was she covered by a

14        progressive discipline policy?

15   A    She was covered by the policy that I just explained.

16   Q    Okay.  And is that policy in writing?

17   A    The plant rules are in writing.

18   Q    Okay.  And the plant rules cover her --
```

19    A    Correct.

20    Q    -- covered her?

21    A    Correct.

22    Q    And were those plant rules contained in the

23         handbook or were they separate?

24    A    The company doesn't have a handbook.

25    Q    Okay.  The plant rules are in writing; correct?

1    A    Yes.

2    Q    And have those rules been produced as part of this

3         lawsuit?

4              MS. LORENC:  If you know.

5              THE WITNESS:  I don't -- I don't recall

6         specifically if they have or have not.

7    BY MR. OLSON:

8    Q    Okay.  Did you participate in the document

9         production in this case?

10   A    Yes, I did.

11   Q    Okay.  So any documents asked for you were

12        personally involved in searching for the records

13        responsive to the request; is that accurate?

14   A    Yes.

15   Q    Okay.  And what is the progressive discipline

16        policy?

17   A    Could you be more specific as --

```
18   Q   What is it --

19   A   -- for what?

20   Q   Well, did you draft it?

21   A   No.

22   Q   Were you responsible for enforcing it?

23   A   Yes.

24   Q   And had you enforced it a number of times?

25              MS. LORENC:  Objection to form.
```

```
1              THE WITNESS:  I need you to be more

2         specific about which policy was being enforced.

3    BY MR. OLSON:

4    Q   The progressive discipline policy that we've been

5         talking about.

6    A   With respect to which rule?  There were numerous

7         policies including plant rules.

8    Q   Okay.  Let's go with at the time of Ms. Wink's

9         termination of employment, what was the progressive

10        discipline policy?

11             MS. LORENC:  Objection, misstates her

12        testimony.

13             MR. OLSON:  So you're objecting to form?

14             MS. LORENC:  I am objecting to the form

15        of your question.

16   BY MR. OLSON:

17   Q   Excuse me a moment.  At the time of the end of
```

18        Ms. Wink's end of employment, what was the

19        progressive discipline policy that applied to her?

20    A   She would have been subject to the company's plant

21        rules.  She would have been subject to the company's

22        cell phone policy, harassment policy.

23    Q   Okay, and what I'm focusing on when an employee

24        violates a rule, what is the progressive discipline

25        policy that would apply to that employee?

 1    A   There are a series of different types of rules.

 2    Q   Okay.  What are they?

 3    A   There's A, B and C, and then the handbook also states

 4        that other violations not covered or the situation is

 5        subject to action not to follow the policy.

 6    Q   Okay.  So if there's a serious infraction, the

 7        company has the discretion to skip all the rules?

 8    A   Correct.

 9    Q   Okay.  Now, you had just used the term the company

10        handbook, but I thought you testified earlier there

11        was no handbook, so I want to make sure we're on

12        the same page there.

13    A   I didn't use the term handbook.

14            MR. OLSON:  Could you read back her

15        answer and indicate whether she said handbook.

16            (Requested portion read by the reporter.)

17             THE WITNESS:  Okay.  So I misstated.  It

18       should be the rulebook.  It's not a handbook.

19  BY MR. OLSON:

20  Q    And the rulebook is -- Do you know what the title

21       is on that document?

22  A    Plant rules.

23  Q    Okay.  And what would be the process you would take

24       to get a copy of that?  Is that something you keep

25       in your office that's readily accessible to you?

1  A    That who would take to get a copy of it?

2  Q    You.

3  A    I have a copy in my office.

4  Q    Okay.  You don't have a copy with you, I assume?

5  A    No.

6  Q    Okay.  And do you have a copy of the one that was

7       in place at the time of Ms. Wink's separation from

8       employment?

9  A    The plant rules that were in place at that time have

10       been in place since 1978.

11  Q    And they still haven't changed?

12  A    No.

13  Q    Okay.  So you said there's A, B and C.  What is A?

14  A    A rules are the rules that are subject to a verbal

15       warning, a written warning, a suspension, and then a

16       termination.

17    Q    Okay.  And are there certain types of infractions

18         that are included in that category?

19    A    Yes.

20    Q    Okay.  And what types of infractions are those?

21    A    Wasting time, inefficiency, taking extended breaks or

22         lunches, violation of published safety rules like PPE

23         violations, and a number of others.

24    Q    And B, is that a group of more serious infractions?

25    A    Yes.

20

1    Q    Okay.  And how does A differ from B with respect to

2         the type of discipline that would be doled out

3         under that policy?

4    A    A B rule violation would be grounds for suspension

5         and the first step in termination and the second

6         step.

7    Q    Okay.  And a C rule is something like stealing or a

8         crime?

9    A    A C rule would be grounds for termination on the

10        first offense.

11   Q    Okay.  And what things are in that category?

12   A    Which?

13   Q    A C.

14   A    C?

15   Q    Right.

16  A    Sabotage, direct threats of safety or health,

17       stealing from the company, insubordination, walking

18       off the job.

19  Q    Okay.  And what are the infractions within the B

20       list?

21  A    Sleeping on the job.  I forget the exact wording but

22       basically endangering the safety or health of

23       yourself or someone else through negligence or

24       carelessness, and several others.

25  Q    Okay.  Now, you mentioned in the context of

                                                              21


1    Ms. Wink's separation of employment that there was

2    a problem with her performance, that she would not

3    be helped by other employees; is that correct?

4  A    Not that she would not be helped by other employees

5       but that the help from other employees would not be

6       able to continue.

7  Q    Okay.  So there would be a termination of help from

8       other employees; is that correct?

9  A    It wouldn't be a termination of that help.  It's that

10       those other employees would not be available.  The

11       company was going through numerous reductions and

12       layoffs.

13  Q    Okay.  And the reason for the help not being

14       available to her was what?  There was a change and

15       you said it was something to do with her phone.

16      What was that?

17   A   The reason --

18              MS. LORENC:  Objection.  That misstates

19      her testimony.  You can answer.

20              MR. OLSON:  So you're objecting to form?

21              MS. LORENC:  Yes.

22              MR. OLSON:  Okay.

23              THE WITNESS:  The reason for the help not

24      being available to her is that there were numerous

25      reductions that were happening at the company, and

1       the help that she and her department were receiving

2       from other departments and from coworkers within

3       the department was no longer able to continue

4       because the staffing levels within those

5       departments and the overtime allowed within those

6       departments was being cut.

7   BY MR. OLSON:

8    Q   Is it accurate to state that Ms. Wink's use of her

9       phone at work or using the phone at work had

10      nothing to do with her separation of employment?

11   A   I would say, no, that's not accurate.

12   Q   Okay.  Then explain to us in every way how her use

13      of the phone related to her separation of

14      employment.

15    A    She was asked and informed that she could no longer

16          continue to have an exception to the company's cell

17          phone policy to keep her personal cell phone on and

18          to make personal phone calls during working hours.

19          She was told that she can continue making personal

20          calls during breaks and lunchtimes but not during the

21          workday because it was disruptive to her and to other

22          people.

23    Q    When was she first informed that she could no

24          longer use her personal cell phone in the manner

25          you just described?

1    A    Friday, July 13th.

2    Q    When was the last time she was told she could not

3          use her cell phone in the manner you just

4          described?

5    A    Friday, July 13th, 2012.

6    Q    And that was an oral statement to her?

7    A    Yes.

8    Q    It was not a written statement to her?

9    A    Correct.

10    Q    And she had not been warned about that previously?

11    A    Correct.  This was a change from a previous exception

12          that had been made.

13    Q    Was this a form of discipline to her?

14    A    Absolutely not.

15   Q   Okay.  So again, how did her -- how did the

16       restriction against her phone usage have something

17       to do with her separation of employment?

18   A   It was one of several items that the company had

19       discussed with her would need to change going

20       forward, and she -- it was one of the items that she

21       stated she needed to have the exception continued to

22       be made.

23   Q   Okay.  And the reason she gave you for having the

24       exception necessary for her was for her to

25       communicate with her son's health care providers;

24

 1       true?

 2   A   Correct.

 3   Q   And the health care her son was receiving was the

 4       subject of her FMLA use; correct?

 5   A   It was --

 6                 MS. LORENC:  Objection to form.  You can

 7       answer.

 8                 THE WITNESS:  It was the subject of one

 9       of her family medical leaves.  She had several.

10   BY MR. OLSON:

11   Q   I understand that's your argument, but right now

12       I'm focused on the time period of July 13, 2012;

13       okay?

14   A   Uh-huh.

15   Q   She only had one FMLA at that time; correct?

16   A   Yes.

17   Q   And that was for her son; correct?

18   A   Correct.

19   Q   All right.  So again, back to my question.  The

20       subject of her need for the phone as she stated it

21       was to communicate with her son's doctors; is that

22       accurate so far?

23   A   Yes.

24   Q   And is it also accurate to state that her

25       communication with her son's doctors related to his

1        care which was the subject of her FMLA usage at

2        that time?

3    A   She had informed the company that she wanted an

4        exception to the policy so that she could schedule

5        appointments for her son.

6    Q   All right.  And those appointments for her son were

7        the reason that she needed FMLA; true?

8    A   Correct.

9    Q   And the company as of July 13 refused to provide

10       that accommodation for her; is that correct?

11   A   No, that's not correct.  The company told her that

12       she could continue doing so on breaks and during

13       lunchtime.

14    Q    Okay.  She told you she was on a waiting list for

15         her son; true?

16                   MS. LORENC:  Objection to form.  You can

17         answer.

18                   THE WITNESS:  She told me she was on some

19         sort of waiting list.

20    BY MR. OLSON:

21    Q    Right.  And she said that she needed to be able to

22         receive a call from the health care provider on a

23         timely basis so that she could maintain her place

24         on the list; true?

25    A    She had said that there was a time frame she needed

1         to respond within.

2     Q    Right.  And that if she waited until a break or

3          until after work, she might lose the spot for her

4          son on the waiting list; true?

5     A    She didn't say how long -- I don't recall how long

6          she would lose the spot.  I don't believe it was less

7          than two hours.

8     Q    That was her concern though; right?  She

9          communicated to you she was afraid that if she

10         waited her son would lose his spot on the waiting

11         list; true?

12    A    That wasn't her initial reason for the request.

13  Q   But it was her -- it was a stated concern to you

14      when you told her she couldn't use her cell phone

15      or receive calls on her cell phone unless it was

16      during a break; true?

17  A   No, she didn't raise it at that point.  She actually

18      when we discussed that stormed out of the meeting.

19      She didn't respond at all.

20  Q   When did she tell you that?

21  A   She had communicated that she was on a waiting

22      list --

23  Q   Right.

24  A   -- after the company had made the exception to allow

25      her to use a company phone or her phone to schedule

1       doctor and therapy appointments --

2   Q   Okay.

3   A   -- but she did not request the exception so that she

4       could keep her place in one of her waiting lists.

5   Q   Okay.  When did you learn that she was on a waiting

6       list?

7   A   I don't recall specifically.

8   Q   She told you that personally; true?

9   A   She told myself and her direct supervisor that.

10  Q   Right.  And how many times did you discuss the

11      topic of FMLA with Ms. Wink?

12              MS. LORENC:  Objection to form.  You can

13    answer.

14              THE WITNESS:  Not very often.

15  BY MR. OLSON:

16  Q    I'd like you to estimate the number of times, and

17       we're going to go through each of those.

18  A    With Ms. Wink specifically?

19  Q    Right.

20  A    Maybe two to three.

21  Q    Okay.  And when was the first time?

22  A    The first time -- the first time was when it was

23       either she or her direct supervisor had communicated

24       to me that she was needing to miss work on an

25       intermittent basis for doctor and therapy

                                                    28


1        appointments for her son.

2   Q    What year was that?

3   A    I don't recall specifically.

4   Q    Do you know if it was during when she initially

5        asked for it for her son or when there was a

6        recertification; do you remember the context of

7        that?

8   A    It was when she initially asked for it.

9   Q    So if I told you that happened in 2011, you don't

10       have any memory that would be inconsistent with

11       that necessarily?

12    A    It would be somewhere between 2011 and 2012.

13    Q    Okay.  And do you remember her going through a

14         recertification of her FMLA request?

15    A    Yes.

16    Q    Okay.  And what was your involvement in that if

17         anything?

18    A    Little to none because I didn't handle directly the

19         leaves of absences.  There was another person in my

20         office who handles that.

21    Q    How did you become aware of the recertification?

22    A    The person in my office who handles it just confirms

23         with me on a weekly basis as she's completing the

24         recertifications for any employee who's on a leave.

25    Q    Okay.  And that's done orally?

1    A    Correct.

2    Q    By Peggy Malmstadt?

3    A    Correct.

4              MR. OLSON:  And do you want a spelling on

5         that?

6    BY MR. OLSON:

7    Q    M-A-L-M-S-T-A-D-T; is that correct?

8    A    Correct.

9    Q    Does she put that in a written report?

10   A    No.

11   Q    And so what did you do with that information that

12      Ms. Malmstadt provided to you concerning

13      recertification by Ms. Wink?

14              MS. LORENC:  Objection to form.  You can

15      answer.

16              THE WITNESS:  Nothing.  It was

17      informational only.

18 BY MR. OLSON:

19 Q   We've covered the training that you've received.

20     Have you provided training to any of your employees

21     concerning the FMLA?

22 A   No.

23 Q   Has Ms. Malmstadt been trained as far as you know

24     on the FMLA?

25 A   Yes.

1 Q   From what source or sources if you know?

2 A   From previous employers and she has attended

3     seminars.  She has a PHR certification as well.

4 Q   Did you hire her?

5 A   Yes.

6 Q   Is she still at Miller?

7 A   Yes.

8 Q   So you've covered now the communication you

9     received about Ms. Wink initially applying for FMLA

10    certification; true?

11   A    Yes.

12   Q    And you've also covered the -- that Malmstadt told

13        you about recertification when she orally reported

14        that to you on a weekly discussion?

15   A    Correct.

16   Q    And what were the other discussions you had with

17        anyone when legal counsel wasn't present about

18        Wink's FMLA?

19            MS. LORENC:  And I'm going to object to

20        form.  Are we still talking about the 2011-2012

21        time frame?

22            MR. OLSON:  Any time, all the way through

23        separation of Wink's employment.

24            THE WITNESS:  I had a conversation with

25        her direct supervisor Matthew Chavez and his

1        next-level manager Margo Eshleman and the president

2        of the company John Busby about her leave to ensure

3        that the department could cover the work when she

4        was gone.

5   BY MR. OLSON:

6   Q    When was that conversation?

7   A    It was sometime after the intermittent leave started

8        but prior to her resignation.

9   Q    Can you narrow it down any further?

10  A    I -- I don't know the specific date.

11    Q    And did you have a series of meetings concerning a

12         reduction in force at the company?

13    A    Yes.

14    Q    And was that discussion part of that reduction in

15         force planning?

16    A    That was the third conversation I had about her

17         leave.

18    Q    Right, but did that fit within the larger category

19         of discussing the reduction in force at the

20         company?

21              MS. LORENC:  Objection to form.  You can

22         answer.

23              THE WITNESS:  The conversation with them

24         about the reduction in force was -- only discussed

25         her leave on two issues:  One, that the department

1         could cover the work while she was gone given the

2         changing staffing and overtime availability within

3         the department and across the company as a whole;

4         and two, nondiscrimination training that I provided

5         to all managers, not just Margo and Matthew, in a

6         RIF selection.

7    BY MR. OLSON:

8    Q    Okay.  And what was the discussion about overtime

9         availability?

```
10   A    It was that the Order Processing Team's department as

11        well as all departments that were nonunion employees

12        were being reduced to 40 hours or less of work per

13        week, and that the departments needed to cut each

14        person's overtime accordingly and know that if they

15        were getting assistance from other departments that

16        that assistance would stop.

17   Q    And how did that relate to Ms. Wink if at all?

18   A    The order processing department had previously been

19        cleared for essentially unlimited overtime, so there

20        were coworkers who were working additional hours to

21        help cover workload that Ms. Wink wasn't getting done

22        or wasn't getting done correctly.  Her manager was

23        doing some additional work and reminding her of

24        things that should be done that she wasn't getting

25        completed.   They were also getting assistance from
```

```
1         several other departments where different members of

2         the other departments would help with the workload in

3         the order processing department.

4    Q    Ms. Wink was not working overtime hours; true?

5    A    Not to my knowledge.

6    Q    And she had not been working overtime hours since

7         she went on FMLA in 2011; is that accurate?

8    A    No, that's not accurate.  Ms. Wink normally preferred

9         not to work overtime before and after her Family
```

10    Medical Leave.

11  Q  All right.  So her over -- her not working

12     overtime, how many hours of overtime did other

13     people have to work as a result of that if you

14     know?

15  A  As a result of what?

16  Q  Her not working overtime.

17  A  I don't know specifically.

18  Q  Were you aware of anyone working overtime as a

19     result of Ms. Wink not working overtime?

20  A  Yes.

21  Q  Who were they?

22  A  Matt Chavez who was a supervisor worked additional

23     hours to cover her work, and I know that there were a

24     couple of others within the department who would work

25     on things that she had not completed or wasn't able

1     to complete.

2  Q  Matt Chavez was an exempt employee, was he not?

3  A  He was exempt but he was working additional hours to

4     cover the work that she wasn't getting completed.

5  Q  He wasn't paid any additional money for any hours

6     over 40 hours a week, was he?

7  A  That's correct.

8  Q  Okay.  And were there any employees other than

```
 9        Chavez who worked more than 40 hours a week?

10   A    Yes.

11   Q    Who were they?

12   A    Sue Hedjak, Maivue Thao --

13   Q    And these are --

14   A    -- Roseanne Endvick.

15   Q    And these are all employees within order

16        processing?

17   A    Yes.

18   Q    And --

19   A    Diane -- Diana Kasprzyk.  Diana is not -- is not in

20        the order processing department, but she was working

21        additional hours to help cover the work.

22   Q    All right.  So in your meeting with Mr. Chavez,

23        the -- was it the owner of the company was one of

24        the people in the meeting?

25   A    The owner of the company had passed away.
```

```
 1   Q    Okay.  Who was the individual in the meeting?

 2   A    Which -- which meeting?

 3   Q    The one -- I'm sorry.  The one that we last talked

 4        about when you met with Chavez to discuss the

 5        covering of work, the overtime availability, and

 6        the nondiscrimination training and the RIF.

 7   A    There were two separate meetings.  The first one was

 8        with Matt Chavez and his direct supervisor Margo
```

```
 9        Eshleman, and the second meeting was with John Busby

10        who's the president of the company, Joe Kovacich

11        who's the vice president of administration, Matthew

12        Chavez, Margo Eshleman, and all of the other managers

13        of the nonunion departments.

14   Q    Okay.  The first meeting was when?

15   A    Early July 2012.

16   Q    And what was decided at that point with respect to

17        Ms. Wink's employment status?

18   A    Nothing was decided.  That was a meeting where we

19        were discussing that there were to be two reductions

20        from the order processing department, and we were

21        discussing skill and ability, work performance of

22        each of the members of the department.

23   Q    And what was stated with respect to Ms. Wink

24        specifically in that first meeting?

25   A    It was stated that she was a good performer, that she
```

                                                                36

```
 1        had the skill and ability to do numerous jobs within

 2        the department and so the company viewed her as

 3        flexible.  As we rate people in a RIF analysis,

 4        flexibility means the ability to cover multiple

 5        positions.  And their analysis was that they wanted

 6        to retain her, and they selected two other

 7        individuals for reduction.
```

8   Q   And those were who?

9   A   Kim Noonan and Roseanne Endvick.

10  Q   And when were they to be eliminated?

11  A   July 23rd.  I think it was a Friday.

12  Q   Of 2012; correct?

13  A   Yes.

14  Q   Meeting two, when was that?

15  A   It was prior to the meeting we just discussed.

16  Q   Okay.  When I -- Meeting one, I attributed that to

17      be the first meeting, but you're saying that

18      meeting number one in early July 2012, was that the

19      second meeting on the topic of Ms. Wink and her --

20      whether she would continue with the company?

21  A   The first --

22  Q   Let's back up.  Let's take it chronologically.  Was

23      the first meeting chronologically about Wink's

24      status with the company in early July 2012?

25  A   The first meeting was the meeting with the president

1   of the company and the nonunion departments informing

2   them that there would be reductions from every

3   department and cuts of overtime from every department

4   and it was the nondiscrimination training for all of

5   the managers.

6   Q   Okay.  And when was that?

7   A   It was early July 2012.

