UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**TRACY L. WINK,**

    Plaintiff,

    v.                                         Case No. 14-CV-367

**MILLER COMPRESSING COMPANY,**

    Defendant.

---

### DECISION AND ORDER ON PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

---

Tracy L. Wink ("Wink") brings this lawsuit against Miller Compressing Company ("Miller") alleging violations of the Family and Medical Leave Act ("FMLA"), non-payment of wages under Wis. Stat. § 109.03, and breach of contract. Wink moves for summary judgment on her FMLA claims and Miller moves for summary judgment on all of Wink's claims. For the reasons that I explain in this decision, both Wink's and Miller's motions for summary judgment are denied.

### SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary

judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**UNDISPUTED FACTS**

Wink was hired by Miller in November 1999. (Plaintiff's Response to Defendant's Proposed Findings of Fact ("Pl.'s Resp. to DPFOF") ¶ 5, Docket # 40.) When Wink was hired, her work hours were from 8:00 a.m. until 4:00 p.m. (*Id.* ¶ 6.) In 2007, Wink requested that her work hours change to 7:00 a.m. to 3:00 p.m. during the school year so that she could pick her son up from school. (*Id.* ¶ 7.) From roughly 2007 to 2012, Wink was assigned to the sales brokerage desk in the Order Processing Department. The job responsibilities at the sales brokerage desk included processing daily scale tickets to invoice customers for scrap, processing brokerage tickets to pay and invoice to customers, interfacing with

2

customers, and fulfilling duties from the dispatch and scales departments. The dispatch and scales departments were open until 4:00 p.m. daily. (*Id.* ¶ 8.)

Commencing October 11, 2011, Miller had in place a "Cell Phone/texting/emailing and Driving Policy" (the "Cell Phone Policy"), which stated, in relevant part: Personal cell phones are prohibited from being used during working hours by all employees and should be kept in the employee's locker or desk, except for production truck drivers, and used only while on lunch or break times . . . ." (*Id.* ¶ 10.) On or about December 7, 2011, Wink signed Miller's Agreement With Respect to Inventions, Confidentiality, Competition and Term of Employment (the "Agreement"). Section 2 of the Agreement provides, in relevant part, "If Employee is Terminated Without Cause . . . Employer agrees to give Employee at least three weeks advance written notice of such a termination, or at Employer's option, Employer may terminate Employee's employment immediately provided that Employer shall continue to compensate Employee for a period of three weeks after such termination at the rate in effect immediately prior to the termination." "Terminated Without Cause" is defined as "a termination of Employee by Employer without a reason arising from Employee's own action or inaction." (*Id.* ¶ 11.)

From 2003 until July 2012, Wink took several FMLA-approved leaves of absence from Miller. (*Id.* ¶ 12.) For each of these leaves of absence, Wink submitted the requisite paper work and Miller formally approved the leave. (*Id.* ¶¶ 13-20.) In February 2012, Wink's youngest son was removed from daycare, which Wink contends was due to his disability. (*Id.* ¶ 23.) Wink requested that she be allowed to work in the office three days a week and do work from home the other two days when possible. (*Id.*) Wink's request was approved and she commenced her new schedule the week of February 6, 2012. (*Id.* ¶ 24.) Wink testified

3

that on the days that she was at home, she would go into the office around 9 a.m. and pick up her workload. (Declaration of Alan Olson ("Olson Decl.") ¶ 2, Deposition of Tracy Wink ("Wink Dep.") at 24, Docket # 32.) Wink testified that she would do her work throughout the course of the day "[i]f time permitted" while her son napped. (*Id.* at 24-25.) Wink would also do work at home at night or on weekends. (Defendant's Response to Plaintiff's Proposed Findings of Fact ("Def.'s Resp. to PPFOF") ¶ 9, Docket # 36.) Upon commencing her new work arrangement, Wink logged her time worked from home and Miller paid her for whatever time she recorded. (Pl.'s Resp. to DPFOF ¶ 29.)