```
8   Q    Okay.  And is the second meeting the one that you

9        just covered with respect to electing to reduce two

10       other people, Roseanne and Kim?

11  A    The second meeting followed the first meeting.  The

12       second meeting was specific just to the order

13       processing department and it was after Matthew and

14       Margo had time to, you know, consider and evaluate

15       each of the team members and it was discussing their

16       analysis.

17  Q    And when was that meeting?

18  A    It was shortly after the meeting with Busby, maybe a

19       couple days.

20  Q    Okay.  And how many individuals did you plan on

21       reducing from the order processing department?

22  A    Two.

23  Q    And was it later decided that more than the two

24       would have to be eliminated?

25  A    No.
```

                                                              38

```
1   Q    Were Kim and Roseanne the two individuals who were

2        let go?

3   A    I'm sorry, let me go back to my previous answer.  You

4        said was it later.

5             THE WITNESS:  Could you read back that

6        question.
```

```
 7                    (Requested portion read by the reporter.)

 8                    THE WITNESS:  So not at that time it

 9         wasn't decided, but there were several reductions

10         after the July 2012 reductions, and at this point

11         today there is one person left from the department

12         out of I think seven that started.

13  BY MR. OLSON:

14  Q    And it's accurate to state that had Ms. Wink's

15         employment not been severed, there would have been

16         another individual who was laid off instead of that

17         separation; true?

18                    MS. LORENC:  Objection to form.  You can

19         answer.

20                    THE WITNESS:  Had Tracy not voluntarily

21         resigned?

22  BY MR. OLSON:

23  Q    Had her employment not ended, someone else's

24         employment there would have been ended through a

25         reduction in force; correct?
```

                                                              39

```
 1  A    Had Tracy not voluntarily quit, the two people that I

 2         mentioned would have been reduced.

 3  Q    I understand your argument about voluntarily quit.

 4         You've got that in the record.  But I'm looking at

 5         her separation of employment.  Had her employment

 6         not ended, someone else would have been subject to
```

7      the reduction in force?

8   A  Correct, and it would have been Kim Noonan.  That was

9      the second person selected for reduction.

10  Q  Okay.  And then so if -- if Noonan was gone and

11     Wink was gone, then why was Roseanne also

12     eliminated?

13  A  I think you're misunderstanding.  The way that the

14     reduction in force evaluation is done is that each

15     team member was evaluated based on some of the

16     categories that I mentioned.  We scored the employees

17     based on those evaluations.  Roseanne had either the

18     highest or the lowest score, meaning that she was the

19     first person selected for reduction.  Kim Noonan was

20     the second person, the next lowest score but scoring

21     better than Roseanne, so she would have been the

22     second person.  Tracy was not selected for reduction.

23  Q  Had Wink's employment not ended, another individual

24     would have been selected for reduction in force; is

25     that correct?

                                                           40


1   A  Yes.

2   Q  Now --

3              MS. LORENC:  Can I just --

4   BY MR. OLSON:

5   Q  -- you talked about --

6          MS. LORENC:  I think you guys are getting

7     confused.

8          MR. OLSON:  No.  She's given an answer

9     and if --

10          MS. LORENC:  Okay, you're not hearing her

11     correctly.

12          MR. OLSON:  Well, you don't know what I'm

13     hearing --

14          MS. LORENC:  Okay.

15          MR. OLSON:  -- all right?  In fact --

16          MS. LORENC:  I was going to try to help

17     you but okay --

18          MR. OLSON:  Please don't --

19          MS. LORENC:  -- that's fine.

20          MR. OLSON:  Please don't help me.  Any

21     help you've provided to this point has been

22     contrary to the law and the facts.

23  BY MR. OLSON:

24  Q    Here is a document that's been produced.  We're

25     going to mark this as an exhibit.

1               (Discussion held off the record.)

2               (Exhibit 4 marked for identification.)

3  BY MR. OLSON:

4  Q    All right.  This is marked as Barbian 4.  It's a

5     document that was produced as part of the document

6      production.  Have you seen this before?

7   A   No, I don't know what this is.

8   Q   Okay.  This indicates that documents Bates labeled

9       D580 through 589 were held as privileged and I've

10      not received a log on these documents.  Can you

11      identify what these documents are?

12  A   I have no idea what D580 through 589 is, no.

13              MR. OLSON:  Okay.  So we make a request

14      to have proper identification of these documents.

15              MS. LORENC:  Are you requesting a log?

16              MR. OLSON:  As would be normal if you're

17      withholding documents, you need to produce a log

18      and --

19              MS. LORENC:  Well, first of all, I seem

20      to recall producing one, but if that's a request

21      you want to make to an attorney and not the

22      witness, I'd certainly be happy to produce a log.

23              MR. OLSON:  I'll get the information

24      through evidentiary processes however I can get it.

25      If she can't identify it, then I'd like you to do

                                                    42


1       that, please.

2   BY MR. OLSON:

3   Q   Ms. Wink's standard hours up to a certain point

4       were seven to three; is that correct?

```
 5   A    No, that's not correct.  When she was originally

 6        hired her hours were eight to four.  When her son

 7        started kindergarten she requested an exception to

 8        her work hours, and they were modified on a temporary

 9        basis to seven to three.

10   Q    Okay.  And who modified the hours?

11   A    Her direct manager Matt Chavez.

12   Q    Okay.  And was that with your approval?

13   A    Yes, it was.

14   Q    When was that?

15   A    I don't recall specifically.  It was approximately

16        2010, 2011.

17   Q    Was it part of her FMLA request?

18   A    No, it was not.

19   Q    Why did she want changed hours for her son?

20   A    She wanted to either drop off or pick up her son from

21        kindergarten.

22   Q    And when did those hours change?

23   A    When did they change to become --

24   Q    From seven to three.

25   A    -- seven to --
```

```
 1   Q    No, I'm sorry.  When they were put -- when she was

 2        put on seven to three, when did they change to

 3        something else after that?

 4   A    We notified her of the need to change the hours to
```

5        eight to four on July 13th, 2012.

6    Q    What did she say in response?

7    A    She started crying and stormed out of the meeting and

8         didn't say anything.

9    Q    So she gave you absolutely no response to the

10        suggestion that her hours would have to change from

11        seven to three to something else?

12   A    Not in the meeting when we first discussed it with

13        her.

14   Q    When was the first time she responded to the hours

15        change issue?

16   A    When I called her after she stormed out of the

17        meeting and asked her to come back and further

18        discuss with the company the things that needed to

19        change and we discussed over the phone the hours as

20        part of that, and she explained that it was not

21        something she thought she could do.

22   Q    All right.  I'd like you to first of all in meeting

23        with Wink, Chavez and yourself on July 13, 2012,

24        describe as precisely and completely as you can

25        everything that was said.

                                                              44


1    A    We asked her to meet with us.  We --

2    Q    Who is we?

3    A    Myself and her supervisor Matt.

```
4    Q   Who asked her?

5    A   Matt asked her to meet in HR with himself and me.

6    Q   What time of day was that?

7    A   Early afternoon.

8    Q   Did you tell Matt to ask her?

9    A   Matt and I had discussed it.

10   Q   Okay.  And that was discussed when?  At that time

11       or sometime prior to that?

12   A   What?  I'm not following.

13   Q   You told Matt to tell Ms. Wink that the two of you

14       would meet with her, and you said that you and Matt

15       discussed it.  Did you discuss it for the first

16       time right then and there that you would meet with

17       her, or did you start that discussion earlier?

18   A   We either talked about it the day before or the

19       morning of.

20   Q   Was there any record of the meeting that you had

21       with Mr. Chavez about Wink the day before?

22   A   No.

23   Q   Was there any record of the conversation you had

24       with Mr. Chavez about Wink on July 13?

25   A   No.
```

                                                        45


```
1    Q   Going into the meeting what was your understanding

2        would be the subject of that meeting?

3    A   The overall subject was asking Tracy for commitment
```

```
 4        and commitment to things that we needed completed

 5        that were being completed by other people and

 6        exceptions that had been made for her which were not

 7        going to continue.

 8    Q   Okay.  And identify all of those things that would

 9        not continue going -- now at this point we're going

10        into the meeting and you understood what you would

11        be covering in the meeting, so describe those

12        items, please.

13    A   So first of all, it was not -- even though there had

14        been reductions that had been happening across the

15        company for years, it was not known by people that

16        there were reductions that were coming up within a

17        week or two, and so we informed her that there were

18        significant structural changes that were happening

19        across the entire company in the next couple weeks.

20        We informed her that we were asking for her

21        commitment and that we needed some things to change.

22                    The first thing that we asked her that

23        we needed to change was first of all her hours of

24        work.  She had been previously working seven to three

25        to pick up the son from school, and normally her
```

```
 1        hours would change eight to four in the summer, and

 2        so we explained to her we needed her hours to change
```

3     back to eight to four.  It was summer, it was July,

4     her hours hadn't changed back, so we asked for her

5     hours to become eight to four again.  We explained to

6     her that the reason for the hours being eight to four

7     was that overtime was not going to be available

8     within the department or outside of the department to

9     cover the like additional hours or things that were

10    not completed.

11              We explained to her that assistance

12    from members of other departments would no longer be

13    provided, because those other departments were not

14    going to have the staffing ability to do more than

15    their own department's work.  We explained to her

16    that she had been making a number of mistakes in her

17    work, and that we viewed that she was distracted when

18    she was at work because she was making excessive

19    amounts of phone calls, she was having extensive

20    conversations with coworkers during the workday, not

21    on breaktime.

22              She had previously been warned about

23    excessive conversations during the workday.  We told

24    her we weren't going to continue warning her about

25    those excessive discussions.  We explained to her

47

1     that she had been with the department for a

2     significant amount of time, that she was more than

```
 3        capable of prioritizing the work herself and not

 4        having to be reminded by her manager of things that

 5        needed to be completed.  And we just asked for her

 6        commitment moving forward that when she was at work

 7        she would be focused at work and that her work would

 8        be completed accurately and thoroughly without

 9        reminder from her manager.

10   Q    Okay.  So you went into that meeting and you didn't

11        have any notes or talking points as to these

12        various things that you intended to cover; is that

13        accurate?

14   A    We had -- we had talking points.  We knew what we

15        were going to cover with her before our meeting.

16   Q    Nothing in writing though; correct?  You didn't

17        have any notes or any outline prepared or anything

18        like that; correct?

19   A    I had an outline I was talking off of, yes.

20   Q    Okay.  Where is that outline?

21   A    I mean I have the outline.

22   Q    You do?

23              MS. LORENC:  I'm going to object to the

24        extent this calls for attorney-client privilege,

25        but you can answer to the extent it does not.
```
                                                          48

 1   BY MR. OLSON:

2   Q   Okay.  Did your legal counsel help you with the

3       outline?

4   A   He reviewed the outline.

5   Q   Okay.  Who is he?  Mr. Lynch or someone else?

6   A   Larry Lynch.

7   Q   Okay.  And the reason he reviewed it is that the

8       issue of FMLA was present; true?

9   A   I asked him to review it because we wanted to

10      continue allowing Tracy the ability to attend doctors

11      and therapy appointments, and we didn't want to be

12      asking her to do something that was contradictory

13      towards allowing her FMLA.

14  Q   Okay.  Now, I had asked your legal counsel to

15      identify whether there were any notes, and the

16      answer came back there were not.  I don't know if

17      these documents, 580 through 589, are those notes,

18      but it's accurate to state that Attorney Lynch

19      looked at the notes, but he didn't change anything

20      on the notes, did he?

21  A   No.

22  Q   Okay.  And those were -- that outline was something

23      that you created; correct?

24  A   It's something I created in discussion with him.

25  Q   Okay.  You created it and then showed it to him was

                                                        49


1       your testimony.  Is that accurate?

```
 2   A    Yes.

 3   Q    Okay.  You created it before you talked to him;

 4        true?

 5   A    No, I created it on the phone with him.

 6   Q    Okay.  And so that outline was to make sure that

 7        you would not run amiss of FMLA requirements; true?

 8   A    Correct.

 9   Q    Okay.  And so Attorney Lynch was aware at that time

10        that you -- strike that -- that Ms. Wink had

11        already been certified for FMLA entitlement; true?

12   A    Yes.

13   Q    And the records then -- or the outline that you

14        went through, that just contained talking points

15        with Ms. Wink; true?

16   A    Yes.

17   Q    And were you aware that once you discuss the items

18        in a document prepared by a lawyer, that the

19        privilege is waived and it no longer applies?

20              MS. LORENC:  Objection, calls for legal

21        conclusion.

22              MR. OLSON:  So you're objecting to form.

23   BY MR. OLSON:

24   Q    But in all your experience as an HR professional,

25        are you aware that attorney-client privilege no
```

50

```
1        longer applies once you share that communication

2        with another third party?

3                MS. LORENC:  Same objection.  She's not

4        an attorney.

5                MR. OLSON:  Okay.  I want that document.

6        The privilege is waived --

7                MS. LORENC:  You can want it all you

8        want.

9                MR. OLSON:  Well, if you don't produce it

10       there's going to be a motion for sanctions, so take

11       it seriously, please.

12               MS. LORENC:  I take it very seriously.

13               MR. OLSON:  Yeah, because I've asked for

14       it.

15               MS. LORENC:  It's privileged.

16               MR. OLSON:  I've asked for it and you

17       told me there were no notes.

18               MS. LORENC:  You asked for handwritten

19       notes and that's different.

20               MR. OLSON:  No, no, no.

21               MS. LORENC:  And I also produced a

22       privilege log which I will get to you, but asking

23       for --

24               MR. OLSON:  I'm not going to -- I'm

25       keeping this deposition open until these documents
```

```
 1     are produced.  I want to make that clear.  And

 2     there may be a motion for sanctions because

 3     documents that are clearly not privileged have been

 4     withheld.

 5              MS. LORENC:  And I disagree that they're

 6     clearly not privileged.  She just testified that

 7     she --

 8              MR. OLSON:  Well, you're familiar with

 9     the waiver privilege.

10              MS. LORENC:  I am.

11              MR. OLSON:  She just testified, and

12     you're probably aware, that she shared them with my

13     client.

14              MS. LORENC:  She did not just testify

15     that she shared them with your client.

16   BY MR. OLSON:

17   Q   Did you cover the talking points on your notes with

18       my client?

19   A   Yes, I used the outline for my discussion with her.

20   Q   Thank you.

21              MR. OLSON:  By withholding documents

22     you're interfering with our discovery and you're

23     jacking up the cost of this litigation.

24              MS. LORENC:  Is there a question there?

25              MR. OLSON:  It's a statement to put you
```

                                                              52

```
 1        on notice that if this information is not produced,

 2        I will move for sanctions.

 3                MS. LORENC:  Well, you first have to

 4        bring a motion to compel the production of

 5        privileged documents before you can go anywhere

 6        near --

 7                MR. OLSON:  I just learned of it now

 8        unfortunately because you misrepresented the facts

 9        to me.

10                MS. LORENC:  That is not accurate.  We

11        have never had a conversation about these

12        privileged documents.

13                MR. OLSON:  Right, because I only asked

14        for handwritten notes; is that your contention?

15                MS. LORENC:  That's my recollection of it

16        right now.

17                MR. OLSON:  Right, I said handwritten

18        notes and I didn't want any other notes if they

19        were typed, is that correct?

20                MS. LORENC:  My recollection, if you'll

21        let me speak before interrupting me since there's a

22        court reporter taking this down, is that you

23        specifically requested any handwritten notes.  I --

24        I researched whether such things existed and

25        determined that we didn't have any.
```

53

```
1                    I still stand by my contention that

2          the outline that was prepared in conjunction with

3          oversight from an attorney is privileged.  She has

4          not indicated that she produced a copy of that

5          outline to your client, nor that she read it

6          verbatim.  She said she used it to cover the talking

7          points.  I don't think that amounts to a waiver of

8          any attorney-client privilege.

9                    MR. OLSON:  All right.  What you're

10         describing is a very sharp practice, and it will be

11         dealt with in due course.

12  BY MR. OLSON:

13  Q    Is it accurate to state that on days that Ms. Wink

14        was working from home, she would pick up work in

15        the morning after she dropped off her son at

16        school?

17                   MS. LORENC:  Objection to form.  You can

18         answer.

19                   THE WITNESS:  I have no idea what the

20         specifics of that arrangement was.

21  BY MR. OLSON:

22  Q    Now, when you told Chavez to summon Wink to a

23        meeting, you met with Wink.  How long was that

24        meeting?

25  A    Less than five minutes.
```

1  Q   Where was the meeting?

2  A   In my office.

3  Q   It was the three of you?

4  A   Yes.

5  Q   Was the meeting recorded in any way, in writing or

6      a device or anything else?

7  A   No.

8  Q   Did you put down any notes during the meeting?

9  A   No.

10  Q   So when she stormed out you didn't write anything

11      down on your notes?

12  A   No.

13  Q   You didn't record the time or anything like that?

14  A   No.

15  Q   When is the last time you looked at those notes?

16  A   It's been quite a while.

17  Q   You looked at those this morning, didn't you?

18  A   I looked at the outline.

19  Q   Right.  That's what we're talking about; right?

20      That's what you had in the meeting with my client.

21      That's what you -- Those are the points you covered

22      with her; true?

23  A   Correct.

24  Q   And you looked at those this morning?

25  A   Correct.

1   Q   Do you consider this morning to be some time ago?

2   A   Because I -- I didn't read through them in detail.

3   Q   Okay.  So you skimmed those; is that right?

4   A   Yes.

5   Q   And it's your testimony there are no handwritten

6       notes on that outline?

7   A   There are no handwritten notes on it.

8   Q   So what were the points that you covered with

9       Ms. Wink before she left the meeting?  Did you go

10      through all of them or some of them?

11   A   We only went through the first two which were the

12      need for her hours of work to change, and that there

13      would no longer be assistance from a member of a

14      different department to cover her workload.

15   Q   And the next communication you had with Ms. Wink

16      was when you called her?

17   A   Yes.

18   Q   How long was that conversation?

19   A   It was probably 15, 20 minutes.

20   Q   Was Mr. Chavez with you when you made that call?

21   A   No.

22   Q   Did you call from a work phone, cell phone,

23      something else?

24   A   Work phone.

25   Q   And you reached Ms. Wink on her phone?

1   A      Yes.

2   Q      Was she on her cell phone?

3   A      It's whatever -- I have no idea.

4   Q      Okay.  Do you know if she was traveling at the

5          time?

6   A      I have no idea.

7   Q      What did you say to Wink and what did she say to

8          you?

9   A      I said, Tracy, why did you storm out of the meeting;

10         you can't just leave work without permission.  And

11         she said, I'm sorry, I lost control of my emotions, I

12         just had to get out of there.  And I explained to her

13         that we hadn't finished the meeting, that there were

14         important things that Matt and I needed to discuss

15         with her.

16                     I went through with her over the phone

17         the points that I gave you earlier, and I asked her

18         to think about it over the weekend.  Told her I

19         wasn't asking for an answer at that point but to

20         think about it over the weekend and to meet with Matt

21         and myself on Monday and let us know if those were

22         things that she could commit to.  And that was it.

23  Q      What did she say?

24  A      She said, okay, she would give it some thought and

25          then she would meet with us Monday.

1    Q    Was she still upset when you talked to her on the

2         phone?

3    A    No, she was much more calm.

4    Q    Was that your intent that if she complied with your

5         requirements, she would continue her employment at

6         the company?

7    A    Absolutely, yes.

8    Q    And the requirement would be that she would no

9         longer be working from home two days out of the

10        week; correct?

11   A    Correct.

12   Q    And her being at home two days out of the week,

13        that was part of her FMLA; is that correct?

14   A    No, that's not correct.

15   Q    Okay.  So did you ever look at her FMLA papers?

16   A    Yes, I looked at them.

17   Q    When did you first look at her FMLA paperwork?

18   A    I don't recall specifically.  It was after it was

19        initially certified and at some point during one of

20        the recertifications.

21   Q    What is your job with respect to the FMLA process

22        at that time?

23   A    I don't certify the paperwork.  I don't typically

24        handle leaves of absences unless the person who

25      handles them was gone.

1    Q    Okay.  Those are the things you don't do.  What I

2         asked is what is your involvement with the -- how

3         does your job relate to the FMLA?

4    A    I work with the managers to make sure that they are

5         able to cover the workload of the department with

6         whatever absence is occurring.  If there is a

7         question from the person who handles the paperwork, I

8         get involved in answering -- fielding questions, so

9         if she's not certain if something would be covered or

10        not, then I would have --

11   Q    She being Peggy Malmstadt?

12   A    Correct.  Then I would get involved in answering

13        that.

14   Q    Do you train your employees that when they are

15        disciplining an employee, they have to document it

16        accurately?

17             MS. LORENC:  Objection to form.  You can

18        answer.

19             THE WITNESS:  When a manager is

20        disciplining an employee, first of all, they have

21        to get approval from a member of HR to issue a

22        discipline.  The discipline is written together

23        between the manager and the HR member before it's

```
24        issued to the employee.  And depending on the level

25        of discipline, sometimes it involves a third party
```

```
 1        observing the discipline being given.