Also in February 2012, Wink requested and received a temporary exception to the Cell Phone Policy from then-president of Miller, John Busby, and someone in Miller's Human Resources department. (*Id.* ¶ 30.) Wink requested the exception to be able to make and receive calls from her son's doctors' offices. (*Id.*)

In early July 2012, Busby met with the nonunion departments at Miller and informed them that there would be reductions from every department and cuts of overtime from every department. It was determined that there were to be two reductions from the Order Processing Department. It was also determined that due to Miller's financial hardships and resulting reduction in force, entitlements to flexible hours were to be revoked company-wide. (*Id.* ¶ 31.) Following Busby's meeting, Matt Chavez ("Chavez"), the supervisor of the Order Processing Department, and his supervisor, Margo Eshleman ("Eshleman"), met to consider and evaluate each of their team members to determine who would be impacted by the reductions. (*Id.* ¶ 32.) A couple of days later, Chavez, Eshleman, and Sarah Barbian ("Barbian") (Miller's Human Resources Director) met to discuss Chavez's and Eshleman's analysis. (*Id.* ¶ 33.) Chavez and Eshleman determined that they

4

wanted to eliminate Kim Noonan and Roseanne Edvick from the Order Processing Department and that the reductions were to take place on July 23, 2012. (*Id.*)

On July 13, 2012, Barbian and Chavez met with Wink and told her that she could no longer work from 7:00 a.m. to 3:00 p.m. and needed to work from 8:00 a.m. to 4:00 p.m. (*Id.* ¶ 35.) They also told Wink that she would no longer receive assistance from a member of a different department to cover her workload because those other departments were not going to have the staffing ability to do more than their own department's work. (*Id.*) After meeting with them between five and ten minutes, Wink stormed out of the meeting and left work. (*Id.* ¶ 37.)

Later that same day, Barbian called and spoke to Wink on the phone and told her that she needed to be in the office five days a week, that she could no longer have an exception to the Cell Phone Policy, that she needed to limit personal conversations at work, and that she needed to prioritize her work and not rely on her boss. (*Id.* ¶ 38.) Wink was told to think about these items over the weekend and to tell Barbian and Chavez on Monday whether she would commit to these changes. (*Id.* ¶ 42; Def.'s Resp. to PPFOF ¶ 28.) On Monday, July 16, 2012, Wink informed Barbian that the weekend was not enough time to arrange care for her son and that she could not be in the office five days a week because of her son's need for care. (Def.'s Resp. to PPFOF ¶ 32.) The parties agree that Barbian and Wink were at a "standoff" where Miller was not saying Wink was fired and Wink was not saying that she quit. (*Id.* ¶ 34.) Wink's employment with Miller ended on July 16, 2012. (*Id.* ¶ 37.)

**ANALYSIS**

Wink makes four claims. First, she argues that Miller unlawfully interfered with her ability to exercise her rights under the FMLA. Second and relatedly, she argues that Miller retaliated against her for taking FMLA leave. Third, she alleges that Miller violated Wis. Stat. §§ 109.03 and 109.11 by failing to pay severance pay. Finally, Wink alleges that Miller breached her employment agreement by failing to pay contractual wages. As indicated earlier, Wink moves for summary judgment on her FMLA claims and Miller moves for summary judgment on all four of Wink's claims. I will address each in turn.

1. *FMLA Interference*

In her amended complaint, Wink alleges that Miller unlawfully interfered with her rights under the FMLA by requiring her to work in the office five days a week when she needed to remain at home two days a week to care for her disabled son; by revoking her exception to the Cell Phone Policy; by limiting her personal conversations at work; by telling her that she could not use her boss to help her prioritize her work; and by changing her hours to 8 a.m. to 4 p.m. However, in both her motion for summary judgment and in response to Miller's motion for summary judgment, Wink focuses solely on her allegation that Miller required her to work in the office five days a week as the basis for her interference claim. Accordingly, I will only address that allegation.

The FMLA entitles an eligible employee up to twelve work weeks of leave during a twelve-month period to care for a child with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). The FMLA permits an employee to take leave intermittently or on a reduced schedule when medically necessary. 29 U.S.C. § 2612(b); *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 760-61 (7th Cir. 2008). The FMLA defines intermittent leave as "leave taken in

6

Case 2:14-cv-00367-NJ   Filed 06/01/15   Page 6 of 18   Document 47

separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202. A "reduced leave schedule" is "a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday. A reduced leave schedule is a change in the employee's schedule for a period of time, normally from full-time to part-time." *Id.*

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). An employee does not need to be aware of her rights in order to invoke them; "'[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA.'" *Ridings*, 537 F.3d at 761 (quoting 29 C.F.R. § 825.303(b)).