 2   BY MR. OLSON:

 3   Q    And it's important that the documentation

 4        concerning the discipline be accurate?

 5   A    Correct.

 6   Q    And is the discipline put in the employee's

 7        personnel file?

 8   A    Yes.

 9   Q    And is it important that all of the information

10        that goes into the employee's personnel file be

11        accurate?

12   A    Yes.

13   Q    Was Miller Compressing bought by another company?

14   A    Yes.

15   Q    When was that?

16   A    September 28th, 2012.

17   Q    What company?

18   A    Alter Trading Corporation.

19   Q    What involvement did you have in that purchase if

20        any?

21   A    A significant amount.  I was part of the due

22        diligence team for Miller Compressing.  I was part of

23        the transition process between both the former
```

24    management group Miller Compressing and the current

25    ownership group Alter Trading.  I was part of

 1    reduction decisions before and after the acquisition.

 2    I was part of communication meetings with employees

 3    about what was happening.

 4  Q  Tell me about the due diligence with respect to

 5    communication with the purchaser.  Were you

 6    responsible for generating reports?

 7  A  Not necessarily reports but documents.

 8  Q  The new company, the purchasing company, had asked

 9    for documentation of employees who were using FMLA;

10    correct?

11  A  I don't think that they requested that.

12  Q  Did you provide that information?

13  A  I don't believe so.

14  Q  So the sale was completed in September of 2012.

15    When did the due diligence begin for that purchase?

16  A  Gosh.  It's difficult to remember specifically

17    because the company had been for sale since 2006 so

18    we were in -- in what I would call an ongoing due

19    diligence process with numerous potential buyers.

20  Q  And when did Alter first come?

21  A  2007.

22  Q  Would it be accurate that you were doing due

```
23        diligence on behalf or with Alter since '07?

24   A    Yes.  It wasn't ongoing with Alter.  They initially

25        decided not to buy the company in 2007, 2008, and
```

```
 1        then they started looking at the company again in --

 2        somewhere between 2011 and 2012.

 3   Q    In your telephone conversation with Ms. Wink, she

 4        told you that she did not think she'd be able to

 5        make arrangements for her son on such short notice;

 6        correct?

 7   A    Correct.

 8   Q    And the arrangements with her son would be to have

 9        somebody who could look after him on the two days

10        per week that she was at home; true?

11   A    I -- I don't recall specifically what arrangements

12        that she had to arrange.  She just said she didn't

13        know if she could do it on such short notice.

14   Q    Okay.  You knew that she was caring for her son two

15        days a week; true?

16   A    I knew that she was telecommuting for two days a

17        week.

18   Q    You knew that she had applied for FMLA that related

19        to her son; true?

20   A    Correct.

21   Q    And you knew that she was caring for her son two

22        days a week; true?
```

23   A      I knew that she was telecommuting two days a week.  I

24          don't know which time she was caring --

25   Q      So you're --

 1   A      -- for her son specifically.

 2   Q      You're denying on the record that you had any

 3          knowledge that Ms. Wink was caring for her son two

 4          days per week pursuant to her FMLA leave; true?  I

 5          want to make this really clear.  You're denying on

 6          the record that you had any knowledge whatsoever

 7          that Ms. Wink's FMLA certification was related to

 8          her caring for her son two days per week; is that

 9          accurate?

10   A      Her certification was to care for her son for

11          whatever his condition was.  She had requested to

12          telecommute from home.  I don't know specifically

13          which days she was taking him to doctors'

14          appointments and therapy appointments because I was

15          not administering her FMLA.  That was administered by

16          someone else.

17   Q      Ms. Malmstadt?

18   A      Correct.

19   Q      So you never even talked to Ms. Malmstadt to

20          identify what her FMLA needs were before you talked

21          to her about what things you were taking away from

22    her?

23  A   I knew that she had intermittent leave time.  I knew

24      --

25  Q   Hold on.  Hold on.  That's not what I asked though.

1       I asked whether you talked to Malmstadt.  Did you

2       go to Malmstadt and figure out what the parameters

3       of the FMLA requirements were for Ms. Wink before

4       you went to Wink and said we're taking away these

5       four or five items?

6   A   I talked to her about what the FMLA certifications

7       were.  I then talked with our attorney about what

8       those certifications were.

9   Q   Did you look at the certifications?

10  A   I looked at them with him, yes.

11  Q   Okay.  And so did you look at all of the FMLA

12      documents in the file?

13  A   Yes.

14  Q   Okay.  So you knew from those records what the

15      parameters of the FMLA were; true?

16  A   Yes.

17  Q   And in your mind you didn't -- it was clear to you

18      you didn't need additional information from anyone

19      to understand what the parameters of the FMLA leave

20      consisted of; is that accurate?

21  A   At that point, no, I didn't need additional

22       information.

23   Q   Okay.  And you didn't ask Wink for additional

24       information?

25   A   No.

1    Q   Okay.  So when you spoke to Wink on the phone, she

2        told you that she was caring for her son two days a

3        week; true?

4    A   She -- her response to me in that conversation was

5        that she needed to make other arrangements for her

6        son, and she didn't know if she'd be able to do it on

7        such short notice.  She did not go into detail about

8        what that was.

9    Q   Well, you knew that she was home with her son two

10       days per week; right?

11   A   I knew that she was telecommuting two days per week.

12   Q   Okay.  So again, I'm right back to square one.  I

13       want you to state on the record you had no

14       knowledge that Ms. Wink took FMLA for two days a

15       week so that she could be home with her son

16       regarding his serious health condition.  Is that

17       your --

18                MS. LORENC:  Objection --

19   BY MR. OLSON:

20   Q   Is that your -- is that your testimony, you had no

21    knowledge of that; is that accurate?

22              MS. LORENC:  Objection to form.

23              THE WITNESS:  You're asking me to infer

24    things that I do not specifically recall.  I

25    recall --

1  BY MR. OLSON:

2  Q    Okay.

3  A    -- seeing her certification.  I've seen numerous

4       certifications --

5  Q    All right.

6  A    -- for multiple employees.  I don't remember

7       specifically her certification.

8  Q    So sitting here today you don't remember whether

9       you were aware that Ms. Wink had FMLA for purposes

10      of caring for her son two days per week because of

11      his serious health condition; is that accurate?

12 A    That's accurate.  I don't remember that specifically.

13 Q    Okay.  What would you look at to refresh your

14      memory on that?

15 A    I would look at the FMLA certification which I didn't

16      review or I would have informed you of that when you

17      asked me which documents I reviewed.

18 Q    So in preparation for your deposition today, you

19      looked at the discovery responses by the company

20      but you didn't look at the certification?

21    A    Correct.

22    Q    Okay.  Well, we'll cover that.

23              Now, you said that you wanted to let

24    Wink know that there were going to be some layoffs.

25    Why did you let her know individually rather than

66

1    doing it with a group of people that were in the

2    order processing department?

3    A    I think you misunderstood what I earlier stated.  I

4    did not inform her that there were going to be

5    layoffs.  I informed her that there were significant

6    changes that were coming.

7    Q    Okay.  And why did you do that in contrast to

8    meeting with the order processing people as a

9    group?

10    A    Because the company wanted to get her commitment that

11    she would be a continuing member of the department.

12    We did not want to layoff an individual if she wasn't

13    able to make that commitment.

14    Q    And if she couldn't make the commitment, then she

15    would be laid off; true?

16    A    No.  If she couldn't have made that commitment, we

17    would have discussed that with our attorney.  It

18    never occurred to us that she would not be able to

19    make that commitment.

20  Q   Well, she told you she couldn't make the

21      commitment; right?

22  A   On Friday afternoon she said she didn't know if she

23      would be able to do that and she would be working on

24      it over the weekend.

25  Q   And she told you that on Monday as well?

1   A   On Monday she said she was quitting, she couldn't --

2   Q   Well, she told --

3   A   -- make the commitment.

4   Q   Right.  So the commitment was that she had to be in

5       the office five days a week; true?

6   A   Correct.

7   Q   And she told you --

8   A   I'm sorry, that's not correct.  The commitment was

9       that she would be in the office when -- when --

10      between Monday through Friday, eight to four, except

11      for doctors' and therapy appointments to take care of

12      her son.

13  Q   So the requirement was she had to be in the office

14      from eight to four five days a week unless there

15      was a doctor's appointment?

16  A   Doctor or therapy appointments or other FMLA event.

17  Q   Okay.  But not to -- she couldn't be home to care

18      for her son?

19              MS. LORENC:  Objection to form.

20  BY MR. OLSON:

21  Q    True?

22              MS. LORENC:  You can answer it.

23              THE WITNESS:  We said she needed to be in

24       the office Monday through Friday, eight to four,

25       other than FMLA events to care for her son.

1   BY MR. OLSON:

2   Q    Okay.  Well, that's different now.  So you said

3        generally FMLA events; is that correct?

4   A    Yes.

5   Q    And that covered her being home two days a week

6        with her son?

7   A    It covered doctors' and therapy appointments for her.

8   Q    Did it exclude her being home two days a week with

9        her son as she had been doing all along?

10  A    Yes, she was needed to be in the office.

11  Q    All right.  And you gave her no written notice of

12       that requirement, did you?

13  A    No.

14  Q    Who were the employees that you wanted the

15       commitment from who were in order processing?

16  A    Tracy was the only employee who had numerous

17       exceptions that we needed to meet with in the order

18       processing department, but there were others we met

19           with in other departments.

20   Q    Okay.  So how many individuals did you want to make

21           a commitment to not work -- to be in the office to

22           do the things necessary so other departments didn't

23           have to work overtime?

24   A    Four.

25   Q    And of those four then there were two that were let

1           go, or were there six and two were let go?

2   A    I'm not following your question.

3   Q    Okay.  Were the two individuals who were let go

4           from the order processing department?

5   A    Yes.

6   Q    And those two individuals, are you including those

7           within the four or were they in addition to the

8           four you just mentioned?

9   A    Your question to me was how many people did I have a

10          discussion with about making a commitment.

11   Q    Well, I wanted to know --

12   A    And they weren't --

13   Q    -- how many you needed to make the commitment.

14                (Reporter interruption.)

15                THE WITNESS:  I said the question was how

16          many people did we have a discussion with about

17          their commitment and needing them to change what

18          their commitment was to work.

19   BY MR. OLSON:

20   Q    Okay.

21   A    And that answer is four.

22   Q    Okay.  And of those four how many discontinued

23        employment?

24   A    One.

25   Q    Who was that?

1    A    Tracy.

2    Q    And there were others who you knew would not make

3         the commitment or they had not up to that point?

4    A    No, the other three made the commitment.

5    Q    There were -- there were other employees within

6         order processing that you had decided had not been

7         committed up to that point?

8    A    No, Tracy was the only one within that department.

9    Q    When was the next time after Tracy's employment

10        ended that anyone in order processing separated

11        employment?

12   A    The two individuals who were position eliminated.

13   Q    Okay.

14   A    And it was July 23rd, on or about.

15   Q    Okay.  And when did you decide that those two

16        individuals would be eliminated?

17   A    I'm sorry.  It was actually one individual, because

18          when Tracy had quit we didn't reduce the second

19          individual, and we had decided that -- we had decided

20          on the two prior to having the discussion with

21          Tracy -- it was about a week prior -- and then after

22          Tracy quit we -- we decided that we were only going

23          to cut the one.  Since Tracy had left it was already

24          one headcount reduction.

25   Q    Who was the one who was cut?

1    A    Roseanne Endvick.

2    Q    And who was the one who was kept?

3    A    Kim Noonan.

4    Q    And was Noonan later cut?

5    A    Yes.

6    Q    When?

7    A    Six to ten months after.

8    Q    How long was the conversation with Ms. Wink on

9          Monday morning?

10   A    It was very short.

11   Q    That was July 16th, 2012?

12   A    Yes.

13   Q    And who was present at that?

14   A    Myself and Matt.

15   Q    And her?

16   A    Correct.

17   Q    In person?

18    A    Yes.

19    Q    Again, in your office?

20    A    Yes.

21    Q    Was that meeting recorded in some manner?

22    A    No.

23    Q    Did you have an outline that you would cover in

24         that meeting?

25    A    No.

1    Q    You didn't use your prior outline that you went

2         over with Lynch?

3    A    No.

4    Q    What was the purpose of that meeting?

5    A    To hear if Tracy was able to make the commitment or

6         not.

7    Q    All right.  And so how long was the meeting?

8    A    Five minutes or less.

9    Q    And did she punch in for the meeting if you know?

10   A    I think she did.  I'm not certain.

11   Q    Okay.  And I want you to describe as completely and

12        accurately as you can everything that was said in

13        that meeting.

14   A    We sat down.  Tracy looked at us and said she wasn't

15        able to do the changes on a going-forward basis, and

16        she wanted to know where we go from here.  We

17      informed her we were sorry to hear that; we didn't

18      know where we went from there.  We told her she

19      could, you know -- I think she asked if she could go

20      home that day, if she had to keep working that day.

21      We told her that she could go home, we would have

22      discussions internally about what that meant going

23      forward and we'd get back to her.  And that was it.

24  Q   Okay.  What was her emotional state in that

25      meeting?

 1  A   Fine.

 2  Q   She told you in that meeting that she could not

 3      make arrangements for her son two days per week;

 4      correct?

 5  A   She just said that she couldn't make the commitment

 6      that we were asking.

 7  Q   That's all she said?  She didn't give you any

 8      details at all?

 9  A   She didn't go into detail, no.

10  Q   When is the last time you spoke with Matt Chavez by

11      the way?

12  A   I spoke with him a couple of weeks ago to let him

13      know that he was being requested for a deposition

14      giving him the date and time.

15  Q   Okay.  Nothing since then?

16  A   (Witness shook head.)

17    Q    Did you talk to him about the case?

18              MS. LORENC:  Did you say no?

19              THE WITNESS:  Sorry.  No.  I just

20         realized that.  Pardon?

21   BY MR. OLSON:

22    Q    Did you talk to him about the case?

23    A    I told him that a charge had been filed.  I told him

24         that we believed he was likely to be asked to give a

25         deposition.  And that was it.

                                                        74


1     Q    Did you talk to him about my efforts to reach him?

2     A    I don't know about your efforts to reach him.

3     Q    Okay.  Did he say anything about my trying to call

4          him?

5     A    I don't speak to Matt.

6     Q    Okay.  How did you reach him?  You called him?

7     A    I called him.

8     Q    Okay.  And that was a number that you had on file

9          in your office?

10    A    Yes.

11    Q    Okay.  Has that number changed?

12    A    No, not to my knowledge.

13    Q    So that was back -- You got his address and phone

14         number from his personnel file?

15    A    Yes.

16  Q    Okay.  When did he last work at the company?

17  A    I think it was the end of February 2014.

18  Q    Was he laid off?

19  A    Yes.

20  Q    Were you aware that Ms. Wink's son had a form of

21       autism?

22            MS. LORENC:  Objection to form.  You can

23       answer it.

24            THE WITNESS:  Not initially.  When she

25       initially applied for FMLA, they did not have a

1        diagnosis or condition, but I was informed later

2        that, you know, he had been diagnosed, yes.

3   BY MR. OLSON:

4   Q    Let me ask you a couple questions that are somewhat

5        personal but I think they could be related.  Do you

6        have any children?

7   A    No.

8   Q    Have you taken any FMLA leave from Miller

9        Compressing?

10  A    Yes.

11  Q    When was that?

12  A    This past year.

13  Q    In 2014?

14  A    Correct.

15  Q    Okay.  Nothing before that?

16   A   No.

17   Q   Okay.  Was that solid leave or intermittent leave

18       that you took?

19   A   Solid.  And then when I returned it was probably a

20       week intermittent.

21   Q   When did you learn that Ms. Wink's son had a form

22       of autism?

23   A   I don't recall specifically.  It was sometime during

24       her leave.

25   Q   Was she talking to her coworkers about her son's

                                                              76

1        autism?

2    A   She was having numerous personal conversations with

3        her coworkers.  I don't know what about specifically.

4    Q   Did anyone complain about that?

5    A   Several people complained.

6    Q   To you?

7    A   Yes.

8    Q   Who were they?

9    A   Jackie Smith, Mary Krecak, John Busby, Joe Kovacich,

10       Phil Heston, Matt Chavez, Margo Eshleman, Tom Kaerek.

11       And I observed it myself firsthand.

12   Q   And was she disciplined for that?

13   A   Yes.

14   Q   When was she disciplined for that?

15   A    I have had repeated conversations with Tracy and a

16        couple others over the past five to six years about

17        her excessive personal conversations with coworkers.

18   Q    Okay.  So with all those conversations then I

19        assume that the discipline progressed through the

20        progressive discipline policy?

21   A    It did not.  We continued giving her verbal warnings

22        and telling her it needed to improve or that it would

23        be, you know, the next disciplinary step.

24   Q    When was the last time you gave her a verbal

25        warning?  Was it on July --

1   A    July 13.

2   Q    -- 13?

3   A    Yes.

4   Q    Prior to that when was the last time?

5   A    It was probably about six months before that.

6        Typically what would happen is we would have a

7        conversation with her and whichever coworkers there

8        was an issue with, it would improve, and then it

9        would regress and we'd have to have a conversation

10        again.

11   Q    Okay.  And you say we.  That would be you and

12        Mr. Chavez?

13   A    Yes.

14   Q    All right.  And is there any documentation of the

15      discussions about her talking to her coworkers?

16   A  I believe that there is some documentation, yes.

17   Q  And those personal conversations were about her

18      son's autism and his medical care?

19   A  I don't think so because many of those conversations

20      were before she was on FMLA leave.

21   Q  Were any of the conversations about her son's

22      autism and medical care?

23   A  I would assume so but I don't know specifically.

24   Q  Okay.  Were people asking her how her son was

25      doing --

1    A  I would --

2    Q  -- that you're aware of?

3    A  I would assume.

4    Q  Okay.  Was she expected not to provide an answer if

5       she was in the workplace?

6    A  No.

7    Q  Okay.  Did she ever communicate to you that people

8       including Mr. Busby were asking her about her son's

9       status?

10   A  Yes.

11   Q  Was there any effort to document when she was

12      getting personal calls regarding her son's autism

13      or the medical care?

14  A    No.

15  Q    Did any employees document their complaints about

16       her phone usage, in other words, send you an e-mail

17       or something?

18  A    No, typically they would pull me aside and say that

19       they had observed Tracy having an extensive

20       conversation either behind a closed door or just on

21       the phone with a coworker, or I would observe it

22       firsthand when I walked up to the second floor

23       because that's where the president's office was, and

24       so when I walked past I would see her standing and

25       talking for the entire duration that I was in his

1       office, and he would comment to me that from his

2       office he could see her standing and talking many

3       times throughout the day.

4   Q    In a conference room behind a closed door?

5   A    She -- What do you mean?

6   Q    Would she go into a room and close the door to talk

7        on the phone?

8   A    Yes.

9   Q    Okay.  And --

10  A    She would also -- She would also just call from her

11       desk which was an open area.

12  Q    Okay.  Now, she had told you that she needed to be

13       in contact with her son's health care providers; is

14      that correct?

15   A   Yes.

16   Q   Okay.  And was there any exception for that?

17   A   Yes, that was an exception.

18           MR. OLSON:  Okay.  We've been at this now

19       for an hour and a half.  Why don't we take a short

20       break and then we can reconvene.

21           (Recess taken from 10:35 until 10:58 a.m.)

22           (Exhibit 5 marked for identification.)

23   BY MR. OLSON:

24   Q   Exhibit 5 is entitled Miller Compressing Company

25       Job Description, order processing, Bates stamp

                                                    80


1        D675, 676.  Can you identify whether this is the

2        job description for the position that Ms. Wink last

3        held?

4    A   Yes, it is.

5    Q   And did you participate in the drafting of this?

6    A   No.

7    Q   When did you start with Miller by the way?

8    A   May 23rd, 2003.

9    Q   Could you describe your job progression there.

10   A   Sure.  I started as an HR generalist, and then was

11       promoted to HR manager when the former manager took a

12       different position around 2005, and then was promoted

13      to HR director shortly thereafter and that's my title

14      since.

15   Q  And as of 2012 how many direct reports did you

16      have?

17   A  Four.  I'm sorry; 2012 when?

18   Q  Tell me when it changed.

19   A  It changed after Alter acquired us.  Prior to that I

20      had three.  After that I had four.

21   Q  Okay.  So the formal Alter acquisition was

22      September 23 of 2012?

23   A  September 28, 2012.

24   Q  Okay.  So pre-acquisition you had how many direct

25      reports?

                                                        81


1    A  There are two direct reports, three people total in

2       the department.

3    Q  Okay.  And who were they?

4    A  Peggy Malmstadt and Carla Lasee.  Actually -- I'm

5       sorry -- Carla started in October of -- it was Alan

6       Dahl, not Carla.  Carla replaced Alan later.

7    Q  How do you spell Carla's last name?

8    A  L-A-S-E-E.

9    Q  Okay.  And what was Carla's job?

10   A  HR coordinator.

11   Q  What did that person have to do with FMLA if

12      anything?

13    A    Nothing.

14    Q    The same would be true for Alan Dahl?

15    A    They were in the same position.

16    Q    When did Malmstadt start with the company?

17    A    I think it was around 2010.

18    Q    Have you had conversation with her about this case?

19    A    Just that it was filed.  And she helped produce the

20         FMLA documents I think we provided in discovery.

21    Q    Getting back to Exhibit No. 5, is there anything in

22         this document you're aware of that is missing from

23         the job duties that were performed by Ms. Wink?

24    A    That would better be answered by Matt, but I'll take

25         a look at it.

                                                    82


1     Q    I'll cover it with Matt.

2     A    Okay.

3     Q    But off the top of your head are you aware of

4          anything that may be missing?

5     A    No, but I would probably have modified under

6          essential duties and responsibilities customer

7          service to specifically include answering incoming

8          customer inquiries about pricing and freight.

9              (Exhibit 6 marked for identification.)

10             THE WITNESS:  Are these for me or are

11         these --

12    BY MR. OLSON:

13    Q    Those are for the court reporter.

14    A    Okay.

15    Q    Exhibit No. 6 is Answer and Affirmative Defenses to

16         Amended Complaint.  Take a look at this document,

17         and I'd like to ask you a question after that.

18    A    Okay.

19    Q    Have you seen it before?

20    A    Yes.

21    Q    Did you review it before it was filed with the

22         court?

23    A    I don't know that I reviewed it before it was filed,

24         but I provided information that Susan used to file.

25    Q    Okay.  Looking at page 11 under Affirmative

                                                          83


1          Defenses, it says that she failed to mitigate her

2          damages which would be reduction of her damages.

3                    Are you aware of any facts that

4          would indicate she failed to reduce her damages?

5                    MS. LORENC:  Objection to form but you

6          can answer.

7                    THE WITNESS:  I think that's a legal term

8          that I am quite honestly not familiar with.

9     BY MR. OLSON:

10    Q    Okay.  Looking at B, the actions that were -- it

11         says the actions taken by the company were its

12        financial conditions, company-wide reorganization,

13        and ongoing reductions in force.

14                    Do you agree with that?

15   A    Absolutely.

16   Q    Any of the other employees that you sought

17        commitment from, the group of four you identified

18        with Ms. Wink, had any of them exercised FMLA

19        rights?

20   A    Margo had previously.

21   Q    How long prior?

22   A    A couple of years prior.

23   Q    Okay.  For how long?

24   A    Several months.

25   Q    But it was not ongoing intermittent leave at the

                                                      84


1         time of Ms. Wink's separation; is that accurate?

2    A    Yes.

3    Q    Margo's last name again is what?

4    A    Eshleman.

5    Q    Okay.  Any other employees who were within that

6         group of four who had exercised FMLA rights?

7    A    Jeff Granger had previously exercised FMLA rights but

8         --

9    Q    He was one of the four?

10   A    Yes.

11   Q    How long prior?

12   A    Probably 15 years prior.

13   Q    Okay.  Anyone else?

14   A    No.

15             (Exhibit 7 marked for identification.)

16   BY MR. OLSON:

17   Q    Exhibit 7 is Miller Compressing Company Application

18        for FMLA Leave of Absence dated July 13, 2011, Bate

19        stamped Wink 14.  Have you seen this document

20        before?

21   A    Yes.

22   Q    When was the first time you saw it?

23   A    I don't recall specifically.  It was after she

24        completed it.

25   Q    Was it sometime around then?

                                                    85


1    A    It would have been within a couple of weeks of

2         July 13th, 2011.

3    Q    Okay.  And in the upper right corner where it says

4         intermittent leave, do you recognize that

5         handwriting?

6    A    Yes.

7    Q    Whose is it?

8    A    Peggy Malmstadt's.

9    Q    Did you have a discussion with Peggy Malmstadt

10        around this time as to the request -- or the

11      application rather?

12  A   Only that she told me as an FYI Tracy had applied for

13      intermittent leave and it had been approved.

14  Q   All right.  And what is the process followed to

15      approve a leave?

16  A   We follow --

17              MS. LORENC:  Objection to form.  You can

18      answer.

19              THE WITNESS:  We follow the same process

20      and paperwork that the federal FMLA follows so we

21      use all of their forms.

22  BY MR. OLSON:

23  Q   Okay.  So there's a written document that expresses

24      to the employee that their leave has been approved;

25      is that correct?

                                                        86


1   A   Yes.

2   Q   And you understand that's required by the FMLA?

3   A   Yes.

4   Q   And do you know of such document that exists for

5       the approval of this application for leave?

6   A   I'm sure that it was sent to Tracy at her home

7       address.

8   Q   And it would have been kept in her FMLA file by

9       Ms. Malmstadt as well?

10   A   I believe so.

11   Q   But sitting here today do you have any specific

12       knowledge of such a form?

13   A   I didn't review the FMLA forms before today.

14   Q   That's not what I asked you.  Sitting here today do

15       you have any specific knowledge of such a form?

16   A   No.

17   Q   And did you discuss with Ms. Malmstadt the reason

18       why she needed intermittent leave?

19   A   She -- Peggy had informed me that Tracy had some

20       medical issues going on with her son and she needed

21       time off to attend appointments to determine what the

22       issue was.

23   Q   In the preparation for the discussions with

24       Ms. Wink on July 13 and 16, 2012, did you have any

25       discussion with Ms. Malmstadt about Wink's

                                                              87


1        employment status?

2    A   About her employment status --

3    Q   Right.

4    A   -- no.

5    Q   Did you have any discussion with her about

6        documents concerning Wink?

7    A   I asked her to give me a copy of the FMLA documents

8        so I could share them with our attorney.

9    Q   And those were kept in a file maintained by

10        Ms. Malmstadt?

11    A    Yes.

12    Q    And those are kept separate from the personnel

13         file?

14    A    Yes, they're kept in the medical records room.

15    Q    And the file folder, what does that look like if

16         you know?

17    A    All of the medical leave folders are red folders.

18    Q    All right.  And is there writing on the outside of

19         the folder, for --

20    A    No.

21    Q    -- example, when somebody pulls a file or something

22         like that?

23    A    No.

24    Q    Are there notations inside the file on the jacket

25         itself?

88

1              MS. LORENC:  Objection to form.  You can

2         answer.

3              THE WITNESS:  No.  There's a label on --

4         the file label that just says employee name, FMLA,

5         short-term disability, worker's comp., and the

6         date.

7    BY MR. OLSON:

8    Q    Okay.  When you got the FMLA paperwork from Wink's