To prevail on this claim, the employee must show that: (1) she was eligible for FMLA protection; (2) the employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided notice of intent to take FMLA leave; and (5) the employer denied her FMLA benefits to which she was entitled. *De La Rama v. Ill. Dept. of Human Services*, 541 F.3d 681, 686–87 (7th Cir. 2008) (internal citations omitted).

Miller does not dispute that Wink can establish the first four elements of an interference claim. (Def.'s Summ. Judg. Br. at 10, Docket # 26.) However, Miller argues that Wink cannot establish that Miller denied her any FMLA benefits to which she was entitled. The crux of the dispute between the parties is whether her request in February 2012 to "work from home" was a request for FMLA leave that was denied, as Wink contends, or was simply a request to work from home, as Miller argues. This question is dispositive because, as the Sixth Circuit stated, "working from home is still working; so that request [is] not a request for leave under the FMLA." *Anderson v. McIntosh Construction, LLC*, 597 Fed. Appx. 313, 314 (6th Cir. Jan. 8, 2015) (unpublished); *see also Bennett v. Girl Scouts of Northeast*

7

*Texas*, No. 09cv443, 2010 WL 723794, *3 (E.D. Tex. Feb. 25, 2010) (noting that a request for an "adjusted work schedule" was not a request for a reduced leave schedule or for intermittent leave under the FMLA, but "simply a request to work from home two days a week" and the "FMLA only provides an entitlement to take leave, not to work from home").

On the record currently before me, there is a dispute of material fact as to the nature of the two days worked from home (i.e., whether the two days constituted FMLA leave, work from home, or a combination of both) and as to whether Miller denied Wink FMLA leave. It is undisputed that Wink requested and was granted a request to work from home two days. (Pl.'s Resp. to DPFOF ¶ 9.) However, the record is mixed as to the nature of Wink's two days at home. Miller's position that the request to work two days at home was not FMLA leave is supported by an email sent by Chavez on February 9, 2012 to people in the groups Wink worked with, stating that "[f]or the time being, Tracy Wink will be working part-time from home. She will be in the office 3 days a week and the balance of the week she will work from home . . . . Tracy will have full access to our HP and ByRequest systems from home." (Olson Decl ¶ 3, Deposition of Sarah Barbian ("Barbian Dep.") at 153, Exh. 19, Docket # 34, 34-3.)

The record also indicates that on the two days Wink was at home, she would go into the office and pick up her workload and would do her work throughout the course of the day "[i]f time permitted. If [her son] napped." (Wink Dep. at 24-25.) Wink would also do work in the evening and on weekends. (*Id.* at 75.) Wink logged her time worked from home and Miller paid her for whatever time she recorded. (Pl.'s Resp. to DPFOF ¶ 29.)

Other record evidence, however, indicates that Wink's February 2012 request was a request for FMLA leave and not simply a request to work from home. To begin, both Barbian and Chavez acknowledged that Wink was home caring for her son. (Barbian Dep. at 163; (Olson Decl ¶ 4, Deposition of Matthew E. Chavez ("Chavez Dep.") at 18, Docket # 33.) On February 17, 2012, Wink completed an application for FMLA leave of absence, noting a start date of February 14, 2012 and an end date of "unknown." On this form she requested leave as follows: "Intermittent. 2 days working from home." (Barbian Dep., Exh. 12 at 7, Docket # 34-2.) Wink argues that this application was a request to use FMLA leave for two days per week on an ongoing basis to care for her son at home. (Pl.'s Resp. to DPFOF ¶ 21; Pl.'s Br. in Opp. at 3, Docket # 39.) Miller, on the other hand, argues that the February 17, 2012 application was to use FMLA leave for only two days, specifically February 14, 2012 and February 15, 2012, which Miller granted and Wink took. (Pl.'s Resp. to DPFOF ¶ 21; Docket # 45 at 4.) It is unclear from this record whether Wink was "working from home" and needed two days off (i.e., February 14 and 15 of leave), or whether she was requesting two days off per week on an ongoing basis to care for her son.

Wink also points to a health care provider certification form dated February 29, 2012 as further evidence of a continuing request for intermittent FMLA leave. (Barbian Dep., Exh. 8.) On this certification form, Wink noted that her son could not attend daycare due to his medical condition and her pediatrician noted that her son needed constant help and could not be left alone. (*Id.*) However, it is still unclear whether Wink was requesting to work from home, or was requesting FMLA leave to care for her son.