```
 9          file through Malmstadt, did she make you a copy or

10          did she hand you the file; how did that work?

11   A      She -- I don't remember if she made me a copy or

12          scanned it to me.

13   Q      So she may have e-mailed it to you?

14   A      One of the two.

15   Q      Okay.  And so around the time that you discussed

16          this application with Ms. Malmstadt, was that

17          pursuant to one of those weekly discussions that

18          you mentioned earlier?

19   A      Yes.

20   Q      And at this time do I recall correctly you didn't

21          know what the diagnosis was for her son?

22   A      I don't think anyone knew at that time.

23   Q      And what specifically was Wink asking for if you

24          know at this time?

25   A      Just time off to attend doctor appointments for
```

89

```
 1          assessments.

 2   Q      She had not been working from home up to this

 3          point?

 4   A      I don't remember the specific date when she started

 5          working from home.

 6                 (Exhibit 8 marked for identification.)

 7   BY MR. OLSON:

 8   Q      Exhibit 8 is a series of documents marked Wink 15
```

```
 9        through 20.  There's a fax cover sheet on Miller

10        Compressing letterhead with a date stamp at the top

11        of March 1, 2012.  Take a look at these documents

12        and then I'll have questions for you.

13                        When is the first time you saw this

14        packet of documents?

15    A   Shortly after it was received.

16    Q   And what was the context of that?

17    A   Peggy Malmstadt just informed me that we had received

18        the recertification paperwork and informed me what it

19        said.

20    Q   Did you look at the documents?

21    A   Not at the time it was received.  She just told me

22        about them, showed me the copy, but I didn't read

23        through them.

24    Q   And then later when -- before you talked to

25        Attorney Lynch, you again looked at these documents
```

```
 1        when Malmstadt provided them to you in the file --

 2    A   Yes.

 3    Q   -- or from the file I should say?

 4            MS. LORENC:  Objection to form but you

 5        can answer.

 6            THE WITNESS:  Yes.

 7    BY MR. OLSON:
```

8    Q    And was this the first time that you learned about

9         the autism diagnosis, or did you learn about it

10        sometime prior?

11   A    I don't remember specifically when the autism

12        diagnosis happened.  We were informed in writing once

13        he was diagnosed; I just don't remember specifically

14        when it was.

15   Q    All right.  And is there anything in the first page

16        that you believe is not stated accurately by

17        Ms. Wink?

18             MS. LORENC:  Objection to form.  You can

19        answer.

20             THE WITNESS:  I don't have any reason to

21        know why it's not accurate, but I don't also have

22        reason to know why it is accurate either.

23   BY MR. OLSON:

24   Q    Based on what you know though, you wouldn't

25        challenge the voracity of any of her statements?

                                                        91


1    A    This is her statement.

2    Q    Right.  But you also have in your mind and

3         experience facts and knowledge, so I'm asking

4         whether you disagree with anything she said here.

5    A    I have no reason to disagree with what she states.

6    Q    And you were aware from this document that she was

7         home with her son two days a week?

8    A    That's what she's stating here.

9    Q    Okay.  And you had no reason to question that;

10        true?

11    A    Correct.

12    Q    And you knew that was part of her FMLA application;

13        true?

14            MS. LORENC:  Objection to form.

15            THE WITNESS:  This isn't part of her

16        application.  This is the cover sheet.  The pages

17        behind it are part of the application.

18    BY MR. OLSON:

19    Q    Okay.  But nonetheless, Wink 15, the first page,

20        your company received it; right?

21    A    Yes.

22    Q    And you saw it?

23    A    Yes.

24    Q    And you knew that she was stating that she was home

25        with her son who had this serious health condition

                                                        92


1        two days per week --

2    A    That's what she stated.

3    Q    -- true?  And you knew that; correct?

4    A    I'm stating that's what she stated.  I don't have

5        direct knowledge or indirect knowledge otherwise.

6    Q    All right.  Her request for leave to care for her

7          son two days per week was never denied by the

     8          company; true?

     9    A     Correct.

    10    Q     The second page, Bates Wink 16, it says FMLA PPWK

    11          from Dr. Mance.  Do you recognize that handwriting?

    12    A     No, I don't.

    13    Q     The rest of the handwriting on that page, do you

    14          recognize the handwriting?

    15    A     No, I don't -- actually -- No, no, I don't.  I assume

    16          it's Tracy's handwriting on that page.

    17    Q     And it says here in the description due to Evan's

    18          effects of PDD-NOS, he is not able to attend day

    19          care.

    20                     You knew at the time that she filed

    21          for this application that the reason she needed

    22          leave was so that she could provide care for her

    23          son at home instead of him going to day care; true?

    24                     MS. LORENC:  Objection to form.  You can

    25          answer.

     1                     THE WITNESS:  This is the certification

     2          form, yes.

     3    BY MR. OLSON:

     4    Q     Okay.  And you had notice specifically that she was

     5          at home with her son two days per week, because he

     6          could not go to day care due to a serious health

7      condition; is that accurate?

8    A   That's what she is stating, yes.

9    Q   Okay, you keep qualifying it that's what she's

10       stating, but you had specific notice of that; is

11       that accurate?

12            MS. LORENC:  Objection to form.  You can

13       answer.

14   BY MR. OLSON:

15   Q   Okay, we'll start over and we'll take as much time

16       as we need to go through this.  If you can answer

17       yes or no, it will make it easier.  If you want to

18       qualify all your answers, you can but I'm going to

19       go back and make sure I have a clear answer, so if

20       I have to spend an hour to cover one question,

21       we're going to do that.

22            MS. LORENC:  She's allowed --

23            MR. OLSON:  I want to make that clear.

24            MS. LORENC:  -- to answer her question --

25            MR. OLSON:  Certainly.

                                              94


1            MS. LORENC:  -- the questions in whatever

2        way --

3            MR. OLSON:  That's fine.

4            MS. LORENC:  -- she wants.

5            MR. OLSON:  Well, as long as she's not

6      being cagey about it, I'd agree.

    7              THE WITNESS:  I'm not being cagey and I'm

    8      not being unclear, and I resent that implication.

    9  BY MR. OLSON:

   10  Q    Again, I want to ask you this question.  You had

   11      specific notice that Ms. Wink's reason for FMLA, at

   12      least in part, was to care for her son with a

   13      serious health condition two days per week at her

   14      home in lieu of him going to day care; true?

   15              MS. LORENC:  Objection to form.  You can

   16      answer.

   17  BY MR. OLSON:

   18  Q    Is that accurate?

   19  A    That's accurate.  That's what she stated in her

   20      certification.

   21  Q    Just say that's accurate --

   22              MS. LORENC:  No.

   23  BY MR. OLSON:

   24  Q    -- and then we'll move on.

   25              MS. LORENC:  She's answered your

                                                              95


    1      question.  You can't tell her how to answer it.

    2  BY MR. OLSON:

    3  Q    The next page, Wink 17, did you receive this page

    4      with the application for recertification of FMLA?

    5  A    We received all 16 pages.

```
 6   Q    And did you read this document when you received

 7        it?

 8   A    No, I didn't read it when we received it.

 9   Q    Did you read it before you talked to Attorney

10        Lynch?

11   A    Yes.

12   Q    And under three where it says he's diagnosed with

13        Pervasive Development Delay, needs help constantly,

14        cannot be left alone, did Ms. Malmstadt communicate

15        that to you --

16              MS. LORENC:  Objection to form.  You can

17        answer.

18   BY MR. OLSON:

19   Q    -- at the time that this came in?

20   A    No.

21   Q    But you nonetheless read it before Ms. Wink's

22        separation from employment; true?

23   A    Yes.

24   Q    All right.  And there's no indication to you that

25        Ms. Wink's son could be left alone as of the time
```

96

```
 1        her employment separated; is that accurate?

 2              MS. LORENC:  Objection to form.  You can

 3        answer if you understand.

 4              THE WITNESS:  I don't recall
```

```
 5       specifically.  I didn't --
 6   BY MR. OLSON:
 7   Q   Well, now's the time to identify it, so do you have
 8       any knowledge or notice of any kind, any indication
 9       whatsoever, that he could be left alone after the
10       company approved his -- or Ms. Wink's application
11       for FMLA?
12   A   Not that I --
13               MS. LORENC:  Same objection.
14               THE WITNESS:  -- recall.
15               MS. LORENC:  You can answer.
16               THE WITNESS:  Not that I recall.
17   BY MR. OLSON:
18   Q   Now, in five it says that he -- the son needed
19       total care to avoid injury to others and self.  Did
20       you conclude that that constituted a serious health
21       condition?
22               MS. LORENC:  Objection to form.  You can
23       answer.
24               THE WITNESS:  I didn't constitute
25       anything with this.  I wasn't making a
```

97

```
 1       determination on this at the time it was received.
 2   BY MR. OLSON:
 3   Q   Okay.  But based on your training under the FMLA
 4       and as an HR professional, is that part of your
```

5       analysis when you look at an FMLA claim, to at

6       least conclude in your own mind, whether you do

7       anything with the information or not, that the

8       individual who's covered has a serious health

9       condition?

10  A   Yes, I didn't contest that she shouldn't have been

11      granted FMLA leave.

12  Q   Okay.

13  A   I was in agreement with it.

14  Q   And that leave should have been granted all the way

15      through the end of her employment; true?

16          MS. LORENC:  Objection to form.  You can

17      answer.

18          THE WITNESS:  The leave was granted

19      through the end of her employment.

20  BY MR. OLSON:

21  Q   Okay.  And looking at Bate stamp 19 where it says

22      we feel there is no medication or therapy at this

23      time to cure this, revaluation is required

24      regularly; did you look at that prior to --

25  A   Which page are you on?

                                                        98

1   Q   It's Bate stamped 19.  It's above the doctor's --

2   A   Okay, sorry.

3   Q   -- signature.

4    A    Can you repeat what you said?

5    Q    Sure.  Where it says there -- presumably written by

6         the doctor -- we feel there is no medication or

7         therapy at this time to cure this, reevaluation is

8         required regularly, and above that it says totally

9         unpredictable and that's underlined; did you read

10        that prior to Ms. Wink's separation?

11   A    Yes, and I reviewed it with our attorney.

12   Q    And then Bate stamped Wink 20 is an explanation of

13        this disorder and it's circled and it says Evan.

14        Did you see that prior to Ms. Wink's separation?

15   A    Yes, I reviewed it with our attorney.

16   Q    So your attorney then communicated everything that

17        you needed -- and without giving me specifics --

18        communicated everything you needed to do to comply

19        with the FMLA in your treatment of Ms. Wink; is

20        that accurate?

21             MS. LORENC:  I'm going to object on

22        attorney-client privilege.  You can answer if it

23        would not involve giving up any privileged

24        information.

25             THE WITNESS:  Can you repeat the question

1         or read it back.

2              (Requested portion read by the reporter.)

3              THE WITNESS:  Yes.

4                (Exhibit 9 marked for identification.)

5     BY MR. OLSON:

6     Q    This is marked as Exhibit 9.  It is a series of

7          e-mails starting March 12, 2012, ending March 19,

8          2012, between Ms. Wink and Ms. Malmstadt as well as

9          Mr. Chavez.

10    A    Okay.

11    Q    I see you're not covered on these.  When was the

12         first time you saw these documents?

13    A    When we produced them in discovery.

14    Q    All right.  And does this refresh your recollection

15         as to any communication that you had between anyone

16         about Ms. Wink's FMLA?

17    A    Can you repeat that, I'm sorry?

18    Q    Sure.  Did you have conversation with anyone

19         surrounding these e-mails?

20              MS. LORENC:  Objection to form.

21    BY MR. OLSON:

22    Q    And when I use the term surrounding, what I'm

23         getting to is that maybe you didn't talk about the

24         e-mails specifically but did you talk about the

25         content described in the e-mails?

                                                        100

1     A    Yes.

2     Q    So the first one, March 12 at 9:56 in the morning,

3      is from Chavez.  Were you blind-copied on this by

4      the way?

5   A   No.

6   Q   Okay.  And it says there I spoke with Peggy and

7      confirmed that your son's condition qualifies for

8      FMLA and that I can use sick time when you are out

9      of the office because of that condition.  I added

10     one hour and 45 minutes of sick time to your time

11     card for last week.

12            What discussion did you have with

13     anyone on that topic?

14            MS. LORENC:  Objection to form.  You can

15     answer.

16            THE WITNESS:  It was just a discussion

17     about if it was acceptable for her to use paid sick

18     time concurrently with her FMLA excused time off,

19     and obviously it was, so Matt just confirmed that.

20  BY MR. OLSON:

21  Q   And then in Wink's response she says basically

22     thank you; I'd like to set up a quick meeting to

23     discuss how FMLA works in a situation like this; I

24     just have a few questions; I'm in the office this

25     week Wednesday through Friday from seven to three.

1            Did you have any conversation with

2      anyone on that topic?

3    A    No.

4                   MS. LORENC:  Objection to form.  You can

5         answer.

6                   THE WITNESS:  No.

7    BY MR. OLSON:

8    Q    And then Ms. Malmstadt responds on March 19 that

9         she did not have a chance to speak with Wink the

10        prior week but she'd be available.

11                  Did you have any conversation with

12        anyone on that?

13   A    No.

14   Q    Did Malmstadt ever indicate to you what Ms. Wink's

15        questions or comments were about FMLA?

16   A    Not that I recall.

17   Q    Do you know what Malmstadt communicated to Wink as

18        to how FMLA worked in her situation?

19   A    Not that I recall specifically.

20                  (Exhibit 10 marked for identification.)

21   BY MR. OLSON:

22   Q    Exhibit 10 is an e-mail between Malmstadt and Wink

23        dated March 20, 2012.  It's Bate stamped Wink 25.

24        And this is Malmstadt's request for hours that were

25        used toward FMLA.

                                                      102

1                   Did you have any conversation with

2     anyone on this topic?

3               MS. LORENC:  Objection to form but you

4     can answer.

5               THE WITNESS:  No, I mean this isn't

6     unusual that Peggy would request an employee to

7     inform her which days that they have missed related

8     to that so that she could track it.  There's a --

9     the calendar format that she tracks the dates on

10    and hours.

11 BY MR. OLSON:

12 Q    Okay.  And what is that calendar format?

13 A    It's whatever -- I think there's either a federal

14      form or a -- I don't know if it's an MRA form, but

15      it's literally a calendar on one piece of paper, and

16      it's meant to X off on the dates that are used for

17      FMLA leave.

18 Q    Okay.  And does it X off hours as well?

19 A    If it's not a full eight-hour day, I think she

20      indicates hours.

21 Q    Has that been produced in this case?

22 A    If it existed it's produced.

23 Q    I haven't seen it so I'm requesting that again and

24      ask that it not be altered or destroyed or changed

25      in any way, and again, I'll keep this deposition

                                                      103

1     open until I receive that document.

2            MS. LORENC:  When you say you're asking

3       for it again, when did you ask for it initially?

4            MR. OLSON:  I've asked for all documents

5       regarding FMLA leave by my client, and it's

6       certainly covered under numerous requests so-.

7            MS. LORENC:  All right.  Well, if you

8       want to identify which requests those are.  I'm not

9       holding anything back, so if it's in existence

10      we'll produce it.

11           THE WITNESS:  Yeah, if -- if we had it we

12      turned it in.

13 BY MR. OLSON:

14 Q    Well, it's done for every employee; right?

15           MS. LORENC:  Objection to form.

16           THE WITNESS:  I don't --

17 BY MR. OLSON:

18 Q    Is it done for every employee on FMLA?

19 A    No, I don't think she uses it for every employee, no.

20 Q    Every employee who takes FMLA?

21 A    No.

22 Q    No?  Do you know why she would not have used the

23      calendar for Ms. Wink?

24 A    I don't know.  I mean she doesn't use it for

25      everyone.  She uses it if she needs help tracking the

                                                        104