The parties also dispute the meaning of a July 5, 2012 recertification request. Barbian testified that Miller would request "regular recertifications from treating physicians for

9

anyone who's on FMLA leave." (Barbian Dep. at 107.) On July 5, 2012, Miller faxed a form to Wink's pediatrician asking him to complete a "30 day recertification" for Wink's son. (Barbian Dep., Exh. 12.)[1] In July 2011, Wink completed an application for intermittent FMLA leave to cover doctor appointments for her son, which was approved by Miller. (Pl.'s Resp. to DPFOF ¶ 20.) Miller argues that the recertification related to her July 2011 request for intermittent leave, not her February 2012 request. (Docket # 45.) Wink argues that this recertification was for her February 2012 leave. (Pl.'s Resp. to DPFOF ¶ 21.) It is unclear from the document itself what it refers to, and Barbian's testimony does not clarify the question.

Finally, Chavez testified that in 2012, he created an Excel spreadsheet to keep track of Wink's FMLA time because her schedule was "becoming very complex" as she was working from home and was using FMLA time (and substituting paid vacation time during this time period), as well as having non-paid time off. (Chavez Dep. at 14-18.) However, Miller has been unable to locate an FMLA calendar or Excel spreadsheet tracking Wink's FMLA absences. (Affidavit of Susan Lorenc ¶ 5, Docket # 46.) Even without this spreadsheet, it seems that on the two days per week that Wink was at home, she was using FMLA leave for some portion of the hours (and either taking vacation time to cover the unpaid leave or taking the time unpaid) and was working (and therefore being paid) for some other portion of the hours.

---

[1] Although Exhibit 12 of Barbian's deposition contains 13 pages, it is unclear whether all of these pages were included in the fax at issue. As Miller's counsel noted at Barbian's deposition, the documents do not appear to be part of the same fax. (Barbian Dep. at 109-110.) For example, the fax from Miller to Wink's pediatrician is six pages long (per the fax cover sheet) and contains Miller's fax number on the top with the date July 5, 2012. (Barbian Dep., Exh. 12, Docket # 34-2 at 1-2 and 8-11.) Exhibit 12 also appears to contain a three page document dated July 13, 2011 from Oklahoma Pediatrics. (Docket # 34-2 at 3-5.) Finally, Exhibit 12 contains Wink's February 29, 2012 FMLA application (Docket # 34-2 at 6-7) and her July 13, 2011 FMLA certification (*id.* at 12-13). Neither of these documents contain a fax number, so it is unclear whether they are actually part of either fax.

10

The dispute of material fact remains because Miller contends that it did not deny Wink the ability to take FMLA leave; rather, it was only denying her the ability to work from home. Barbian testified that Wink was not told she could not use FMLA leave for "doctor appointments, therapy, [or] whatever" as "long as she had FMLA time left"; rather, she was simply being told that she could no longer telecommute. (Barbian Dep. at 120.) Wink, on the other hand, understood Miller's position to be that she had to be in the office five days per week and could no longer use FMLA time to care for her son two days per week at home. (Wink Dep. at 49.) This dispute cannot be resolved on this record.

In sum, because there is a dispute of material fact as to whether Miller denied Wink FMLA benefits to which she was entitled, both parties' motions for summary judgment as to Wink's FMLA interference claim are denied.

### 2. *FMLA Retaliation*

Next, Wink argues that Miller retaliated against her for taking FMLA leave by requiring her to work in the office five days a week. An employee who alleges that her employer retaliated against her for exercising her rights under the FMLA can proceed under the direct or indirect methods of proof familiar in employment discrimination litigation. *Smith v. Hope School*, 560 F.3d 694, 702 (7th Cir. 2009). An employee proceeding under the direct method must demonstrate that her employer intended to punish her for requesting or taking FMLA leave. *Id.* Wink only proceeds under the direct method.

Under the direct method, Wink must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008).