```
1        dates and hours.  If she doesn't need help tracking

2        it, then she doesn't use the calendar.

3   Q    Did you ever have conversation with Malmstadt about

4        the hours that Ms. Wink was using for FMLA?

5   A    Just the weekly update.

6   Q    Okay.  And what was the feedback that you were

7        getting from Malmstadt about the hours that Wink

8        was --

9   A    Nothing other than she was continuing to use time on

10       an intermittent basis.

11                 (Exhibit 11 marked for identification.)

12  BY MR. OLSON:

13  Q    This is Exhibit No. 11.  Do you recognize this

14       document?

15  A    No, I don't.

16  Q    Is this the FMLA calendar you mentioned?

17  A    No, it's not.

18  Q    Is the FMLA calendar something that's handwritten

19       or is it typed into a computer?

20  A    It's a one-page document that's a copy of a calendar;

21       literally it's the months of the calendar, and for

22       every day that someone is on medical leave an X is

23       marked over that day.

24  Q    Okay.  Did you look at that when you talked to

25       Attorney Lynch?
```

105

```
1   A    I looked at whatever documents were in there.  I

2        don't remember specifically seeing one or not seeing

3        one.

4   Q    And this document, what is this used for if you

5        know?  Are you familiar with it?

6             MS. LORENC:  And I want to object for the

7        record.  This document is not Bates labeled.  Was

8        this produced in this litigation?

9             MR. OLSON:  Well, I don't know sitting

10       here right now.  I've got the same document -- I

11       will say yes -- with our mandatory responses.  This

12       is a cleaner copy; that's why it's not labeled.

13       This is Wink 21 through 23.

14             MS. LORENC:  Thank you.

15  BY MR. OLSON:

16  Q    So you don't know where this document came from,

17       and you've not seen it before; do I understand that

18       correctly?

19  A    Correct.

20  Q    Okay.  And you don't know whether this was supplied

21       to Ms. Malmstadt in response to her request for

22       information about FMLA time?

23  A    It wasn't part of the FMLA file, so I would believe

24       it wasn't submitted to her.

25  Q    Unless Malmstadt made a mistake; right?
```

106

```
 1              MS. LORENC:  Objection.  You can answer

 2      if you know.

 3  BY MR. OLSON:

 4  Q    Do you find Malmstadt to be competent in her

 5      position?

 6  A    Extremely.

 7  Q    Okay.

 8              (Exhibit 12 marked for identification.)

 9  BY MR. OLSON:

10  Q    This is Exhibit 12.  This is Bate stamped Wink 1

11      through 13.  The date is July 5, 2012.  You see at

12      the top it says Miller Compressing with a fax

13      number.  Do you recognize that fax number?

14  A    No.

15  Q    Where it says from up above, do you recognize that

16      fax number?

17  A    No.

18  Q    Okay.  In the header for Miller Compressing

19      Company, it shows the fax number there

20      414-671-5658.  Is that the fax number or was it at

21      that time?

22  A    In the header that's the -- that's the HR secure fax

23      number, but are you referring to --

24  Q    And then in --

25  A    I think -- you know what, I think I was looking on a
```

107

```
 1        separate page.

 2   Q    Oh, okay.

 3   A    Yeah, on the top page, that's the HR fax number.

 4   Q    Okay.  So this is something that according to this

 5        cover sheet went from Peggy Malmstadt to Dr. Mance?

 6   A    Correct.

 7   Q    And it was dated July 5, 2012, and she's asking for

 8        a 30-day recertification for Evan.  What is the

 9        significance of 30 days if you know?

10   A    The company has the right to a medical

11        recertification from the treating physician every 30

12        days.

13   Q    No matter what the condition is?

14   A    I don't have an understanding that there's a

15        distinction based on condition under the FMLA.

16   Q    Okay.  Did Ms. Malmstadt issue this under your

17        direction?

18   A    Ms. Malmstadt has the general direction from me that

19        she should seek regular recertifications from

20        treating physicians for anyone who's on FMLA leave.

21   Q    So what triggered this request at this time as

22        opposed to some other time?

23   A    She was probably due for recertification.

24   Q    So you didn't specifically go to Ms. Malmstadt and

25        tell her to ask for recertification; is that
```

1    accurate?

2  A  Yes.

3  Q  And you don't know -- Other than it generally

4     coming up for recertification, you don't know why

5     Malmstadt did it at this time as opposed to some

6     other time?

7  A  No.

8  Q  Was Malmstadt asking for recertification from the

9     doctor for Evan every 30 days?

10 A  I don't know.  Typically what she would do is when

11    she would do recertifications, she would do them for

12    everybody who was on leave with the company and she'd

13    do them all at the same time.

14 Q  Did you train Ms. Malmstadt on FMLA?

15 A  No.  I think I answered that previously.

16 Q  Well, you said that she underwent her own training

17    through different sources?

18 A  Right.

19 Q  But you didn't give her any training?

20 A  No.

21 Q  And this first page, this is something that you saw

22    prior to Ms. Wink's separation of employment?

23 A  Yes.

24 Q  And the second page as well as all the way through

25    to Wink 13, you saw all of these prior to her

1        separation from employment?

2   A    Yes.

3          MS. LORENC:  I'd like to object to the

4        way in which this Exhibit 12 is combined together.

5        These aren't all part of the same fax, so to the

6        extent there's a representation that this all came

7        together as one fax, we would disagree with that

8        contention.

9          MR. OLSON:  So the first page in the

10       receipt lines up above, it says page one of six for

11       both receipt lines.  And then the second page, Wink

12       2, says page six of six for both receipt lines.

13       Wink 3 on one of the receipt lines says page four

14       of five.  The other one says three of five.

15          MS. LORENC:  It's also to a different

16       phone number.

17          MR. OLSON:  Okay.

18   BY MR. OLSON:

19   Q    Which of these pages -- You've already testified

20       that you've seen all of these pages prior to

21       Ms. Wink's separation from employment; is that

22       accurate?

23   A    Yes.

24   Q    Regardless of what the order was, it may have been

25       a different order, but you saw all these?

 1   A    Yes.

 2   Q    And about the time that this came in, July 5, 2012,

 3        did you look at it then?

 4   A    I looked at it with our attorney prior to my

 5        conversation with her on July 13th.

 6   Q    Okay.  When was that conversation with the

 7        attorney?

 8   A    I believe it was the day before.

 9   Q    July 12 then it would have been 2012?

10   A    Yes.

11   Q    But did you see this when it came in, this being

12        Exhibit 12, on or about July 5?

13   A    No.

14             MS. LORENC:  And I'm going to object.

15        Again, since there's multiple different dates and

16        fax numbers, I just want to make sure which

17        document you're talking about.

18   BY MR. OLSON:

19   Q    Well, did you see any of these pages prior to when

20        you took them to Attorney Larry Lynch to review?

21             MS. LORENC:  Objection to form but you

22        can answer.

23             THE WITNESS:  No.

24   BY MR. OLSON:

25   Q    Did you sit down with Larry Lynch and talk about

1         these face to face or over the phone, or what was

2         that -- or do it by e-mail; how did that work?

3                    MS. LORENC:  And again, I'll object as to

4         attorney-client privilege.  You can answer so long

5         as it doesn't involve privileged communications.

6                    THE WITNESS:  We had talked over the

7         phone, face to face, and over e-mail, not just

8         about this but about several ongoing topics at the

9         time.

10   BY MR. OLSON:

11   Q    Okay.  So with respect to Ms. Wink, did you talk to

12        Attorney Lynch by phone and in person?

13   A    Yes.

14   Q    Did you review the documents with him in person?

15                   MS. LORENC:  I'm going to instruct you

16        not to answer that.

17                   MR. OLSON:  I'm asking whether the

18        documents were reviewed with him in person, not the

19        substance of the communication.

20                   MS. LORENC:  Well, you're making the

21        assumption that the documents were reviewed with

22        him, and if she answers that then she's telling you

23        that they reviewed the documents.  So you've asked

24        if they met in person --

1          go to the substance of the communication.  So

2          again, if you're instructing her not to answer,

3          then we can take it up with the judge, but that's

4          not a proper assertion of attorney-client.

5                    MS. LORENC:  I'm instructing her not to

6          answer.

7     BY MR. OLSON:

8     Q    Okay.  In paragraph number three at Wink 3 --

9          please take a look at that.  Did you prior to

10         Ms. Wink's separation read where it states has had

11         difficulty staying in day care, challenging care

12         daily, and the rest of it I can't read; did you

13         read that?

14    A    Yes.

15    Q    Now, on page Wink 7 where it says administration

16         received by Peggy Malmstadt, February 29, 2012,

17         that is acknowledging her receipt.  That's not

18         actually an approval of the FMLA leave, is it?

19    A    Correct, that's approval -- or, I'm sorry, correct,

20         that's receipt, not approval.

21    Q    And in looking through this exhibit or the prior

22         exhibit, anywhere in there do you see what you

23         believe to be an approval of the request for FMLA

```
24        or the recertification of FMLA?

25    A   No, I don't.
```

```
 1    Q   And I'm not sure if it was clear from your prior

 2        answer, but do you know of -- sitting here today of

 3        any specific written authorization from the company

 4        approving -- Let me ask it a different way.  Strike

 5        that last question.

 6                    Sitting here today are you aware of

 7        any written approval of the FMLA application by

 8        Ms. Wink?

 9    A   I don't know specifically if -- if there was an

10        approval, it would be part of the file that was

11        provided.  Typically if there was an approval, it

12        would be on the federal form that -- and I forget

13        what the form is called, but I think it's like a

14        two-page form and it says your request for a leave

15        has been approved or has been denied, and you check

16        the box, and then you -- it would have been mailed

17        out to Tracy at her home address.  I don't know if a

18        copy of those is kept in the file or not.

19                    MS. LORENC:  Can I ask a question off the

20        record?

21                    (Discussion held off the record.)