*Statutorily Protected Activity*

The parties disagree on whether Wink engaged in a statutorily protected activity. Wink argues that she engaged in a statutorily protected activity by requesting intermittent FMLA leave in February 2012. Miller argues that Wink was not requesting FMLA leave; rather, she was requesting to work from home. As discussed above, during the relevant time period, it appears that during the two days Wink was at home, she used FMLA leave for part of the time and was paid for work part of the time, though this is not clear on the current record. On February 17, 2012, however, Wink did complete an application for a FMLA leave of absence, noting a start date of February 14, 2012 and an end date of "unknown." On this form she requested leave as follows: "Intermittent. 2 days working from home." (Barbian Dep., Exh. 12 at 7, Docket # 34-2.) Also as discussed above, Wink argues that application was a request to use FMLA leave for two days per week on an ongoing basis to care for her son at home. (Pl.'s Resp. to DPFOF ¶ 21; Pl.'s Br. in Opp. at 3.) Miller, on the other hand, argues that the February 17, 2012 application was to use FMLA leave for only two days, specifically February 14, 2012 and February 15, 2012, which Miller granted and Wink took. (Pl.'s Resp. to DPFOF ¶ 21; Docket # 45 at 4.)

In support of its argument, Miller states that Chavez had already approved her request for a "flexible schedule" almost two weeks earlier without designating it as FMLA leave and without consulting Miller's Senior Human Resources Generalist who administers FMLA leave, the start date referenced on the application did not correspond with the start date of Wink's "flexible schedule," and the only recertification that post-dated February 2012 referred to Wink's July 2011 leave. (Def.'s Br. in Opp. at 8, Docket # 37.) Miller is correct that Wink commenced her new schedule the week of February 6, 2012. (Pl.'s Resp.

12

DPFOF ¶ 24.) However, as discussed above, the parties dispute the meaning of a July 5, 2012 recertification request. Thus, there is a dispute of material fact as to whether Wink engaged in a statutorily protected activity by requesting intermittent FMLA leave on an ongoing basis in February 2012.

*Materially Adverse Action*

Wink argues she suffered a materially adverse action when Miller changed her schedule by requiring her to be in the office five days a week. Miller argues that Wink's schedule was a special exception Wink was receiving from Miller's normal policies and due to the company-wide restructuring that was going on, Miller decided to revoke flexible schedules for all employees, including Wink. (Docket # 26 at 14.) A schedule change may constitute a materially adverse action when there is evidence that the defendant sought to exploit a "known vulnerability" by altering a plaintiff's work schedule upon return from FMLA leave. *See Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014); *see also Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (finding that, in altering plaintiff's schedule, employer sought to exploit a "known vulnerability"—the fact that she used her prior flex time schedule to care for her disabled son). I find there is a genuine dispute of material fact on this issue as well. Both Barbian and Chavez were aware that Wink's son could not attend daycare due to his medical condition and that Wink's mother could only watch him three days per week, leaving her without childcare for two days a week. (Barbian Dep. at 93, 167-69; Chavez Dep. at 26-27.) Further, Wink testified that Barbian and Chavez spoke to her about changing her schedule on a Friday and that she was told that she needed to give them a commitment by Monday. (Wink Dep. at 85.) Wink testified that she told them that the weekend was not enough time for her to secure

13

alternative child care. (*Id.*) She further testified that she asked Barbian if she could continue with her current schedule "for a little while longer" until she could "work something out," but was told that the first time she missed work Miller would consider that "a voluntary quit." (*Id.* at 88.) Thus, because Wink could not secure alternative child care over the weekend, she testified that although she wanted to continue working at Miller, she understood that her employment was terminated because she could not meet Miller's requirement that she be in the office five days a week. (*Id.* 88-89.) Thus, on this record, a rational trier of fact could find that Wink's schedule change constituted a materially adverse action.

*Causal Connection*

The only allegedly materially adverse action at issue is the change in Wink's schedule. Wink must show a causal connection between the adverse employment action and her protected activity. The causal-nexus element may be met through either a direct admission or through "'a convincing mosaic of circumstantial evidence'" permitting that same inference. *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (quoting *Ridings*, 537 F.3d at 771). The "convincing mosaic of circumstantial evidence" may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the adverse action. *Id.*

Wink argues that Miller made a direct admission that it was terminating her employment because of her FMLA leave. (Pl.'s Br. in Opp. at 14.) Specifically, Wink cites both Barbian's and Chavez's testimony that if Wink could have made daycare arrangements

14

for her son, her employment would have continued. (*Id*.) Wink cites the following testimony from Barbian:

> Question: Was that your intent that if [Wink] complied with your requirements, she would continue her employment at the company?
>
> Barbian: Absolutely, yes.
>
> Question: And the requirement would be that she would no longer be working from home two days out of the week; correct?
>
> Barbian: Correct.