22    BY MR. OLSON:

23    Q   Did you ever document your conversations with
```

24    Ms. Wink about her talking about her son too much

25    at work?

1    A    No.

2    Q    Did you ever document her using the phone too much

3          at work to talk to his health care providers?

4    A    I think that was part of the outline discussion with

5          her on July 13th.

6    Q    Part of that outline was that she was talking to

7          her son's doctors too much on the phone?

8    A    Part of the outline was that she was using the

9          company phone and her personal phone during working

10         time, and we wanted that to only be done on breaks

11         and lunches.

12   Q    Even if it was to talk to his health care

13         providers; true?

14   A    True.

15   Q    What is OPT?

16   A    Order Processing Team.

17   Q    Did you have communication with Ms. Wink that she

18         could not use other members of the Order Processing

19         Team as backup for herself?

20              MS. LORENC:  Objection to form.  You can

21         answer.

22              THE WITNESS:  Matt Chavez had that

23          conversation with her.

24    BY MR. OLSON:

25    Q    In your presence?

1    A    Yes.

2    Q    During what conversation?

3    A    The July 13th conversation.

4    Q    What did he say to her?

5    A    He -- he had explained to me prior to that that she

6         had been --

7                    MS. LORENC:  Just answer the question.

8         He just stated that she had been using members of

9         the department to assist her in completing her work

10        without his authorization, and that she needed to

11        get his authorization for taking team members off

12        of what their assigned duties were.

13    BY MR. OLSON:

14    Q    And how did that reconcile with her deciding what

15        work should be prioritized?

16    A    I don't understand the question.

17    Q    Was she expected that not only could she not use

18        others to assist her on tasks, but she also once

19        she decided what would be a top priority in her

20        tasks, she should only do it herself and not use

21        other people on the team?

22    A    That's correct.

23    Q    And was she allowed to talk to Chavez about using

24         other people on the team if she got his permission

25         first?

1     A    Yes.

2     Q    Okay.  And would that be part of prioritizing, if

3          she went to him and asked about using other people

4          on the team to get prior -- a high priority task

5          completed?

6     A    No, the prioritizing issue with her was her ability

7          to determine what order her work needed to be

8          completed in.

9     Q    Well, the completion of the work would sometimes

10         require her to seek the assistance of other team

11         members; true?

12    A    No, her work and the work of everyone in that

13         department is evenly divided.

14    Q    Okay.  What's the significance of the term team if

15         they're all doing only their own tasks and it's all

16         evenly divided?

17    A    It's the manager's responsibility to distribute the

18         work.  It's not the responsibility of coworkers to

19         assign work to other coworkers.

20    Q    Okay.  So if he's assigning the work, then is he

21         not identifying the priority of the work?  He being

22    Chavez.

23  A   I guess I don't understand what you're asking.

24  Q   When Chavez was giving the work evenly to each

25      person in his department, the Order Processing

1       Team, was he also communicating the priority of the

2       work?

3                   MS. LORENC:  I'll object.  If you know

4           you can answer, but I'm objecting to form.

5                   THE WITNESS:  I mean each of the members

6           knew what the priorities of each of their own jobs

7           were.  If they needed assistance in completing it,

8           it was his discretion who would complete that work.

9   BY MR. OLSON:

10  Q   So he would not communicate to them what the

11      priorities of their work was.  He would give them

12      the work, and they had to determine on their own

13      what the priority would be?

14  A   Correct, once they were trained.

15  Q   And so establishing the priority would be up to

16      Ms. Wink, and if something she determined was a

17      high priority she could not use someone else unless

18      she asked; is that accurate?

19  A   Yes.

20  Q   Was she using the backup of other employees

21      excessively?

22    A    Yes, she --

23              MS. LORENC:  Objection to form.  You can

24         answer.

25              THE WITNESS:  Yes, she was.


                                                              118


 1    BY MR. OLSON:

 2    Q    Okay.  And was that something that she had been

 3         talked to about previously?

 4    A    She had not been talked to previously about that.

 5    Q    Okay.  Did you tell Ms. Wink that the FMLA only

 6         covered appointments and therapy sessions?

 7              MS. LORENC:  Objection to form.  You can

 8         answer.

 9              THE WITNESS:  No, I told her that the

10         company would honor her FMLA to cover her absences

11         for doctor appointments and therapy visits, and

12         that we would follow the FMLA to the letter of the

13         law.

14    BY MR. OLSON:

15    Q    Well, you told her though that FMLA didn't apply to

16         her staying home with her son; right?

17    A    No, I didn't tell her that.

18    Q    Was that your opinion?

19    A    No, that's not my opinion.

20    Q    Was there anything she said about her son at work

21    that was distasteful or improper, or was it just

22    the amount of time or number of times that she

23    talked about her son's condition that was a

24    problem?

25  A   It was the quantity and duration of the conversations

1    that were excessive and were distracting both herself

2    from her work and others from completing their work.

3  Q   But not the content?

4  A   I don't know what the content of her conversations

5    with other people were.

6  Q   Nonetheless, you wanted her to continue working

7    there; is that right?

8  A   Yes.

9  Q   What did you tell Ms. Wink if anything as to why

10    she needed to be in the office five days a week?

11          MS. LORENC:  Objection to form but you

12    can answer.

13          THE WITNESS:  Because that's the regular

14    work schedule, because the department is -- there

15    are two primary functions of the department:  It's

16    to support the Marketing Administration Team and

17    it's to support customers who call in and have

18    inquiries about their transactions, and those times

19    most frequently that those questions or inquiries

20    come in are Monday through Friday, eight to four.

21    BY MR. OLSON:

22    Q    Okay.  So you understood that by requiring her to

23         be in the office five days a week, her FMLA would

24         no longer be granted with respect to her being home

25         with her son two days per week; correct?

1     A    We never told her that her FMLA wouldn't continue to

2          be granted.  I specifically told her it would

3          continue to be granted to the letter of the FMLA law.

4     Q    But not for the purposes of her being home with her

5          son two days per week; you made that clear to her,

6          didn't you?

7     A    No, what I made clear to her is that she wouldn't be

8          allowed to continue telecommuting.  She would have

9          been able to use FMLA time for those days, but we

10         weren't going to continue the telecommuting.  And her

11         work schedule would have to be eight to four, not

12         seven to three.

13    Q    All right.  So she could be home then to care for

14         her son two days per week after July 13; true?

15    A    She could have, sure --

16    Q    Okay.  And --

17    A    -- as long as she had FMLA time left, yes.

18    Q    Okay.  So you told her she could stay home with her

19         son two days per week; right?

20  A   I didn't communicate anything about the two days a

21      week.  I said your work schedule is going to be

22      Monday through Friday, eight to four; we'll continue

23      to certify your FMLA leave time for doctor

24      appointments, therapy, whatever, and we'll adhere to

25      the letter of the law for your FMLA.

1   Q   Okay.  So you mentioned therapy sessions, doctor

2       appointments, but you didn't mention anything about

3       her being home with her son two days per week; is

4       that correct?

5   A   Yes.

6   Q   What I said is correct?

7   A   I did not talk to her about two days a week anything.

8   Q   Wasn't that the biggest obstacle in your mind, that

9       she was out of the office two days per week?

10  A   No.

11  Q   Wasn't that the biggest concern you had?

12  A   No.

13  Q   Okay.  What was the biggest concern you had about

14      Ms. Wink making a commitment to the company going

15      forward as of July 13?

16  A   The biggest commitment issues were the eight to four

17      instead of seven to three because that's when the

18      coverage was needed.  The telecommuting was not

19      working for us because there was a number of mistakes

20    that were happening in her work and her manager

21    wanted to more directly oversee and review the work;

22    he was approving the time that she was working, so he

23    wanted to directly oversee that.  There were mistakes

24    that were happening in her work that we wanted

25    cleaned up.

1    Q    So the first priority was, what, to have her there

2         and accountable to her boss in the office where she

3         wasn't distracted?

4    A    Absolutely.

5    Q    Okay.

6              MR. OLSON:  Okay.  Well, it's noon now.

7         We can take a break and reconvene whenever it's

8         convenient for you.

9              (Recess taken from 11:59 a.m. until 12:58

10        p.m.)

11             MS. LORENC:  I was able to confirm with

12        my office that we sent the privilege log to you on

13        August 28th along with the rest of the production.

14             MR. OLSON:  Was that by e-mail?  I didn't

15        see it in the hard copies anywhere.

16             MS. LORENC:  I can confirm that as well.

17        However we sent the other stuff to you is how it

18        was sent.

19                    (Exhibit 13 marked for identification.)

20   BY MR. OLSON:

21   Q    This is Exhibit 13, Defendant's Objections to

22        Interrogatories.  It is a seven-page document.  Is

23        this the record you had identified in the morning

24        session that you reviewed in preparation for your

25        deposition today?

1    A    No.  I reviewed the responses to the interrogatories,

2         not the objections.

3    Q    I don't show -- Well, let me ask you this:  Did you

4         sign a version of this document?

5    A    Did I?  I don't believe I did.

6    Q    Okay.  And take a look at this document.  Are you

7         saying there's another version that has additional

8         answers to it?

9    A    Can I check what the version is I looked at?  I don't

10        remember --

11   Q    Sure.

12   A    I don't remember what the title of it was.

13   Q    Sure.

14             MS. LORENC:  And for the record, you're

15        looking at Defendant's Objections to

16        Interrogatories.  We provided Defendant's Answers

17        to Interrogatories as well.  As you may recall, we

18        needed a short extension to provide the answers,

19    but under the federal rules I didn't want the

20    objections to be waived so we produced objections

21    and then separately produced answers.

22 BY MR. OLSON:

23 Q   Okay.  Do you mind showing me the one that you

24    referred to?

25              MS. LORENC:  Assuming they don't have any

1    of my --

2              MR. OLSON:  Yeah, if they don't have

3    notes on them.

4              THE WITNESS:  The answers.

5              MS. LORENC:  Be careful, there's a piece

6    of paper behind it.

7              MR. OLSON:  Thank you.  Can we make a

8    copy of this and mark it?

9              MS. LORENC:  Do you not have our answers

10   to interrogatories?

11              MR. OLSON:  Can we not make a -- can we

12   not mark this?

13              MS. LORENC:  Well, we can do this off the

14   record.  I'm just concerned --

15              THE WITNESS:  Can I look at that first to

16   see if I wrote anything on there?

17              THE REPORTER:  Am I off the record?

18            MS. LORENC:  Well, maybe not.

19            MR. OLSON:  Go ahead and check it.  I

20      didn't see anything handwritten on it.  We'll

21      probably use this one.

22            THE WITNESS:  Okay.  But, yeah, I would

23      like that copy back.

24            MR. OLSON:  Okay.

25            (Discussion held off the record.)

                                                    125

1            (Exhibit 14 marked for identification.)

2  BY MR. OLSON:

3  Q    Exhibit 13, did you see this document before it

4       went out?

5  A    I received a copy of it when it did go out.  I didn't

6       review it before it went out.

7            (Exhibit 15 marked for identification.)

8  BY MR. OLSON:

9  Q    Exhibit 15 is Bate stamped 594 through 614.  These

10      appear to be payroll records for Ms. Wink.  Have

11      you seen these documents before?

12 A    Yes.

13 Q    Did you participate in the preparation of these

14      documents?

15 A    By preparation do you mean the processing of the

16      paychecks?

17 Q    Printing them out -- I mean the actual exhibit

18       documents.

19    A    Yes, I requested a copy from our payroll department.

20    Q    Okay.  And normally do the payroll records reflect

21       if an employee has taken FMLA time?

22    A    No, they do not.

23    Q    Why do they not?

24    A    Because this is her check stub, and the attendance

25       records reflect FMLA time.  This is just what she was

126

1       paid and the codes.

2    Q    Right, but isn't it possible to code FMLA time

3       within the pay record?

4             MS. LORENC:  Objection to form.  If you

5       know you can answer.

6             THE WITNESS:  I wasn't responsible for

7       payroll.  That's just not how our payroll system

8       was set up for the check stubs.

9    BY MR. OLSON:

10    Q    If there's a substitution of pay for FMLA time,

11       would that show up in the check stub?

12    A    The -- Whatever the paid balance was.  So if it was

13       sick time, vacation, that would show up on the check

14       stub.

15    Q    But not that it was pay covering FMLA time?

16    A    Correct.

17   Q   Is it accurate that the employee is not provided

18       with the designation of the FMLA time?

19   A   Are you referring to the federal designation form?

20   Q   Let me back up half a step.  What is the document

21       you said is -- keeps track of within the company

22       the time taken during each pay period by the

23       employee that is designated as FMLA time?

24   A   Her attendance records would show that, and then that

25       should be kept in the FMLA file.

1    Q   And you mentioned before the midday break an FMLA

2        calendar.  Is that the document you're talking

3        about now or is it something else?

4    A   There's two records.  There is the attendance record

5        which is every time an employee punches in or out the

6        time stamp -- any time like a supervisor codes

7        something as sick time, vacation, FMLA, that would be

8        in her attendance record.  And then the FMLA calendar

9        that you're referring to is a different document.

10   Q   And what's the title on the attendance record?  Is

11       that what it's called?

12   A   I think it would say Kronos on it.

13   Q   And that comes out of the Kronos software --

14   A   Yes.

15   Q   -- program?  And we've not seen such a document

16       today in the exhibits, have we?

17    A    I don't recall specifically what was -- I mean I

18         believe it was provided.

19              MS. LORENC:  You can look back through

20         the exhibits if you want to.

21              THE WITNESS:  Yeah, not in anything we've

22         reviewed today.

23   BY MR. OLSON:

24    Q    Not anything today?

25    A    Yeah.

                                                      128


1    Q    But you believe that it was produced as part of the

2         case, a list of the time taken by Ms. Wink that was

3         designated as FMLA in the Kronos system?

4    A    I believe her time records were submitted, so any of

5         like her punches in and out and absences from work.

6    Q    How was her time recorded for the days that she was

7         at home with her son?

8    A    I don't remember specifically.  I mean I wasn't the

9         one approving those days.  It just -- she wouldn't

10        have any punches in or out, and then it would be

11        coded in the system as an excused absence.

12   Q    And once it's coded as an excused absence, who

13        designates it specifically as FMLA or not FMLA

14        time?

15   A    One of three or four people:  Either the payroll

16          coordinator would designate it if she knew that the

17          person was off on FMLA time.  The direct supervisor

18          could do it.  The next-level manager could do it.  An

19          HR member could do that.

20    Q     Who made the final decision to terminate Ms. Wink?

21    A     No one.  The company didn't decide to terminate her.

22    Q     Who made the decision to present her with the

23          ultimatum that she had to commit to being at work

24          five days a week or she could not continue her

25          employment?

1     A     She wasn't given an ultimatum of being there five

2           days a week.  She was told that her work schedule was

3           changing and what it was changing to.

4     Q     Let's not go through all of them.  Let's focus on

5           that one first.

6     A     Okay.

7     Q     Her work schedule was changing to five days per

8           week; is that correct?

9     A     Correct, her schedule is Monday through Friday.

10    Q     She had to be in the office five days a week from

11          eight to four; correct?

12    A     That was her schedule, correct.

13    Q     All right.  Who made that decision, you or someone

14          else?

15    A     Myself, her direct supervisor, her next-level

16      manager, and the president of the company.

17   Q   Who was the next-level manager at that time?

18   A   Margo Eshleman.

19   Q   Is she with the company now?

20   A   No, she's not.

21   Q   Was she laid off?

22   A   Yes, she was.

23          (Exhibit 16 marked for identification.)

24   BY MR. OLSON:

25   Q   Exhibit 16 is Bate stamped D592 and 591.  Are you

                                                    130

1       familiar with this document?

2   A   Yes.

3   Q   Is this a document you created?

4   A   First of all, let me just say that there are -- these

5       are two -- two separate spreadsheets.

6   Q   Okay.

7   A   I did not create the first page.  I did create the

8       second page.

9   Q   Who created the first one if you know?

10   A   Matt Chavez and Margo Eshleman.

11   Q   And did he do that at your direction?

12   A   Yes, he did.

13          MS. LORENC:  And just so the record is

14       clear when you say the first one, you're referring

15      to 592; right?

16                  THE WITNESS:  Yes.

17  BY MR. OLSON:

18  Q     Did you review 592 with Mr. Chavez?

19  A     Yes, I did.

20  Q     And was there anything in here with which you

21        disagreed?

22  A     No.

23  Q     The original one I assume was color coded?

24  A     It was just highlighted.  They were all the same

25        colors.  I don't know what the highlighting was

                                                        131


1         supposed to designate.

2   Q     Okay.  Tracy Wink was highlighted.  What was the

3         significance of that?

4   A     I have no idea.

5   Q     1.0, what does that refer to?

6   A     I believe it's full-time equivalency.

7   Q     Is full-time equivalency 40 hours per week?

8   A     Yes.

9   Q     And up until that point she had been working about

10        30 hours a week; is that right?

11  A     Pardon?

12  Q     As of July 12 she had been working about 30 hours a

13        week?

14  A     Correct.

15   Q   So did this show what the expectation of Ms. Wink

16       would be going forward?  Why does it say one in

17       other words if she's only working 30 hours a week?

18              MS. LORENC:  Objection --

19              THE WITNESS:  I don't know.  I didn't

20       create this.

21   BY MR. OLSON:

22   Q   And you didn't talk to him about that?

23   A   Not about the -- not about the one or the point five.

24   Q   Was Gail Briglevic a part-time employee?

25   A   No, she was a full-time employee but she was working

                                                            132

1        part of her time at the scales.

2    Q   So she was part-time in scales?

3    A   Correct.

4    Q   And part-time somewhere else?

5    A   Correct.

6    Q   Alexandra Harris, was she part-time?

7    A   She was a part-time employee.

8    Q   The next column, scale payables, what does that

9        refer to?  Is that a department?

10   A   It's a specific function within the department.

11   Q   And then order processing, is that all done at the

12       one location?

13   A   Yes --

14          MS. LORENC:  Objection to form.

15          THE WITNESS:  Yes, it is.

16  BY MR. OLSON:

17  Q     Now, over in the right column you see at the top it

18        says Greenwood Scale.  Is that a different

19        location?

20  A     Yes, that's a different location.

21  Q     There's an X there for a few of the employees under

22        order processing.  Does that indicate they were

23        doing order processing for that location or at that

24        location or something else?

25  A     There's a key at the top -- the right-hand top

1         column, and the X indicates that they were current or

2         primary backup and they were covered in that

3         functional area.

4   Q     Okay.  As opposed to having parens around the X

5         where that was their primary job responsibility?

6   A     Correct.

7   Q     So would you agree that this chart reflects that

8         Wink was responsible to be working 40 hours a week

9         doing sales brokerage order processing?

10          MS. LORENC:  Objection to form.

11          THE WITNESS:  That was what her primary

12        function was.

13  BY MR. OLSON:

14   Q   And you don't know why some of the employees have a

15       designation for a one or a point five and others do

16       not?

17   A   No, I'm not certain.

18   Q   What does this chart reflect with respect to any

19       change for Ms. Wink?

20   A   I don't recall.

21   Q   And looking at it now you can't tell?

22   A   No.

23   Q   In C where it says Matthew, that's Matt Chavez, is

24       that correct, in the lower left corner?

25   A   Yes.

                                                    134

1    Q   And it says Matthew to retrain at all desks.  Do

2        you know what that refers to?  Does that mean he'll

3        retrain people at all desks or he himself will

4        retrain at all desks?

5    A   He himself will refresh at all desks.

6    Q   And the second page of Exhibit 16 marked D591, did

7        you use information from the first page of this

8        exhibit to create 591?

9    A   Yes, I did.

10   Q   And what was the purpose of this document?

11   A   It was my listing to reflect who had previously been

12       in the department and who would be in the future

13      departments.

14  Q   And with respect to order processing, it says Wink

15      quit.  Was she already in that column --

16              MS. LORENC:  Objection to form.

17  BY MR. OLSON:

18  Q   -- prior to you indicating that she had quit?

19  A   No, no.

20  Q   Did you create this document before the 18th?

21  A   No.

22  Q   Were there other drafts or versions of this

23      document?

24  A   There was a previous draft a week or so previous to

25      this, and it showed that the two selections were Kim

                                                    135


1       Noonan and Roseanne Endvick only.

2   Q   And that prior version then, that resulted in

3       Noonan being put off for a month -- strike that.

4               As a result of Wink no longer being

5       employed by the company, that resulted in Noonan's

6       layoff being put off a month; is that accurate?

7   A   No, I believe Kim worked longer than one month

8       following the July layoffs, but her --

9   Q   Was that -- Go ahead.

10  A   -- her quit -- her quit did result in one of the

11      members of the department's not being laid off.

12  Q   Who was that?

13    A    Kim Noonan.

14    Q    When you say her you mean Tracy Wink?

15    A    Correct.

16    Q    And the future department, that would indicate what

17         the department would look like after the layoff or

18         layoffs?

19    A    Yes.

20    Q    And where it says Kasprzyk OP August, does that

21         mean she'd be laid off in August or something else?

22    A    It means either she would be laid off in August, or

23         that she would be reassigned to the department in

24         August.

25    Q    Did you explore whether Wink could be reassigned to

1          a different department in contrast to having a

2          requirement that she not work from home twice a

3          week?

4     A    Yes, we did.

5     Q    Did you document that somewhere?

6     A    That was documented with the first page.

7     Q    And how was it documented?  Are you saying there's

8          a document somewhere that was combined with this

9          page?

10    A    No.

11    Q    Okay.

12   A    This first page is to document all of the areas that

13        she had been trained in.

14   Q    Oh, I see.  So was there somewhere she could have

15        worked and still been at home twice a day -- twice

16        a week rather?

17   A    No.

18   Q    What was Alexandra Harris's job?  She worked in

19        orders?

20              MS. LORENC:  Objection to form but you

21      can answer it.

22              THE WITNESS:  What did you say?

23  BY MR. OLSON:

24   Q    According to this chart Alexandra Harris worked in

25        orders?

                                  137

1   A    Not that she worked there.  She was -- knew how to

2        perform that job.

3   Q    Okay.

4   A    It's not her current assignment.

5   Q    Okay.  Is she still with the company?

6   A    No, she's no longer with the company.

7   Q    When did she cease being with the company?

8   A    I believe she was laid off at the end of August 2012.

9   Q    She continued part-time up until her layoff?

10   A    Yes.

11   Q    Did someone replace her?

12    A    No.

13    Q    You had mentioned that Gail Briglevic was assigned

14         to two different departments.  What was the --

15         Aside from being in scales, where else was she

16         working?

17    A    She was working at a joint venture called Seven

18         Stars.

19    Q    Okay.  What is Seven Stars?

20    A    That's an auto salvage company.

21    Q    Okay.

22    A    It was a joint venture.

23    Q    Is she still with the company?

24    A    No, she's not.

25    Q    When did she leave?

                                                      138


 1    A    July 23rd, 2012.

 2    Q    So on page one of Exhibit 16 marked 592, what areas

 3         could Ms. Wink work in according to this document?

 4         All the areas that are checked or was there

 5         something else?

 6    A    She was trained to work in all the areas that were

 7         checked.

 8    Q    Now, she had testified as I recall that there was

 9         only one desk that she was not complete in

10         training, nonferrous payables.  Is that your

11    recollection as well?

12  A   Yes.

13  Q   What is carload?  Is that part of the order

14      processing function?

15  A   No, it's not.  It's a transportation function.

16  Q   Okay.  But nonetheless, Sarah Reese was doing that

17      and she is listed under order processing.  Do you

18      know why she would be on order processing but

19      performing carload?

20          MS. LORENC:  Objection.  I don't think

21      that's lining up correctly, is it?  I withdraw my

22      objection, I apologize.

23          THE WITNESS:  Because it's not a

24      full-time position by itself.

25

                                            139


1   BY MR. OLSON:

2   Q   Okay.  Where else was she working?

3   A   She also worked for order processing and in

4       transportation.

5   Q   Okay.  But she's not under transportation, is she?

6   A   Everyone on the spreadsheet is just listed once.

7   Q   But her primary duty is listed as carload under

8       order processing.  Do you agree with that?

9   A   It's also listed as a primary function of scale

10      payables, which was an order processing function.

11    Q    Okay.  So she was split between those two

12         departments?

13    A    Correct.

14    Q    And could Wink do carload?

15    A    No.

16              (Exhibit 17 marked for identification.)

17    BY MR. OLSON:

18    Q    Exhibit 17 is marked D578.  It's a Miller

19         Compressing Company QES Meeting Record regarding

20         training nondiscrimination.  This was according to

21         this presented by you.  This is the training you

22         had mentioned earlier; is that correct?

23    A    This was the formal training, but I had mentioned

24         that it was part of a discussion prior to the 16th as

25         well.

                                                      140


 1    Q    And is this a form that you had used previously, or

 2         was it generated for the first time in regard to

 3         this RIF?

 4    A    Is this form a form that I've used previously --

 5    Q    Right.

 6    A    -- or the specific --

 7    Q    This template, this blank -- as a blank template

 8         had you used it previously?

 9    A    Yes, this is the company's normal meeting record for

```
10        formal training.

11   Q    All right.  Keep those together.

12                   MS. LORENC:  Are you done with 17?

13                   MR. OLSON:  Yes.

14                   THE WITNESS:  Is this my copy back?

15                   MS. COVINGTON:  Oh, but that has the --

16        that's the original copy that she gave you.

17                   THE WITNESS:  I just need my copy back.

18                   MS. LORENC:  I can give this to you.

19                   THE WITNESS:  Okay.

20   BY MR. OLSON:

21   Q    All right.  So Exhibit 14, this is the document you

22        identified as one of the records that you reviewed

23        in preparation for your deposition today; is that

24        correct?

25   A    Yes.
```

```
1    Q    And did you ever sign a version of this document?

2    A    I don't recall if I did or not.

3    Q    In reading through this -- You looked at it this

4         morning; is that right?

5    A    Yes.

6    Q    Was there anything in here that you saw with which

7         you disagreed?

8    A    No.

9    Q    Is there anything in response that you believe is
```

10      missing from a complete answer?

11              MS. LORENC:  You can review it if you

12      want.

13              THE WITNESS:  Could you read that back,

14      please.

15              (Requested portion read by the reporter.)

16              THE WITNESS:  No.

17  BY MR. OLSON:

18  Q    Take a look at the top of page two, please.   In

19       response to Interrogatory No. 1, it states in the

20       last sentence of that answer, on Monday, July 16,

21       2012, Plaintiff reported to Ms. Barbian that she

22       could not switch her hours to eight to four p.m.

23       because of day care issues and that she quit.

24                  Is that accurate, that she did tell

25       you that she could not switch her hours because of

142

1       day care?

2   A    Yes.

3   Q    And did Peggy Malmstadt have the authority to grant

4        an employee FMLA leave on her own, or did she need

5        to get additional approval from someone else within

6        the company?

7               MS. LORENC:  Objection to form.

8               THE WITNESS:  She had the authority to

```
 9         approve it on her own.

10    BY MR. OLSON:

11    Q    And did she do that for Ms. Wink each time, or did

12         someone else tell Ms. Malmstadt that it was okay to

13         grant the FMLA?

14              MS. LORENC:  Objection to form.

15              THE WITNESS:  She -- she did it for

16         Ms. Wink each time.

17    BY MR. OLSON:

18    Q    And Ms. Malmstadt did it on her own each time

19         without approval from you or from someone else; is

20         that correct?

21              MS. LORENC:  Same objection.

22              THE WITNESS:  Correct.

23    BY MR. OLSON:

24    Q    Jeff Granger, what were his flexible hours?

25    A    He would work eight to two, sometimes 1:30.
```

143

```
 1    Q    When were his flexible hours revoked?

 2    A    The week before the reductions, July 23rd, 2012.

 3    Q    Did he continue in the company's employ?

 4    A    Yes, he did.

 5    Q    Until when?

 6    A    End of February 2014.

 7    Q    Was he laid off?

 8    A    Yes, he was.
```

```
 9   Q   What were Margo Eshleman's hours, flex hours?

10   A   Seven to 11 or seven until noon, and she also worked

11       from home after that.

12   Q   Did she work from home due to FMLA reasons?

13   A   No.

14   Q   What were her hours changed to?

15   A   Seven to four.

16   Q   And she was no longer allowed to work from home?

17   A   Correct.

18   Q   And did that happen in July of 2012?

19   A   It happened the week before the July 2012 reductions.

20   Q   Lonnie Greene, what was her flex time?

21   A   She had varying hours on the night shift.  I'm sorry.

22       She had varying hours on the day shift.

23   Q   How was that changed then?

24   A   She was -- We eliminated the first shift position and

25       she began working second shift hours.
```

144

```
 1   Q   Okay.  So is it accurate to state that in answer to

 2       Interrogatory No. 11, none of those three

 3       individuals who had their flex time revoked were

 4       using flex time for FMLA purposes?

 5   A   At that time, correct.

 6   Q   Okay.  And in answer to No. 13, it says that Sarah

 7       Barbian, Matthew Chavez, and John Busby were given
```

8      the directive to terminate two people from

9      Plaintiff's department.  Who gave that directive?

10  A    John Busby and Susan Miller.

11  Q    Well, it says John Busby was given the directive;

12       so he gave a directive to himself?

13            MS. LORENC:  Objection.

14            THE WITNESS:  Susan Miller the owner of

15       the company gave the directive to him.

16  BY MR. OLSON:

17  Q    Okay.  Is she still involved with the company?

18  A    No, she's part of the former management group.

19  Q    So she's not involved with the company in any way

20       anymore; is that right?

21  A    Correct.

22  Q    When did she last have involvement with the

23       company?

24  A    September 27th, 2012.

25  Q    And were you present when Susan Miller directed

1      John Busby to terminate two people from the order

2      processing department?

3  A    No, I wasn't.  That was at a board meeting.

4  Q    When was that board meeting?

5  A    I don't know the exact date.  It was sometime towards

6       the end of June 2012.

7  Q    Have you ever reviewed minutes from board meetings?

8    A    No.

9    Q    Are minutes taken during the board meetings?

10   A    Yes.

11   Q    And that was concerning the reduction in force that

12        was in effect as of July of 2012 that Miller gave

13        that directive to Busby; is that correct?

14             MS. LORENC:  Objection to form.  You can

15        answer it if you understand it.

16   BY MR. OLSON:

17   Q    Do you understand the question?  It's probably not

18        very well worded.  Was it during a board meeting

19        that Miller in June of 2012 directed Busby to cut

20        two people out of the order processing department?

21             MS. LORENC:  Objection.  She already

22        testified she wasn't at the board meeting, but you

23        can answer it if you know.

24             THE WITNESS:  The direction that was

25        given to Busby from the board of directors

                                                    146


1         including Susan Miller was to make cuts across the

2         board.  Order processing was one of all departments

3         who were affected.

4    BY MR. OLSON:

5    Q    And specifically two people from order processing;

6         right?

7    A    Busby made the decision for two people.

 8              MR. OLSON:  Okay.  Counsel, I renew my

 9         request for documents regarding the reduction in

10         force including the board minutes from June of 2012

11         during which that topic was discussed and any other

12         board meeting minutes.

13              MS. LORENC:  Well, I don't believe you've

14         made a request for board meeting minutes --

15              MR. OLSON:  Well, go back and read my

16         requests.

17              MS. LORENC:  If you want to direct me to

18         a specific request --

19              MR. OLSON:  You've got them.  You've had

20         them for several months.

21              MS. LORENC:  Yes.

22              MR. OLSON:  Read them.  If you can't find

23         it, let me know but I guarantee it's in there.

24              MS. LORENC:  Well, you've made

25         misrepresentations about what I have and haven't

 1         done today including producing the privilege log,

 2         so -- but we have not withheld anything, so if we

 3         have them -- and she's already testified she wasn't

 4         at the board meeting so she doesn't know if there

 5         were any minutes taken that day, but if there were

 6         we will produce them subject to privilege.

```
 7                (Discussion held off the record.)

 8   BY MR. OLSON:

 9   Q    Is it accurate that no one with management

10        authority told Ms. Wink that she could not discuss

11        her son with her coworkers?

12   A    Yes, that's accurate.

13   Q    So you never mentioned to her that she was talking

14        about her son too much at work?

15   A    No, I told her she was having excessive personal

16        conversations that needed to cease.

17   Q    And those were primarily about her son, were they

18        not?

19   A    I've already answered several times that I don't know

20        what her personal conversations were about.

21   Q    From where did you get the information?

22             MS. LORENC:  Objection to form.

23             THE WITNESS:  I think I've already

24        answered that also.  Phil Heston, Mary Krecak, John

25        Busby, Joe Kovacich, Jackie Smith, Matt Chavez,
```

148

```
 1        Margo Eshleman --

 2   BY MR. OLSON:

 3   Q    None of --

 4   A    -- Tom Carek.

 5   Q    None of them told you that she was talking about
```

6   her son too much at work; right?

7   A   They didn't say her son.  They said there was an

8       excessive amount of chitchat happening.

9   Q   Okay.  So then why was it that she was not allowed

10      to talk to her son's doctor's office unless she was

11      on a break if that was not an issue?

12  A   Because that was an exception, to make personal calls

13      during work time, because she was making mistakes in

14      her work and it was clear that she was distracted,

15      and we wanted her focused on her work.

16  Q   Okay.  So you were aware that she was making calls

17      to her son's doctor from work; is that correct?

18  A   Yes, she requested an exception from the policy --

19  Q   Okay.

20  A   -- for that.

21          MS. LORENC:  Please let her finish her

22      question before you cut her off -- her answer,

23      excuse me.

24          MR. OLSON:  Oh, sure, by all means.

25  BY MR. OLSON:

                                                    149


1   Q   Did you consult with anyone other than the

2       attorneys to provide answers to Exhibit No. 14?

3   A   You said to Exhibit No. 14?

4   Q   Right.

5   A   I discussed with Peggy Malmstadt, Matt Chavez.  I

6        think that was it.

7    Q    For which ones did Chavez provide information, for

8        which responses?

9    A    He provided the reduction analysis, Exhibit 16.

10            MS. LORENC:  He's asking just about the

11       answers to No. 14.

12            THE WITNESS:  Oh.

13   BY MR. OLSON:

14   Q    Yeah, the interrogatory responses.

15   A    Okay.  He provided information regarding number one,

16       number two --

17            MS. LORENC:  He wants to know if you

18       spoke to Matt when giving answers to this --

19            THE WITNESS:  Oh.

20            MS. LORENC:  -- to Exhibit 14.

21            THE WITNESS:  No, no.

22   BY MR. OLSON:

23   Q    Did Matt provide information to you to assist you

24       in answering one and four -- what were the numbers

25       you said?

                                              150


1    A    I said numbers one and two.

2    Q    One and two.  Did he provide you with information

3        to assist you in answering those?

4    A    No, I mean I was confirming what I already knew to be

5      true with him.

 6   Q  Did you take notes during your conversations with

 7      him --

 8   A  No.

 9   Q  -- in answering these?  Okay.  What other ones did

10      Mr. Chavez provide information in assisting you to

11      answer these?

12   A  I guess I'm having a difficult time answering that

13      because of the way that the questions are listed in

14      here.

15             MS. LORENC:  Do you understand what his

16      question is?

17  BY MR. OLSON:

18   Q  Did you go to --

19             THE WITNESS:  I mean he wants me to list

20      every single question that Matt provided

21      information --

22  BY MR. OLSON:

23   Q  Right.

24   A  -- to this response.

25   Q  Right.

                                              151


 1             MS. LORENC:  At the time that we were

 2      responding to these.

 3             THE WITNESS:  Right.  At that time it was

 4      none.

5    BY MR. OLSON:

6    Q    Oh.  So Chavez didn't give you any information.

7         What about his boss, did she give you any

8         information?

9    A    I have not had any discussions with her about this.

10   Q    Okay.  What about Ms. Malmstadt?

11   A    She provided the FMLA documentation that we provided.

12   Q    What about in response to the interrogatories, did

13        you go to her to confirm any of the information

14        that you provided in the answers?

15   A    No, because that was the only information I didn't

16        have was the FMLA information, the requests and

17        approvals.

18   Q    So in answering questions about the FMLA, you did

19        not go to Malmstadt for information; is that

20        accurate?

21   A    No, that's what I did ask her for information that

22        was relating to her FMLA.

23   Q    And you used that in answering interrogatories

24        contained in Exhibit 14; correct?

25   A    Correct.

                                                          152


1    Q    Thank you.

2                 (Exhibit 18 marked for identification.)

3

4    BY MR. OLSON:

5    Q    This is Exhibit 18.  It's marked D680.  It's from

6         John Busby to you and cc'd to Phil Heston.  Can you

7         describe the circumstances surrounding this

8         document and what it refers to?

9    A    This is referring to a direct employee reporting to

10        Phil Heston.  His name is Dick Kimmel.  His wife was

11        having some serious health issues and Dick was having

12        significant distraction issues at work, and it was

13        asking us to have a conversation with him to get help

14        during the day so that he could be focused on his

15        job.

16   Q    Okay.  And is he still with the company?

17   A    Yes, he is.

18   Q    What's his job?

19   A    It's the same role it was at the time of this, an

20        account representative.

21   Q    Okay.  And, I'm sorry, you said his last name is

22        what?

23   A    Kimmel, K-I-M-M-E-L.

24              (Exhibit 19 marked for identification.)

25

                                                          153


1    BY MR. OLSON:

2    Q    This is Exhibit 19.  It's a couple of e-mails

3         starting February 9, 2012 at 1:27 p.m. from Matt

```
  4            Chavez to a series of individuals.  You're not

  5            listed on here but I'd like to ask you questions

  6            about it when you're ready.

  7    A       Okay.

  8    Q       Did you talk to anyone about the topic of Ms. Wink

  9            being in the office three days a week and being at

 10            home two days a week around this time of

 11            February 9, 2012?

 12    A       Tracy had requested to work from home two days a week

 13            and we granted that request on a temporary basis, and

 14            this e-mail is notifying groups that she worked with

 15            that her schedule would be changing and changes in

 16            work assignments.

 17    Q       Who gave the approval for this --

 18                    MS. LORENC:  Objection, form.

 19    BY MR. OLSON:

 20    Q       -- if you know?

 21    A       Myself, Matt Chavez, Margo Eshleman, and John Busby.

 22    Q       And at the time that this was granted, was there

 23            any communication to Ms. Wink how long it would

 24            last?

 25    A       There was never a commitment of how long it would
```

                                                              154

```
  1            last, but we were clear that it wasn't indefinite and

  2            that it was temporary.
```

3    Q    Who were you clear to on that point?

4    A    Her --

5    Q    In other words, did you tell Ms. Wink that?

6    A    I did not have the direct conversation with her about

7         that.  Her direct supervisor did.  But I was very

8         clear with her direct manager and next-level manager

9         Margo and with John Busby the president of the

10        company.

11   Q    Okay.  And at the time you knew that she was caring

12        for her son two days per week; is that correct?

13             MS. LORENC:  Objection, asked and

14        answered.  You can answer it.

15             THE WITNESS:  It was on or about that

16        time.

17   BY MR. OLSON:

18   Q    Okay.  And was there discussion with Ms. Wink that

19        if she needed to care for her son, she should apply

20        for FMLA?

21   A    No, because she already had applied and was approved.

22   Q    Previously.  Was there any discussion in the

23        context of her working from home that she should

24        get recertified for FMLA?

25   A    There were two different issues:  Her working from

                                                          155

1         home and her approved time off.

2    Q    Okay.  Do you see the three bullet points in

3      Exhibit 19?

4   A   Yes.

5   Q   As of July 13, 2012, did you anticipate that any of

6       the tasks in those bullet points would change?

7   A   Everything changed as of July 2012.

8   Q   I'm focused in particular on those three bullet

9       points.  How would the first bullet point have

10      changed as of July 13, 2012?

11  A   Her direct supervisor would have to answer how that

12      specifically would have changed, but the second

13      bullet point would have changed because Maivue was

14      laid off -- or, I'm sorry, Roseanne was laid off in

15      July of 2012.

16  Q   So who took over that, distributing the morning

17      reports?

18  A   I'm not sure who took over that.

19  Q   Okay.  How long did that take each day?

20  A   I have no idea.

21  Q   Okay.  And is it Ms. or Mr. Thao?

22  A   Ms.

23  Q   Ms. Thao processing ferrous and nonferrous

24      invoices, did that change?

25  A   I don't recall.  Matt would know that.

                                                              156

1   Q   And that was something that Ms. Wink was not

2       trained in; is that right?

3   A   I don't recall if she was trained on the ferrous

4       invoices.  I know that she wasn't trained on the

5       nonferrous invoices.

6                   (Exhibit 20 marked for identification.)

7   BY MR. OLSON:

8   Q   This is Exhibit 20.  It is a July 16, 2012, e-mail

9       from you to Alan Dahl at 4:26 p.m., cover copy to

10      Peggy Malmstadt, Sheri Kubiak, and Matt Chavez

11      regarding Tracy Wink.  Did you author this e-mail?

12  A   Yes, I did.

13  Q   Is it accurate?

14  A   Yes, it is.

15  Q   And did you intend that this would go into

16      Ms. Wink's personnel file?

17  A   Yes, I did.

18  Q   And this is at 4:26 in the afternoon.  As I recall

19      you had met with Ms. Wink that morning.  What

20      happened with regard to Ms. Wink if anything

21      between the morning when she told you that she

22      could not accommodate the work schedule and this

23      time when you issued this e-mail?

24              MS. LORENC:  Objection to form.  If you

25      know.

                                                           157


1               THE WITNESS:  Nothing happened.

2   BY MR. OLSON:

3   Q    Okay.  And you state here the company was no longer

4        able to continue the scheduling flexibility she was

5        requesting.  That scheduling flexibility was with

6        respect to her working at home two days per week?

7   A    It was with respect to her working from home two days

8        per week, and it was with respect to the

9        seven-to-three versus eight-to-four scheduled hours.

10  Q    Okay.

11                  (Exhibit 21 marked for identification.)

12  BY MR. OLSON:

13  Q    This is Exhibit 21.  Do you recognize this

14       document?

15  A    Yes, I do.

16  Q    What is it?

17  A    It's a time record for Tracy Wink for the pay period

18       of it looks like July 9th through July 15th, 2012.

19  Q    All right.  And this record, does it reflect when

20       an employee is on FMLA and when they are not?

21  A    It would have, yes.

22  Q    And where would -- So where would it show that?

23  A    In the column next to the date on the pay code.  If

24       it was FMLA time, it would have a code that says

25       FMLA -- or I think it says unpaid or non-paid time,

```
 1       FMLA.

 2   Q   Is this part of the document from the system you

 3       mentioned earlier?

 4   A   Yes.

 5   Q   What's the name of that again?

 6   A   Kronos.

 7   Q   Kronos.  Who would have made those entries

 8       designating certain time designated as FMLA time?

 9   A   She could have made an entry herself.

10   Q   Who's she?

11   A   Tracy could have made the entry herself.  Matt Chavez

12       could have made the entry.  Margo Eshleman could have

13       made the entry.  Peggy Malmstadt or myself in HR

14       could have made the entry, or the payroll department

15       could have made the entry.

16   Q   So when Wink was at home, if she worked some hours

17       on the days that she was there caring for her son,

18       she could go into the system from her house and put

19       the hours in?

20   A   Yes.

21   Q   And then I assume somebody in management would

22       check it before it was processed in finality?

23   A   Her direct manager would approve the time card, then

24       the payroll processor would approve the time card.

25   Q   Did you discuss with Ms. Wink applying for
```

                                                            159

```
 1        unemployment compensation?

 2   A    Yes, I did.

 3   Q    Tell me everything you recall as completely and

 4        concisely and accurately as you can what you

 5        discussed with her about applying for unemployment

 6        compensation.

 7   A    After she had informed the company that the change in

 8        work schedule would not work for her and that she was

 9        quitting -- I believe that was on a Monday, the

10        16th --

11   Q    She didn't actually say she was quitting, did she?

12   A    She said I can't do what you're asking.

13   Q    Right.  She didn't use the term I'm quitting, did

14        she?

15   A    She just said where do we go from here --

16   Q    Right.

17   A    -- and then I --

18   Q    Now, did you view that to be -- I'm sorry if I cut

19        you off.  Did you have more to say?

20   A    Go ahead.

21   Q    Okay.  At that point did you view that to be sort

22        of a standoff where you as the company were not

23        saying she was fired and she was saying I'm not

24        quitting?

25   A    Yes, she asked me what that -- what it meant, where
```

```
1        we went from there.

2   Q    Okay.  And she said, well, are you telling me I'm

3        fired; something like that?

4   A    She asked me if we said that she was fired, and I

5        told her, no, I'm not telling you you're fired.

6   Q    Okay.  And she conversely said I'm not quitting;

7        right?

8   A    I don't remember if she said that or not.

9   Q    Okay.  So then go on.  What was discussed about

10       unemployment compensation?

11  A    So then after -- after we discussed that things

12       weren't going to work going forward, I had told her,

13       you know, I was really sorry to hear that she wasn't

14       going to remain with the company, that I would have

15       to have some discussions internally to see what we

16       could do for her in the transition.

17            I spoke with a number of people

18       internally including John Busby the president, and we

19       agreed that we would not contest her unemployment.

20       We felt that she had been a good, long-term employee

21       of the company, we wanted to do something to help her

22       out in the transition, and so I discussed with Tracy

23       the next day that the company wouldn't contest her

24       unemployment.  I gave her a copy of how you apply for

25       unemployment benefits including the phone number and
```

```
 1        the website address to apply for the benefits.  I

 2        instructed her how to complete the forms so that she

 3        would be awarded benefits by the state, and I

 4        informed her that the company would not provide any

 5        information to the state regarding her separation.

 6   Q    Okay.  Was that on July 17, 2012?

 7   A    It was between the 16th and the 17th, that Monday and

 8        Tuesday, that those conversations happened.

 9               (Exhibit 22 marked for identification.)

10   BY MR. OLSON:

11   Q    This is Exhibit 22.  It's Bate stamped Wink 27.

12        It's a discharge questionnaire.  Is this the form

13        you just mentioned that you provided to Ms. Wink?

14   A    No.

15   Q    Okay.  You gave her the application itself?

16   A    No.

17   Q    What form did you give her?

18   A    I gave her the form from the DWD website that's

19        online that says how to apply for unemployment

20        benefits.

21   Q    Okay.  And Exhibit 22, you saw this in the process

22        of her applying for benefits?

23   A    I don't recall how I got a copy of this.  I normally

24        don't receive this from the state.

25   Q    Please take a look at the verbiage inserted above
```

1       Ms. Wink's signature and date line.  Does that

2       contain what you told her to fill in on the

3       document?

4   A   I told her that she should inform the department that

5       the company was no longer able to offer her a

6       flexible schedule.

7   Q   And do you view this to be consistent with that?

8   A   I view it to be partially consistent with that.

9   Q   Okay.  How is it inconsistent?

10  A   Because she lists it as the company could no longer

11      accommodate, and it wasn't an accommodation; it was

12      an exception from the normal schedule.

13  Q   And that exception was pursuant to her FMLA

14      application; right?

15  A   No, her exception was originally requested so that

16      she could drop her sons off and pick them up from

17      kindergarten.

18  Q   Well, we can go back through the FMLA forms again,

19      but you knew she was caring for her son two days a

20      week, did you not?

21          MS. LORENC:  Objection to form.

22          THE WITNESS:  I knew that she was working

23      from home for two days a week, yes.

24  BY MR. OLSON:

25  Q   You also knew she was caring for her son?

1    A    I knew that she was caring for her son, yes.

2    Q    Okay.  At home two days per week; true?

3             MS. LORENC:  Objection.  This line has

4        been asked multiple times.

5             MR. OLSON:  I'm asking again because I'm

6        getting conflicting information.

7             MS. LORENC:  No, you're not.  You can

8        answer again.

9    BY MR. OLSON:

10   Q    We'll pull it out again and we'll take the time we

11       need.  Did you or did you not know that she was

12       home two days per week caring for her son?

13   A    I knew that she was telecommuting from home two days

14       per week, and I knew that she was caring for her son

15       on an intermittent basis.

16   Q    And she had to be at home because the kid could not

17       be in day care, and she didn't have anyone to care

18       for him; is that true?

19   A    That's what she put on her certification.

20             (Exhibit 23 marked for identification.)

21   BY MR. OLSON:

22   Q    This is Exhibit 23.  It's an Agreement With Respect

23       to Inventions, Confidentiality, Competition and

24       Term of Employment, Miller Compressing Company.

25       These are Bate stamped D90 through 95.  Do you

1     recognize this document?

2  A   Yes, I do.

3  Q   Did you participate in drafting it?

4  A   No, I did not.

5  Q   When was the first time you saw it?

6  A   When I was hired in 2003.

7  Q   All right.  And were you familiar with the

8     provision for three weeks of severance pay?

9          MS. LORENC:  What page are you looking

10    at?

11         MR. OLSON:  I asked her a question.

12  BY MR. OLSON:

13  Q   Are you familiar with the provision that provides

14     for three weeks of severance pay?  You're looking

15     for it so maybe you're not.  I don't know; you tell

16     me.

17  A   I'm familiar with the provision.  I'm looking for the

18     specific section.

19  Q   Okay.  If I find it I'll let you know.

20  A   It's section two on page two.

21  Q   Okay.  And had you ever paid out or instructed

22     payroll to pay out an employee the three weeks of

23     notice pay under rule of notice?

24  A   Yes, I have.

25   Q   And how many times did you do that?

1    A   Probably a hundred.

2    Q   Okay.  And did any employees have to sign a release

3        in order to get that pay?

4    A   No.

5    Q   Ms. Wink was the only individual who was requested

6        to sign a release in order to get that pay; is that

7        accurate?

8    A   No, that's not accurate.

9    Q   Did Ms. Wink ever receive the three weeks of notice

10       pay?

11   A   No.

12   Q   Who were the individuals who were asked to sign a

13       release in order to get three weeks of severance

14       pay?

15   A   No one was asked to sign a release to get the

16       three -- Oh, to get three weeks of severance pay?

17   Q   Right.

18   A   You're referring to severance pay --

19   Q   Pursuant to the provision contained in Exhibit 23.

20   A   No one had to sign a release to get -- This is not

21       severance pay in this agreement.

22   Q   Okay.  What do you call it?  Notice pay, in lieu of

23       notice?

24   A   We called it pay in accordance with the non-compete

25      agreement.

1   Q    Okay.  And in order to get that pay, did anyone

2        have to sign a release of legal claims?

3   A    No.

4   Q    And you said there were a hundred people who were

5        paid out on that?

6   A    Correct.

7   Q    And is that pay regarding noncompetition the same

8        pay that's reflected in Exhibit 24, Bate stamped

9        Wink 29?

10  A    No, it is not.

11  Q    How is it different?

12  A    The non-compete agreement is specific to saying if an

13       employee is terminated without cause, that we would

14       agree to give three weeks advance pay in lieu of

15       advance notice.

16  Q    Okay.  Was she terminated without cause?

17  A    She was not terminated.

18  Q    She quit.  Now, you understood though that she was

19       quitting under duress, didn't you?

20           MS. LORENC:  Objection to form.  You can

21       answer that.

22  BY MR. OLSON:

23  Q    Do you understand she was quitting under duress?

24    A    She was quitting because she couldn't meet the

25         scheduling requirements of the position.

167

1     Q    Right, but I mean was the sobbing and the running

2          out of the office any kind of an indication to you

3          that she was under duress, that she didn't have

4          somebody to watch her disabled child, and that she

5          couldn't make those arrangements in two days, over

6          a weekend especially, and when she told you that

7          she could not accommodate the work schedule

8          requirements of the company that you communicated

9          to her, that that was a -- that was a quitting

10         under duress?

11              MS. LORENC:  Objection to form.  You can

12         answer.

13    BY MR. OLSON:

14    Q    Did any of those things indicate that to you?

15    A    The company never informed her that her arrangements

16         had to be in place on that Monday.  We asked for her

17         commitment by that Monday, that she would make that

18         commitment on an ongoing go-forward basis.

19    Q    Okay.  So how much time did you give her to make

20         the arrangements?

21    A    We asked her to give us her commitment by that Monday

22         that she would be making those changes.

23    Q    Okay.  And you wanted her to give you some specific

24          indication as to how she was going to do that;

25          correct?

1    A    Quite honestly, the company didn't care how she was

2          going to do that.  The company just wanted her

3          commitment that she would be working eight to four.

4    Q    Right.  And she told you she couldn't do it; right?

5    A    Correct.

6    Q    And she was crying about it the Friday before;

7          right?

8    A    Correct.

9    Q    And she came back and said I couldn't do it; I

10         can't make these arrangements; my mom can only do

11         it three days a week, and I've got to be there for

12         my son the other two days; correct?

13   A    Correct.

14   Q    Did you understand she was quitting under duress?

15   A    I didn't believe that she was quitting under duress,

16         no.

17   Q    No?  So who did you believe that she could have had

18         caring for her disabled son on the days that she

19         should have been at work?

20              MS. LORENC:  Objection to form.

21              THE WITNESS:  That's not my business and

22         honestly, I don't care.

23    BY MR. OLSON:

24    Q    Right.  So did you understand that she was in a

25         difficult position as of Monday in that she had no

1         alternatives to send her disabled son to day care

2         or to have a family member such as her mom cover

3         the other days?  You knew that, did you not?

4     A    I understood she couldn't do the schedule eight to

5         four.

6     Q    Right.  And you understood that she was under

7         duress at that point when she quit.  She wanted to

8         work at the company.  The only reason she couldn't

9         was because she couldn't meet the demands of

10        working five days a week in the office; true?

11    A    At that point in time she couldn't.

12    Q    Is that right?

13    A    Which was -- it was okay for the company for her not

14        to work --

15    Q    Do you agree with what --

16              MS. LORENC:  Just answer his question.

17    BY MR. OLSON:

18    Q    -- I said?

19    A    You asked if the company felt that she couldn't work

20        in the office five days a week --

21    Q    Right.

22    A    -- and I said that was fine with the company.

23   Q   So you told her on Monday, you know, look, if you

24       need more time that's fine, you take the time you

25       need, see if you can find somebody else to watch

1        your disabled son two days per week, we'll give you

2        the time you need; is that what you're telling us?

3    A   No, what -- what changed is that her telecommuting

4        was no longer going to work for the company.  We

5        never told her that her FMLA absences would

6        discontinue to be approved.  We told her that her

7        schedule would be Monday through Friday, eight to

8        four.

9    Q   You never told her that if she needed to care for

10       her son two days per week as she had been doing and

11       as you had received notice, that she could continue

12       to do that; correct?

13   A   We never told her she couldn't continue to do that.

14   Q   Okay.

15   A   We told her her schedule was Monday through Friday,

16       eight to four.

17   Q   Why did you not tell her that if she needed to be

18       home caring for her son two days a week, she could

19       do that?  If that was okay with you, why didn't you

20       just tell her that?

21   A   Because what we weren't allowing was her to

```
22        telecommute two days per week.

23    Q   Well, you knew she was home with her son two days a

24        week, and you also knew that you were saying she

25        had to be in the office five days per week.  Those
```

```
1         two things are mutually exclusive, would you agree?

2         She can't do both.  Would you agree she -- Let's

3         take it from this:  Do you or do you not agree that

4         Ms. Wink would not be able to be at home caring for

5         her disabled son two days per week while at the

6         same time she's in the office five days per week?

7     A   Somebody's work schedule versus their approved FMLA

8         absences are two --

9     Q   Hold on.

10    A   -- different things.

11    Q   Hold on.  All you have to do is answer my question.

12            MS. LORENC:  She is and you keep

13        interrupting her.

14    BY MR. OLSON:

15    Q   Do you agree that it would have been physically

16        impossible for Ms. Wink to be at home caring for

17        her son two days per week while at the same time

18        she was in the office five days per week?

19            MS. LORENC:  Can you let her finish her

20        answer?

21            MR. OLSON:  Only if she answers my
```

22      question.

23                  MS. LORENC:  I think she's trying to and

24      you keep interrupting her.

25                  MR. OLSON:  She's not and you're

1       interfering.

2  BY MR. OLSON:

3  Q    It's a simple question.  Do you agree it would be

4       physically impossible for her to work in the office

5       five days per week while at the same time she's at

6       home caring for her disabled son two days per week?

7  A    I agree someone cannot be in two places at once.

8  Q    Okay.  Now we've established that basic rule of

9       physics.  And when you told her that she needed to

10      be in the office five days per week, you never told

11      her that the exception was she could still care for

12      her son in her home two days per week like she had

13      been doing all along; correct?

14 A    We never discussed that her --

15 Q    Is that correct; yes or no?

16                  MS. LORENC:  Could you let her answer?

17                  MR. OLSON:  No.  She can answer yes or

18      no.  I'm not going to have her --

19                  MS. LORENC:  She doesn't have to answer

20      yes or no.

```
21                    MR. OLSON:  She does --

22                    MS. LORENC:  No, you cannot --

23                    MR. OLSON:  -- if it's a yes or no --

24                    MS. LORENC:  Show me a rule that says you

25        have to require her to answer yes or no.
```

```
 1                    MR. OLSON:  She's not entitled to waste

 2        our time and you're not entitled to waste our money

 3        anymore.

 4                         Please read back the question.  I want

 5        a yes or no answer.

 6                    MS. LORENC:  And I'm instructing you you

 7        don't have to give a yes or no answer if you can't.

 8        You answer the question.

 9                    MR. OLSON:  This game playing is over.

10                    MS. LORENC:  There's no game playing.

11        You keep interrupting her because you're not

12        getting the answer you want.

13                    MR. OLSON:  Right.

14                         Please read back my question.

15                    (Requested portion read by the reporter.)

16   BY MR. OLSON:

17   Q    Is that correct or is it incorrect?

18   A    We never addressed the FMLA --

19   Q    No, no --

20   A    -- absence.
```

21  Q    -- no, no.  Okay, we're going to start again and I

22       want a clear answer.  This has got to be clear.

23       The Court wants a clear record.  We're not going to

24       dance around anymore.  I want you to --

25                 MS. LORENC:  Excuse me.

1                 MR. OLSON:  -- answer this question.

2                 MS. LORENC:  You're harassing my client

3        and we're about to leave.  You don't get to say

4        she's dancing --

5                 MR. OLSON:  You do so at your own risk.

6                 MS. LORENC:  You're harassing her.  Let

7        her answer the question.

8                 MR. OLSON:  I'll get an answer to this

9        question if we have to stay here all day and next

10       week, I don't care, because the Court doesn't like

11       it when we have an unclear record.

12                MS. LORENC:  The Court also doesn't like

13       it when you harass her.  You're not letting her

14       answer the question.

15                MR. OLSON:  She's going to answer this

16       question, and she's going to do it concisely and

17       it's a yes or no question.

18  BY MR. OLSON:

19  Q    When you told Ms. Wink that she had to be in the

20      office working five days per week, you never told

21      her that the exception would be she could be at

22      home caring for her son two days per week; yes or

23      no?

24  A   I --

25          MS. LORENC:  If you can answer that yes

1       or no do it, otherwise, you can say I've already

2       answered that.

3           THE WITNESS:  I never --

4           MR. OLSON:  No, no, I don't have an

5       answer.

6           THE WITNESS:  -- told her she had to be

7       in the office five days a week.

8   BY MR. OLSON:

9   Q   You didn't?

10  A   I said --

11  Q   Okay.  Hold on.

12  A   -- her schedule is Monday through Friday, eight to

13      four.  That is what I told her.

14  Q   Okay.  Is Monday through Friday five days a week?

15  A   That's five days a week.

16  Q   All right.  So when you told Ms. Wink that she had

17      to be in the office Monday through Friday, eight to

18      four, you never told her that the exception was

19      that she could be at home two days per week to care

20    for her son; yes or no?

21  A    Yes, we never discussed that.

22  Q    Thank you.  See, it's very easy.  Just focus on the

23       question and answer.

24             MS. LORENC:  Okay.  Then ask a question

25       and move on.

                                                    176


1             MR. OLSON:  I'd love to.

2             MS. LORENC:  Are you okay?  Do you need a

3        break?

4             THE WITNESS:  I'm fine.

5   BY MR. OLSON:

6   Q    Now, you had told Ms. Wink that the first time she

7        missed work, that would be -- that would constitute

8        a voluntary quit; correct?

9             MS. LORENC:  Objection to form.  You can

10       answer it.

11            THE WITNESS:  I told her that if she

12       missed and it didn't fall under FMLA, it would be

13       counted against her attendance.

14  BY MR. OLSON:

15  Q    Wait a minute.  You told her that?  You said

16       specifically if she missed and it didn't fall under

17       FMLA?  Is that -- is that your testimony, that you

18       told her specifically FMLA?  You used that

19      verbiage?

20  A   You are asking about two different conversations

21      first of all.

22  Q   Okay.  I'm asking you whether you ever said words

23      to the effect that if she missed a day, that it

24      would be -- that it would constitute a voluntary

25      quit in the context of any communication after

1       July 13, 2012.

2   A   I don't recall telling her it would constitute a

3       voluntary quit.  I recall telling her if she --

4       because she asked on the 16th what would happen if

5       she -- if she missed work, and I said it will count

6       under the attendance system if it's not excused and

7       protected under FMLA.

8   Q   So you may have told her it would be a voluntary

9       quit; you don't know one way or the other?

10  A   I don't -- I remember having the discussion with her

11      that -- on Monday when she said that this wasn't

12      something that she could do on an ongoing basis, that

13      the company considered that a voluntary quit.

14  Q   All right.  And I want this very clear in the

15      record.  Your testimony today is that on the 16th

16      you told her that she could have FMLA time, and it

17      wouldn't be counted against her; is that your

18      testimony?

19  A    Absolutely she could have FMLA time.

20  Q    No, no, no.  You told her that; that's your

21       testimony?

22  A    Yes.

23  Q    I want that in the record.

24  A    Yes.

25            MS. LORENC:  The whole thing's on the

178

1       record.

2  BY MR. OLSON:

3  Q    And you told her that on the 16th; right?

4  A    Pardon?

5  Q    You told her that on the 16th?

6  A    Yes.

7  Q    Did you tell her than on the 13th too?

8  A    No, I did not -- I don't think I told her that on the

9       13th.

10  Q    Tell us exactly what you said to her about FMLA

11       time on the 16th.

12  A    She asked what would happen with her absences if she

13       didn't come into work on the schedule, and I said if

14       they're unexcused and they -- if they're not excused

15       and they don't fall under FMLA, it will count towards

16       the company's attendance system.

17  Q    Do you know what the term key employee is under the

18        FMLA?

19    A    Yes, I do.

20    Q    And Ms. Wink was not a key employee, was she?

21    A    No, she was not.

22    Q    Would you agree that if an employee is ineligible

23        for FMLA leave, the notice must explain why the

24        employee is ineligible?

25              MS. LORENC:  Objection to form.  You can

1        answer if you know the answer.

2              THE WITNESS:  Yes, I believe.

3    BY MR. OLSON:

4    Q    Okay.  And do you also understand that the FMLA

5        requires that when an employer gives an employee

6        notice of ineligibility -- or strike that.

7              When the employer gives notice of

8        eligibility of FMLA, the employer has to provide

9        specific expectations to the employee in writing?

10    A    Yes.

11    Q    And the employer has to provide to the employee

12        specific obligations in writing?

13    A    Could you read that back?

14              (Requested portion read by the reporter.)

15              THE WITNESS:  Yes.

16    BY MR. OLSON:

17    Q    And does the FMLA require that the employer

18    describe to the employee in writing the

19    consequences of failing to meet the expectations or

20    the obligations connected with the FMLA leave?

21  A    Yes.

22  Q    Are you aware that the FMLA requires that an

23    employer advise the employee in writing when

24    certain absences do not count as FMLA leave?

25  A    Yes.

                                                    180


1   Q    Was any such notice ever given to Ms. Wink?

2   A    Not that I'm aware of.

3   Q    Are you aware that an employer cannot ask for a

4        second opinion on a certification for a 12-month

5        period?

6            MS. LORENC:  Objection to form.  You can

7        answer.

8            THE WITNESS:  I don't know that specific.

9        I would have to look at that.

10  BY MR. OLSON:

11  Q    Did you have an understanding as to what type of

12    care Ms. Wink would need to be providing for her

13    son to qualify for FMLA leave?  In other words, on

14    the days that she was home caring for her son, did

15    you have an understanding sort of institutionally

16    on behalf of the company as to what kind of care

17          she'd have to provide to him in order to qualify

18          for FMLA leave for those times?

19      A   My understanding was that she would be taking him for

20          assessments, doctor and therapy appointments, on

21          those days.

22      Q   Is it your understanding that the FMLA allows a

23          family member to qualify for FMLA leave if she

24          attends to basic medical, hygienic, or nutritional

25          needs even if it's not part of ongoing treatment?

                                                    181


1                 MS. LORENC:  Objection to form.

2                 THE WITNESS:  You're asking me some very

3           specific questions that I don't know off the top of

4           my head.

5    BY MR. OLSON:

6       Q   Okay.

7       A   Those are things that I would have to check with what

8           the statutes say.

9       Q   Okay.  So sitting here today you don't know if the

10          FMLA covers only things directly related to the

11          medical treatment such as driving the disabled

12          child to medical appointments, or whether it

13          extends beyond that; is that accurate?

14      A   That's something I would have an attorney review,

15          correct.

16      Q   Okay.  Did you have that reviewed -- that issue

17      reviewed when you talked to Attorney Lynch?

18  A   Yes, I did.

19              MS. LORENC:  Objection, calls for

20      attorney-client privilege.

21  BY MR. OLSON:

22  Q   So at the time of July 16, you were aware of what

23      the answer was to that question I just posed?

24              MS. LORENC:  Objection --

25  BY MR. OLSON:

1   Q   In other words, you were aware of the scope of care

2       that would be covered for Ms. Wink under the FMLA?

3               MS. LORENC:  Objection to the extent it

4       calls for privileged communications.  If you can

5       answer that without divulging privileged

6       communications, go ahead.

7               THE WITNESS:  Our attorney explained the

8       --

9               MS. LORENC:  Okay.  Be careful --

10              THE WITNESS:  Yeah.

11              MS. LORENC:  -- because you're getting

12      into attorney-client privilege here so --

13              THE WITNESS:  So then, no, I can't answer

14      that.

15              MR. OLSON:  All right.  Subject to my

16     other objections about missing documents, that's

17     all I have for you at this time.

18               MS. LORENC:  We'll read.

19               (The proceedings concluded at 2:29 p.m.)

20               (Original exhibits attached to original

21     transcript.  Copies attached to copy transcripts.)

22

23

24

25

1      STATE OF WISCONSIN )
                          ) SS.
2      MILWAUKEE COUNTY   )

3

4                I, Elaine A. Thies, RPR and Notary

5      Public in and for the State of Wisconsin, do hereby

6      certify that the preceding deposition was recorded by

7      me and reduced to writing under my personal

8      direction.

9                I further certify that said deposition

10     was taken at ALAN C. OLSON & ASSOCIATES, S.C., 2880

11     South Moorland Road, New Berlin, Wisconsin, on the

12     26th day of January, 2015, commencing at 9:03 a.m.

13     and concluding at 2:29 p.m.

14               I further certify that I am not a

15     relative or employee or attorney or counsel of any of

16    the parties, or a relative or employee of such

17    attorney or counsel, or financially interested

18    directly or indirectly in this action.

19              In witness whereof, I have hereunto

20    set my hand and affixed my seal of office on this 6th

21    day of February, 2015.

22

23              _____
                ELAINE A. THIES - Notary Public
24              In and for the State of Wisconsin

25    My commission expires 11-4-17.


                                                     184


1     STATE OF WISCONSIN     )
                             ) SS.
2     MILWAUKEE COUNTY       )

3

4               I, SARAH K. BARBIAN, do hereby certify

5     that I have read the foregoing transcript of

6     proceedings, taken on the 26th day of January, 2015,

7     at ALAN C. OLSON & ASSOCIATES, S.C., 2880 South

8     Moorland Road, New Berlin, Wisconsin, and the same is

9     true and correct except for the list of corrections,

10    if any, noted on the annexed errata sheet.

11

12              Dated at _____,

13    _____, this _____ day of

14    _____, 2015.

15

16                                          _____
                                            SARAH K. BARBIAN
17

18

19

20

21

22

23

24

25