(Barbian Dep. at 57.) Wink cites Chavez's testimony that it was his understanding that Wink's employment ended because she could not meet Miller's requirements regarding her schedule. (Chavez Dep. at 29.) As discussed above, I cannot determine on this record whether Wink's February 2012 request was a request for FMLA leave or a request to work from home. Assuming, however, Wink's request was a request for FMLA leave that Miller denied, then, taking this testimony in the light most favorable to Wink, a rational trier of fact could find that Wink's continued employment was premised on her putting her son into daycare and thus not taking FMLA leave.

However, Miller has presented evidence that entitlements to flexible hours were revoked company-wide due to Miller's financial hardships as the reason for Wink's schedule change. (Affidavit of Sarah Barbian in Supp. of Def.'s Mot. for Summ. Judg. ¶ 11, Docket # 27-1.) A rational trier of fact could also find that Wink's schedule change was due to Miller's financial hardships, as Miller argues. Because there are disputes of material fact, neither party is entitled to judgment as a matter of law and summary judgment is properly denied to both Wink and Miller on Wink's FMLA retaliation claim.

### 3. *Wis. Stat. § 109.03 Wage Claim and Breach of Contract Claim*

Wink argues that Miller violated Wis. Stat. §§ 109.03 and 109.11 for failing to pay her earned severance pay. Wink also argues that Miller's failure to pay her severance constituted a breach of her December 7, 2011 Agreement With Respect to Inventions, Confidentiality, Competition and Term of Employment (the "Agreement"). Miller has moved for summary judgment on both of these claims.

The wage claim statute creates a private right of action for employees to recover unpaid wages. *See* Wis. Stat. § 109.03(5). Wages under the statute include severance pay. Wis. Stat. § 109.01(3). On December 7, 2011, Wink signed the Agreement with Miller. (Pl.'s Resp. to DPFOF ¶ 11.) Section 2 of the Agreement provides, in relevant part, "If Employee is Terminated Without Cause . . . Employer agrees to give Employee at least three weeks advance written notice of such a termination, or at Employer's option, Employer may terminate Employee's employment immediately provided that Employer shall continue to compensate Employee for a period of three weeks after such termination at the rate in effect immediately prior to the termination." "Terminated Without Cause" is defined as "a termination of Employee by Employer without a reason arising from Employee's own action or inaction." (*Id.*)

Miller argues that Wink was not "terminated without cause" as defined by the Agreement and thus was not entitled to the three weeks pay. (Docket # 26 at 18.) Wink argues that her separation of employment was not due to any action or inaction within Wink's control and rather was the direct result of Miller revoking her FMLA leave and denying her the reasonable opportunity to make alternative child care arrangements for her son. (Docket # 39 at 14.)

16

Because the parties dispute whether Wink was terminated from Miller or quit, there is a dispute of material fact precluding summary judgment on these two claims. While it is true that Wink testified that during the July 16, 2012 meeting neither Barbian or Chavez specifically used the word "terminated," Wink also testified that she understood that if she could not make alternative childcare arrangement over the weekend, that she would be terminated on Monday. (Wink Dep. at 89, 92-93.) Although Wink acknowledged that Miller was not specifically saying that they were firing her, she also testified that she did not quit and wanted to continue her employment with Miller. (*Id.* at 88, 94.) However, both Barbian and Chavez testified that they considered Wink to have quit. (Barbian Dep. at 39; Chavez Dep. at 29.) Drawing all inferences in the light most favorable to Wink as the non-movant, I find that a rational trier of fact could find that Wink's employment with Miller was terminated without cause and that Miller failed to pay her severance, in violation of Wisconsin's wage statute and the Agreement with Miller.

## CONCLUSION

Both Miller and Wink have moved for summary judgment on Wink's claims of FMLA interference and retaliation. For the reasons explained above, there are genuine disputes of material fact as to whether Miller denied Wink FMLA benefits to which she was entitled and retaliated against her for exercising her rights under the FMLA. Thus, both parties' motions for summary judgment as to Wink's FMLA claims are denied. Further, because there is a genuine dispute of material fact as to whether Wink was terminated from her employment with Miller or quit, Miller's motion for summary judgment as to Wink's wage claim and breach of contract claim is denied.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 25) is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (Docket # 28) is **DENIED**.

Dated at Milwaukee, Wisconsin this 1st day of June, 2015.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge